UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROGER R. CRANE, JR,

                                                    Plaintiff,

                    - vs -

POETIC PRODUCTS LIMITED,

                                                    Defendant.

-----------------------------------------------------------------

POETIC PRODUCTS LIMITED,

                                                    Counterclaimant,

                    - vs -

ROGER R. CRANE, JR,

                                                    Counterclaim Defendant.

**Case No. 07 Civ. 7063 (BSJ) (FM)**


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFF'S DECLARATORY JUDGMENT CLAIM
AND IN SUPPORT OF PLAINTIFF'S MOTION TO DISMISS THE COUNTERCLAIMS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON THE
COUNTERCLAIMS**


NIXON PEABODY LLP
Attorneys for Plaintiff
437 Madison Avenue
New York, New York 10022

Of Counsel:
Frank H. Penki
Tamar Y. Duvdevani

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.      STATEMENT OF FACTS ........................................................................................ 2

    A.    The Two Works ................................................................................................ 2

    B.    Public Domain Elements Shared By The Last Confession And In God's Name ............. 10

    C.    Procedural History ......................................................................................... 11

ARGUMENT ..................................................................................................................... 11

II.     THE SUMMARY JUDGMENT STANDARD .......................................................... 11

III.    PROVING COPYRIGHT INFRINGEMENT ........................................................... 13

    A.    Proving Substantial Similarity Of Protectible Elements .................................. 14

IV.     UK COPYRIGHT LAW: THE COPYRIGHT, DESIGNS AND PATENTS
        ACT OF 1988 .................................................................................................. 18

    A.    Originality ....................................................................................................... 18

    B.    Infringement Under U.K. Law ......................................................................... 20

V.      SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF CRANE BECAUSE
        NO SUBSTANTIAL SIMILARITY EXISTS BETWEEN THE WORKS ...................... 22

    A.    Even If Poetic Products Can Show Access, It Cannot, As A Matter Of Law,
        Demonstrate Substantial Similarity Between *The Last Confession* and the Protectible
        Elements of *In God's Name* ......................................................................... 22

        1.    *Alleged Similarities* .............................................................................. 22

        2.    *Plot* ...................................................................................................... 24

        3.    *Narrative Structure, Style and Tone* ...................................................... 26

        4.    *Time Sequence* ..................................................................................... 27

        5.    *Theme* .................................................................................................. 28

VI.     ANY USE OF *IN GOD'S NAME* BY CRANE WOULD BE A
        TRANSFORMATIVEUSE AND, THUS, A FAIR USE, PRECLUDING A FINDING
        OF COPYRIGHT INFRINGEMENT.............................................................................. 29

VII.    POETIC PRODUCTS' ALLEGATIONS OF COPYRIGHT INFRINGEMENT ALSO
        FAIL UNDER BRITISH LAW ..................................................................................... 30

VIII.   POETIC PRODUCTS' SECOND COUNTERCLAIM IS PREEMPTED BY THE
        COPYRIGHT ACT...................................................................................................... 32

CONCLUSION............................................................................................................................ 33

## PRELIMINARY STATEMENT

Roger Crane's play, *The Last Confession*, does not infringe *In God's Name*, and to believe otherwise would be to misunderstand the basic tenets of both U.S. and U.K. copyright law.

It is the *sine qua non* of copyright law that the expression of an idea is protected, but not an idea itself. If not for such a mandate, there would be only one science fiction novel, one patchwork quilt, one police thriller, one love song, one novel about George Washington, or, for that matter, one work about Pope John Paul I. Another axiom of copyright is that the law protects only those elements of a work that are original to the work; elements that are in the public domain, such as historical fact, are excluded from copyright protection. Indeed, the Supreme Court has mandated that all facts, scientific, historical, biographical or news of the day, whether alone or as part of a complication, are not original and therefore may not be copyrighted.

Roger Crane, a Manhattan attorney with a Catholic upbringing, has always been fascinated by the Vatican. In 1978, when Pope John Paul I was elected to succeed Pope Paul VI, and died thirty-three days later, Mr. Crane, and millions of others, were astounded. The Pope's sudden death was front page news in the days that followed, and conspiracy theories abounded. Many in the years that followed published works about Pope John Paul I's succession, sudden death, and the controversy that surrounded both. In 1984 David Yallop, a self-proclaimed investigative writer, became one of those authors with *In God's Name: An Investigation Into The Murder Of Pope John Paul I.* In 1997, Mr. Crane became another with his play, *The Last Confession.*

*The Last Confession* is a play and work of fiction based on the historic events surrounding the succession and death of Pope John Paul I. The play's protagonist, Cardinal Benelli, tells the story of Pope John Paul I's conclave, time in the Vatican, and death in a series

of flashbacks. As it is a play, *The Last Confession* is comprised of dialogue and theatrical instruction broken into two acts. The dialogue is mostly fabricated by Mr. Crane, with a sprinkling of historical quotations.

*In God's Name* is David Yallop's investigative book regarding the death of Pope John Paul I. It spans the Pope's birth, rise to power, days at the Vatican, and the aftermath of his death, with an emphasis on the financial and political corruption that plagued the Vatican in the late 1970's. The historical narrative researched, documented, and presented by *In God's Name* serves one main goal: to prove to the reader that Pope John Paul I was murdered.

Despite the fact that Crane's work is a fictional play based upon historical events, and that Yallop's book is a lengthy factual investigation that reaches a controversial (though unoriginal) conclusion, lawyers in England representing Poetic Products, the holder of the copyright to *In God's Name*, began to send Mr. Crane letters accusing Mr. Crane of copyright infringement. As discussed herein, these allegations are unfounded, and summary judgment should be awarded to Crane on all claims.

## I.    STATEMENT OF FACTS

### A.    The Two Works

The resolution of this motion turns on the presence or absence of substantial similarity between *The Last Confession* and the protectible elements of *In God's Name*.[1] Because a determination of substantial similarity requires an examination of the works themselves, short summaries of both works follow.

---

[1]   Copies of *The Last Confession* and *In God's Name* have been submitted to the Court as Exhibits 1 and 2 to the November 13, 2007 Declaration of Tamar Y. Duvdevani ("Duvdevani Decl."). Unless otherwise indicated, lettered Exhibits (*e.g.* Ex. A, B, C, etc.) are those attached to the November 13, 2007 Declaration of Roger R. Crane Jr. ("Crane Decl.") and numbered Exhibits (*e.g.* Ex. 1, 2, 3, etc.) are those attached to the Duvdevani Declaration.

## The Last Confession

Roger Crane's *The Last Confession* is a 111-page play.  It is a work of fiction intertwined with historic facts, that is broken up into Act One and Act Two.  Act One opens in a Cardinal Benelli's study at nighttime.  The cardinal is seriously ill.  Lorenzi announces a visitor, the Confessor.  The two speak about Benelli's illness and his last confession.  Benelli admits to the Confessor that he has lost his faith.  (*The Last Confession* at 9.)  Right as the Confessor is about to leave, Benelli begins to speak his confession.  "It begins with Luciani, it begins five years ago," he states.  (*Id.* at 10.)  "Bless me Father for I have sinned.  I have killed the Emissary of God."  (*Id.*)  Benelli and the Confessor continue to confront each other throughout the play.

