# EXHIBIT A

"reproduce" essentially means "copy".[41] However, even though the two words are now often used interchangeably in this context, historically the expression "reproduce in any material form" encompassed a wider class of act than simply "copy". For example, under the law before the 1911 Act, a musical work was not copied by the making of a mechanical device which could reproduce the musical work in terms of sound.[42] The later Acts made clear that in the case of literary, dramatic or musical works, references to reproducing a work were to include their reproduction in the form of a record or film.[43] Although the 1988 Act does not contain such express provision, there can be no doubt that the law has not changed on this point.[44]

**7–32**    **Reproduction versus adaptation.** In relation to literary, dramatic and musical works, there exists a separate category of restricted act, namely the making of an adaptation, this being expressly defined, but including for example in relation to a literary work, a translation or a dramatisation of it.[45] The whole topic is discussed in more detail under the heading of "Adaptation"[46] but it is suggested, although the point is not clear, that in some cases at least, a version of a work may amount to both a reproduction of it and an adaptation of it.

### (i) Literary works

#### (a) *Introduction*

**7–33**    The general principles have already been considered. As has been pointed out, copying of a literary work may take place not only when the work is reproduced in the same medium, for example in writing or in print, but also when reproduction occurs in some other material form. So, for example, a song lyric is copied when it is reproduced on a sound carrier such as a compact disc and a written work is copied when it is stored in digital form on the hard disk of a computer. As with all categories of works, the making of transient or incidental copies amounts to copying just as much as the making of permanent copies.[47]

**7–34**    **Defendant's work must represent claimant's.** It has already been pointed out that in general terms a work is not reproduced unless what has been produced represents the work in some real sense. A description in a novel of a scene from nature is thus not infringed by a drawing made to depict that scene. So, in the context of a literary work, the copyright in a book which described a method of teaching mathematics was not infringed by making a series of coloured rods

---

[41] *British Leyland Motor Corp. Ltd v Armstrong Patents Co. Ltd* [1986] A.C. 577, per Lord Griffiths at 646; *Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 W.L.R. 273 at 276; *Purefoy Engineering Co. Ltd v Sykes, Boxall & Co. Ltd* (1954) 72 R.P.C. 89; *Norowzian v Arks Ltd* [1998] F.S.R. 394 (the words "reproducing the work in any material form" is a "common-sense explanation of what copying in relation to a literary work must mean. What is protected is the work itself").

[42] See *Boosey v Whight* [1900] 1 Ch. 122, decided under the 1842 Copyright Act, where it was held that perforated rolls for mechanical organs were not "copies" of the claimant's sheet music. However, under the 1842 Act, the claimants were the owners not of a musical work as that expression would now be understood but of the copyright in sheet music, and thus the exclusive right of multiplying copies of those sheets, *i.e.* essentially as a book. The law was changed by the 1911 Act. See s.1(2)(b) of that Act.

[43] Copyright Act 1956, s.48(1). The Copyright Act 1911, s.1(2)(d) was to the same effect.

[44] *Norowzian v Arks Ltd* [1998] F.S.R. 394. And see also CDPA 1988, s.172(2) (no departure from previous law merely as a result of a change of expression).

[45] CDPA 1988, s.21.

[46] See para. 7–121, below.

[47] CDPA 1988, s.17(6). See, however, s.28A and para. 9–15, below, as to the permitted act of making transient or incidental copies.

which demonstrated that method,[48] the copyright in written instructions for the making of a garment was not infringed by making the garment,[49] and the copyright in the words and numerals in knitting guides was not infringed by making garments to those instructions.[50] Again the copyright in a book of recipes is not infringed by making a dish according to one of the recipes.[51]

The problem can also arise in relation to literary works that consist of tables or compilations. Such works are obviously infringed by their unlicensed and substantial reproduction in the form of another written table or compilation, but do other forms of copying amount to a reproduction in a material form? In particular, is a list of components or articles reproduced for these purposes by assembling those components, either loosely or in the form of composite article amount to a reproduction? The question was discussed, although not answered, in *Anacon Corp. Ltd v Environmental Research Technology Ltd*,[52] where Jacob J. held that copyright subsisted in a circuit diagram both as an artistic work[53] and a literary work, the literary work consisting of the written information which the diagram contained, even though it was largely in the form of code (*i.e.* symbols for electrical components and how they interconnected). It was held that the literary copyright was infringed by the making of a "net list", that is, a list of all the components, and what other components they were connected to and where, since the net list reproduced the information found in the literary work. Whether the literary copyright was also infringed by the making of a circuit from the circuit diagram was left undecided, but with the indication that while the mere presence of the components on a circuit board would not make it an infringement, if the components were marked then it might do so, on the grounds that one could then read the information from the circuit board. In *Sandman v Panasonic U.K. Ltd*,[54] Pumfrey J. expressed the view that a circuit would be a reproduction of a circuit diagram as a literary work because it would contain all the literary content of the copyright work, even though it would require analysis for it to be extracted. It is not clear whether Pumfrey J. was referring to a case in which the components were marked, and indeed he adds that the question might turn on the facts. If the question turns on whether the components are marked or not, it is suggested that this is an artificial distinction, for there seems no good reason to distinguish between cases where the components carry a written description, or one where the components are, for example, colour-coded in accordance with industry conventions or the manufacturer's system, or one where they are unmarked and require destructive analysis to determine what they are. It also is artificial, because if interconnects are part of the literary information which makes up the literary work[55] such interconnects will not be "marked" but could be "read" by a visual inspection of their layout.

## (b) *Substantial part: general considerations*

**Wholly new versus derivative works.** The general question of what amounts to    7–35
a substantial part has already been considered. Two separate types of cases can

---

[48] *Cuisenaire v Reed* [1963] V.R. 719; *Cuisenaire v South West Imports Ltd* [1968] 1 Ex.C.R. 493.
[49] *Lambretta Clothing Co Ltd v Teddy Smith (UK) Ltd* [2003] EWHC 1204 (Ch), at para.78 (first instance only).
[50] *Brigid Foley Ltd v Ellott* [1982] R.P.C. 433.
[51] *J & S Davis (Holdings) Ltd v Wright Health Group Ltd* [1988] R.P.C. 403 at 414; *Edge Pty Ltd v Apple Computer Inc* (1986) 65 A.L.R. 33 at 61.
[52] [1994] F.S.R. 659.
[53] Which had not been infringed: see para. 7–55, below.
[54] [1998] F.S.R. 651.
[55] See para. 3–17, above.

be identified in relation to literary works, first, where the claimant's work is essentially a new work, such as a novel, poem, etc. where no part of it was derived from other sources, and, secondly, where the claimant's work is to some extent derivative, having been created by drawing on earlier works or other source material. Where the claimant's work is wholly original in the first sense, the question of substantial part is uncomplicated by the presence in the claimant's work of unoriginal material. In the case of a derivative work on the other hand, a number of complicating factors may arise. The first is that an explanation of independent creation rather than copying as the reason for similarities in the works may be more credible. The second is that a work of this kind may be protected on two levels, (a) the actual language used to convey the information, etc. and (b) the work of compilation in assembling and presenting the materials. Copyright in such a work may be infringed if there has been substantial copying of the work of compilation although little language copying.[56] Thirdly, and related to this, where the claimant's work contains extracts from other works, it may be necessary to examine closely what it is that the defendant has taken and what it was that made the claimant's work original, *i.e.* what was the nature of the labour or skill which the claimant contributed. If what has been taken was not original to the claimant's work, because for example it was itself taken from another work, there will be no infringement unless the originality of the claimant's work consisted of the choosing and bringing together of such material and it is this labour and skill which has been appropriated.

**7–36**    **Non-literal or non-textual copying.** It is not essential for the purposes of infringement that the very words used in the claimant's work have been taken. As the cases about préçis, etc. discussed below, clearly show, so-called non-textual copying may amount to an infringement just as much as literal copying. The principle is not confined to préçis and the like, however, but extends to any case in which there has been a substantial taking of the original skill and labour of the author in expressing his ideas, thoughts, etc. Thus the copyright in a historical work was infringed where there was a substantial taking of the information which the author had assembled,[57] a novel may be infringed where a substantial amount of the incident, plot and characterisation has been copied in another novel.[58] Most of the cases on the point relate to dramatic works, or the dramatisation of literary works,[59] but the general point of principle is the same.

**7–37**    **Wholly "new" literary work: verbatim extracts.** Quantity is not the appropriate test. Thus the taking of four lines out of 32 from a serious poem may be an infringement,[60] yet four lines consisting of some 20 quite simple words having no sort of literary merit taken from the refrain of a popular song may not be.[61]

---

[56] The copyright protection afforded to compilations is considered in the next section.

[57] *Ravenscroft v Herbert* [1980] R.P.C. 193.

[58] *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] 1 W.L.R. 2416, *per* Lord Hoffmann at 2422; *Cantor Fitzgerald v Tradition (U.K.) Ltd* [2000] R.P.C. 95; *Brighton v Jones* [2004] EWHC 1157 (Ch); *Christoffer v Poseidon Film Distributors Ltd* [2000] E.C.D.R. 487, citing *Ravenscroft v Herbert* [1980] R.P.C. 193, and *Harman Pictures NV v Osborne* [1967] 1 W.L.R. 723, although on the facts *Christoffer* appears to have been a case of the copying of a dramatic work by the making of a film and other preparatory acts; *Autospin (Oil Seals) Ltd v Beehive Spinning* [1995] R.P.C. 683 at 697, although citing the example of a novel being turned into a play, a clear case of infringement by making an adaptation. See para. 7–124, below.

[59] See paras 7–52 and 7–124, below.

[60] *Kipling v Genatosan Ltd* [1917–23] Mac.C.C. 203: the four lines forming the "essential part of the crescendo" of Kipling's "If".

[61] *Chappell & Co v D.C. Thompson & Co* [1928–35] Mac.C.C. 467. The decision was clearly influenced by the fact that the words were being used by the defendant as part of a serial story and therefore caused no damage to the claimant's work as part of a popular song.

thereby made of the skill and labour of its author.[13] Other acts expressly brought within the definition of making an adaptation, considered below, provide even clearer examples. The concept of an exclusive right to make an adaptation of a work was first introduced by the 1956 Act, partly to bring under one head a number of separate exclusive rights provided for under the 1911 Act,[14] and partly to make it clear that certain other acts were also within the exclusive rights of the copyright owner.[15] The concept has been continued by the 1988 Act and in subsequent amendments made to it. The Act provides that no inference is to be drawn from the provisions relating to the making of an adaptation as to what does or does not amount to copying of a work,[16] and since there is no reason in principle why the same act cannot fall within two separate classes of restricted act, it is suggested that in some cases the same act may infringe both the reproduction right and the adaptation right.

In general, an adaptation is made when it is recorded, in writing or otherwise.[17] If the restricted act extended no further than the *making* of an adaptation, the right would be of limited value but the Act provides that not only is the making of an adaptation a restricted act but it is also a restricted act to reproduce an adaptation in any material form, issue copies of it to the public, perform it in public or communicate it to the public.[18] For this purpose it is immaterial whether the adaptation itself was recorded in the above sense when any such further act was done.[19] This provision makes it clear, for example, that copyright in a musical work may be infringed by performing an adaptation of it on stage, even though the adaptation itself is never recorded.

In the usual way, it is a restricted act not only to do any of the above acts in relation to the work as a whole but also in relation to any substantial part of it. Further, copyright is infringed not only by anyone who does one of these restricted acts without the licence of the copyright owner, but also by anyone who authorises the doing of such an act without licence.

### Literary and dramatic works

7–122    The expression "adaptation" is defined by reference to particular categories of work. Thus, in relation to a literary or dramatic work, other than a computer program or a database, the 1988 Act defines "adaptation" to mean:

(a) a translation of the work;

(b) a version of a dramatic work in which it is converted into a non-dramatic work or, as the case may be, a version of a non-dramatic work in which it is converted into a dramatic work;

(c) a version of the work in which the story or action is conveyed wholly or mainly by means of pictures in a form suitable for reproduction in a book, or in a newspaper, magazine or similar periodical.[20]

---

[13] But note that there is some authority, referred to below, that a translation of a literary work is not a "copy" of it.

[14] *i.e.* the "translation" and "dramatisation" rights (see ss.1(2)(a), (b) and (c) of the Copyright Act 1911).

[15] *i.e.* the "strip-cartoon" right and the right to make an arrangement or transcription of a musical work (see ss.2(6)(a)(iv) and (b) of the Copyright Act 1956).

[16] CDPA 1988, s.21(5).

[17] CDPA 1988, s.21(1). For this purpose, writing includes any form of notation or code, whether by hand or otherwise and regardless of the method by which, or medium in or on which, it is recorded. CDPA 1988, s.178.

[18] CDPA 1988, s.21(2).

[19] CDPA 1988, s.21(2).

[20] CDPA 1988, s.21(3)(a).

**Translation.**[21] Although "translation" commonly means the turning of a work    **7–123**
from one human language into another, it is suggested that the word is wide
enough to include the conversion of a work into code or Braille.[22] It should be
noted that two separate rights may exist where there has been a translation,
namely the right of the owner of the copyright in the original work to restrain
reproduction, etc. of the original or any translated form, and the right of the
owner of the copyright in the translation to restrain reproduction of his translation.
Anyone wishing to reproduce a particular translation should therefore obtain a
licence from the owner of the copyright in both the original and the translation.[23]
The position will be the same even where the translation was unauthorised since,
although an infringement, it will be entitled to copyright.[24]

**Dramatisation of non-dramatic works.** Infringements of this kind may occur    **7–124**
when a novel is turned into a play or a screenplay for a film.[25] In such cases there
may of course be sufficient copying of language for the defendant's dramatic
work to be a reproduction of the plaintiff's work. However, even where there is
no language copying but, for example, the defendant has to a substantial extent
taken the incidents and plot from the plaintiff's novel and turned them into a
dramatic work, this will amount to an infringement by the making of an
adaptation.[26] The issues which arise here are similar to those which arise in rela-
tion to the reproduction of one dramatic work by another.[27] Thus the question is
whether the situations or plot have been copied from the novel and then
represented in dramatic form.[28] This is not to say that mere ideas or a character
can be protected in this way, certainly if the character or ideas are not novel,[29] but
if the combination of events which has been taken is not merely trivial, but
amounts to a substantial part, there will be an infringement.[30] Examples from the
cases include infringements by dramatising a novel in the form of a play, a

---

[21] Pre- Copyright Act 1911 cases on this point need to be approached with caution since there was
some doubt, prior to the 1911 Act, whether copyright in a work could be infringed by making a
translation of it: *Burnett v Chetwood* (1817) 2 Mer. 441; *cf. Cate v Devon, etc. Newspaper Co*
(1889) 40 Ch. D. But see *Copinger* (4th ed.), pp.187, *et seq.*, arguing strongly for the opposite
view. The 1911 Act made it clear that the exclusive rights to produce, reproduce, perform and
publish a work included the exclusive right to do these acts in relation to any translation of the
work (see s.1(2)(a)). As noted above, the Copyright Act 1956 introduced the concept of the
restricted act of making an adaptation of a work, which was defined to include the making of a
translation (see ss.2(5), (6)(a)(iii)).