The subsequent storyline is told in flashbacks through the confession.  (*See generally id.*)  Act I opens during the end of the reign of Pope Paul VI, who is ill and will soon pass.  (*Id.* at 17, 24, 27.)  Cardinal Benelli at the request of Cardinal Luciani unsuccessfully confronts Bishop Marcinkus over his sale of the Catholic Bank of Venice.  (*Id.* at 16-18.)  Cardinal Felici offers to make Cardinal Benelli Pope when Paul VI dies.  (*Id.* at 24.)  Benelli is exiled from Rome.  (*Id.* at 29.)  When the Paul VI dies, each cardinal in the Act has his own belief as to who should be the next pope; several believe that it should be Benelli.  (*Id.* at 31-35.)  Benelli believes it should be Albino Luciani, a relatively unknown figure who is barely considered by the others or by the press.  (*Id.* at 34-37-38.)  Upon his first appearance on the stage and through the conversation of the other characters, Luciani is painted as a liberal figure.  (*Id.* at 11, 34, 37-38.)  This is exemplified by two different acts of Luciani: his authoring a book of letters to figures in history like Mark Twain, Marie Antoinette and Jules Verne, and his letter to the parents of the first test-tube baby born in England stating the he has "no right to condemn them" for the birth.  (*Id.* at 11, 37-38, 42).  Luciani is portrayed as an unwilling nominee for Pope, but Benelli's influence with

Vatican politics catapults him into the nomination. (*Id.* at 37-39.) It is clear through the dialogue of Act I that Benelli chose Luciani because he was the option with integrity and compassion, and with whom a hunger for power was absent. (*Id.* at 34.) After the voting tally, Luciani is named the successor, and shrouded in papal robes too large for his frame. (*Id.* at 39-40.) Outside of the flashback the Confessor asks Benelli "Why Luciani? Even the robes didn't fit." (*Id.* at 40.) Benelli replies, "They made papal garments in every size … except his. Nobody had his measure." (*Id.* at 40.)

Luciani does not wish to accept the nominee, but does so. (*Id.* at 39.) Almost immediately, changes begin that are appealing to the modern day audience but almost heretical to the various cardinals. (*Id.* at 41.) Luciani walks the streets of Rome unescorted, refuses to speak with the royal "we," and refuses to be carried by eight men in a throne on a platform during his coronation. (*Id.* at 43.) Benelli explains to the Confessor:

> Benelli:     It was as if a thousand years of dust and ceremonies had vanished overnight. And the people, the people loved him for it. They came by the thousands and knelt at the feet of this priest who was less than a Pope and more than Pope. And the more they loved him, the more those nearest power began to fear him. And as I watched, I began to wonder what had happened in that conclave. I began to feel a sense … of purpose.
>
> Confessor:     It reaffirmed your belief in God.
>
> Benelli:     I began to believe in man.

(*Id.* at 47.) Benelli tells the Confessor that he was too proud to ask Luciani to make him Secretary of State, knowing that in the end he knew Luciani would have to go to him. "So … I left him in Rome, surrounded by enemies, alone." (*Id.* at 56) At the end of Act I, it becomes all the more clear that the new Pope's views are inapposite with that of his surrounding counsel,

particularly in regard to the Vatican view on birth control. In an ominous conversation, Felici and Villot discuss the dilemma:

> Villot: He will destroy everything Pope Paul did.
>
> Felici: He will destroy the Church.
>
> Villot: We made him Pope.
>
> Felici: Benelli made him Pope.
>
> Villot: As long as he is Pope we have to obey.
>
> Felici: Popes are like editors, neither is indispensable.

(*Id*. at 60.) Benelli then tells the Confessor (and the audience) that Luciani called upon him to return as Secretary of State, and that Luciani planned to remove Villot, Marcinkus, and Baggio from their Vatican positions. "He said it was time to send people home." (*Id*. at 62.)

Act Two begins with Luciani in office as Pope John Paul I. (*Id*. at 64.) Luciani's plans to clean house are revealed. Luciani tells Baggio that he shall fill the vacant diocese of Venice and will leave the Vatican. (*Id*. at 67.) Baggio adamantly refuses, instead insulting Luciani. (*Id*. at 68.) Luciani tells Villot that Baggio refused his order, and tells Villot that he is to be replaced as Secretary of State by Benelli, and that Marcinkus is to be transferred to Chicago. (*Id*. at 70.) By the next scene, the Pope is dead. (*Id*. at 72-73.)

Benelli returns to the Vatican and takes part in the investigation of Luciani's death, demanding an autopsy. He and the cardinals debate about whether an autopsy should be conducted. The examining doctor is questioned. (*Id*. at 80-81.) Benelli accuses Villot of murdering the Pope. (*Id*. at 94.) In a climatic moment, Villot states that he drove Luciani too hard until he died. (*Id*. at 96.) In reply, Benelli softly states, "We all killed him." (*Id*.)

Benelli concludes the investigation and the next conclave begins. (*Id.* at 99-100.) Benelli needs only 5 votes to become the next Pope, but realizing that a deadlock will occur, recognizes that the next Pope will be from Poland. (*Id.* at 106.) Indeed, Cardinal Wojtyla becomes John Paul II, and turns out to have been the Confessor. In the last scene, Benelli confronts Pope John Paul II over the direction he has taken the Church. Benelli fails to convince him. (*Id.* at 109-10.) The Pope tells Benelli that if his confession is published, it will be used against the Church by all of its enemies, and Benelli subsequently burns his confession. However, he finds some redemption because he regains his faith. (*Id.* at 111.)

The play involves several themes. One is a troubling question, posed by Cardinal Benelli, that examines the dilemma created by the exercise of power by people in the Vatican as opposed to the simple life of Christ. Cardinal Benelli also asks: "Where do God's plans end and man's begin? Where is the line between divine providence and human intervention?" (*See id.* at 10). Other themes are Cardinal Benelli's guilt over John Paul I's death, his loss of faith, his search for God, and his ultimate redemption. (*See generally id.*) Whether the Pope was murdered is left for the viewer to decide.

### *In God's Name*[2]

David A. Yallop's *In God's Name: An Investigation Into The Murder Of Pope John Paul I,* is a 343-page book including the prologue and index. It is broken up into a preface, a prologue, and seven chapters: The Road to Rome; The Empty Throne; Inside the Conclave;

---

[2] Crane has submitted the 2007 edition of *In God's Name* to the Court, the same edition used by Poetic Products to make their allegations contained in their recent letters to Crane. This is the edition that is currently available in bookstores. This edition was not in existence at the time Crane wrote *The Last Confession*. However, the original, 1984 edition appears to be almost identical to the recent version, less a new Postscript and some small edits, and is therefore adequate for the purposes of this motion.

Vatican Incorporated; The Thirty-Three Days; We Are Left Frightened; and By Benefit of

Murder – Business as Usual.  Yallop writes in the Preface:

> As already indicated, I confront an insurmountable difficulty when it
> comes to the task of naming specific sources within the text, as many of my
> sources must remain secret.  I can assure the reader that all the information, all the
> details, all the facts have been checked and double-checked to the extent that
> multiple sources were available.  I take the responsibility for putting the evidence
> together and for the conclusions reached.
>
> I am sure that the fact that I recount conversations between men dead
> before my investigation began will be cause for comment. . . . These secondary
> sources, sometimes with deeply differing personal opinions on the issue discussed
> by the Pope and his secretary of state, provided the words attributed.  Therefore,
> while the dialogue within this book is reconstructed, it is not fabricated.

(*In God's Name* at Preface xvii.)

The first chapter, "The Road to Rome," documents Luciani's upbringing and family.  (*Id.*

at 1-4).  It discusses Luciani's childhood home in the village of Canale, and his parents, Bortola

and Giovanni, as well as his siblings.  (*Id.* at 2-3.)  It explains how Luciani went off to seminary

in 1923 at the age of 11, through his graduation to the major seminary at Belluno. (*Id.* at 3-13)

Yallop documents William Lynch of the U.S. Department of Justice visiting the Vatican

regarding American counterfeit bonds that were alleged to have landed in the Vatican bank.  (*Id.*

at 32-40.)  Yallop explored how Luciani was viewed by critics, some thinking him a nostalgic

while others viewed him as to the left.  "Others saw his humility and gentleness as mere

weakness."  (*Id.* at 44.) The chapter ends discussing Luciani's book, *Illustrimi*, a collection of

letters that he wrote, one of which was to Jesus, which Yallop quotes in the book.  (*Id.* at 48-50.)