[22] If not, then such acts must presumably be regarded as amounting to a reproduction of a work,
since otherwise they would not be restricted acts at all, a curious result. But see *Apple Computer,
Inc v Mackintosh Computers Ltd* (1988) 44 D.L.R. (4th) 74.

[23] *Murray v Bogue* (1853) 1 Drew. 353 at 368.

[24] *Redwood Music Ltd v Chappell & Co Ltd* [1982] R.P.C. 109; *ZYX Music v King* [1995] 3 All
E.R. 1 (at first instance); and see para. 3–263, above.

[25] Again, care must be taken with the earlier cases on this point. Before the passing of the Copyright
Act 1911, it did not constitute an infringement to convert a novel or other non-dramatic work into
a dramatic work, provided there was no substantial language copying (see *Read v Conquest*
(1861) 9 C.B. (N.S.) 755; *Tinsley v Lacey* (1863) 32 L.J. Ch. 535; *Warne & Co v Seabohm* (1888)
39 Ch.D. 73. Under the Copyright Act 1911 it was expressly provided that the exclusive rights to
produce, reproduce, perform and publish a work included the right to convert a non-dramatic
work into a dramatic work, and vice versa (see ss.1(2)(b), (c)). The law was thus changed: see
*Corelli v Gray* (1913) 30 T.L.R. 116. The Copyright Act 1956 introduced the concept of the
restricted act of making an adaptation of a work, which was defined to include similar rights (
ss.2(6)(i), (ii)). However, to turn a novel into a film would have been to reproduce the novel, not
to have made an adaptation of it (see s.48(1)—definitions of "dramatic work" and "reproduction").

[26] *Corelli v Gray* (1913) 30 T.L.R. 116. Again, arguably it will also amount to copying of the work,
where part of the merit of the literary work was its plot, characterisation, etc.

[27] See para. 7–52, above.

[28] *Kelly v Cinema Houses Ltd* [1928–35] Mac.C.C. 362.

[29] *Kelly v Cinema Houses Ltd* [1928–35] Mac.C.C. 362; *Dagnall v British and Dominion Film
Corporation Ltd* [1928–35] Mac.C.C. 391 (a case of infringement of a dramatic work by
reproduction); *Harman Pictures N.V. v Osborne* [1967] 1 W.L.R. 723

[30] *Kelly v Cinema Houses Ltd* [1928–35] Mac.C.C. 362; *Fernald v Jay Lewis Productions Ltd*

448    THE RIGHTS OF A COPYRIGHT OWNER: PRIMARY INFRINGEMENT

sketch,[31] a script for a film or a film itself,[32] or a short story in the form of a ballet.[33] In the case of a historical work, which the claimant has compiled from various sources, it will in the usual way be necessary to examine whether the incidents in common between the two works which the defendant has dramatised have been taken by him from the claimant's work or from those other sources.[34]

7–125    **Conversion of dramatic into non-dramatic work.**[35] As in the case of non-dramatic works, a dramatic work may be infringed simply by its language being reproduced to a substantial extent. Even where there has not been such copying, however, the copyright in a dramatic work may be infringed if it is converted into a non-dramatic form. Thus where the events and conversations in a play were described in detail, scene by scene, constituting more than just a synopsis, this was held to be an adaptation.[36] It made no difference that the descriptions formed part of a larger work and were interspersed with commentaries and other writings. On the other hand, short synopses of operas are unlikely to be infringements of the operatic works if the operas are described shortly and in very bare outline.[37] The position would presumably be different if numerous incidents were reproduced.

7–126    **Strip cartoon.** As has been seen, in relation to a literary or dramatic work, "adaptation" includes a version of the work in which the story or action is conveyed wholly or mainly by means of pictures in a form suitable for reproduction in a book, or in a newspaper, magazine or similar periodical.[38] A pictorial representation of the plot of a book or a play will therefore constitute infringement even though no words are used in the representation.

7–127    **Computer programs.** In the early days of the debate about software protection, there was concern whether infringement could be avoided by arguments about the distinctions between the levels of code involved in the translation from what was written by the human author (source code) to the lowest level of code, on which the computer operated (machine code), or by arguing that there was no infringement if a program was re-written in a different computer language. The Copyright (Computer Software) Amendment Act 1985 addressed these issues by specifically providing that a version of a program in which it was converted into or out of a computer language or code, or into a different computer language or code, was an adaptation of the program.[39] This approach was substantially repeated in the 1988 Act, by means of a special definition of "translation", and thus adaptation, so far as computer programs were concerned.[40] As part of the

---

[1975] F.S.R. 499; *cf. MacGregor v Powell* [1936–45] Mac.C.C. 233; *De Mandnit v Gaumont British Picture Corporation Ltd* [1936–45] Mac.C.C. 292.

[31] *Corelli v Gray* (1913) 30 T.L.R. 116.

[32] *Fernald v Jay Lewis Productions Ltd* [1975] F.S.R. 499 (infringement by taking a single episode from a semi-fictional story, itself consisting of 12 episodes, and dealt with in only four out of 126 pages of the book); *Zeccola v Universal City Studios Inc* (1982) 46 A.L.R. 189.

[33] *Holland v Vivian Van Damm Productions Ltd* [1936–45] Mac.C.C. 69.

[34] *Harman Pictures N.V. v Osborne* [1967] 1 W.L.R. 723.

[35] See the footnotes to para. 7–124, above, dealing with the earlier law.

[36] *Sillitoe v McGraw-Hill Book Co (U.K.) Ltd* [1983] F.S.R. 545.

[37] *Valcarenghi v The Gramophone Co Ltd* [1928–35] Mac.C.C. 301, where it was found that the defendants had not infringed, not having transposed the work into a novel or short story.

[38] This right was expressly included for the first time in the Copyright Act 1956. Before then there was doubt whether such an act amounted to an infringement.

[39] Copyright (Computer Software) Amendment Act 1985, s.1(2).

[40] S.21(4), as enacted, provided that: "In relation to a computer program a 'translation' includes a version of the program in which it is converted into or out of a computer language or code or into a different computer language or code, otherwise than incidentally in the course of running the program".

# EXHIBIT B

A
    majority or not.' That passage, where it refers to the calling of a meeting, accords with the well-settled practice of the court in cases in which, in proceedings brought by a company, a dispute arises as to the authority with which the company's name has been used as plaintiff.' It is common practice in such cases to adjourn any motion brought to strike out the company's name, with a view to a meeting being called to see whether the company desires the action to be brought or not."

B
    Mr. Harman submits, on the other hand, that the principle does not apply to the present case because nobody purported to act for the company and there is nothing to ratify. The Board of Trade claimed the statutory power to sue in the name of the company which, in my judgment, they did not possess as against the defendant bank, and it is submitted the bank is, therefore, entitled to

C
have the action stayed and one cannot treat the Board of Trade as simply dropping out, leaving this an action brought by the board's solicitor on behalf of the company but without authority. However, the action is an action brought in the name of the plaintiff company; the company and not the Board of Trade are the plaintiff, and it is so brought without authority. It seems to me that the

D
case does fall within the principle and, accordingly, there being a winding-up petition pending, I ought to adjourn this matter until after the hearing of that petition. I will hear counsel as to the length of any such adjournment.

E
                    *Order that the application be adjourned until seven days after the determination of a petition for winding up of the company.*

F
    Solicitors: *Simmons & Simmons; Solicitor to the Board of Trade.*

                                   K. N. B.

*1967*

*S.B.A. Properties Ltd. v. Cradock*

*Goff J.*

<br>

[CHANCERY DIVISION]

G
*HARMAN PICTURES, N. V. v. OSBORNE AND OTHERS

1967
Feb. 21, 22, 23, 24, 27, 28;
March 20

Goff J.

*Copyright—Infringement—Literary work—Work based on historical event—Screenplay on same subject—Common sources for material selected—Marked similarity in choice of incidents—Many similarities and some dissimilarities—Whether prima facie*

H
*evidence of infringement justifying interlocutory relief.*
*Injunction—Interlocutory injunction—Copyright—Infringement action to restrain—Maintenance of status quo—Principles on which interlocutory relief granted.*

    The plaintiffs, film producers and distributors, owned the copyright in so far as concerned any reproduction in cinematograph form of a book, The Reason Why, dealing with the incident of the Charge of the Light Brigade and the events connected with it. Discussions with the two defendant companies

1967

Harman
Pictures,
N. V.
v.
Osborne

(also film producers 'and distributors) of the possibility of    A
a purchase of the plaintiffs' rights or of a joint production
of a film based on The Reason Why came to nothing. Later the
plaintiffs learnt that the defendant companies intended to produce
on their own account a film called " The Charge of the Light
Brigade " based on a screenplay written by the first defendant,
a well-known playright and a director of and shareholder in the
two defendant companies. There was a marked similarity in the    B
choice of incidents between the book and in the screenplay,
although besides many similarities there were a number of dis-
similarities. The plaintiffs issued a writ against the defendants
to restrain them from infringing their copyright in The Reason
Why. The defendants contended that the screenplay was based
on independent research from common sources without making
any improper use of the book but the first defendant furnished
no evidence as to how or how long he had worked on the screen-    C
play, there being only a bare denial of infringement of the
plaintiffs' copyright.

On the plaintiffs' motion for interlocutory relief until trial
or further order limited to an injunction restraining the defen-
dants from " exhibiting or releasing " their film for exhibition:—

*Held*, (1) that similarities of incidents and situations afforded    D
prima facie evidence of copying and that on the evidence so far
filed by both sides and the first defendant's lack of explanation
as to the sources consulted, the plaintiffs had established a prima
facie case of infringement of their copyright (post, pp. 736F–H,
737H).

Dicta of Crossman J. in *Poznanski* v. *London Film Production
Ltd.* [1937] MacG.Cop.Cas. 107, 108 and Ungoed-Thomas J. in
*Donmar Productions Ltd.* v. *Bart* (*Note*) (post, p. 740); [1967]    E
2 All E.R. 338 applied.

*Jarrold* v. *Houston* (1857) 3 K. & J. 708; *Pike* v. *Nicholas*
(1869) 5 Ch.App. 251; *Rees* v. *Melville* [1914] MacG.Cop.Cas. 168
and *Macmillan & Co. Ltd.* v. *Cooper* (1923) 40 T.L.R. 186, P.C.
considered.

(2) That although a plaintiff seeking interlocutory relief must
establish a strong prima facie case for the existence of his right,    F
and at least that he was likely to succeed on that issue, and also
a prima facie case of infringement, for the latter purpose
he had only to show that his case was reasonably capable of
succeeding (post, p. 738B); that in exercising its discretion to grant
the relief the court would have regard to the balance of conven-
ience, but the governing principle was the preservation of the
status quo; and that, in the circumstances, the plaintiffs were    G
entitled to the interlocutory injunction sought (post, p. 738F–H).

*Jones* v. *Pacaya Rubber and Produce Co. Ltd.* [1911] 1 K.B.
455, C.A. and *Donmar Productions Ltd.* v. *Bart* (post, p. 740);
[1967] 2 All E.R. 338. Notes applied.

MOTION.

The plaintiffs, Harman Pictures, N. V., registered in Curaçao,    H
Netherlands Antilles, owned the copyright in an original literary
work by Mrs. Cecil Blanche Woodham-Smith entitled The Reason
Why, which was based on a study of the background and events
leading up to the military engagement known as " The Charge
of the Light Brigade." Their copyright extended to the repro-
duction of The Reason Why, or parts of it, in the form of a
cinematograph film or play.

A    In 1963 there were discussions with the defendant companies, Woodfall Film Presentations Ltd. and Woodfall Film Productions Ltd., with a view to their acquisition of the plaintiffs' rights in The Reason Why or to their concurrence with the plaintiffs in a joint production of a film based on that work. The discussions came to nothing, and the defendant companies later arranged that

B    the first defendant, John Osborne, should write the script for a motion picture to be produced by the defendant companies called "The Charge of the Light Brigade."

By their writ, issued on November 28, 1966, the plaintiffs claimed, inter alia, an injunction restraining the defendants from infringing the plaintiffs' copyright in The Reason Why by Cecil

C    Woodham-Smith or from purporting to assign the copyright or any part thereof in a screenplay called "The Charge of the Light Brigade" by John Osborne (which screenplay they alleged infringed the copyright of the work) or from granting or purporting to grant any licence in respect of the screenplay or from dealing with or disposing or purporting to dispose of any interest therein

D    or copies thereof.

By notice of motion dated January 16, 1967, the plaintiffs sought an interlocutory injunction restraining infringement of their copyright, the full terms of which, including the limited form agreed at the hearing, are set out in the judgment.

The facts are more fully stated in the judgment.

E

*Sir Andrew Clark Q.C.* and *Lord Lloyd of Hampstead* for the plaintiffs.

*John Arnold Q.C.* and *Michael Kempster* for the defendants.

The following cases, in addition to those referred to in the

F    judgment, were cited in argument: *University of London Press Ltd.* v. *University Tutorial Press Ltd.*[1]; *Jarrold* v. *Heywood*[2]; *Cambridge University Press* v. *University Tutorial Press*[3]; *Bolton* v. *British International Pictures Ltd.*[4]; *Bagge* v. *Miller*[5]; *Smith* v. *Chatto*[6]; *Preston* v. *Luck*[7]; and *Smith* v. *Grigg Ltd.*[8]

G                                        *Cur. adv. vult.*

GOFF J. The plaintiffs are a body incorporated and registered according to the law of the Netherlands Antilles, and they are the owners of the copyright so far as concerns reproduction in cinematograph film form of the well-known book The Reason Why

H    written by Mrs. Woodham-Smith dealing with the Charge of the Light Brigade and the story which lay behind it. They produce and distribute films in association with Mr. Laurence Harvey.

[1] [1916] 2 Ch. 601; 32 T.L.R. 698.
[2] (1870) 18 W.R. 279.
[3] (1928) 45 R.P.C. 335.
[4] (1936) MacG.Cop.Cas. 20.
[5] (1917-23) MacG.Cop.Cas. 179.
[6] (1874) 31 L.T. 775; 23 W.R. 290.
[7] (1884) 27 Ch.D. 497, C.A.
[8] [1924] 1 K.B. 655; 40 T.L.R. 248, C.A.

1967
Harman
Pictures,
N. V.
v.
Osborne

1967
Harman
Pictures,
N. V.
v.
Osborne

Goff J.

The defendant, John James Osborne, is a well-known playwright    A
and screen writer and is a director of and shareholder in the
two defendant companies both of which are English companies.
They produce and distribute films commonly known as Woodfall
Films.

In 1963, there were discussions between Mr. Laurence Harvey
and the late Mr. James Woolf on behalf of the plaintiffs and a    B
Mr. Robin Fox and Mr. Richardson, a director of both the
defendant companies, on their behalf as to the possibilities of
the defendant companies acquiring the plaintiffs' rights or con-
curring in a joint production. In his affidavit Mr. Harvey says:

> " The said Robin Fox told me that he had read the said
> work with admiration and he further stated that both John    C
> Osborne (the first defendant in this action) and the said
> Richardson had also read the said work, and that John
> Osborne had expressed enthusiasm for the treatment of the
> subject by the authoress and the way she had arranged her
> material and that the said Richardson had expressed a keen
> desire to produce a motion picture based on the said work."