The next chapter, "The Empty Throne," documents the funeral of Pope Paul VI, the

press' coverage of the conclave, and the politics behind the same.  (*Id.* at 51-60.)  Yallop

includes in the chapter letters that Luciani wrote to his niece and sister prior to his journey to the

conclave.  (*Id.* at 61.)   In "Inside the Conclave," Yallop documents the historically reported four

ballots of the conclave, ending in the fourth ballot with Luciani's victory. (*Id*. at 63-71.) Yallop documents that Luciani accepted the ballot, stating, "May God forgive you for what you have done in my regard. . . . I accept." (*Id*. at 70.) The smoke began to emerge from the chimney at 6:24 p.m. (*Id*. at 71.) While inside, the Gammarelli brothers, tailors to the Vatican, sought out a cassock that would fit the new Pope. (*Id*. at 71-72.) Luciani was announced to the public, and Yallop published his coronation speech. (*Id*. at 74-75.)

"Vatican Incorporated" is the next, lengthier chapter. (*Id*. at 80-144.) The chapter documents the wealth of the Vatican and the 1929 creation of the Special Administration by Pope Pius XI to handle the Vatican's $81 million dollar windfall, and the appointment of layman Bernardo Nogara to run it. (*Id*.). Yallop documents Nogara's death in 1958 and the Vatican's continued financial history, including the Mafia's involvement. (*Id*. at 88-100.) Among other historical figures involved in Vatican finance, Yallop discusses Michele Sindona, Icio Gelli, and the relationship between Masonic Lodge P2 and the Vatican. (*Id*. at 97-120.) Yallop brings the reader through the Vatican Bank's finances through the 1960s and 1970's, up through 1978, where he explains that the bank's gross assets in September 1978 were over $1.2 billion. (*Id*. at 142.) Yallop ends the chapter explaining that if Luciani "was to succeed with his dream of a poor Church for the poor, it was going to be a Herculean task." (*Id*. at 143.)

The next chapter, aptly titled "The Thirty-Three Days," discusses Luciani's time as Pope through his death on September 29, 1978. (*Id*. at 145-202.) Yallop is unequivocal that Luciani was murdered:

> It was a few minutes before 9:30 p.m. Albino Luciani closed his study door. He had spoken his last words. His dead body would be discovered the following morning. The circumstances surrounding that discovery make it abundantly clear that the Vatican perpetrated a cover-up. The Vatican began with a lie and then developed a tissue of lies. It lied about little things. It lied about big things. All of the lies had but one purpose: to suppress the fact that Albino Luciani, Pope

> John Paul I, was murdered sometime between 9:30 p.m. on September 28 and
> 4:30 a.m. on September 29, 1978.

(*Id*. at 202.)

The last two chapters of *In God's Name* are "We Are Left Frightened" and "By Benefit

of Murder – Business as Usual," (*id*. at 203-304), and follow Yallop's conclusion that Luciani

was murdered. "We Are Left Frightened" begins with various factors that would have had to be

considered if Luciani was murdered for any of the reasons previously discussed in *In God's

Name*. (*Id*. at 203.) Yallop quotes Sister Vincenza, who discovered the Pope on his deathbed.

(*Id*. at 205.) He takes the reader through the public's reaction and the lack of an autopsy. (*Id*. at

207-223.) Yallop documents the public's love for Luciani, explaining that in that day in history

crowds ignored rain, and "nearly a hundred thousand people were in St. Peter's Square for the

open-air Requiem Mass on October 4. Nearly one million people had filed past the body during

the previous four days." (*Id*. at 226.) "A great many people remained disturbed about the

sudden death, among them Albino Luciani's own doctor, Giuseppi Da Ros." (*Id*.) Yallop quotes

the Vatican's final public statement concerning the "furore" over Luciani's death. (*Id*. at 228.)

Yallop interviewed and quoted various doctors to discuss Luciani's death (*Id*. at 229-31),

concluding that the cause and time of death of Luciani remain unknown. (*Id*.) He takes the

reader through Luciani's medical history (*id*. at 231-34), again reviewing what he believes are

the Vatican's many lies. (*Id*.) By the end of the chapter, if the reader has any doubt of the

author's theory, Yallop discusses Luciani's murder as fact. (*Id*. at 246-47.)

The last chapter of *In God's Name* opens with the conclave to name a successor to

Luciani, and the election of the "compromise candidate" Cardinal Karol Wojtyla, Paul John Paul

II. (*Id*. at 248-49.)   Yallop explains that Pope John Paul II was briefed on everything that

happened during Luciani's 33 days, including his position on birth control. (*Id*.) However,

writes Yallop, "[n]ot one of Luciani's proposed changes became a reality. Whoever had murdered the Pope had not murdered in vain." (*Id.*) Yallop discusses Opus Dei, its wealth and its power. (*Id.* at 265.) He writes about Roberto Calvi and the inspection of the bank, and the murder of Emilio Alessandri. (*Id.* at 250-51.) Yallop states that Luciani's murder "had given Marcinkus, Calvi, Sindona, and their P2 friends breathing space. Now the murder of Emilio Alessandri bought them further time. The investigation initiated by Judge Alessandri continued, but at a snail's pace." (*Id.* at 254.) Yallop documents Michele Sidona's indictment on March 9, 1979 and the investigation into his schemes by Girgio Ambrosoli. (*Id.* at 258-64.) In sum, Yallop documents in detail the period that followed Luciani's time in office and the various corruptions connected to the Vatican in the late 1970's.

Yallop's final conclusion echoes the theme of his book: that on September 28, 1978, Luciani "was martyred for his beliefs. . . . The decision that the Pope must die was taken and God's candidate was murdered." (*Id.* at 304.)

B.    <u>Public Domain Elements Shared By The Last Confession And In God's Name</u>

On June 22, 2007, counsel for Poetic Products sent to counsel for Crane a letter that contains the alleged instances of copying that, according to Poetic Products, amount to infringement. (Crane Decl. ¶ 24, Ex. B.) The document attached to the Duvdevani Declaration as Exhibit 3 is a chart containing (1) passages from *The Last Confession* that allegedly infringe *In God's Name* as per Poetic Products' June 22, 2007 letter to Crane; (2) cites to other books and articles in the public domain that contain the same factual and historical information or quotations; and (3) the "corresponding" passages from *In God's Name* that were allegedly infringed. The chart shows that all but a very small portion of the allegedly infringed material is easily found in other published sources, and that all allegedly infringing materials are comprised of historical facts. Additionally, Exhibit 4 contains dozens of articles concerning Pope John Paul

I's succession, death and other information found in both *The Last Confession* and *In God's Name*.

C.    Procedural History

On June 22, 2007, Poetic Products began to send Crane letters containing allegations of copyright infringement.  (Crane Decl. ¶ 24, Exs. B, C.)  On August 8, 2007, Crane filed a Complaint for a declaratory judgment of non-infringement of copyright against Poetic Products, seeking a declaration from the Court that The Last Confession "has not in any way infringed the copyright of PPL or any person or entity owning rights to In God's Name. . . or otherwise violated any rights of PPL." (Docket No. 1: Compl. at 4.)  On October 16, 2007, Poetic Products filed its Answer and Counterclaims for copyright infringement and unfair competition.  (Docket No. 7.)  Poetic Products alleges that Crane's *The Last Confession* infringed *In God's Name* in the U.K. as well as in the U.S. (Counterclaim ¶ 7-8, 11.)  Crane answered Poetic Products' Counterclaims on November 13, 2007. (Docket No. 8.)  The parties have not engaged in any discovery, as none is necessary to decide the pivotal issue of whether the two works are substantially similar.

**ARGUMENT**

**II.    THE SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Brown v. Perdue*, 04 Civ. 7417, 2005 U.S. Dist. LEXIS 15995, at *15 (S.D.N.Y. Aug. 4, 2005),

*aff'd*, 177 Fed. Appx. 121, 2006 U.S. App. LEXIS 13877 (2d Cir.); *cert denied*, 127 S. Ct. 580 (2006).