These negotiations came to nothing and the defendant John    D
Osborne has written the script for a motion picture entitled
" The Charge of the Light Brigade " which the defendants are
proposing to produce entirely on their own account. Meanwhile
the plaintiffs had been endeavouring to exploit their rights else-
where but their negotiations were frustrated by Press announce-
ments of the defendants' intended production.    E

In these circumstances the plaintiffs have brought this action
in which they claim:

> " An injunction restraining the defendants and each of
> them by themselves, their servants or agents (a) from in-
> fringing or authorising the infringement of the plaintiff
> company's said copyright, (b) from making or producing any    F
> film of or based on the said screenplay, (c) from assigning or
> purporting to assign the copyright or any part thereof in the
> said or any similar screenplay or any part thereof or from
> granting or purporting to grant any licence in respect of the
> said or any similar screenplay or from dealing with or dis-
> posing or purporting to dispose of any interest in the said or
> any similar screenplay or any copies thereof; "    G

damages, and consequential relief.

They moved the court for interlocutory relief and, as claimed
in the notice of motion, what they were seeking was:

> " An order restraining the defendants and each of them
> whether by themselves or by their servants or agents until    H
> judgment in this action or further order from doing any
> of the following acts, viz.: (a) making or producing any film
> of or based on the screenplay ' The Charge of the Light
> Brigade ' by the first defendant or otherwise infringing or
> authorising the infringement of the plaintiff's copyright in
> the work The Reason Why by Cecil Blanche Woodham-Smith;
> (b) assigning or purporting to assign the copyright or any
> part thereof in the said or any similar screenplay or any part

June 2, 1967    THE WEEKLY LAW REPORTS    [1967] 1 W.L.R.    727

1967

Harman
Pictures.
N. V.
v.
Osborne

Goff J.

A thereof; (c) granting or purporting to grant any licence in respect of the said or any similar screenplay or dealing with or disposing or purporting to dispose of any interest in the said or any similar screenplay or any copies thereof."

In his reply, however, Sir Andrew Clark, for the plaintiffs, limited his claim so far as interlocutory relief is concerned to an injunction restraining the defendants from exhibiting any such

B film or releasing it for exhibition. Mr. Arnold, for the defendants, took a preliminary objection that the plaintiffs could not be entitled to interlocutory relief in any event because of delay. In my judgment, however, this is not sound. It is conceded that there could be no question of delay before the plaintiffs first saw a

C script, which was not until the end of October, 1966. True it is that the motion was not launched until January 16, 1967, but the writ was issued much earlier, namely on November 28, 1966. Having regard to the fact that the plaintiffs are out of the jurisdiction, I cannot see any such delay on their part as would disentitle them to interlocutory relief, particularly as there is no suggestion anywhere in the correspondence that they were intend-

D ing or appeared to be intending to abandon their rights.

Apart from this, the defendants say on the merits first that both the book and the script deal with a common subject which is a famous event in history on which there is, as indeed there is, a wealth of non-copyright literature and information, and that

E they have simply drawn on this and prepared an original work of their own without making any improper use of Mrs. Woodham-Smith's book; secondly, that in any case the appropriate relief would be not an injunction but an account of profits.

At the outset the plaintiffs must, of course, establish a strong prima facie case that the copyright in respect of which they are

F suing exists and that they are the owners of it, but that is conceded.

It is common ground that there can be an original work entitled to protection although the subject matter is not original, but is for example, as in the present case, some well-known event in history. The precise amount of knowledge, labour,

G judgment or literary skill or taste which the author of any book or other compilation must bestow upon its composition in order to acquire copyright in it within the meaning of the Copyright Act, 1911, cannot be defined in precise terms: *per* Lord Atkinson in *Macmillan & Co. Ltd.* v. *Cooper.*[1] There is, however, no dispute that Mrs. Woodham-Smith displayed all these qualities in amply

H sufficient measure and acquired copyright in her book, whilst the plaintiffs' title to the film rights by assignment is also not disputed. What is much more difficult is whether the plaintiffs have made out a sufficient prima facie case of infringement, or rather intended infringement, and before considering the facts, I must refer at some length to the relevant law.

There is no copyright in ideas or schemes or systems or

[1] (1923) 40 T.L.R. 186, 190, P.C.

1967

Harman
Pictures,
N. V.
*v.*
Osborne

GOFF J.

methods: it is confined to their expression—see *McCrum* v. *Eisner* [2]  **A**
where Peterson J. said [3]:

> "'Copyright, however, does not extend to ideas, or
> schemes, or systems, or methods; it is confined to their expres-
> sion; and if their expression is not copied the copyright is not
> infringed.' There is, therefore, no copyright in the idea of a
> recruit, coupled with 'the orders of the day.' The only   **B**
> copyright that can exist is in the expression of such an
> idea, and the question in all such cases must be whether
> the expression of the idea has been imitated."

But there is a distinction between ideas (which are not copy-
right) and situations and incidents which may be: see *per*
Swinfen Eady L.J. in *Rees* v. *Melville* [4]:    **C**

> "In order to constitute an infringement it was not neces-
> sary that the words of the dialogue should be the same,
> the situations and incidents, the mode in which the ideas
> were worked out and presented might constitute a material
> portion of the whole play, and the court must have regard
> to the dramatic value and importance of what if anything
> was taken, even although the portion might in fact be small   **D**
> and the actual language not copied. On the other hand, the
> fundamental idea of two plays might be the same, but if
> worked out separately and on independent lines they might
> be so different as to bear no real resemblance to one
> another."

One must, however, be careful not to jump to the conclusion
that there has been copying merely because of similarity of stock   **E**
incidents, or of incidents which are to be found in historical, semi-
historical and fictional literature about characters in history, see
*Poznanski* v. *London Film Production Ltd.* [5]  In such cases the
plaintiffs, and that includes the plaintiffs in the present case, are
in an obvious difficulty because of the existence of common
sources, as was emphasised in the case of *Pike* v. *Nicholas.* [6]  The   **F**
headnote in that case reads:

> "The plaintiff published a book, and the defendant after-
> wards published a book on the same subject, in which he
> mentioned the plaintiff's book as one of the authorities con-
> sulted by him. The plaintiff alleged that the defendant's
> book was a piracy, and in proof showed (amongst other things)   **G**
> that the plaintiff had referred to a large number of authorities
> to which the defendant had referred. The defendant stated
> that he had taken the references from a previous writer from
> whom the plaintiff had taken them, and showed that he, the
> defendant, had referred to two authorities not mentioned by
> the plaintiff; but as to two of the authorities referred to by the
> plaintiff, and also by the defendant, the defendant was unable   **H**
> to state where he had found them:—*Held*, that, under the
> circumstances, the defendant had not made such use of the
> plaintiff's book as to entitle the plaintiff to an injunction. An
> author who has been led by a former author to refer to older
> writers, may, without committing piracy, use the same

[2] (1917) 87 L.J.Ch. 99.        [5] (1936) MacG.Cop.Cas. 107.
[3] Ibid. 102.                   [6] (1869) 5 Ch.App. 251.
[4] (1914) MacG.Cop.Cas. 168,
174.

A    ʼpassages in the older writers which were used by the former
author."

Lord Hatherley L.C., said [7]:

B
"A case of alleged piracy like this was obviously very
difficult to determine when the authors took a common subject
and depended upon authors open to both of them, and when
portions of the one work, which were said to resemble por-
tions of the other work, might be taken from those common
authors to which each was at liberty to resort."

Later he said [8]:

"On the other hand, the defendant had quoted an author
taken from Prichard, Calpurnius Flaccus, who was not quoted
by the plaintiff, and had added to his quotation a passage
from Tertullian which was not inapt to the subject. These
C    circumstances showed clearly that the defendant went to the
original source, namely, Prichard, and that he got those quota-
tions from Prichard which the plaintiff got from Prichard.
Although the defendant might have been led to look more
minutely into Prichard than he otherwise would have done by
D    referring to the plaintiff's work, still the plaintiff could not
say, ʻ I, having found these passages in Prichard, will prohibit
all the world, who may find the same passages, from making
use of them.' The moment he had given that degree of light
to the defendant which led him to refer to that common
source, if the defendant did really and bona fide look at that
common source, he did all that this court required him to do.
He must not simply copy the passage from the plaintiff's book,
E    but having been put on to the track, and having looked at that
particular part of the book which the plaintiff led him to, he
was entitled to make use of every passage from that author
which the plaintiff had made use of."

Giffard L.J. said [9]:

"The plaintiff undertook a more formidable task than was
F    ever undertaken before in any copyright case; for there was
the fact, that the two parties started with exactly the same
theme to treat of. That was beyond all question. These
books were written with reference to a prize that was pro-
posed to be given by a society in Wales. They started with a
desire to arrive at, as nearly as possible, the same conclusion,
and with a desire, no doubt, to glorify the Ancient Britons as
G    much as could well be done. Moreover, what may be termed
the platform divisions, by means of which they worked out
their books, were very nearly the same, and were for the most
part taken from Dr. Prichard's book, and thus they were at
once found starting entirely in the same groove. Besides, their
books consisted mainly of results gathered from other author-
ities, and could not, in the true sense of the word, be treated
as original, except to a very slight extent. As to this, the Vice-
H    Chancellor [James] laid down most accurately in his judg-
ment—ʻ that there is no monopoly in the main theory of the
plaintiff, or in the theories and speculations by which he has
supported it, nor even in the use of the published results of
his own observations.' It would, therefore, at once appear,
that the task undertaken by the plaintiff was an almost impos-
sible one, unless he could show that there were substantial

1967
Harman
Pictures.
N. V.
v.
Osborne
GOFF J.

[7] (1869) 5 Ch.App. 251, 259.    [9] Ibid. 267.
[8] Ibid. 262.

1967

Harman
Pictures,
N. V.
v.
Osborne

GOFF J.

passages either actually copied, or copied with mere colour-    A
able alteration. It would not do to show merely one or two
passages, but some material part of the book must be shown
to have been taken."

That case was, however, in some respects special, because both
authors set out to achieve the same object. Moreover the defend-
ant had been examined and cross-examined at considerable length,    B
a very important feature absent in the present case at this stage.
Further it is to be observed that Lord Hatherley L.C. said [10] that
they did not intend to lay down any general principles which were
contrary to those laid down by James V.-C.,[11] and the only prin-
ciple which he laid down [12] was that the question is between a
legitimate and a piratical use of an author's work. James V.-C.[13]    C
said that it was

"certainly very singular that an author should not be able
to give a single place or time when or where he consulted a
high authority, and that he should not be able to produce a
single original note, extract, or quotation."

The principle stated [14] is entirely in accordance with *Jarrold* v.    D
*Houlston*,[15] where the relevant part of the headnote reads:

"But another person may originate another work in the
same general form, provided he does so from his own re-
sources and makes the work he so originates a work of his
own by his own labour and industry bestowed upon it. In
determining whether an injunction should be ordered, the    E
question, where the matter of the plaintiff's work is not
original, is how far an unfair or undue use has been made
of the work. If, instead of searching into the com-
mon sources and obtaining·your subject matter from thence,
you avail yourself of the labour of your predecessor,
adopt his arrangement and questions, or adopt them with a
colourable variation, it is an illegitimate use. Falsely to deny
that you have copied or taken any idea or language from    F
another work, strong indication of animus furandi."

The point in the last sentence played a large part in the actual
decision in that case, and of course I have not got that on this
motion, although the plaintiffs may seek to show it by cross-
examination at the trial. However, that does not affect the general
principles stated in the other passages which I have just read from    G
the headnote. I must now quote from the judgment of Page Wood
V.-C.[16] where the principles embodied in the headnote are laid
down:

"The really difficult question in cases of this description,
where it must be admitted that the matter is not original, is
how far the author of the work in question can be said to have    H
made an unfair or undue use of previous works protected by
copyright? As regards all common sources, he is entitled to
make what use of them he pleases; but, as Lord Langdale said
in *Lewis* v. *Fullarton*,[17] he is not entitled to make any use of

[10] 5 Ch.App. 251, 257.
[11] Ibid. 255.
[12] Ibid. 260 (footnote).
[13] Ibid. 259 (footnote).
[14] Ibid. 260 (footnote).
[15] (1857) 3 K. & J. 708.
[16] Ibid. 714.
[17] (1839) 2 Beav. 6.

JUNE 2, 1967    THE WEEKLY LAW REPORTS    [1967] 1 W.L.R.    731

A    a work protected by copyright which is not what can be called a fair use. As regards the question of fair use of the plaintiffs' work, the defendant to a great degree prevents inquiry. He says broadly in his affidavit, ' I deny that I copied or took any idea or language from the work of Dr. Brewer.' Upon a broad statement of that description, the question of fair use is almost excluded. He does not say, he has not read the work of Dr. Brewer. He says he has not read the second edition, or seen

B    the eleventh edition; and that he never read the preface—a denial which, of itself, raises an inference that he had read the body of the work: and he denies that he has taken any idea or language from it. The only uses consistent with that statement on the part of the defendant would appear to be these : in publishing a work in the form of question and answer on a variety of scientific subjects, he had a right to look to all those

C    books which were unprotected by copyright, and to make such use of them as he thought fit, by turning them into questions and answers. He had also a further right, if he found a work like Dr. Brewer's and, perusing it, was struck by seeing—as I think has been the case in the present instance—that the author had been led up to particular questions and answers by the perusal of some other work, to have recourse himself to

D    the same work, although possibly he would not have thought of doing so but for the perusal of the plaintiffs' book. Both these, I apprehend, would be perfectly fair and legitimate modes of using the plaintiffs' book; and neither would be inconsistent with Mr. Philp's affidavit, that he has not copied or taken any idea or language from Dr. Brewer's book. There is another sort of legitimate use which might fairly be made

E    by Mr. Philp, although it is scarcely so consistent with what he has deposed to in his affidavit. It would be a legitimate use of a work of this description if the author of a subsequent work, after getting his own work with great pains and labour into a shape approximating to what he considered a perfect shape, should look through the earlier work to see whether it contained any heads which he had forgotten. . . . The question I

F    really have to try is, whether the use that in this case has been made of the plaintiff's book, has gone beyond a fair use. Now, for trying that question, several tests have been laid down. One which was originally expressed, I think by a common law judge, and was adopted by Lord Langdale in *Lewis* v. *Fullarton*,[17] is, whether you find on the part of the defendant an animus furandi—an intention to take for the purpose of saving himself labour. I take the illegitimate use, as opposed

G    to the legitimate use of another man's work on subject matters of this description to be this: if, knowing that a person whose work is protected by copyright has, with considerable labour, compiled from various sources a work in itself not original, but which he has digested and arranged, you, being minded to compile a work of a like description, instead of taking the

H    pains of searching into all the common sources, and obtaining your subject matter from them, avail yourself of the labour of your predecessor, adopt his arrangements, adopt moreover the very questions he has asked, or adopt them with but a slight degree of colourable variation, and thus save yourself pains and labour by availing yourself of the pains and labour which he has employed, that I take to be an illegitimate use."

1967

Harman
Pictures,
N. V.
v.
Osborne

GOFF J.