"An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since 'the requirement is that there be no genuine issue of material fact.'" *Silberstein v. Fox Entm't Group, Inc.*, 424 F. Supp. 2d at 624 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial." *Id.* "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 120 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 248)). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under governing law.'" *Id.* (quoting *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 248)).

A court may decide as a matter of law whether two works are - or are not - substantially similar, and courts in this Circuit have routinely done so. *See id*; *see also, e.g., Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir. 1980) ("For where both the plaintiff's and defendant's works are before the court, the court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity.") (internal quotation marks omitted); *Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996); *Velez v. Sony Discos*, 05 Civ. 0615, 2007 U.S. Dist. LEXIS 5495 (S.D.N.Y. Jan. 16, 2007); *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382 (S.D.N.Y. 2005); *Brown v. Perdue*, 2005 U.S. Dist. LEXIS 15995, at *17-18; *Odegard Inc. v. Safavieh Carpets, Inc.*, 398 F. Supp. 2d 275, 278 (S.D.N.Y. 2005); *Queenie, Ltd.*

*v. Sears, Roebuck & Co.*, 124 F. Supp. 2d 178 (S.D.N.Y. 2000); *Churchill Livingstone, Inc. v. Williams & Wilkins*, 949 F. Supp. 1045 (S.D.N.Y. 1996).

## III.    PROVING COPYRIGHT INFRINGEMENT

"A claim of copyright infringement consists of only two elements. The plaintiff must show that the plaintiff owns a valid copyright and that the defendant has engaged in unauthorized copying." *Walter Sedovic Architech, P.C. v. Alesandro*, 98 Civ. 2120, 53 U.S.P.Q.2D (BNA) 1059, 1999 U.S. Dist. LEXIS 17443, at *5-6 (S.D.N.Y. Nov. 2, 1999) (Jones, J.) (citing *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985)); *see also, e.g., Brown*, 2005 U.S. Dist. LEXIS 15995, at *16 ("In order to succeed on a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'") (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). "The copying must be shown to be so extensive that there is a substantial similarity between the defendant's work and the protectible elements of the plaintiff's work." *Walter Sedovic Architech, P.C. v. Alesandro*, 1999 U.S. Dist. LEXIS 17443, at *5-6 (citing *Fisher-Price, Inc. v. Well-Made Toy Mfg.*, 25 F.3d 119, 122-23 (2d Cir. 1994)). "[S]imply because a work is copyrighted does not mean every element of that work is protected." *Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 367 F. Supp. 2d 514, 521 (S.D.N.Y. 2005) (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001.) "The only elements of a work that are entitled to copyright protection are those that are original." *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 674, 681 (2d Cir. 1998).

Poetic Products' claims, therefore, turn upon a finding of substantial similarity between the two works.[3] "The test for 'substantial similarity' is 'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Brown,* 2005 U.S. Dist. LEXIS 15995, at *16 (quoting *Warner Bros. Inc. v. American Broadcasting Companies,* 654 F.2d 204, 208 (2d Cir.1981)). "If the similarity concerns only noncopyrightable elements of a work, or no reasonable trier of fact could find the works substantially similar, summary judgment is appropriate." *Id.* (emphasis added) (citing *Walker v. Time Life Films,* 784 F.2d 44, 48 (2d Cir. 1986)). As discussed below, Poetic Products cannot demonstrate that substantial similarity exists between *The Last Confession* and *In God's Name* or that any similarities consist of protectible elements of Poetic Products' work.

A.    Proving Substantial Similarity Of Protectible Elements

"It is beyond dispute that copyright protection extends only to the expression of ideas, and not to the ideas themselves." *Hogan v. DC Comics,* 48 F. Supp. 2d 298, 308 (S.D.N.Y. 1999); *see also, e.g., Brown,* 2005 U.S. Dist. LEXIS 15995, at *18. A court that is "'confronted

---

[3]    Crane had access to *In God's Name.* This fact is irrelevant to the dispositive issue of substantial similarity. This is "because access without similarity cannot create an inference of copying, even massive evidence of access cannot by itself avoid the necessity of also proving the full measure of substantial similarity. . . . One must hasten to add that there is nothing wrong in having access to one's competitor's products." 4 NIMMER § 13.03[D], at 13-90, 13-91. *See also, e.g., Selmon v. Hasbro Bradley, Inc.,* 669 F. Supp. 1267, 1271 (S.D.N.Y. 1987) ("[E]ven if defendants had access to copyrighted material, if substantial similarity between defendants ultimate product and the copyrighted material cannot be shown, no inference of copyright infringement can be justified and access is rendered irrelevant."); *accord, Positive Black Talk, Inc. v. Cash Money Records, Inc.,* 394 F.3d 357, 372 n.11 (5th Cir. 2004) ("[T]he degree of access never affects the ultimate burden to show substantial similarity. Proof of access constitutes circumstantial evidence only of factual copying and is irrelevant to the determination of whether that copying is legally actionable (i.e., whether there is substantial similarity)") (emphasis added) (citing 4 NIMMER § 13.03[D], at 13-92 ("[A]ccess logically exerts no impact on copying as a legal matter; no matter how steeped in plaintiff's work defendant may have been, if the resulting product is non-actionable as a matter of law, then the absence of substantial similarity that must underlie every successful claim still dooms the infringement suit.")); *Stromback v. New Line Cinema,* 384 F.3d 283, 299 (6th Cir. 2004) ("In spite of the absence of similar protectible elements in both works, Stromback contends that NLC's admission of access precludes a finding of no substantial similarity as a matter of law. This argument is easily rejected, because without substantial similarity, there can be no inference of copying, and thus, no infringement.") (citing *Arnstein v. Porter,* 154 F.2d 464, 469 (2d Cir. 1946) ("Of course, if there are no similarities, no amount of evidence of access will suffice to prove copying.")).

with an allegedly infringing work, must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected esthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.'"  *Boone v. Jackson*, 05-5558-CV, 206 Fed. Appx. 30, 33, 2006 U.S. App. LEXIS 28565, at *8 (2d Cir. Nov. 15, 2006) (quoting *Tufkenian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134-35 (2d Cir. 2003)).

"It is well-settled that historical facts contained in a factual work are not copyrightable." *Williamson v. Pearson Educ.*, 00 Civ. 8240, 2001 U.S. Dist. LEXIS 17062, at *11 (S.D.N.Y. Oct. 19, 2001) (emphasis added) (citing *Harper & Row v. Nation Enters.*, 471 U.S. 539, 581 (1985); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 309 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009 (1967); and 17 U.S.C. § 102(b)); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1074 (2d Cir. 1992) ("Facts do not contain the requisite originality and creativity required as a 'sine qua non of copyright.'").  For instance, no biographer holds a monopoly in the story of the subject's life. *See, e.g., Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 n.5 (2d Cir. 1980).  As explained by the Second Circuit:

> Facts do not contain the requisite originality and creativity required as a 'sine qua non of copyright.'  There is a world of difference between the creative expression of an idea or a fact and its revelation.  Once the idea or fact is understood, even for the first time, the copyright laws do not protect these building blocks of knowledge from exploitation by anyone.  As the Supreme Court has recently explained: 'the distinction is between creation and discovery: the first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence.'  Thus, 'facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted.'
>
> *Arica Inst., Inc. v. Palmer*, 970 F.2d at 1074-75 (internal citations omitted) (emphasis

added).  The Supreme Court has held, "all facts -- scientific, historical, biographical, and news of the day" do not trigger copyright "because these data are not 'original' in the constitutional

sense." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347-348 (1991). "They may not be copyrighted and are part of the public domain available to every person." *Id.* The Court explained that because the "primary objective of copyright is not to reward the labor of authors" but to promote the progress of science and the arts, "copyright assures authors the right to their original expression, but encourages others to freely build upon the ideas and information conveyed by a work." *Id.* at 349-50. Moreover, because the retelling of history necessarily proceeds in a certain chronological order, an author cannot hold a copyright in the sequence of the story's elements. *See Arica*, 970 F.2d at 1075 (In such circumstances as historical works containing chronological narrations of events, ordering is inevitable and thus "devoid of creativity" and the "sequence is non-copyrightable."). "Similarly, *scenes a faire*, sequences of events that necessarily result from the choice of setting or situation, do not enjoy copyright protection." *Brown*, 2005 U.S. Dist. LEXIS 15995, at *18 (citing *Williams v. Crichton*, 84 F.3d at 587).