[17] (1839) 2 Beav. 6.

1967
Harman
Pictures,
N. V.
v.
Osborne
———
GOFF J.

A

I should also refer, I think, to *MacMillan & Co. Ltd.* v. *Cooper*[18] in the Privy Council, where Lord Atkinson, in delivering the judgment of the board, quoted with approval—and as having been approved by the Court of Appeal in *Moffat and Paige Ltd.* v. *Gill*[19]—the following passage from the judgment of Sir Arthur Wilson in an earlier Indian case:

B

" ' In the case of works not original in the proper sense of the term, but composed of, or compiled or prepared from materials which are open to all, the fact that one man has produced such a work does not take away from anyone else the right to produce another work of the same kind, and in doing so to use all the materials open to him. But, as the law is concisely stated by Hall V.-C., in *Hogg* v. *Scott*,[20] " the true principle in all these cases is, that the defendant is not at liberty to use or avail himself of the labour which the plaintiff has been at for the purpose of producing his work, that is, in fact, merely to take away the result of another man's labour, or, in other words, his property." ' "

C

Lord Atkinson continued[21]:

D

" Sir Arthur Wilson then points out that this principle applies to maps, guide-books, street directories, dictionaries, to compilations of scientific work and other subjects, and considers that it applies to a selection of poems. He then gives the reason why it applies to Mr. Palgrave's Golden Treasury in the following words: ' Such a selection as Mr. Palgrave has made obviously requires extensive reading, careful study and comparison, and the exercise of taste and judgment in selection. It is open to anyone who pleases to go through a like course of reading, and by the exercise of his own taste and judgment to make a selection for himself. But if he spares himself this trouble and adopts Mr. Palgrave's selection, he offends against the principle.' He then proceeds to quote the following passage from Lord Eldon's judgment in *Longman* v. *Winchester*,[22] approved of by Lord Hatherley in *Spiers* v. *Brown*[23]; ' So in the instance mentioned by Sir Samuel Romilly, a work consisting of a selection from various authors, two men might perhaps make the same selection; but that must be by resorting to the original authors, not by taking advantage of the selection already made by another.' "

E

F

Then in *Moffat and Paige Ltd.* v. *Gill*,[24] already referred to, Sir Richard Henn Collins M.R. said:

G

" The sources from which these works were drawn were common. It was open to anybody to compile an edition of ' As You Like It,' and open to him to go to all the sources of criticism and to make selections from them. It was open to him to cull quotations from other books and to put them together as the author of the plaintiffs' book has done. . . ."

H

Later the Master of the Rolls said[25]:

" . . . but are you at liberty to apply the same principle to a series of quotations—to take the reference given by one author

18  40  T.L.R. 186, 189.
19  (1902) 86  L.T. 465; 18  T.L.R. 547, C.A.
20  (1874) L.R. 18 Eq. 444, 458.
21  40 T.L.R. 186, 189.
22  (1809) 16 Ves. 269, 271.
23  (1858) 6 W.R. 352, 353.
24  86  L.T. 465, 470.
25  Ibid. 471.

A  although he quotes such-and-such a passage as illustrating this particular matter—to say, 'I will just go and see if that is correctly copied or not, and if it is correctly copied I propose to introduce it with any other quotation which illustrates the particular passage, and I propose to adopt that as my own work?' That leaves out the whole merit: the felicity of the quotation; its adaptability to a particular end; its illustration of a particular characteristic. All those things enter into the

B  choice of one quotation as apart from another. That is a process which may involve gifts both of knowledge and intelligence. The aptness of quotation does not depend on the particular page or number of lines in which it is found; and that is all you find if you obey a certain direction to go to a certain place and take it. It does not entitle you to annex the skill and judgment and taste which has dictated the selec-

C  tion. It does appear to have been the defendant Mr. Marshall's view of his rights, as his counsel has put it forward for him, that if he once knew where to find the quotation then he had a right to annex it; and that if he once knew where to look and find the quotation, and if it corresponded with what the author had written, he has a right to take it. I cannot accede to that for a moment; and it seems to me that the law

D  is clearly such as to entitle the plaintiff to complain if quotations selected and arranged by him are imitated and adopted by the defendant Mr. Marshall."

I have to apply these principles to the facts of this case, always bearing in mind that this is a motion for interlocutory relief and the facts have as yet by no means been fully investigated.

E  Mr. Richardson in his affidavit says that during the winter of 1961–62 he and the defendant John Osborne discussed the possibility of making what he describes as another historical film, which in its context postulates somewhat inaccurately that "Tom Jones" was an historical film, but that is not of much moment. What is important is that he says that he provided John Osborne

F  with Kinglake's Invasion of the Crimea, Hibbert's Destruction of Lord Raglan and The Reason Why, and that some months later Osborne confirmed his interest and singled out Captain Nolan as a fascinating character, and he goes on: "On behalf of the defendant companies I commissioned him to write a screenplay on 'the charge'" which appears therefore to have been at the end of 1962

G  or early 1963. Mr. Richardson then says: "Also on behalf of the defendant companies I commissioned, inter alia, John and Andrew Mollo to carry out a programme of research," and they "supplied information to Osborne and myself based on their researches." John Mollo has made an affidavit himself confirming this and giving somewhat extensive information about their work, but he

H  says they were instructed by Mr. Richardson in or about January, 1964, and he does not say when they reported to him or to John Osborne.

Mr. Arnold has pointed out that there is evidence of independent research in the work of the Mollos', and internal evidence in the script that John Osborne made use of it, e.g., in the quotation from Xenophon in scene 6. On the other hand it appears from the

1967

Harman
Pictures,
N. V.
v.
Osborne

GOFF J.

1967

Hutman
Pictures.
N.V.
v.
Osborne

Gopp 3.

passages in the evidence to which I have just referred that John    A
Osborne may have been engaged on the work for something like a
year before the Mollo brothers were even instructed, and one does
not know how far the screenplay had taken shape or what use he
had made of The Reason Why before the Mollos came on the
scene. In this connection it is interesting to observe that whilst
the book, the script and Kinglake all refer to two flags flying at    B
Canroberts Hill as the signal that the enemy was approaching, the
Mollos' note does not.

Further, Mr. Arnold has drawn my attention forcefully to the
following significant considerations. Captain Nolan is the prin-
cipal character in the film but not in the book, although of course
he figures largely in it, and moreover, a considerable number of    C
matters attributed to Captain Nolan in the film are in fact in the
book, having been transposed in the film from other officers to
whom they really related. Further, Mrs. Woodham-Smith, even if
she knew it, did not bring out that he was an Indian officer,
whereas the film emphasises that fact in a fictitious posting scene
in which on that very score Lord Cardigan registers instant    D
hostility towards Captain Nolan. Indeed this is, I think, one of
the strongest points in the defendants' argument, as the book says
that Cardigan was anxious to have Nolan on his staff, which is a
very different treatment. Again there are a number of passages in
which the script is identical with the common sources whilst the
book is not, or where the script is nearer to the original, notably    E
for example, at the death of Captain Nolan, where in the book his
horse carries his body back through the wrong regiment, whilst
the script has it correctly. Then the book gives the title of one of
Captain Nolan's books as Nolan's System for Training Cavalry
Horses, whereas it is really, as stated in the script, The Training of
Cavalry Remount Horses.    F

Mr. Arnold also relied on the fact that in scene 108 the name of
the transport ship is given as the *Shooting Star*, which is the name
given in Mrs. Duberly's Diary at page 54, whereas the book has
*Southern Star*: see p. 214, but this may not have been the same
ship, for at page 156 of the book the transport is named *Shooting
Star*. Perhaps more significantly, there is at least one example    G
where it is clear that the book comes from one source and the
script from another. I refer to the retreat of the Turks where the
book reports them as saying " Ship, ship, ship," which comes from
Kinglake, and in the script it is " Ship, Johnny," which comes from
Mrs. Duberly's Diary. Again it is said that the defendants have
used the Cavalry Journal extensively although it is not one of the    H
works specified in Mrs. Woodham-Smith's bibliography. Mr.
Arnold has also relied in many instances on small points of detail
being common to the sources and the script, e.g., again, at Can-
roberts Hill, Kinglake refers to the two flags as the " arranged
signal " whereas the book says " the signal." Then, for the open-
ing of the Battle of Balaclava, the book says that the guns in the

A    redoubt fired, whereas Kinglake says the fort opened fire from one
of its 12-pounder guns and the scenic direction in scene 237 is
"Fire from one of the 12-pounder guns from the Number One
Redoubt." Again the book says at page 246 that at the guns
Captain Morris engaged the Russian officer in command, whereas
the script in scene 364 reads "Morris drives his horse full at a tall
B    Russian who seems to be a squadron leader," which is what is
stated in Kinglake at page 253.

But I have read the whole of the script very carefully and com-
pared it with the book, and I find many similarities of detail there
also. Thus, the descriptive direction in scene 106 gives: "hogging
the stage in the foreground the officers with their mothers, wives,
C    and even young brides," whilst the book has at page 142: "Officers
took their wives with them, some took their mothers, there were
several young brides." In scene 118 "Nolan encourages the
soldiers and sailors who are struggling with the terrified creatures."
The book tells us at page 144 that "our men worked well and
were ably seconded by some of the sailors." Then there is scene
D    136 in which Lord Lucan says: "Above my head sir," and the
book states that Cardigan went over Lucan's head, and the unusual
expression in scene 214 that the cavalry had been "so low in the
brushwood," which is the precise expression in the book at page
200. Again it is prima facie not without significance that apart
from the burial of Captain Nolan the play ends with the very quo-
E    tation which Mrs. Woodham-Smith used to end her description of
the battle.

Mr. Arnold has made a very exhaustive examination of one
section of the script showing that there are many incidents recorded
in the book which find no counterpart in the script, some of which
are of considerable dramatic promise and which one would expect
F    to find reproduced if copying were afoot, e.g., the Russian cavalry
jeering at the inactivity of the British cavalry, and in particular the
fatal fourth order being first entrusted to another officer and
Captain Nolan claiming the right to bear it. As Sir Andrew Clark
points out, some of these might well be accounted for as being
similar to other events already in the script, and in any event
G    abridgment was necessary, but that may not be a complete
answer.

Mr. Arnold has also analysed the quotations which are com-
mon to both works and the number of incidents and situations
which occur in the script only, and statistically these analyses
favour him, but on comparing the book and the script I was, and
H    remain, impressed by the marked similarity of the choice of inci-
dents, and the relative importance of those which are common and
those in the script only and by the juxtaposition of ideas, for
example the incident of the issue of unwanted stable jackets is fol-
lowed in the script by this line in the narrative. General Airey
says to Cardigan and Lockwood, "A triumph my Lord," whilst in
the book the same incident is followed by "the review was a

1967

Harman
Pictures,
N. V.
v.
Osborne

Gore J.

1967

Harman
Pictures,
N. V.
v.
Osborne

GOFF J.

triumph for the lieutenant-colonel." Captain Richard Reynolds,    A
represented in the play by Captain Williams, was cashiered in 1840
for inciting Lord Cardigan to a duel, and the incidents of Lord
Cardigan arranging to have his officers spied upon and the issue of
the unwanted stable jackets both occurred in 1833. In the script,
though not in the book, they appear after the cashiering, but it is
interesting to observe that they both still appear together and in the    B
same order as in the book. Again, in the scene describing the
assault on the farmer I find in both book and script the use of the
expressions " snooks " and " guffaw " in close proximity. More-
over, as Sir Andrew Clark has pointed out, there are a number of
descriptive phrases in the book which find their way either from
the book or otherwise into the script, e.g., " Divine Right Tory "    C
and " beautiful Golden Head," and the fact that Nolan was a
Captain without purchase and the reference to Hugert de Burgh as a
squire.

The question remains, did John Osborne work independently
and produce a script which from the nature of things has much in
common with the book, or did he proceed the other way round and    D
use the book as a basis, taking his selection of incidents and quota-
tions therefrom, albeit omitting a number and making some altera-
tions and additons by reference to the common sources and by
some reference to other sources? It is, of course, impossible to
arrive at a final conclusion on that question until the trial when
one will have had the advantage of discovery, and when the wit-    E
nesses, particularly Osborne, can be cross-examined and one can
evaluate the significance of the failure of either side to call any
witness whom one would have expected to see. It may well be that
the defendants will justify themselves completely. On the other
hand they may not. All I have to determine at this stage is
whether the plaintiffs have made out a prima facie case, taking    F
into account, of course, all the evidence so far filed by both sides
and Mr. Arnold's able argument for the defendants, and if so,
whether in all the circumstances relevant for my consideration I
ought to grant any, and if so, what relief pending the trial.

For this purpose, and at this stage, in my judgment the lack of    G
explanation by John Osborne how or when he worked and how
long it took him, is of fundamental importance. All I have is a
bare assertion that he did not base the script upon the book. That
being sworn to must, of course, be regarded seriously, but I find
it impossible to think that he can have produced this large script
ready for " shooting " (at any rate as he claims independently)    H
without some kind of sketch plan and probably extensive notes or
trial drafts of the whole or parts of it. All these will emerge on
discovery, and may well serve either to corroborate or discredit his
evidence. It is also, I think, remarkable that instead of John
Osborne (who knows) saying even in outline what sources he con-
sulted and how he arrived at his selection, or even taking one or

A  two examples of common situations and giving his own explanation, he has left it to his solicitor, who does not know what happened, to compile a list of sources, and he then says they have truly identified many but not all of the sources of which he availed himself in each particular. That list includes The Reason Why, and he does not say that that is wrong and it should not have been

B  included, nor alternatively does he give any explanation of the manner and extent of his use of that work. Here I would return to the judgment of Crossman J. in Poznanski v. *London Film Production Ltd.*,[26] where he said:

C  "Similarities in incidents and situations, although affording prima facie evidence that the incidents and situations in a film have been copied from the incidents and situations in a stage play, may not be sufficient to override denial of copying, coupled with an explanation of the similarities by reference to other sources. . . . What I have to consider first is whether there are such similarities between the incidents and situations in the plaintiffs' play and those in the defendants' film as to make the defendants' film a reproduction of a substantial part

D  of the plaintiffs' play."

In the end Crossman J. reached a very clear conclusion in favour of the defendants before him and he said[27]:

"The plaintiffs say that there is copyright in the selection from the historical, semi-historical and fictional literature dealing with the subject matter of the play and the film of certain incidents, certain chronology and certain characterisa-

E  tion, and in the treatment of such selected material, and that M. Savoir made a selection for the purpose of the play, treated and selected the material in a certain way, and consequently had copyright in the selected material as so treated. They say that the authors of the film consciously or unconsciously followed M. Savoir's selection and treatment, and in so follow-

F  ing it infringed his copyright. I think, however, that in so far as the selection of incidents, chronology and characterisation for the film and the treatment of the selected material resemble the selection and treatment for the play, such resemblance may well be due to the fact that the incidents, chronology and characterisation selected for the film, and the treatment of such selected material for the film, are the most suitable for the

G  film. I do not find myself driven to the conclusion that the selection or treatment was a copying of M. Savoir's selection and treatment. I find that if and so far as there are similarities between the play and the film, the similarities are mainly in ideas, which are not the subject matter of copyright, and that the treatment and development of these ideas in the film are quite different from the treatment and development in the play. The longer I consider the play and the film, the greater

H  the differences appear to me to be."