As such, even where a plaintiff is able to create an issue of actual copying that could not be defeated by defendants' showing of independent creation, substantial similarities between the allegedly infringing work and the <u>protectible</u> elements of the plaintiff's work must be shown to survive summary judgment. *See, e.g., Silberstein v. Fox Entm't Group, Inc.*, 424 F. Supp. 2d at 630; *see also, e.g., Odegard Inc. v. Safavieh Carpets, Inc.*, 398 F. Supp. 2d 275, 279 (S.D.N.Y. 2005) ("Illegal copying is proved by showing substantial similarity, not between the works as a whole, but only as between the protectable elements of the copyrighted work and the accused infringing work."). In most cases, the test for substantial similarity is the ordinary observer test, which asks whether an average lay observer would recognize the alleged copy as having been

appropriated from the copyrighted work. *See, e.g., Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 274 (S.D.N.Y. 2005). However, this test is not without its limitations.

In *Feist Publications, Inc. v. Rural Tel. Servs., Inc.*, 499 U.S. at 349-51, the Supreme Court held that copyright protection in the selection, coordination and arrangement of otherwise uncopyrightable elements is "thin" because the scope of the copyright is limited to the particular selection or arrangement. "Furthermore, a 'subsequent [author] remains free to use [the public domain elements] to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement.'" *Odegard Inc. v. Safavieh Carpets*, Inc., 398 F. Supp. 2d at 279 (quoting *Feist* at 349-51.). In other words, "'[t]he plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea. The means of expression are the artistic aspects of a work; the mechanical or utilitarian features are not protectible." *Queenie, Ltd.*, 124 F. Supp. 2d at 180 (quoting *Fisher-Price, Inc.*, 25 F.3d at 123) (internal quotations omitted).

Where the copyrighted work incorporates elements that are both protectible and unprotectible, "the inspection must be 'more discerning' – the court 'must attempt to extract the unprotectable elements . . . from consideration and ask whether the protectible elements, standing alone, are substantially similar." *Queenie, Ltd.*, 124 F. Supp. 2d at 181 (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)); *see also, e.g., Brown*, 2005 U.S. Dist. LEXIS 15995, at *20-21 ("When a work contains both protectible and unprotectible elements, the Court can only inquire whether 'the protectible elements, standing alone, are substantially similar.'") (quoting *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)); *Sandberg and Sikorski Corp. v. Andin Int'l, Inc.*, 98 Civ. 2890, 1999 U.S. Dist. LEXIS 21359, at *14 (S.D.N.Y. July 15, 1999) ("'Where, as here, we compare products that have both protectible

and unprotectible elements, we must exclude comparison of the unprotectible elements from our application of the ordinary observer test.'") (quoting *Fisher-Price*, 25 F.3d at 123).

## IV.    UK COPYRIGHT LAW: THE COPYRIGHT, DESIGNS AND PATENTS ACT OF 1988

Poetic Products alleges that *The Last Confession* not only infringes *In God's Name* in this country, but in England as well.  (Counterclaim ¶ 7-8.)  As discussed more fully in Section VII, claims of infringement in England are governed by U.K. copyright law.  The applicable law is therefore discussed below.

### A.    Originality

British copyright law is primarily found in statutory form in the Copyright, Designs and Patents Act 1988 (the "CDPA").  To qualify for copyright protection, a work should be regarded as original, and must exhibit a degree of labor, skill or judgment.  2 PAUL EDWARD GELLER & MELVILLE B. NIMMER, INTERNATIONAL COPYRIGHT LAW AND PRACTICE § 2[1][b][i] (2006).  "British law has traditionally accorded copyright in most works if they satisfy criteria of originality that, quite unlike criteria in Continental laws of *droit d'auteur*, do not call for minimal 'creativity,' although [European Community] developments in the U.K., rights of performers are treated separately in Part II of the 1988 Act."  *Id*. at § 1[1][c].  However, without sufficient effort, there is, in principle, no protection.  *Id*. at § 2[1][b][ii].  Furthermore, even when a copy is a product of labor, skill, and judgment, originality is nevertheless absent where it is "wholly copied from an existing work, without any significant addition, alteration, transformation, or combination with other material."  *Id*.

The 1988 Act exhaustively lists eight specific types of protected subject matter, all of which are deemed copyrightable "works."  *Id*. at § 2[2][a][i].  "The eight types of work can be

divided into three general categories: first, authors' copyrights in literary, dramatic, musical, and artistic works; second, the 'hybrid' copyright in films; third, copyrights in other media productions, namely, sound recordings, sound and television broadcasts, and published editions." *Id*. at § 2[2][a][i]. In the U.K., "there is an exception to copyright protection under the doctrine of fair dealing, which is similar to the United States doctrine of fair use." Sharon F. Foster, *Does the First Amendment Restrict Recognition and Enforcement of Foreign Copyright Judgments and Arbitration Awards?*, 10 *Pace Int'l L. Rev.* 361, 374 (1998).

Under the CDPA, to be original, "a work 'need not be original or novel in form, but it must originate with the author and not be copied from another work.'" *Bridgeman Art Library v. Corel Corp.*, 25 F. Supp. 2d 421, 426 (S.D.N.Y. 1998) (quoting *Interlego AG v. Tyco Industries Inc.*, 1 A.C. 217 (P.C. 1989), 3 All E.R. 949, 970 (1988) (appeal taken from Hong Kong)). "That is not to say that the author, in all circumstances, must create the entire work from scratch to be accorded copyright protection." *Id*. "'Protection of a derivative work turns on whether the [author's] skill, judgment and labour transforms the underlying work in a relevant way.' That is, the originality requirement is not met where the work in question 'is wholly copied from an existing work, without any significant addition, alteration, transformation, or combination with other material.'" *Id*. (quoting GELLER & MELVILLE B. NIMMER, § 2[3][b], at UK-28 (1998)).

In *Bridgeman Art Library v. Corel Corp.*, 25 F. Supp. 2d at 427, Judge Kaplan expressed that U.S. copyright law is persuasive in construing British copyright law:

> United States law is persuasive in construing English law for two reasons. First, there is substantial similarity between the originality requirements of the UK Act and the Copyright Act. As does the U.K. Act, the Copyright Act extends protection only to 'original works of authorship.' 17 U.S.C. § 102(a) (1998). A work is original if it owes its creation to the author and was not merely copied. *Feist Publications*, 499 U.S. at 345. With respect to derivative works, the originality requirement warrants that there be a distinguishable variation between the work in which copyright is sought and the underlying work. *Batlin*, 536 F.2d

at 490-91; *Matthew Bender & Co. Inc. v. West Publishing Inc.*, 158 F.3d 674, 1998 WL 764837, at *6-*9 (2d Cir. 1998). Important to this calculus is that the demonstration of some physical, as opposed to artistic, skill does not constitute a 'distinguishable variation.' *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir. 1980) (citing Batlin, 536 F.2d at 491). Second, the Privy Council itself has looked to American law as persuasive authority with respect to copyright originality. *See* Interlego, 3 All ER at 969 (quoting Story, J.)).