That, however, was at the trial, but Crossman J.[28] said categorically—and this seems very important to me for present purposes—that similarities in incidents and situations do afford prima facie evidence of copying.

26 [1937]  MacG.Cop.Cas.  107,  27 Ibid. 111.
108.                         28 Ibid. 108.

1967
Harman
Pictures,
N. V.
v.
Osborne

Goff J.

[1967] 1 W.L.R.    THE WEEKLY LAW REPORTS    JUNE 2, 1967

1967

Harman
Pictures,
N. V.
v.
Osborne

GOFF J.

On the question as to the principles on which the court acts in    A
granting or withholding interlocutory relief, I have been referred to
a transcript of the judgment of Ungoed-Thomas J. in *Donmar
Productions Ltd.* v. *Bart*,[29] where he considered that matter
at length. This shows that the plaintiff must first establish a
strong prima facie case for the existence of the right on which he
sues. He must at least show that he is likely to succeed. If he    B
does that, however, or if his right is not disputed, then although he
must go on to show a prima facie case of its infringement, yet for
that purpose he does not have to show that he is likely to be suc-
cessful, or more likely to be so than the defendant, but only that he
has a case *reasonably* capable of succeeding. Even then the
remedy is still discretionary and, in exercising its discretion, the    C
court will have regard to the balance of convenience, but the gov-
erning principle is the preservation of the status quo. Mr. Arnold
has stressed that in *Jones* v. *Pacaya Rubber and Produce Co.
Ltd.*,[30] cited by Ungoed-Thomas J., it was necessary to grant an
injunction to preserve the property since otherwise relief at the
trial would have become impossible. I think, however, that is    D
really true of the present case, since distribution of a film so like
The Reason Why, as is the defendants' script, would render it
quite impossible for the plaintiffs to exploit their copyright. Be
that as it may, and whilst I recognise that the plaintiffs' rights are
vulnerable and would probable be lost by any independent pro-
duction of a film play on the Charge of the Light Brigade, whether    E
made by the defendants or some third party, still, in my judgment,
the plaintiffs are entitled to have their property protected against
injury by the defendants or anyone else using Mrs. Woodham-
Smith's work to assist them to bring out a film ahead of the plain-
tiffs.

Accordingly, unless there be grounds based on the balance of    F
convenience or the circumstances generally why the court in the
exercise of its discretion should withhold relief, the plaintiffs are,
in my judgment, entitled on proper terms to such an injunction as
will protect their property pending the trial of the action, when the
difficult question whether the defendants' script is legitimate can be
properly decided.    G

In these circumstances, in the present case I am satisfied that I
ought to grant relief in the limited form in which it is now asked,
which will preserve the status quo by enabling the defendants to
proceed with the making of their film, so that if they prove right
they will not have suffered any or any appreciable loss before the
time comes when they are ready to exhibit or distribute. Of    H
course they will have wasted their money if they prove wrong, but
they would be in that position if I did not injunct them because
they could only go on at their peril. The plaintiffs, on the other
hand, will have their property preserved pending the trial. It is
true that if I were to refuse any injunction at this stage, and the

[29] Post, p. 740.                    [30] [1911] 1 K.B. 455, C.A.

A  plaintiffs ultimately succeeded, they would be entitled to an account of the profits, and I could now put the defendants on terms to keep separate accounts and even to keep all proceeds separately from their other moneys, but as Sir Andrew rightly pointed out, the defendants might not make any, or might not make such as the plaintiffs would hope to secure from their own production. True,
B  on the other hand, that if ultimately the plaintiffs make the film, they may be less successful than the defendants would be, but in my judgment if the plaintiffs are right they are entitled to control the situation and have the play made and cast as they want it.

I must, however, impose terms for the protection of the defendants, and that is indeed conceded by Sir Andrew. As the plain-
C  tiffs are not within the jurisdiction, I must require them to give security towards implementing any liability they may incur under their cross-undertaking in damages. It is impossible to quantify that at this stage, but they have offered £10,000, which is the figure I had independently conceived in my own mind. The injunction will therefore be conditional on the plaintiffs giving
D  security in that amount to the satisfaction of the master within 21 days or such further time, if any, as the parties may agree or the master direct. Further, the defendants will have liberty to apply to discharge the injunction at any time. Thus if, as the matter proceeds, it looks as if the defendants will be ready to distribute before the trial, they can come back and ask to have the injunction
E  discharged, or for more security, by which time the court will be better able to estimate the amount of the loss which the defendants will suffer if they be further restrained. The defendants will also be able to come back if there be any other material change in the circumstances. As at present advised, I think that any such application should be on the usual two days' notice despite the fact that
F  the plaintiffs are out of the jurisdiction, though there would probably have to be some adjournment, but I will hear counsel on this if they wish.

I also think that I ought to reserve the costs to the trial judge, and I can do that unless counsel make representations to the contrary. I shall give any directions that may be asked for as to
G  liberty to apply for a speedy trial.

Counsel for the parties addressed the court on the form of the order, and the court directed that counsel should agree and sign a minute of the order. The terms were as follows:

H  " that the defendants . . . be restrained until judgment in this action or further order, (a) from exhibiting releasing or distributing any film of or based on the screenplay " The Charge of the Light Brigade." . . . (b) from assigning . . . the copyright or any part thereof in the said . . . screenplay or from granting . . . any licence in respect of the said or any similar screenplay . . . or from dealing with or disposing . . . of any interest in the said or any similar screenplay, . . .
    " The order to be conditional on security in the amount of

1967

Harman
Pictures,
N.V.
v.
Osborne

GOFF J

1967
———
Harman
Pictures,
N. V.
v.
Osborne
———
GOFF J.

£10,000 being provided by the plaintiffs within 21 days hereof.    A

" Liberty to the defendants to apply at two days' notice for
further security in the event of any change of circumstances.
" Liberty to apply to fix an early date for trial of the
action.
" Costs of motion to be costs in the cause."

Solicitors: *Goodman, Derrick & Co.; Wright & Webb.*    B

K. N. B.

---

[CHANCERY DIVISION]    C

1964
*June* 3, 4, 5
———
UNGOED-
THOMAS J.

*\* DONMAR PRODUCTIONS LTD. v. BART AND OTHERS

[1964 D. No. 936]

[NOTE]    D

*Copyright — Licence — Literary and musical work — Licensees' rights
to produce with living actors — Agreement for option rights in
event of any " bona fide offer for word motion-picture, radio
and commercial television rights "—An offer made—Licensees'
alleged better offer not accepted—Action to restrain disposal of
copyright—Application for interlocutory relief.*    E

*Injunction—Interlocutory—Copyright—Disposal of—Action to restrain
—Maintenance of status quo—Principles on which interlocutory
relief granted.*

MOTION.

By an agreement of May 5, 1959, between the plaintiffs, Donmar
Productions Ltd. (Donmar), producers of the musical play " Oliver,"    F
and the first defendant, Lionel Bart, author of the play, Donmar
were to have the sole licence to perform " Oliver " with living actors
in Great Britain and certain places elsewhere, with an option to
acquire the rights to produce " Oliver " in the United States of
America and Canada provided it was first produced in London.
(That was done and the option was exercised.) Further, Donmar
were to be notified immediately of any bona fide offer received    G
by Lionel Bart for the " world motion-picture, radio and commercial
television rights " and, in default of Donmar themselves making
an offer on the same or better terms, Lionel Bart was to be free
to accept or refuse the original offer.

On May 5, 1964, Brookfield Productions Ltd., the third defendants
(who had notice of the agreement of May 5, 1959), made an offer
to Montpelier Arts and Enterprises Ltd., the second defendants (who    H
were conducting some of Lionel Bart's business affairs), in return
for the assignment to Brookfield of the rights in " the entire book,
music and lyrics " of " Oliver." The offer included an intention,
but not an undertaking, to make a motion-picture of " Oliver."

On May 13, 1964, Donmar made (through Romulus Films Ltd.)
what they claimed was a better offer. On May 20, Donmar were
informed that their offer was not considered a better offer and that
it would not be accepted. On May 21, Donmar issued a writ.
By this motion they sought an interlocutory injunction restraining,

# EXHIBIT C

*193 Ravenscroft v Herbert and New English Library Limited

In the High Court of Justice—Chancery Division

25 July 1979

[1980] R.P.C. 193

Before: Mr. Justice Brightman

25th, 26th, 31st January, 1st, 2nd, 5th–9th, 26th–29th February, 22nd March, 23rd–25th July 1979

Copyright — Infringement of a literary work — Language copying — Incident copying — Whether copying is of a substantial part — What amounts to flagrancy of infringement — What amounts to benefit from infringement — Conversion — Whether an author and his publisher are joint tortfeasors — Quantification of damages when infringing material is interspersed with non-infringing material.

Copyright Act 1956 sections 1, 2, 17, 18, 49.

The plaintiff's claim was in respect of infringement of copyright in a literary work. The plaintiff's work was a book of non-fiction. It detailed the history of a spear — the spear which forms part of the Hapsburg treasure in the Hofburg Museum, Vienna. The plaintiff had traced this spear back through time and had identified it as the spear which pierced the side of Christ at the crucifixion. Further he had identified it as the spear used by many legendary historical personages. Further he had identified it as the source of inspiration for Hitler's Germany. The plaintiff had researched the history of the spear by orthodox methods and by using mystical meditation. The first defendant was an author of works of fiction. He had read the plaintiff's book and had been fascinated by it. He thought it would make a good basis for a novel. He wrote a work of fiction about the post-war fate of the spear. The book was about a neo-Hitler group, secret agents, terrorists and the like. The book was divided into sections. At the beginning of each was a prologue. The prologues recounted the story of the Hofburg spear from the Crucifixion to the end of the 1939 war. The first defendant admitted using the plaintiff's work as a source but denied copying such a substantial part as to amount to infringement of copyright. He said that he had used only the historical facts contained in the plaintiff's work, and that his purpose in so doing was to give an air of credence to his novel. The second defendants were the publishers of the first defendant's novel. They had a contract with the first defendant which obliged them to publish. The second defendants pleaded that even if the work was an infringement of copyright, they were not liable for damages for conversion since they had reasonable grounds for believing it was not an infringement. The plaintiff claimed that in any event the first defendant was jointly liable with the second defendants for the latter's conversion since, because of the publishing contract, he was a joint tortfeasor. In the plaintiff's claim for damages there was a claim under section 17(3) of the Copyright Act. He claimed that the defendants' activities amounted to a flagrant breach of his rights. There had been an order for a speedy trial and that the affidavits filed in interlocutory proceedings should stand as pleadings.

*194

Held, giving judgment for the plaintiff,

(i) the defendants had infringed the copyright of the plaintiff. In writing the prologues for his work, the first defendant had copied the plaintiff's work to a substantial extent; there was much language copying; there were the same characters, incidents, and interpretation of the significance of events in both the plaintiff's and the first defendant's works.

(ii) the defence of the second defendants to the claim for conversion damages failed.

(iii) the first defendant was liable as a joint tortfeasor for the conversion of the second defendants; there had been a common design, and that was to publish the book. Morton-Norwich Products Inc. v. Intercen Ltd. [1978] R.P.C. 152 followed.

(iv) for the purposes of section 17(3) of the Copyright Act, "flagrancy" implied the existence of scandalous conduct, deceit and such like; it included deliberate and calculated infringements, and "benefit" implied that the defendant had reaped a pecuniary advantage in excess of the damages he would otherwise have to pay. The present case was not one in which damages under section 17(3) of the Copyright Act were appropriate.

(v) in assessing the quantum of damages the court had to assess the value of the infringing part of the defendant's work in relation to the whole of it; and that although the infringing part represented only 4% of the defendant's work, the value of that 4% was 15% of the whole.

(i) copyright protects the skill and labour employed by an author in the production of his work. That skill

and labour embraces not only the language originated and used by the author but such skill and labour as he employed in selection and compilation. Harman Pictures N.V. v. Osborne [1967] 1 W.L.R. 723, Elanco (Products Ltd.) v. Mandops Ltd. [1979] F.S.R. 46 (C.A.) followed.

(ii) an author is not entitled, under the guise of producing an original work, to reproduce arguments and illustrations of another author so as to appropriate to himself the literary labour of that author. Pike v. Nicholas (1870) L.R. 5 Ch. App. 251 followed.

(iii) the law of copyright will probably allow a wider use to be made of a historical work than of a novel.

(iv) the claim and defence would have been better appreciated if there had been proper pleadings.

The following further cases were cited in the judgment:

- ICCL v. Axelton [1974] 1 N.Z.L.R. 695.
- Jarrold v. Houlston (1857) 3 K. & J. 708.
- Ladbroke (Football) Limited v. William Hill (Football) Ltd. [1964] 1 W.L.R. 273.
- Nichols A.V.S. v. Rees, Oliver and others [1979] R.P.C. 127.
- Oxford Book Co. v. College Entrance Book Co. 98 Fed. Rep. 688.
- Springfield v. Thame (1903) 89 L.T. 242.

The following additional cases were cited in argument:

- Ash v. Hutchinson & Co. (Publishers) Ltd. (1936) 2 All. E.R. 1496. **\*195**
- Barnard v. National Dock Labour Board (1953) 2 Q.B. 18.
- Bauman v. Fussell [1978] R.P.C. 485.
- Belegging Lavender BV v. Witten [1979] F.S.R. 59.
- Beloff v. Pressdram Ltd. [1973] R.P.C. 765.
- Cambridge University Press v. University Tutorial Press Ltd. (1928) 45 R.P.C. 335.
- Caxton Publishing Co. Ltd. v. Sutherland Publishing Co. Ltd. [1939] A.C. 178.
- Cummins v. Bond [1927] 1 Ch. 167.
- Davies v. Bowes 209 Fed. Rep. 53.
- Donoghue v. Allied Newspapers Ltd. [1938] 1 Ch. 106.
- Fernald v. Jay Lewis Ltd. [1975] F.S.R. 499.
- Football League Ltd. v. Littlewoods Pools Ltd. [1959] Ch. 637.
- Fraser v. Evans [1969] 1 Q.B. 349.
- Harrison Bradley v. Smith [1964] 1 W.L.R. 456.
- Housden v. Marshall [1959] 1 W.L.R. 1.
- Joy Music Ltd. v. Sunday Pictorial Newspapers (1920) Ltd. [1960] 2 Q.B. 60.
- Kelly v. Cinema Houses Ltd. [1928–35] Macg. Cop. Cas. 362.
- The Lady Anne Tennant v. Associated Newspapers Ltd. [1979] F.S.R. 303.
- Rees v. Melville [1911–16] Macg. Cop. Cas. 168.
- Sayre v. Moore 102 E.R. 138.
- Townsend v. Howarth (1875) 48 L.J. Ch. 771.
- Twentieth Century Fox Film Corp. v. Anglo-Amalgamated Film Distributors Ltd. The Times 22/1/1965.
- Warwick Film Productions Ltd. v. Eisinger [1969] 1 Ch. 508.
- Williams v. Settle [1960] 1 W.L.R. 1072.
- Wilmer v. Hutchinson & Co. [1936–45] Macg. Cop. Cas. 13.
- Valcanenghi v. The Gramophone Co. [1928] Macg. Cop. Cas. 301.