*Id.*

B.      Infringement Under U.K. Law

Like U.S. law, U.K. law analyzes copyright infringement as the unauthorized taking of an author's work. *See* GELLER & MELVILLE B. NIMMER, § 82[1][a], at UK-96. In England, if "a taking is shown, but it is less than nearly complete taking of the work, inquiry shifts to substantiality." *Id.*

"In assessing substantiality, the court may consider the type of work involved." *Id.* In cases like this one, where the taking at issue involves "technical or historical material," a copyist has been authorized under UK case law to take greater amounts than what would be permitted in works of fiction. *See id.* (citing *Elanco Products v. Mandops* [1980] R.P.C. 213; *Ravenscroft v. Herbert* [1980] R.P.C. 193, 205; *Biotrading & Financing Oy. v. Biohit Ltd.* [1988] F.S.R. 109, 122.) Where an author's work records information, "the defendant must not copy its entire presentation but rather exercise his own labor, skill, and judgment in bringing information together." *Id.* at UK-98.

The law of U.K. copyright infringement applicable to this case is exemplified in the U.K. action involving Dan Brown's *The Da Vinci Code*. In *Baigent v. Random House Group Ltd.*, [2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), claimants were the authors of the book *The Holy Blood and the Holy Grail* ("HBHG"), published in 1982. They alleged that *The Da Vinci Code* infringed HBHG and commenced proceedings against the defendant publishing

house. The High Court of Justice dismissed the claims of copyright infringement, making

several rulings while discussing the *Ravenscroft* case:

1.  "First it seems to me that it is accepted that an author has no copyright in his facts nor in his ideas but only in his original expression of such facts or ideas." *Id*. at ¶ 171.

2.  "Second the purpose of copyright is to protect the skill and labour employed by the Plaintiff in the production of his work." *Id*. at ¶ 172.

3.  "Third in the case of works not original in the proper sense of the term but composed or compiled from materials which are open to all the fact that one man has produced such a work does not take away from anyone else the right to produce another work of the same kind 'and in doing so to use all the materials open to him'. What he cannot do however is avail himself of the labour of the Plaintiff." *Id*. at ¶ 173.

4.  "Subject to what I say in the next paragraph where a book is intended to be read as a factual historical event and that the Defendant accepts it as fact and did no more than repeat certain of those facts the Plaintiff cannot claim a monopoly in those historical facts. It is accordingly perfectly legitimate for another person to contrive a novel based on those facts as otherwise a Claimant would have a monopoly of the facts." *Id*. at ¶ 174.

5.  "[T]he facts and the themes and the ideas cannot be protected but how those facts, themes and ideas are put together . . . can be. It follows from this that the Claimants must show that there is a putting together of facts, themes and ideas by them as a result of their efforts and it is that which Mr Brown has copied." *Id*. at ¶ 176.

In sum, Justice Peter Smith ruled that, like U.S. law, it is the manner in which facts, themes and

ideas are collated and presented that qualify for copyright protection, but not the underlying

ideas or historical information. *See id*. The decision was upheld by the Court of Appeal on

March 28, 2007. *See Baigent v. Random House Group Ltd*., [2007] EWCA Civ 247. *See also,*

*e.g., Ravenscroft v. Herbert* [1980] R.P.C. 193, 205-06; *Warwick Film Productions Ltd. v.*

*Eisinger,* [1969] 1 Ch 508 (holding that where the defendant had taken significant extracts from

the transcripts of Oscar Wilde's trials contained in plaintiff's book, but not any of the plaintiff's

editing or accompanying commentary, no infringement was found because "[t]he reproduction of

a part which by itself has no originality will not normally be a substantial part of the copyright and therefore will not be protected.").

## V.    SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF CRANE BECAUSE NO SUBSTANTIAL SIMILARITY EXISTS BETWEEN THE WORKS

### A.    Even If Poetic Products Can Show Access, It Cannot, As A Matter Of Law, Demonstrate Substantial Similarity Between *The Last Confession* and the Protectible Elements of *In God's Name*

For the purposes of this motion, Crane does not dispute that there exists a valid copyright for *In God's Name* or whether Crane had access to the same. Regardless, Poetic Products cannot withstand summary judgment because the two works at issue are not substantially similar.

### 1.    Alleged Similarities

As seen in Exhibits 1, 2, and 3, each and every one of the similarities between *The Last Confession* and *In God's Name* alleged by Poetic Products are similarities between unprotectible elements. Taking Poetic Products' first allegation as an example, in the first act of *The Last Confession*, there is a scene wherein Cardinals Benelli and Luciani converse:

Benelli:    Albino, it's good to see you. I enjoyed your book.

Luciani:    You did? Thank you. It was just some letters.

Benelli:    Yes (*Smiling*.) but to Mark Twain, Jules Verne . . . very illustrious. What brings you to Rome?

(Ex. 3 at 1; *The Last Confession* at 11.) Poetic Products has alleged that this dialogue infringes the following text of *In God's Name*:

Eventually a collection of the letters was published in book form, Illustrissimi – the most illustrious ones.

The book is a delight. Apart from providing an invaluable insight into the mind of Albino Luciani, each letter comments on aspects of modern life......... Chesterton and Walter Scott receive a letter from the Patriarch, as do Goethe, Alessandro Manzoni, Marlowe and many others. There is even one addressed to Christ which begins in typical Luciani fashion.

'Dear Jesus,

I have been criticized. 'He's a Bishop, he's a Cardinal,' people have said, 'he's been writing letters to all kinds of people: to Mark Twain, to Peguy, to Casella, to Penelope, to Dickens, to Marlowe, to Goldoni and heaven knows how many others. And not a line to Jesus Christ!'

*and*

He quoted Mark Twain, Jules Verne and the Italian poet Trilussa. He talked of Pinocchio. Having already compared the soul to a car he now drew an analogy.

(Ex. 3 at 1; *In God's Name* at 48-49, 148.) This allegation is representative of Poetic Products' misunderstanding of copyright law. That Luciani (Pope John Paul I) wrote a book entitled *Illustrissimi* comprised of letters written to historical and fictional figures including Mark Twain and Jules Verne is a fact that Poetic Products cannot, as a matter of law, claim as its own. (Ex. 3 at 1). *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. at 347-348 ("[A]ll facts -- scientific, historical, biographical, and news of the day" do not trigger copyright "because these data are not 'original' in the constitutional sense.")

Indeed, at least three other sources have documented that Pope John Paul I wrote a book comprised of letters to these figures.[4] In *The Year of Three Popes*, Peter Hebblethwaite writes: "It was partly to relieve his frustrations that he began to write Illustrissimi, a series of letters to authors or characters in history or fiction." (Ex. 3 at 1.) In *The Making Of The Popes*, Andrew Greely writes, "He [Luciani] quoted nineteenth – century Roman romantic poetry as well as Jules Verne, Mark Twain, Napoleon and St. Bernard." And Francis X. Murphy writes in *The Papacy Today – 1978*: "Addressing himself to Charles Dickens and Mark Twain . . . Luciani displayed a grasp of world literature . . ." (Ex. 3 at 1.) Regardless, even without other sources, the simple fact that Yallop holds out his book as factual <u>mandates</u> that the facts contained therein

_____

[4]    Not to mention the book *Illustrissimi* itself, which is for sale on Google books, Amazon.com, and countless other places.

are not protectible elements of *In God's Name*. *See Arica Inst., Inc. v. Palmer*, 970 F.2d at 1074-75 ("[T]he first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence.' Thus, 'facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted.'").

An examination of the remainder of Poetic Products' allegations (and the works themselves) reveals that none of the alleged similarities comprise copyright infringement as a matter of law. (*See* Exs. 1, 2, 3; *see also, e.g.*, Ex. 4 (dozens of public domain articles concerning the same historical events as *In God's Name*.))  This is true regardless of whether Crane used *In God's Name* as a source for the historical information found in the dialogue of his play. *See, e.g., Arica Inst., Inc. v. Palmer*, 970 F.2d at 1074-75; *Brown v. Perdue*, 2005 U.S. Dist. LEXIS 15995 at *27 (noting that the ideas and themes of both works "find their origin in historical facts, events and figures, as well as pre-existing works.").