The plaintiff, Trevor Ravenscroft, was the author of a book called "The Spear of Destiny". The first defendant, James Herbert, was an author of popular fiction. In particular, he wrote a book called "The Spear". The second defendants, New English Library Limited, were its publishers. The action was in respect of alleged infringement of copyright.

### Representation

Peter Sheridan Q.C. and E. P. Skone James, instructed by Raymond Tooth & Co., appeared for the plaintiff. Hugh Laddie and John Baldwin, instructed by Bartlett & Gluckstein, Crawley & de Reya, appeared for the defendants.

Brightman J.—

This is a copyright action brought by the author of a non-fiction book called *The Spear of Destiny*. The plaintiff alleges that the first defendant, Mr. James Herbert, in writing a novel entitled *The Spear*, has infringed his copyright. The second defendant is the publisher. A central feature of both books is a spearhead which forms part of the Hapsburg treasure exhibited in Vienna. The spearhead is described in

the museum guide as The Holy Lance. The middle of the spearhead has been cut out and the space filled by what is described as the Holy Nail. The guide book (I have been referred to the 1963 edition) records that the spear was carried in important battles as an emblem of the king; that victories were attributed to its power; and that after the 13th century it was venerated as the lance with which the side of Our Lord was pierced at the Crucifixion. The plaintiff's book, which combines historical fact with a great deal of mysticism, purports to tell the story of the spear from the earliest times down to the end of the last war. Mr. Herbert's book is a thriller which weaves an improbable story of neo-Hitler terrorism in England around the supposed post-war exploits of the spear. The fact that the Hofburg Spear, as I will sometimes call it, is harmlessly lying in the Hofburg Museum in Vienna for anyone to see causes Mr. *196 Herbert no problem because, according to the novel, this is only a useless replica. So far, no copyright problem emerges. The reason that battle has been joined is that Mr. Herbert is alleged to have made extensive use of the plaintiff's non-fiction work in order to paint in a backcloth of apparent truth against which his own fiction story can be narrated. The question for decision is whether Mr. Herbert has made a legitimate or illegitimate use of the plaintiff's work.

The plaintiff, Mr. Trevor Ravenscroft, has had a varied career. He was born in 1921. After training at Sandhurst he was commissioned in the Royal Scots Fusiliers. He served in the 1939 war and joined the Commandoes. He was taken prisoner after a raid on Rommel's Headquarters in North Africa. Twice he escaped and was recaptured. After the war he studied for some time as a medical student before turning to journalism. In 1948 he made the acquaintance of Dr. Walter Stein.

Dr. Stein was an Austrian. He had lived in Vienna and was educated at the University there. During the period 1909 to 1913 he became acquainted with Hitler who was, at that time, living in poor circumstances in Vienna. They had many conversations together. When war broke out in 1914 Dr. Stein served as an officer in the Austrian Army. After the end of the 1914 war he taught history in Stuttgart in Germany. He opposed the rise of Nazi power, and for this purpose infiltrated a Nazi secret society called the Thule Gesellschaft. In 1933 he fled from Germany, came to England and built up a medical practice in London.

During his time as a prisoner of war the plaintiff had become interested in what has been described to me as supernatural levels of consciousness, which means learning about past facts through meditation. This interest led him to a study of medieval European history and, in particular, of the legends surrounding the Holy Grail. In the course of his reading he came across a book written by Dr. Stein called The Ninth Century. This is a study of the historical background of the Grail romances. The plaintiff was much impressed by this book. He thought that Dr. Stein had achieved those supernatural levels of consciousness which so much interested him. He sought the acquaintance of Dr. Stein, and a close friendship developed between them. Dr. Stein indeed believed that he had the power to recapture lost moments of history by meditation, and he found a ready listener in the plaintiff. Their friendship began in the year 1948. Their discussions ranged over a wide field, including medieval and modern European history, contemporary politics and medicine. Although each was working, the plaintiff as a journalist and Dr. Stein as a doctor, their homes were close together, in Kensington, and they would meet in the evenings.

In pursuing his studies into medieval mythology the plaintiff became interested in the Hofburg Spear. This also was an interest of Dr. Stein. The plaintiff was in Vienna in 1948 and he saw the Hofburg Spear. He was not, I think, then aware that the museum attributed to it the ancestry and the powers mentioned in the current museum guide book. Dr. Stein unfolded to the plaintiff the story of the spear, as he claimed to have traced it, partly by orthodox historical study and partly by meditation, beginning in pre-Christian times and continuing to the present day.

The plaintiff did not make anything approaching a full record of what was told him by Dr. Stein. He did not, at that time, have any notion of himself writing a book about the Hofburg Spear. He did, however, keep a diary from time to time, and he also made separate notes for future reference. However, one evening in 1957 Dr. Stein telephoned the plaintiff and asked him to call. There is some evidence, though it is inconclusive, that Dr. Stein had a few days previously made up his mind to compose his own book *197 about the spear. However that may be, on that evening Dr. Stein told the plaintiff that it was he who would have to write the story of the Hofburg Spear. They had a long session together, the plaintiff returning home in the early hours of the morning. It was the last time they met. Dr. Stein was taken ill next day and shortly afterwards died in hospital. The plaintiff believes that Dr. Stein had a premonition of his early death.

After the death of Dr. Stein the plaintiff continued his work as a journalist. He did not, for the time being, try to write the story of the spear. He had married in 1954 and he needed to make money in order to support his wife and family. He did, however, continue to research the subject and read widely. He told me that history was his main interest in life and that he had studied it for more than 30 years. For a time he gave up journalism in order to lecture on history. His familiarity with the recorded events of the Middle Ages was apparent when he gave his evidence. In 1969 he finally ceased to be a journalist and started to write his book about the Hofburg Spear. He spent two years on the task. He devoted the whole of his time

to it and did no other work. He made use of Dr. Stein's book, *The Ninth Century*, his own records, his recollections of what Dr. Stein had told him twelve or more years earlier and his own notes on Medieval History. He travelled extensively and studied in the British Museum Library and elsewhere.

In 1972 the plaintiff's book came out. It was entitled *The Spear of Destiny*. It was published by Neville Spearman Publishers Ltd. in hard-back covers in 1972. Mr. Armstrong of that company, as the agent of the plaintiff, gave Trans-World Publishers Ltd. a licence to produce a Corgi paperback edition in 1974. The Corgi edition was the one used throughout this case, as the English hardback is now difficult to come by. The Corgi edition has, on the cover, a picture of a diminutive Hitler wearing a sort of red Roman toga and holding the spear and a swastika shield, depicted against a lurid background of Hitler's face in electric blue. This was done without the plaintiff's approval while he was in America. He was much incensed because it was not the sort of impression he desired his book to give to a potential reader. There was also an American hardback edition published in 1973. Since those days the plaintiff and Mr. Armstrong have fallen out over various matters. The plaintiff has now received back all the rights with which he had parted, including the American rights. It is not in dispute that the plaintiff is now the sole owner of the copyright in *The Spear of Destiny*.

The *Spear of Destiny* is a book of some 350 pages in the paperback edition. It is discursive and disjointed, and demands of the reader considerable effort and concentration. It is packed with an immense amount of historical data which no one suggests are in any way inaccurate. It also contains much philosophical discussion and mysticism. It is divided into a brief prologue, an introduction, 24 chapters and an epilogue.

The prologue introduces the reader to the spear. Its early history is lightly sketched by the plaintiff. Joshua is mentioned as an early holder. It is implied that it helped him to demolish the walls of Jericho. Later it passed to King David, and also into the hands of Herod, before coming into the possession of one of the Roman soldiers present at the Crucifixion. A legend grew up, the plaintiff recounted, that whoever held the spear would have immense power to control the destiny of the world either for good or for evil, as he might choose.

The introduction explains that the book would have been written by Dr. Stein but for his untimely death. The reader is told of the plaintiff's friendship with Dr. Stein, of Dr. Stein's intimate knowledge of Hitler before the 1914 war, and of the way Hitler *198 was attracted to the power of the spear during this period. The first chapter contains a graphic description of Hitler's supposed visit to the Hofburg Museum in 1909 and of his fascination with the guide's description of its supernatural powers.

The book ranges through history, legend and mythology, at times branching into collateral matters, culminating in Hitler's attempt at world domination due to his possession of the spear with its unique properties of good and evil. We are shown, as I understand the tale, how in the 4th century the Roman Emperor Constantine the Great held the spear, followed by the Emperor Theodosius, and in the 5th century by Alaric and Theodoric. Justinian held it for the Eastern Empire in the 6th century, the barbarian Charles Martel in the 8th century, Charlemagne in the 9th century, and so to Otto the Great in the 10th century and Barbarossa and Frederick II of the House of Hohenstauffen in the 12th and 13th centuries. All this, we are told, was researched by Hitler himself among books in the Hofburg Library, as he endeavoured to satisfy himself that the Hofburg Spear was in fact the supernatural spear traceable to the Crucifixion. It was Dr. Stein's interest in the spear and Hitler's obsession with it that led to their mutual acquaintance in the period 1909 to 1913.

After the end of the 1914 war we see the rise to power of Hitler, his association with the occult secret societies of Germany and his partnership with Himmler. When the crisis came, we are informed, in 1939 when Hitler invaded Austria in order to obtain the spear and possess its power. He removed it to Nuremberg, where it remained throughout the war. After the repeated bombing of Nuremberg it was discovered with other treasures in an underground chamber and passed for a short while into the possession of the United States of America in the person of General Patton before being returned, in 1946, to the Hofburg Museum with other Austrian possessions.

The book has a single theme, the identity of the Hofburg Spear with that used at the Crucifixion, and the supernatural qualities of such spear. The book itself is largely a mixture of selected authentic episodes from European history in general, and German history in particular, in the Middle Ages and modern times, derived from the plaintiff's very considerable knowledge as a historian, plus his recollection of what Dr. Stein revealed to him. Authentic recorded history, the personal knowledge of Dr. Stein and the meditations of Dr. Stein, are inextricably mingled and served up to the reader in a highly individualistic and unusual book.

I now turn to the defendant. Mr. Herbert is a successful novelist. He was born in 1943. After he left school he studied art, and in 1963 went into advertising, where he did well. He joined a company in a large way of business and, after progressing from typographer to art director was placed in charge of a team of typographers and copywriters under an art director. Finally he was made an associate director of his

company and became more involved with the business side of the concern. He did not find this gave him a sufficient interest. He took to writing novels. His first novel was called The Rats. He worked on it in the evenings and over such weekends as he was not on duty for his company. The novel took nine months to complete. It was published by the second defendant, New English Library Limited. In 1973 or thereabouts he wrote The Fog. In 1974 The Survivor. Next came Fluke, written in about 1975. These books were all published by New English Library Ltd. During this time he remained with his advertising company but, he said, "it was actually killing me working seven days a week for those years".

In 1974 Mr. Herbert had a spell in hospital. Someone brought him a magazine called Penthouse. It contained a potted version of The Spear of Destiny. He thought it *199 would make a splendid theme for a novel. He bought the book and read it. He also read books about Hitler, Himmler, and the preoccupation of the Nazi Regime with the occult. He also read books and newspaper articles about terrorism, espionage and weapons. He read Parsival, written by the 13th century Bavarian poet Wolfram von Eschenbach, and the libretto of Wagner's opera on the same theme.

He started his new novel in the autumn of 1976 and completed it in the following summer. He was still in advertising and still writing only in the evenings and at some weekends. The novel was published by the second defendant in 1978. It was called The Spear. It bears on the dust cover a picture of the Hofburg Spear.

Mr. Herbert's novel contains 278 pages. It is divided into seven prologues, twenty-three chapters and an Author's note. The prologues recount the story of the Hofburg Spear from the Crucifixion down to the end of the 1939 war. The chapters record, in the form of a novel, the post-war exploits of the novel.

I will, for the moment, leave aside the prologues and attempt a brief summary of the novel. The time is the present. The hero is a private detective called Steadman, sometimes identified in the story as a modern Parsifal. Steadman is approached by an Israeli Intelligence agent for the purpose of tracing one of their operators who is missing. Steadman turns down the assignment. However, his female business partner thinks that the assignment should be accepted and secretly makes contact with the Israeli agent. She is captured by an enemy and killed in most unpleasant circumstances. Steadman seeks out the Israeli Intelligence agent, thinking that he is the murderer. The agent tells him that the murderer is an arms dealer called Gant. Steadman returns home and finds on the doorstep a man called Pope, who introduces himself as an agent of MI5. Pope tells Steadman that Gant is connected with a Nazi secret society called the Thule Gesellschaft operating in England. Pope hints that the society is in possession of a magic spear. Pope tells Steadman that he is anxious to infiltrate Gant's organisation. He persuades Steadman to contact Gant on the pretence of negotiating an arms deal for a client. Steadman drives to Aldershot where the Ministry of Defence has laid on an exhibition of weapons and armaments for potential purchasers. Steadman introduces himself to Gant, discusses his pretended requirements and arranges to see Gant at his home in Guildford. He falls in with an attractive young lady called Holly, who has been interviewing Gant on behalf of a newspaper. They leave the exhibition grounds together but are chased and nearly killed by a remote controlled tank. Steadman proceeds to Gant's country house at Guildford. Gant makes a prisoner of Steadman and reveals to him that he is working with the Thule Gesellschaft to take over power in England. Gant then leaves for his secret hide-out in Devon, which is named after the Nazi stronghold built by Himmler for top Nazis at Paderborn in Germany and called The Wewelsburg. Steadman is left in the care of Gant's henchmen at Guildford but manages to elude his guard and make his way to the Devonshire Wewelsburg. He is met on the doorstep by Gant and also by Pope, now revealed in his true colours, and by other unpleasant characters. Steadman, who is shortly to be liquidated, is told more details of Gant's plot to take over power in England, and in particular of the planned destruction by missile of the aircraft carrying the United States Secretary of State to London. This assault, it was hoped, would sabotage Arab/Israeli peace talks and help to create world chaos. For his execution Steadman is led into a hall where members of the secret society are holding a meeting. They are grouped round the Hofburg Spear. This, it appears, was cunningly switched with a replica during the last days of Nuremberg and brought by a Nazi to England. Steadman learns that it will be used to slay him in a ritual killing. Fortunately the police, aided by local agents of MI5 and the CIA, and a detachment *200 of Marine Commandoes flown from Plymouth, successfully assault the Devonshire Wewelsburg. In the course of the operation, however, Steadman undergoes the alarming experience of being chased by the skeleton of Himmler, which normally reposes in the basement of the house. Luckily he is saved by the redoubtable Holly in the nick of time. The missile is destroyed on its launching pad and Steadman hurls the spear into the flaming debris.

To this short account of the novel one would need, for completeness, to add half a dozen more murders and some very unpleasant torture scenes.

One must not under-estimate the commercial attraction of the rubbish which I have attempted to describe. The book is written with much inventiveness and a racy flow of language and incident, and the numerous scenes of violence exercise a strong appeal to certain readers. The defendant's novels have

enjoyed great financial success. Mr. Herbert does not think of himself as a serious novelist.