Because the only similarities between the works are of unprotectible elements, summary judgment must be granted in favor of Crane without further analysis.  However, for the sake of completeness, the elements of *In God's Name* and *The Last Confession* are analyzed below, demonstrating that no substantial similarity exists among any other elements.

        2.      <u>Plot</u>

*In God's Name* is an investigative work into the death of Pope John Paul I that was written to support David Yallop's theory that the Pope was murdered.  It is a factual accounting of the upbringing and early life of Luciani, his climb through the ranks of the Church and entry into Rome, his rise to Pope, his murder, and the political and financial intrigues of the 1970's Vatican.  The book is more than a simple biography of Luciani and his Vatican: Yallop promotes

as fact that Luciani was murdered and that the Vatican covered up the murder, and explains and supports his theory with historical fact.

The Last Confession is a story about the election and death of Luciani as told in flashback by Cardinal Benelli. Benelli, the central character of the play, is dying. A character aptly named the Confessor is with Benelli to listen to his confession. The play cuts in and out of discussions between Benelli and the Confessor, with the focus on the flashbacks (Benelli's confession): the death of Pope Paul VI, the conclave to elect the new pope, the election of Luciani as Pope John Paul I, his 33 days in office, and the Pope's death, for which Benelli blames himself. There is no conclusion as to whether or not the Pope's death was a murder: that is for the audience to decide. The Confessor turns out to be Pope John Paul II, who Benelli confronts in the final scene.

To the extent that both works are about Pope John Paul I's succession and death, such "basic plot ideas" are not protectible, even were they not fact. Jones v. CBS, Inc., 733 F. Supp. 748, 754 (S.D.N.Y. 1990); Hogan v. DC Comics, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) ("The two works share a similar basic underlying idea: they both involve a half-vampire character who is on a quest that leads him to discover his origins. Almost all of the remaining similarities between the works are unprotectable themes and concepts that flow predictably from this idea."). Moreover, it is clear that the protagonist in The Last Confession is not Luciani, but Benelli. If there can be a protagonist in a factual work such as In God's Name, it is Luciani. This is further evidence of lack of substantial similarity. See, e.g., Flaherty v. Filardi, 388 F. Supp. 2d 274, 287-88 (S.D.N.Y. 2005) (no substantial similarity where, among other elements, characters of the protagonists in each work were different); Williams v. Crichton, 860 F. Supp. 158, 168-69 (S.D.N.Y. 1994), aff'd, 84 F.3d 581 (2d Cir. 1996) (no substantial similarity where plaintiff selected only a few characters as basis for similarity and where characters in one work

were "much more thinly developed than" in the other.).  Overall, the plots of the works are quite different.

### 3.    Narrative Structure, Style and Tone

"Narrative structure is an important part of the expression of a literary work, and differences in narrative structure have been deemed significant in holding that the two works do not even meet the more lenient standard of substantial similarity." *Gal v. Viacom Int'l, Inc.*, 2007 U.S. Dist. LEXIS 68808, at *44 (citing *Kretschmer v. Warner Bros.*, No. 93 Civ. 1730, 1994 U.S. Dist. LEXIS 7805 at *24 (S.D.N.Y. Jun. 8, 1994) (pace and structure of works "very different" where one plot was "neatly divided in two halves" whereas the other "deals almost exclusively" with the adventures of the main character)).

*In God's Name* and *The Last Confession* differ dramatically in narrative structure, style and tone.  *In God's Name* is a 343-page piece of investigative writing, and is touted as such. From the outset, Yallop makes clear that the book is being published only after "nearly three years' intensive research," and assures the reader that his facts have all been "checked and double-checked."  (*In Gods Name* at xv, xvii.)  The book is written in the straightforward style of a factual accounting.  It contains a preface, a prologue, an epilogue, and an index.  Interspersed in the book are sections containing black and white photographs of such real-life historical figures as Albino Luciani, Pope John Paul VI, Presidents Nixon and Johnson meeting the Pope, Michele Sindona, and other figures discussed in the book.  There is nothing to indicate that the book contains any fiction whatsoever; to the contrary, the editor's description on the flap of the original edition proclaims:

> Now, in this fully documented minute-by-minute account of John Paul I's last hours and the events that followed, David Yallop reveals how the intricate web of Vatican lies was fabricated and explores the motives and opportunities of the six powerful men who stood at the center of a deadly conspiracy.

(Ex. 5: 1984 edition of *In God's Name* at back flap.)

No fictional characters or events are contained in the book.

On the other hand, *The Last Confession* is a 111-page play -- and work of fiction -- based on historical fact, broken up into two Acts. At the outset of the play, the cast of seventeen "characters" are introduced: Cardinal Giovanni Benelli, The Confessor, Cardinal Albino Luciani (Pope John Paul I), Cardinal Jean Villot, Bishop Paul Marcinkus, Pope John Paul VI, Cardinal Pericle Felici, Cardinal Alfredo Ottaviani, Cardinal Sebastiano Baggio, Cardinal Bernadin Gantin, Cardinal Leo Suenens, Cardinal Aloisio Lorscheider, Monsignor John Magee, Father Diego Lorenzi, Dr. Renato Buzzonetti, Sister Vincenza, and Thomas. These characters are all based on real people except for Thomas, a creation of Mr. Crane. Many scenes of the play have some link to historical facts, and in several instances the dialogue contains direct quotes that were actually uttered by the individuals on whom the characters are based. But in large part, the dialogue contained in *The Last Confession* is created by Mr. Crane. As discussed earlier, the play is in the format of flashbacks of a confession that Cardinal Benelli is making to the Confessor, who turns out to be Pope John Paul II. Accordingly, the narrative structure, style, and tone of the works at issue are completely dissimilar, precluding any finding of substantial similarity.

####    4.    Time Sequence

The confession contained in The Last Confession spans the periods of time from the death of Pope Paul VI through the death of Luciani and the election of Pope John Paul II – a period of about a year.

In God's Name spans the birth of Luciani in 1912 through the late 1970's during Pope John Paul II's reign – a period of several decades.

5.    <u>Theme</u>

The themes of *The Last Confession* include a single troubling question, posed by Cardinal Benelli. "Where do God's plans end and man's begin?" he asks. "Where is the line between divine providence and human intervention?" With this theme, the audience is made to understand Benelli's guilty confession at the beginning of Act I that he killed the Pope. It was Benelli's guilt lying in having maneuvered the gentle, "Smiling Pope" into office to avert the control of the Vatican's aggressive conservatives and reactionaries. Other themes involve Cardinal Benelli's loss of faith, his search for God, and his ultimate redemption.

The theme of *In God's Name* is a rather straightforward one: Luciani was murdered, and Yallop takes the reader through historical fact to prove the theory. The publisher of *In God's Name* expands upon this theme, describing the book on the back cover:

> Only thirty-three days after his election, Pope John Paul I, Albino Luciani, died in strange circumstances. Almost immediately rumors of a cover-up began to circulate around the Vatican. In his researches David Yallop uncovered a an extraordinary story: behind the Pope's death lay a dark and complex web of corruption within the Church that involved the Freemasons, Opus Dei and the Mafia and the murder of the 'Pope's Banker' Roberto Calvi.

(*In God's Name* at back cover.)

In sum, both works concern the rise and fall of Pope John Paul I, and share some common historical facts. No other similarities exist between the works. Such differences in style, tone, theme, plot, and total concept and feel preclude a finding of substantial similarity. *See, e.g.*, *Gal v. Viacom Int'l, Inc.*, 05 Civ. 0263, 2007 U.S. Dist. LEXIS 68808, at *47-48 (S.D.N.Y. Sep. 18, 2007) ("Differences in total concept and feel are of great significance when determining the degree of similarity between the two works."). Thus, as a matter of law, Poetic Products' claims fail.