> "All my books go in for violence for the sake of violence. I make no excuse for it, it is
> what I do; it is what people enjoy reading".

He writes tongue in cheek, and agrees that *The Spear* is a horror comic.

I turn now to the prologues, as I will, for convenience, but inaccurately, call them. They are not in fact proemial, but interleave the story of the novel. Mr. Herbert considered that his novel would benefit if an air of credibility were introduced. His novel should contain, for the instruction of the reader, a series of prologues setting out the allegedly true story of the spear in former times. In five of the seven prologues the plaintiff's rendering of the story of the Hofburg Spear is copied to the extent which I must now indicate.

Mr. Herbert does not dispute that he used the plaintiff's book for the source of much of the material which he recounts in the prologues. He used, he said, the *Penthouse* article as a sort of card index for identifying the facts which he desired to use, and *The Spear of Destiny* as a filing cabinet where he could glean the full facts.

> "I used the *Penthouse* feature as the main reference for me ... If I felt I needed to
> embellish anything, or it was not quite clear ... then I would go to *The Spear of
> Destiny*".

The instances of copying complained of are set out in the exhibit TTR.4 to the plaintiff's evidence, supplemented by the exhibit TTR.X. To a large extent these instances speak for themselves. It would not be possible, in a judgment of reasonable length, to deal with every instance individually. It will be sufficient if I indicate the general picture.

There are, in all, fifty alleged instances of language copying in TTR.4. One is to be found on the dust jacket of the defendant's book. Eight in the first prologue, which deals with the Crucifixion. None in the second prologue, which is only concerned with the capture and death of Himmler. Eleven in the third prologue, which deals with Hitler's alleged first visit to the Hofburg Museum in 1909. Eleven in the fourth prologue, which deals with Hitler's alleged historical researches in the Hofburg Library before the First World War. Thirteen in the fifth prologue, which covers the seizure of the spear at the time of the Anschluss. And large scale copying, with particular emphasis on three incidents, in the sixth prologue, which deals with General Patton's *201 visit to the underground store of treasures in Nuremberg. There is no significant copying in the last prologue, which traces the fictional escape of the authentic Hofburg Spear to England.

In the "Author's Note" at the end of the book there is included this sentence:

> "The idea for this book came from Trevor Ravenscroft's extraordinary *The Spear of
> Destiny*, a detailed (and unsettling) study of Adolf Hitler's association with the Heilige
> Lance".

It is quite obvious from a comparison of the two books and from the defendant's evidence that he had the *Penthouse* article and the plaintiff's book in front of him as he wrote five of the prologues. The first prologue opens with the Roman soldier seated on his horse at the foot of the Cross and ends with the miraculous cure of his defective vision after he had used his spear. All the main facts in the prologue, which extends over two pages, are taken from pages ix to xi of the plaintiff's book. The defendant condenses the story and changes the language to a greater or lesser extent. Where the defendant concedes that the language is the same his answer is:

> "Of course they would be identical words; we are saying the same thing"; or: "Would
> you think there is another way of putting that?"; or: "I put the same facts down, they
> have got to appear similar. It would have been very easy for me to disguise all this,
> but there was no reason to".

The third prologue describes Hitler's supposed visit to the Hofburg Museum in 1909, when he allegedly became obsessed with the Hofburg Spear. The prologue extends over one and a half pages. The plaintiff's knowledge of this supposed visit was derived exclusively from Dr. Stein, to whom it is supposed to have been related by Hitler himself. The prologue is a condensed version of pages 6 to 9 of the plaintiff's book. Hitler throws away his sketch book in despair at his failure in life. He seeks shelter from the rain in the Hofburg Museum. He hears the guide explain to tourists the magic power of the spear. He stands transfixed before the spear until closing time. This prologue contains instances of close language copying. The defendant does not shirk the issue. Dealing with Hitler's discarded sketch book and his sheltering in the Museum he is asked:

> "(Q) Do you agree with me there is a remarkable similarity in the words? (A) Of course there is, they are saying exactly the same thing. (Q) The one is copied from the other — is it? (A) If that is what Mr. Ravenscroft says and that is the fact of it, yes, I would say that, of course I would. (Q) You have more or less used the words used by Mr. Ravenscroft, have you not? (A) *That* is how it was".

The two descriptions of the spear (which Mr. Herbert had never seen for himself) and its mode of display are almost identical.

> "(Q) Almost identical words, do you agree? (A) Well, that is what the spear was lying in. Why should I change that? (Q) The one was taken from the other, yes? (A) Of course it is taken from the other, yes.
>
> "(Q) An exact copy, is it not, one from the other? (A) That is the description of the spear, it has got to be exact ... Yes, it is saying the same thing, it must be. (Q) You borrowed it because it was a jolly good description, was it not, that Mr. Ravenscroft used? (A) Of course it was ... yes ... That was how the spear \*202 looks, why change it? That was the description. (Q) Again, you liked the words, did you, that Mr. Ravenscroft used? (A) They were saying exactly what needed to be said. (Q) Well enough for you to use most of the words yourself? (A) I saw no reason to disguise the words".

The fourth prologue in the defendant's novel is headed "1913" and outlines the result of Hitler's four years of historical research. It names eleven alleged holders of the spear and records that in all 45 Emperors had claimed the spear between the coronation of Charlemagne (commonly dated A.D. 800) and the fall of the Germanic Empire 1,000 years later. The eleven supposed holders, named by the defendant in his historical survey are Mauritius, Maximin, Constantine the Great, Theodosius, Alaric the Visigoth, Theoderic the Visigoth, Justinian, Charles Martel, Frederick Barbarossa, Frederick the Second Hohnestauffen and Otto the Great. These are the identical characters in history named by the plaintiff on pages 13 to 18 in his book, with the addition, in the plaintiff's record, of the Roman general Aetius and for a brief moment St. Francis of Assisi.

When asked why he selected the eleven particular names he mentioned the defendant replied: "These are the ones that are important. They are important to Mr. Ravenscroft so they are obviously important to me". The defendant agrees that he has no independent knowledge of Medieval History and did no research of his own. There is much language copying from one book to the other in the defendant's writing of this prologue.

The fifth prologue deals with the Anschluss. It extends over two pages and is mainly taken from pages 311 to 316 of the plaintiff's book. At this stage Dr. Stein was no longer in touch with Hitler, so that the plaintiff is writing of what he has researched himself or recollected from his talks with Dr. Stein some twelve years or more previously. The prologue opens with three German officials standing on the steps of the Hofburg awaiting the arrival of Hitler to view the spear. It closes with the decision Hitler then made to exterminate the Jewish people and dominate the world. The language copying is less pronounced, but there are the same characters, the same incidents and the same interpretation of the significance of the Anschluss. Hitler arrives with Himmler and is met by Von Sievers, Major Buch and Kaltenbrunner; Hitler has a private session with the spear; Winston Churchill alone is aware of the significance of his entry into Vienna; it is at this moment that Hitler decides to conquer the world.

The penultimate prologue in the defendant's book is concerned with the recovery from two underground

hide-outs in Nuremberg of treasures looted by the Nazis, including the Hapsburg Regalia and other items taken from the Hofburg Museum. This much is recorded in historical fact. The plaintiff, as the result of the revelations of Dr. Stein stemming from his meditations on history, is able to go further and tell us that General Patton personally visited the main underground treasurehouse; and that he stood spellbound before the Hofburg Spear. I refer to, but without actually reading, three pages from the plaintiff's book and 2½ pages from the defendant's book as illustrations of the plaintiff's style of writing history, and the scope of the defendant's copying. Those passages are, the first full paragraph on page 342 of *The Spear of Destiny* down to the third full paragraph on page 345; and in the defendant's book, pages 175 and 176 and the second and third paragraphs on page 177. In connection with these passages I observe that nowhere save in *The Spear of Destiny* had Mr. Herbert read that General Patton had made a study of The Holy Grail; that he had visited Klingsor's Castle above Monte Castello; that the spear lay on the Polish altar as described; that *203 General Patton knew anything whatever about the spear or had the slightest interest in it. These facts, or supposed facts, are strung together, with much language copying as appears from the passages to which I have referred, in exactly the same way as the plaintiff had strung them together in support of his theory of the ancestry and power of the spear. Not one supposed fact contained in the passage from the defendant's book was taken from any source but the plaintiff's book.

The writ was issued in October 1978. The matter came before the judge on motion on the 7th November. Both sides accepted an order that the affidavits should stand as pleadings in the action. There was, I think, a mistaken impression that such an order would facilitate a speedy trial. In fact it might have been more helpful to a proper appreciation of the claim and the defence to it if pleadings had been served, and this need not have occasioned any delay in preparing for trial.

In his defence as adumbrated in his affidavit, Mr. Herbert states that the prologues are included as a form of historical background to add credence to the fictional story he has written, and although they are not, he says, central to the story, they form an important part of the structure of the novel. I think that is a fair statement. I do not think I need to refer any more to the evidence.

As a prelude to a consideration of the opposing arguments I will refer briefly to the nature of copyright protection. Under section 1 of the 1956 Act copyright in relation to a work means (put shortly) "the exclusive right ... to do certain acts in relation to that work". Such acts are "those acts which ... are designated as the acts restricted by the copyright in a work of that description". Under section 2, subsection (5) the acts restricted by the copyright in ( *inter alia* ) a literary or dramatic work include "reproducing the work in any material form". Under section 49 any reference in the Act "to the doing of an act in relation to a work ... shall be taken to include a reference to the doing of that act in relation to a substantial part thereof".

The question which I have to decide is a question of fact, whether there has been substantial copying of *The Spear of Destiny* amounting to an infringement of the plaintiff's rights. This raises two issues, first whether there has been copying, and, secondly, whether such copying is substantial within the meaning of section 49. I have read both books. The plaintiff gave evidence before me during a period of over four days, and the defendant for almost three days. It is absolutely plain that in writing five of the prologues that I have mentioned the defendant copied from the plaintiff's book. The next issue, therefore, is whether such copying is in relation to a substantial part of the plaintiff's book and therefore in excess of what is a legitimate degree of copying.

Mr. Laddie, for the defendants, rightly says that an author has no copyright in his facts, nor in his ideas, but only in his original expression of such facts or ideas. He submitted that in deciding whether copying is substantial there are four principal matters to be taken into account. First, the volume of the material taken, bearing in mind that quality is more important than quantity; secondly, how much of such material is the subject-matter of copyright and how much is not; thirdly, whether there has been an *animus furandi* on the part of the defendant; this was treated by Page-Wood V.C. in Jarrold v. Houlston (1857) 3 K & J. 708 as equivalent to an intention on the part of the defendant to take for the purpose of saving himself labour; fourthly, the extent to which the plaintiff's and the defendant's books are competing works.

*204

Copyright protects the skill and labour employed by the plaintiff in production of his work. That skill and labour embraces not only language originated and used by the plaintiff, but also such skill and labour as he has employed in selection and compilation. The principles are clear from the cases. There is a helpful summary of the authorities in Harman Pictures N.V. v. Osborne ([1967] 1 W.L.R. 723). For my purposes it is sufficient to cite two passages from that case which are taken from earlier authority:

"... another person may originate another work in the same general form, provided he does so from his own resources and makes the work he so originates a work of his own

> by his own labour and industry bestowed upon it. In determining whether an injunction
> should be ordered, the question, where the matter of the plaintiff's work is not original,
> is how far an unfair or undue use has been made of the work? If, instead of searching
> into the common sources and obtaining your subject-matter from thence, you avail
> yourself of the labour of your predecessor, adopt his arrangements and questions, or
> adopt them with a colourable variation, it is an illegitimate use".

This appears at page 730 of the report.

There is also this passage:

> "In the case of works not original in the proper sense of the term, but composed of, or
> compiled or prepared from materials which are open to all, the fact that one man has
> produced such a work does not take away from anyone else the right to produce
> another work of the same kind, and in doing so to use all the materials open to him.
> But as the law has been precisely stated by Hall V.C. in Hogg v. Scott, `the true
> principle in all these cases is that the defendant is not at liberty to use or avail himself
> of the labour which the plaintiff has been at for the purpose of producing his work, that
> is, in fact, merely to take away the result of another man's labour or, in other words,
> his property'": see page 732.

In this case the judge was confronted with the well-known book by Mrs. Cecil Woodham Smith entitled
*The Reason Why* and also the script for a motion picture written by John Osborne. The question which the
judge posed was this (at page 736):

> "... did John Osborne work independently and produce a script which, from the nature
> of things, has much in common with the book, or did he proceed the other way round
> and use the book as a basis, taking his selection of incidents and quotations therefrom,
> albeit omitting a number and making some alternations and additions, by reference to
> the common sources and by some reference to other sources?"

That is the same test as was stated by Buckley L.J. in Elanco Products Ltd. v. Mandops (Agrochemical
Specialists) Ltd. [1979] F.S.R. 46 which was heard on motion for interim relief. The facts, briefly, were
that the plaintiffs had invented a herbicide and had carried out trials in order to discover how the product
could best be used. Various research establishments had also conducted their own field trials. The results
of both the plaintiffs' trials and of the independent trials had been published in certain scientific journals.
The plaintiffs marketed the herbicide in tins with which they included a leaflet compiled by the plaintiffs
which set out detailed instructions on how the herbicide should be used, upon what crops and when, and
what weeds it would best control. The plaintiffs claimed copyright in the leaflet and asserted that it was a
*205 compilation of what they regarded as relevant information extracted from all the available literature
and especially from their own. After the patent had expired the defendants began to sell the same
herbicide with a leaflet which was alleged to be similar to the plaintiffs'. The substantial defence raised by
the defendants was that they were entitled to take any information available to the public including that
contained in the plaintiffs' literature provided that they did not adopt the same form or the same
language, that is to say provided that they did not just copy the plaintiffs' literature. Buckley L.J. said this
at page 57:

> "As I understand the law in this case, the defendants were fully entitled to make use of
> any information of a technical or any other kind, which was available to them in the
> public domain, for the purpose of compiling their label and their trade literature, and
> they were not entitled to copy the plaintiffs' label or trade literature thereby making
> use of the plaintiffs' skill and judgment and saving themselves the trouble, and very
> possibly the cost, of assembling their own information, either from their own
> researches or from sources available in documents in the public domain and thereby
> making their own selection of material to put into that literature and producing their
> own label and trade literature".

The main thrust of Mr. Laddie's argument was that the plaintiff intended his book to be read as a factual account of historical events, that the defendant accepted it as fact and did no more than repeat certain of those facts. The plaintiff cannot claim a monopoly in historical facts. The law of copyright does not preclude another author from writing upon the same theme. It is perfectly legitimate for another person to contrive a novel about the Hofburg spear, even about its supposed ancestry and supernatural powers. Otherwise one would be driven to the conclusion that the plaintiff has a monopoly of the facts. Members of the public are entitled to use *The Spear of Destiny* as a historical work of reference. Mr. Laddie conceded that if the plaintiff had research and selected which facts to use, and had expended substantial labour in making that selection, and a substantial amount of his labour had been taken by the defendant, then there might be infringement. In the present case, he submitted, the plaintiff's facts were selected by history or by Dr. Stein and not by the plaintiff. In the result, there had been no reproduction of the plaintiff's book in relation to a substantial part thereof. In the course of his copying the defendant confined himself to those matters which are represented in the plaintiff's book as historical facts, whether their origin is to be found in documented history or in the meditations of Dr. Stein.