## VI.   ANY USE OF *IN GOD'S NAME* BY CRANE WOULD BE A TRANSFORMATIVE USE AND, THUS, A FAIR USE, PRECLUDING A FINDING OF COPYRIGHT INFRINGEMENT

"From the infancy of copyright protection," the fair use doctrine "has been thought

necessary to fulfill copyright's very purpose, 'to promote the Progress of Science and useful

Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., art. I,

§ 8, cl.8). "'In truth, in literature, in science and art, there are, and can be few, if any, things,

which in an abstract sense, are strictly new and original throughout.  Every book in literature,

science and art, borrows, and must necessarily borrow, and use much which was well known and

used before.'" *Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 327

(S.D.N.Y. 2005) (quoting *id.*).   Under the first fair use factor, the court's function, in inquiring

into "the purpose and character of the use," 17 U.S.C. § 107(1), is:

> to see, in Justice Story's words, whether the new work merely 'supersedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message …, in other words, whether and to what extent the new work is 'transformative.' . . . The goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such [transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space…

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (quoting *Campbell*, 510 U.S. at

579.)  In *Bill Graham Archives*, the court awarded summary judgment in favor of defendants on

fair use, precluding plaintiff's claims of copyright infringement.  *Bill Graham Archives, LLC v.

Dorling Kindersley Ltd.*, 386 F. Supp. 2d at 333.  In doing so, Judge Daniels explained that

defendant's use of plaintiff's posters in its book "is sufficiently transformative, and different

from the original purpose to advertise, draw attention to and solicit listeners to an event, such

that the market is not one expected to be reserved to the copyright holder.  Nor is it reproduced

for purely aesthetic value."  Additionally, the court explained that the fact that defendants' book

was for a commercial purpose "does not preclude fair use." *Id*. at 329.  "The Supreme Court has

stated that even the Section 107 illustrative fair uses 'are generally conducted for profit in this country.'" *Id*. (quoting *Campbell*, 510 U.S. at 584).  In sum, the court held that the first fair-use factor, and the fair use factors in general, weigh in favor of defendants -- and preclude a finding of copyright infringement -- "since the purposes of copyright are best served by permitting transformative uses that foster the creation of new works." *Id*. at 333.

Here, Crane did not make use of any portions of *In God's Name* that were protected by either U.K. or U.S. copyright law, as any similarities between the works are factual. (*See* Exs. 1-3.)  However, assuming *arguendo* that Crane appropriated *In God's Name*, such us of an investigative, factual book, for his creation of *The Last Confession*, a two act play, would be a transformative one, and thereby a fair use, preventing a finding of copyright infringement. *See, e.g.*, *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004).  To find otherwise would run contrary to the "purposes of copyright."

## VII.  POETIC PRODUCTS' ALLEGATIONS OF COPYRIGHT INFRINGEMENT ALSO FAIL UNDER BRITISH LAW

An analysis of copyright infringement under English law is necessary for those alleged instances of infringement that Poetic Products claims to have occurred in London, England. (*See* Counterclaims ¶¶ 7, 8, 9.)  This is because the copyright law of the country where the alleged infringement took place is the law that is to be applied to those allegations. *See, e.g.*, *Carell v. Shubert Org.*, 104 F. Supp. 2d 236, 257-59 (S.D.N.Y. 2000); *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 637 (S.D.N.Y. 2000).  Thus, while U.S. law is appropriate to decide whether *The Last Confession* infringes *In God's Name* in Crane's past, present, and future publications of *The Last Confession* in this country, English law must be applied for Poetic Products' allegations of Crane's infringements occurring in the United Kingdom. (*See* Counterclaims ¶¶ 7, 8, 9.)

A corollary to this rule is that it is well-settled that this Court can exercise jurisdiction over foreign copyright infringement claims. *See Carell v. Shubert Org.*, 104 F. Supp. at 259 ("[T]here is no reason to believe that the Court would be foreclosed from applying foreign law to plaintiff's foreign infringement claims.") (and cases cited therein); *Bridgeman Art Library v. Corel Corp.*, 25 F. Supp. 2d at 427. Because the Court has personal jurisdiction over Poetic Products (Compl. ¶ 11), and subject matter jurisdiction over the U.S. Copyright claims, the Court has pendant jurisdiction to analyze the English claims at issue. *See, e.g., Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d at 637-38 ("In the present case, this Court would unquestionably have subject matter jurisdiction over any claims properly arising under United States copyright law, potentially allowing the Court to exercise pendent jurisdiction over claims arising under foreign law. Moreover, there would appear to be complete diversity as among the parties to this action.").

Poetic Products' claims of infringement in England fail under British copyright law. In the English *Da Vinci Code* case of *Baigent v. Random House Group Ltd.*, [2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), *aff'd, Baigent v. Random House Group Ltd.*, [2007] EWCA Civ 247, the High Court explained that it is the manner in which facts, themes and ideas are collated and presented that qualify for copyright protection, but not the underlying ideas or historical information. *See id.* at ¶ 176; *see also, e.g., Ravenscroft v. Herbert* [1980] R.P.C. 193, 205-06; *Warwick Film Productions Ltd. v. Eisinger,* [1969] 1 Ch 508. As evidenced by reading both of the works and Exhibit 3, any similarities to *In God's Name* contained in *The Last Confession* is historical information. The two works present this information quite differently. Thus, for many of the same reasons that Poetic Products' claims fail under U.S. law, they fail under U.K. law as well.

## VIII. POETIC PRODUCTS' SECOND COUNTERCLAIM IS PREEMPTED BY THE COPYRIGHT ACT

"It is axiomatic that '"unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by [the Copyright Act].""" *Orange County Choppers, Inc. v. Olaes Enters.*, 497 F. Supp. 2d 541, 556 (S.D.N.Y. 2007) (quoting *Samara Bros., Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000)); *see also, e.g., Adams v. Warner Bros. Pictures Network*, 05 Civ. 5211, 2007 U.S. Dist. LEXIS 47448, at *16 (S.D.N.Y. June 29, 2007) (citing *NBA v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997)); *Video-Cinema Films, Inc. v. CNN, Inc.*, 98 Civ. 7128, 2001 U.S. Dist. LEXIS 25687, at *33 (S.D.N.Y. Nov. 28, 2001) (Jones, J.) ("Defendants' summary judgment motions for Plaintiff's unfair competition claims are granted as well. Plaintiff's unfair competition claims are based on the same conduct as its copyright claims, and thus are preempted by federal law.").

Here, Poetic Products' second count of the Counterclaim alleges that "Crane's act and conduct, as alleged above, constitute unfair competition under applicable common law." (Answer and Counterclaims at 10.) Its additional two paragraphs of the count do not add an "extra element" that changes the '"nature of the action so that it is qualitatively different from a copyright infringement claim.'" *Thomas Publ. Co., LLC v. Tech. Evaluation Ctrs., Inc.*, 06 Civ. 14212, 2007 U.S. Dist. LEXIS 55086, at *11-12 (S.D.N.Y. July 27, 2007) (quoting *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). This is the precisely the sort of unfair competition claim preempted by the Copyright Act, as it is based on the same conduct as the copyright claim against Crane. *See Video-Cinema Films, Inc. v. CNN, Inc.*, 2001 U.S. Dist. LEXIS 25687, at *33. For this reason, and because *The Last Confession* does not infringe *In God's Name* under British or U.S. law (*see* Sections V-VII), this Count must be dismissed.

**CONCLUSION**

In light of the foregoing, Plaintiff Roger Crane respectfully requests that the Court

declare that Crane's *The Last Confession* does not infringe *In God's Name* under U.S. and U.K.

law.


Dated: November 13, 2007
      New York, New York

                                          **NIXON PEABODY LLP**


                                        By:    /s/ Frank Penski
                                                Frank H. Penski (FP-9221)
                                                  Tamar Y. Duvdevani (TD-7603)

                                        437 Madison Avenue
                                        New York, New York 10022
                                        Telephone: (212) 940-3000