In developing his argument Mr. Laddie drew a distinction between historical works and works of fiction. He said that if any author writes a history book he obtains copyright, but what amounts to an infringement of that copyright, i.e. substantial reproduction, depends to a great extent upon whether all the defendant has taken is historical facts or amounts to more than that. The degree of user which would amount to an infringement is different in the case of a historical work than in the case of a work of fiction. There is more freedom to copy in the case of the historical work.

I am inclined to accept that a historical work is not to be judged by precisely the same standards as a work of fiction. The purpose of a novel is usually to interest the reader and to contribute to his enjoyment of his leisure. A historical work may well have that purpose, but the author of a serious and original historical work may properly be assumed by his readers to have another purpose as well, namely to add to the knowledge possessed by the reader and perhaps in the process to increase the sum *206 total of human experience and understanding. The author of a historical work must, I think, have attributed to him an intention that the information thereby imparted may be used by the reader, because knowledge would become sterile if it could not be applied. Therefore, it seems to me reasonable to suppose that the law of copyright will allow a wider use to be made of a historical work than of a novel so that knowledge can be built upon knowledge.

Mr. Laddie referred me to Oxford Book Co. v. College Entrance Book Co. 98 Fed. Rep. 688 a decision of the United States Circuit Court of Appeal. The publisher of *Visualised American History* sued the publisher of *Visualised Units* of American History alleging breach of copyright. The following passage occurs in one of the judgments:

> "Historical facts are not copyrightable *per se* nor are errors in fact. The plaintiff's book was designed to convey information to the readers. The defendant authors were as free to read it as anyone else, and to acquire from it such information as they could. They could indeed with equal right obtain such mis-information as it contained for the copyright gave no monopoly of the contents of the book ... and so far as plaintiff's copyright is concerned they could use whatever of either character they gleaned from the book in their own writing provided they did not copy any substantial part of the copyrighted work but created something distinctly their own".

Mr. Laddie told me that the nearest English case in direct support of his submission on the special position of a history book is Springfield v. Thame (1903) 89 L.T. 242. The plaintiff had composed an article which described in 83 lines the narrow escape from drowning of a distinguished eye specialist. He sent copies of the article to the *Daily Mail* and to the *Evening Standard*. The *Daily Mail* accepted the article, paid the plaintiff for it and published a sub-edited version which was condensed into 18 lines. The *Evening Standard*, without the licence of the plaintiff, then published the same paragraph with slight alternations.

Joyce J. said this *obiter*:

> "In my opinion, if the original composition had been accepted and published *verbatim et litteratim* in the *Daily Mail*, the paragraph in the *Evening Standard* would still have been no infringement of the copyright in the original composition, since there is no copyright in news, but only in the manner of expressing it".

I do not think that much can be read into this case for present purposes. It proceeded upon the basis that Mr. Springfield had no monopoly in the facts of the escape and was not entitled under the law of copyright to any protection for his skill and labour (if any) in researching such facts. The learned judge found that the offending paragraph was in truth and in substance a different statement of the facts contained in the original composition.

In my judgment, Mr. Laddie's proposition must not be pressed too far. It is, I think, clear from the authorities that an author is not entitled, under the guise of producing an original work, to reproduce the arguments and illustrations of another author so as to appropriate to himself the literary labours of that author: see Pike v. Nicholas (1870) L.R. 5 Ch. App. 251, Ladbroke (Football) Ltd. v. William Hill [1964] 1 W.L.R. 273 and the passages, which I have already read, from the Harman Pictures N.V. case.

*207

Mr. Sheridan, for the plaintiff, invites me to view the matter in a different light. He submits that the plaintiff's work is not a historical work of the conventional type, because it is not a chronology. It is not a continuous methodical record of public events (which is the primary dictionary definition of "history"). The plaintiff's book is poles away from history. It is disjointed and unmethodical (no offensive criticism is intended of the literary technique that he employs) being composed of a variety of different events, recollections, quotations, philosophy, meditations and so on, designed to support the theory in which the plaintiff had come to believe. Vast areas of history are left out by the plaintiff in his attempt to persuade the reader that the Hofburg Spear has the ancestry and attributes which the plaintiff believes are to be ascribed to it. The book is a very personal insight into history. What the plaintiff has done is to select events from history and from his recollection of the meditations of Dr. Stein in order to present to the reader the credentials of the Hofburg Spear.

I accept Mr. Sheridan's analysis of the nature of the plaintiff's work.

There was a suggestion by Mr. Laddie that some distinction should be drawn in the present case because much of what the defendant copied from *The Spear of Destiny* was merely information derived by the plaintiff from Dr. Stein. I do not think it matters whether the source of the plaintiff's book was painstaking research into documented history or painstaking recording and recollection of what Dr. Stein had told him. It was also suggested that a distinction should be drawn on the ground that *The Spear of Destiny* was, since the death of Dr. Stein, the only possible source of certain of the facts brought to light by the meditation of Dr. Stein. It does not, however, seem to me that the paucity of sources of information excuses the defendant from taking the trouble of assembling his own information and making his own selection of material. If that is not practicable, he can always apply to the plaintiff for a licence.

I find as a fact that in writing five of the prologues to *The Spear* Mr. Herbert made use of *The Spear of Destiny animo furandi* that is to say, with an intention on his part to take from *The Spear of Destiny* for the purpose of saving himself labour. I also find as a fact that *The Spear* and *The Spear of Destiny* are competing works to an appreciable extent. Both are written for the general reader, although I would suppose that the educational and intellectual level of the average reader of *The Spear of Destiny* is likely to be higher than that of the average reader of *The Spear*. *The Spear of Destiny* is not a history book written for historians, but a non-fiction book for the ordinary public.

Having studied the two books and heard the evidence, I have no shadow of doubt that the defendant has copied from *The Spear of Destiny* to a substantial extent. In the prologues that I have mentioned he has deliberately copied the language of the plaintiff on many occasions. To a more significant extent he has adopted wholesale the identical incidents of documented and occult history which the plaintiff used in support of his theory of the ancestry and attributes of the spear, of Hitler's obsession with it and also General Patton's. He did this in order to give his novel a backbone of truth with the least possible labour to himself. In so doing he annexed for his own purposes the skill and labour of the plaintiff to an extent which is not permissible under the law of copyright. The defendant has clearly infringed the plaintiff's copyright. I am only sorry that so much time, effort and money has had to be spent on the trial of this action.

*The court heard further argument before giving judgment on the relief that should be granted.*

*208

Brightman J.—

I must now deal with the form of the Order following upon the judgment which I delivered in March.

The injunction.

There is no dispute between the parties, as I understand it, that it is appropriate for an injunction to be

granted in the terms set out in paragraph (1) of the Writ. To avoid any obscurity the injunction will be preceded by a declaration that the relevant prologues, which will have to be identified in some intelligible way — I have been calling them numbers one, three, four, five and part of six — infringe the plaintiff's copyright.

### Damages for infringement.

There will be an enquiry as to the damage sustained by the plaintiff by reason of the breach of copyright. The plaintiff claims to be entitled to additional damages under section 17(3) of the Act of 1956. That is a matter which I am entitled to leave to the enquiry, but for the convenience of the parties I intend to decide the point now. To entitle the plaintiff to such additional damages it must be established that effective relief would not otherwise be available to the plaintiff giving regard to the flagrancy of the infringement, any benefit shown to have accrued to the defendants by reason of the infringement, and other material considerations. Flagrancy in my view implies the existence of scandalous conduct, deceit and such like; it includes deliberate and calculated copyright infringements. There is some guidance to be obtained from the Concise Oxford English Dictionary, Nichols Advanced Vehicle Systems v. Rees, Oliver and Others [1979] R.P.C. 127, and also from a New Zealand case, International Credit Control Limited v. Axelton [1974] 1 N.Z.L.R. 695 at 705.

"Benefit" in sub-section (3) in my view implies that the defendant has reaped a pecuniary advantage in excess of the damages he would have otherwise to pay. In my judgment the sub-section is not applicable to the present case. There was no cover up by the defendants. The author's note printed as the last page of the text draws attention to the fact that the first defendant had drawn inspiration from the plaintiff's work, which is referred to both by its title and by its authorship. I am satisfied that the first defendant did not intend to injure the plaintiff and did not appreciate that he was doing so. Nor do I think that there is any benefit, within the meaning of section 17(3), or other material considerations which would justify me in deciding that the sub-section was applicable to this case.

### Conversion.

Under section 18(1) of the Act the plaintiff is deemed to be the owner of infringing material and to have been the owner thereof since the time when such material was made. The relevant infringing material in the present case consists of the manuscript of the first defendant's book and the printed pages of infringing prologues. The manuscript was converted by the first defendant when he delivered it to the second defendant. The printed pages were converted by the second defendant when it bound them up with non-infringing material. Each of such acts was an act inconsistent with the title of the deemed owner. Under section 18 the plaintiff has all such rights and remedies in conversion. So there must prima facie be an enquiry as to the damage sustained by the plaintiff by reason of the acts of conversion that I have mentioned. These acts of conversion raise three points for consideration: First, whether the second defendant acted innocently. If so the second defendant will not be liable in damages. Innocence is not the word used in the statute, which reads as follows:

> "A plaintiff shall not be entitled by virtue of this section to any damages or to any other
> pecuniary remedy (except costs) if it is proved or admitted that, at the *209 time of
> the conversion ... where the articles converted ... were infringing copies, the defendant
> believed, and had reasonable grounds for believing, that they were not infringing
> copies".

The second defendant pleads that it had reasonable grounds. Asked for particulars it gave them as follows. I will read five of the grounds before commenting. "(1) The first defendant is a professional author whose books the second defendant has published since 1974. The four novels written by the first defendant prior to the writing of the book in suit were highly successful, selling in excess of one million copies in total. In respect of none of those books has any complaint been made that the same infringed copyright. (2) The first defendant claimed to the second defendant that he had done more research in the course of writing the book in suit than he had done in respect of any preceding book. (4) It was common in the trade, particularly in the case of fictional novels based on historical incidents, for the ideas for such novels to be derived from one or more antecedent factual works and for such derivation to be freely acknowledged without complaint of copyright infringement being made. (5) It is common in the trade for fictional novels to be based on historical facts. (6) In preparing the book in suit the second defendants followed, so they believe, the recommendations as to copyright provisions contained in the guide prepared by the Publishers' Association".

I take the view that none of those reasons, either regarded separately or together, furnish reasonable grounds by themselves for believing that the prologues in question were not infringing copies. They do not

seem to me to go at all to the root of the case which needs to be established by a defendant seeking to rely on section 18(2)(b).

I must give a little more time to paragraph (3) which I have not yet read: "The second defendant was not aware of any facts or matters which would put him on inquiry that the book in suit infringed copyright". The second defendant knew, as I have said, that the idea for the first defendant's book came from the plaintiff's book. That was made clear in the author's note to which I have referred, which was the subject-matter of some discussion between the first defendant and the second defendant. The second defendant took upon itself to obtain such licences for quoted matter as were thought necessary. Evidence was given by Mr. De Cruz, the managing director of the second defendant, on this point,:

> "(Q) What precautions does your company take to prevent itself from being sued for infringement of copyright? (A) My company has a skilled editorial staff, people who are experienced at handling these matters, and these books in manuscript form, well in advance of printing and publication, are read very carefully by our professional editorial staff".

There is no evidence before me from anyone employed by the second defendant that trouble was taken to check that there was no infringement so far as the plaintiff's book was concerned, notwithstanding that it was the source of the first defendant's inspiration. None of the skilled editorial staff, experienced at handling these matters, was called to give evidence before me. I do not know what they knew. In my judgment the second defendant has not established the defence which might have been available under section 18(2)(b).

A second point is whether the first defendant is liable jointly with the second defendant for the tort of conversion of the infringing pages which was committed when and so far as they were bound up with non-infringing material. I answer that *210 question yes. There was a contract between the first and second defendant whereby the second defendant was obliged to publish. There was therefore a common design and the first defendant is a joint tortfeasor with the second defendant: see Morton-Norwich Products Inc v. Intercen Limited [1978] R.P.C. 152. It is correct that there is no allegation in any pleading of a joint design. This was a case directed to be tried without pleadings, or more accurately, the affidavits were ordered to stand as pleadings. The contract to which I have referred was an agreed document before me although I think it was not an actual exhibit to any affidavit. In a case where such an order is made I think it would be wrong for me to base any decision upon fine points of pleading which might perhaps have been appropriate if the case had been tried on pleadings properly so called.

A third point arises because this is a case where infringing material is interspersed with non-infringing material. How, I need to ask myself, are damages to be quantified in such a case? There is a useful passage in paragraph 572 of the current edition of Copinger, which I will read:

> "A difficult question arises where the work produced by the defendant consists in part of infringing matter and in part of innocent matter. It has been decided that, in such a case, the value of the whole work has first to be assessed as though the whole work had been converted. It is then necessary to ascertain the proportion of this sum which is properly attributable to the infringing material; this proportion will represent the damage recoverable. No exact method of calculation is prescribed. Clearly the respective lengths of infringing and non-infringing articles cannot be conclusive, since it is the value, and not the length of the material, which has to be taken into account. The court must, by what has been called *rusticum judicium*, determine, on the materials before it, the value of the plaintiff's part of the composite work at the date of conversion".

The infringing prologues represent approximately 4 per cent of the whole of the first defendant's book. The value could of course be less or more than 4 per cent. In my judgment it is more. How much more is a matter that could of course be left to the enquiry, but I think it may be convenient to the parties if I decide the point now, as I have the two books well in mind. In my judgment I said this:

> "In his defence as adumbrated in his affidavit, Mr. Herbert states that the prologues are included as a form of historical background to add credence to the fictional story he has written, and although they are not, he says, central to the story, they form an

important part of the structure of the novel. I think that is a fair statement".

The infringing prologues are the linchpin round which the first defendant's story revolves. Without that linchpin I think that the first defendant's story would be in danger of falling flat. I bear in mind, however, that there are obvious alternative linchpins which could be inserted into the axle which would not involve any breach of copyright. The particular linchpin chosen, unfortunately, by the first defendant has a value to the structure of the story which is disproportionate to its size and that is going to lead to consequences for the defendants. Assessing the matter as best I can I decide that the value of the infringing prologues to the book as a whole is 15 per cent.

An order is sought for delivery up of unbound infringing material — I refer to the printed prologues — so that order will be made. I am told, and this is obvious commonsense, that there is likely to be some overlap between such damages as may be *211 found in answer to the enquiry relating to infringement and the damages found in answer to the enquiry relating to conversion. Some appropriate formula may have to be included in the order to cover that point.

Judgment for the plaintiff. Defendants to pay 90 per cent of plaintiff's costs. J.B.

*212

(c) Crown Copyright. Published by Sweet & Maxwell on behalf of the Patent Office

© 2008 Sweet & Maxwell Ltd

Westlaw UK