UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROGER R. CRANE, JR,

                Plaintiff,

    - vs -

POETIC PRODUCTS LIMITED,

                Defendant,

POETIC PRODUCTS LIMITED,

                Counterclaimant,

    - vs -

ROGER R. CRANE, JR,

                Counterclaim Defendant,

Case No. 07 Civ. 7063 (BSJ) (FM)

**DECLARATION OF DAVID ANTHONY YALLOP**

I, DAVID ANTHONY YALLOP, declare under penalty of perjury that the following is true and correct:

1.    I am a director and shareholder of the Defendant and Counterclaimant in this Action, Poetic Products Limited ("PPL"). PPL is a limited company registered in England and Wales and the owner of the US and UK copyright of the Book, "In God's Name", which I authored. I am authorised to make this Declaration on behalf of PPL.

**My background and writing career**

2.    Accounts of some of my investigative books and quest for justice for others can be found inside the front cover of "In God's Name". As well as writing investigative books, I have written fiction and many screenplays for both film and television.

**"In God's Name"**

*Publishing history*

3.     I wrote the book "In God's Name" ("IGN") (as a servant of PPL). The US and UK copyright in IGN is vested in PPL. IGN was first published by Jonathan Cape Limited in 1984. The British paperback edition followed in 1985. IGN has been published in many other countries, including the USA. To date it has been translated into more than 30 languages and the various editions have sold over six million copies. In April 2007 IGN was republished in a new edition by Constable & Robinson Limited in the UK and, at about the same time, by Carroll & Graf in the USA. This resulted in copies of IGN being widely displayed for sale in bookshops in the UK, as well as on the internet. Little did I know that, at that very time, a Play that bore striking similarities to IGN was about to be launched on to the English stage.

4.     There are some non-material differences between the 2007 edition of IGN and the previous English language editions, namely:

- There is a new Introduction to the 2007 edition;
- The Postscript to the 2007 edition is an updated version of that which appeared in editions from 1985 onwards.

5.     It appears that that the copy of IGN that Mr. Crane's lawyer has put before the Court [Duvdevani Declaration Exhibit 2] is the 2007 US edition. I note from the published script of the Play, The Last Confession, in my possession (which appears to be the same as that put before the Court [Duvdevani Declaration Exhibit 1]) that it is stated to have been first published by Oberon Books Limited in 2007, but that the copyright notice asserts "Copyright © Roger Crane 1997", with no mention of any later copyright. However, nothing seems to turn on the Court being asked to review a later edition of IGN than that to which Mr.Crane admits having access[1].

---

[1] When asked by PPL's English lawyers to produce Mr.Crane's copy of IGN for inspection (to check for annotations and notes on it), the response from Mr.Crane's English lawyers was that Mr.Crane no longer had this in his possession or control and that he believed he borrowed IGN from a library and returned it to the library a long time ago. When PPL's lawyers asked for the production of notes or drafts in Mr.Crane's possession and for identification of the library from which the copy of IGN was borrowed, the response received was that the requests were premature. That was patently an inappropriate avoidance of the requests made as, under English Court requirements, potential parties to English litigation are expected to co-operate by exchanging relevant information and documents at the pre-action stage.

6.    It should also be noted that the page references to IGN which appear in this Declaration, in the draft comparison schedules served on Mr. Crane's English lawyers last year [Crane Declaration Exhibits A and B] and in the comparison schedules exhibited to this Declaration [Exhibits 4 and 5] are page numbers of the 2007 edition.

### *Subject and Content of IGN*

7.    IGN is described, in its sub title, as *"An investigation into the murder of Pope John Paul I"* and sets out the theory that Pope John Paul I ("Pope JPI") was murdered, with suggestions as to who may have committed the crime and how, together with their motives.

8.    An indication of the subject matter and content of IGN is provided by the section at the beginning of the book entitled "Prologue". As the very use of that term suggests, it sets the scene for the rest of the book.

9.    The scene with which I begin is set in the Vatican, on the evening of Pope JPI's 33rd day in office, with the Pope having dinner with his secretaries, Fathers Lorenzi and Magee. I use this to refer back to the previous 33 days of his Papacy and to look forward to the action that he was intending to take the next day. I paint a picture of Pope JPI's physical features and character.

10.    I then move to another scene, a floor below within the Vatican, where Bishop Paul Markincus, the head of the Vatican Bank, is working late. I describe him physically and by character. I mention his worries about the new Pope. Then, I move to another scene in the Vatican, where Cardinal Villot, the Secretary of State, is still at his desk, considering the list of transfers, forced resignations and new appointments that Pope JPI has handed to him an hour before.

11.    Then, without creating precise scenic locations and times, I refer to Italian banker Roberto Calvi in Buenos Aires, Sicilian banker Michele Sindona in New York and Cardinal Cody in Chicago. I describe the events that are concerning them, but not their physical appearance. Finally, I mention Licio Gelli and describe the power that he holds over some of those already mentioned, again without painting a picture of his appearance or location.

12.    The dramatic image that I thus seek to create in the mind of the reader is set in the Vatican, with three characters, in three separate rooms, on the evening of 28 September 1978. The reader is

3

made aware of four other, less distinct characters elsewhere who are involved in the affairs at the Vatican that are about to explode.

13. Next, I explain to the reader that *"these six men, Marcinkus, Villot, Calvi, Sindona, Cody and Gelli had much to fear if the Papacy of John Paul I continued. It is equally clear that all of them stood to gain in a variety of ways if Pope John Paul I should suddenly die"*. I then note that sometime between the late evening of 28 September and the early morning of 29 September 1978, Pope JPI dies. *"Time of death: unknown. Cause of death: unknown"*. I state that I am *"convinced that one of these six men had, by the early evening of September 28th, already initiated a course of action to resolve the problems that Albino Luciani's Papacy was posing. One of these men was at the very heart of a conspiracy that applied a uniquely Italian solution"*.

14. Following the Prologue, IGN continues with seven chapters entitled:

The Road to Rome:
The Empty Throne
Inside the Conclave
Vatican Incorporated
The Thirty-three Days
We Are Left Frightened
By Benefit of Murder – Business as Usual
Followed by:    Epilogue

There is also a useful and detailed Index. In the case of named characters, the references to them are sub-categorised into subject matter. For instance, if one wanted to find out about Cardinal Benelli, one would find 56 pages referencing him. If one wished to narrow that down, there are eight sub-categories, including *"and John Paul I" [20 page references]; "and Marcinkus" [six page references]; "as Papal candidate" [five page references] and "and the papal election" [six page references]*.

[The 2007 edition has a Postscript to this Edition, which is an updated version of that contained in earlier editions].

4

15.    In broad terms, the content and themes of IGN can be categorised as follows:

    (a) The early life and career of Albino Luciani, later Pope John Paul I. His character, beliefs and outlook.

    (b) His time as Patriarch of Venice. His humility in that role.

    (c) The later part of the Papacy of Pope Paul VI. Character and beliefs of Paul VI. His attitude to birth control and other issues of faith (and Luciani's attitude to those issues, including his liberal views on birth control).

    (d) The finances of the Vatican and of the Vatican Bank. Its connections with dubious and illegal operations and operators. Characterisation of Bishop Paul Marcinkus, head of the Vatican Bank.

    (e) The links of the Vatican Bank and Marcinkus, during Paul VI's Papacy and into that of JPI, with the Mafia figure Michele Sindona, with members of the illegal Italian Masonic lodge P2 including its head, Licio Gelli, and with the corrupt Banco Ambrosiano and its head, Roberto Calvi.

    (f) Marcinkus' links with Cardinal Cody of Chicago.

    (g) Benelli's friendship with Luciani. Benelli providing information to Luciani about corruption in the Vatican.

    (h) The death of Pope Paul VI. The Conclave to elect a new Pope. Benelli puts forward Luciani as a Papal candidate and leads the support for him. The other candidates. The voting and the election of Luciani as Pope.

    (i) The new Pope JPI and his welcome by the world. His enthronement and departure from tradition.

    (j) His 33 days in office. How his new approach to the Papacy and his liberal views met with disapproval from traditionalists in the Vatican, such as Cardinal Villot, the Secretary of State.

    (k) Pope JPI's plans to "clean out the stables", including replacing Villot as Secretary of State and Marcinkus as head of the Vatican Bank.

    (l) The death of Pope JPI. His body discovered by Sister Vincenza. The aftermath and cover up.

    (m) The election of Pope JPI's successor. Benelli coming within a few votes of winning, but a compromise candidate, Karol Wojtyla, being elected as Pope John Paul II.

      (n) Characterisations of figures including Luciani, Paul VI, Villot, Benelli, Marcinkus, Cody, Calvi, Sindona, Gelli, Felici, Ottaviani, Baggio, Gantin, Suesens, Lorscheider and Fathers Magee and Lorenzo, as well as Sister Vincenza.

      (o) Analysis of the theory that Pope JP1 was murdered. My conclusion that he was murdered. Consideration of those potentially responsible, with a presentation and explanation of a "shortlist" of six, with my views on each. Left to the reader to decide on the "vedict" of who was guilty.

16.    Having described the broad content and themes of IGN, it is appropriate (especially in view of the sub-title to the book) to consider in more detail my conclusion, as set out in IGN, that Pope JP1 was murdered. I do not name the murderer, but leave it to the readers to decide on their verdict:

*"The central purpose of my investigation has been the death of ... Albino Luciani. Villot, Calvi, Marcinkus, Sindona, Gelli, Cody: one of these men was at the very heart of the conspiracy that resulted in the murder of Luciani. Before you, the reader, consider your verdict, let us take one final look at these men."* [page 284].

17.    I then set out a commentary on each of the six suspects and, on page 302-303, set out my personal view that:

*"The chain that link by link leads from a murdered Pope to Bishop Paul Marchinkus to Roberto Calvi to Umberto Ortolani* [an associate of Gelli and Calvi] *and Licio Gelli is strong. ... We are left with murder. Not, in my view, by person or persons unknown, but by persons all too well known, with, at the heart of the conspiracy, Licio Gelli."*

Note that I do not express the view that Gelli was the murderer or that he acted alone, but that he was at the heart of the conspiracy to murder in which he was linked with Bishop Marcinkus and Roberto Calvi. In setting out my view, I do not mention Villot, Cody or Sindona: that does not mean that I do not regard them as involved, though I regard Villot as less likely to have been involved than the others.

18.    Of Villot, I write, a few pages earlier [pages 284-286], that he had motive and opportunity to murder Pope JPI; that after the Pope's death he destroyed evidence and lied; that he took other actions that *"ensured that someone got away with murder"*. However, I cast doubt on Villot's involvement in the conspiracy to murder:

> *"It may well be that the various illegal actions perpetrated by Villot after the discovery of Albino Luciani's body were motivated by what Villot considered the paramount factor, the greater good of the Catholic Church, if he saw clear evidence of murder, clear proof that Albino Luciani did not die a natural death. Many would contend that his subsequent actions were to protect the Church. Even given that rationale, I would still contend that morally he would appear to have been in need of help"*.

19.    As to Cody, I comment that *"The despotic, arrogant Cody clearly had a motive, and a powerful one, to involve himself in a conspiracy to murder Albino Luciani. A question mark may remain with regard to his financial corruption* [a reference to a Federal Grand Jury investigation into allegations that Cody had diverted up to one million of Church funds to a friend: the investigation ended without charges being brought when Cody died of natural causes in 1982]. One of Cody's responses to the Grand Jury was *"I am only answerable to God and Rome"*. I comment that *"if any Pope was going to remove Cody from Chicago it would be over his dead body – either Cody's or the Pope's",* having already given my view that Pope JPI was about to remove Cody from office. [See pages 286-289].

20.    As to Archbishop Paul Marcinkus, I write in detail elsewhere in IGN about the crimes that I consider Marcinkus commited with Calvi, that made huge sums of money for the Vatican Bank, which Marcinkus ran. In this part of the book, I make reference to that and comment that *"With regard to the murder of Albino Luciani, Marcinkus had the motive and the opportunity"*. I also comment that *"If not actively involved in the conspiracy to murder Albino Luciani it is possible that Marcinkus acted as a catalyst, wittingly or unwittingly ... There is no doubt that Marcinkus conveyed in full his fears on the new Papacy to Roberto Calvi. There is equally no doubt that Albino Luciani was about to remove Marcinkus from the Vatican Bank and cut off all links with Banco Ambrosiano. Did the fears that Marcinkus expressed not only to Calvi but to others about his new Pope provoke the course of events ...?"* [See pages 289-292].

21.    As to Sindona, I note that he was facing extradition from the USA to Italy, but also prosecution in the USA. *"The one remaining ace he could hope to play was dependent on Vatican co-operation. Sindona reasoned that if Bishop Marcinkus* [and two other Cardinals] *gave evidence on his behalf, a jury would be very heavily influenced by statements from three such august people. With Albino Luciani as Pope, the possibility of any Vatican testimony, let alone favourable testimony, did not exist"*. There is the motive. That Sindona had the capacity to murder, I do not doubt. I note that he was a member of both the Mafia and the P2 illegal Masonic lodge and that he would have no compunction about murdering a Pope who stood in his way. [See pages 292-294].

22.    Then there is Roberto Calvi. I state: *"The case against Roberto Calvi with regard to his direct involvement in the death of Albino Luciani is strong. Very strong."* and *"Calvi was engaged in the progressive, continuing theft of over one billion dollars, a theft that would have been completely exposed if Luciani had lived"*. Elsewhere in the book, I set out in detail my belief that Calvi, as head of the corrupt Banco Ambrosiano, had engaged in massive criminal fraud and money laundering operations that involved the knowing assistance of the Vatican Bank of which Bishop Paul Marcinkus was the head. The Vatican Bank had made massive profits from this and my belief is that Pope JPI had found out about this and was about to remove Marcinkus from his post and put an end to the Vatican Bank's involvement in illegal activity. [Pages 294-297].

23.    And finally, Gelli. I refer to Gelli as *"the Puppet Master with a few thousand strings from which to select"*. I describe Gelli as *"Calvi's ultimate master"*. I describe elsewhere in the book how Gelli was the Master of the illegal Masonic lodge P2, which numbered among its membership Italian government figures, Army officers and others exercising power in the Italian state, as well as the Mafia. I describe the web of financial crime and violence in which Gelli was embroiled. I comment that: *"Can anyone really believe that Gelli and Ortolani would have merely shrugged their shoulders when Calvi told them that Albino Luciani was about to take a course of action that would mean the party was over?"*. [See pages 297-303].

## *Similarity of Subject and Content in TLC*

24.     Having set out the above synopsis of IGN [paragraphs 7-23 above], I will now indicate those parts and aspects of IGN that appear in TLC.

25.     Dealing first with the characters mentioned in the above synopsis of IGN, ALL of the characters mentioned in the synopsis of IGN appear in TLC (either as actual characters in the Play or as persons mentioned in dialogue), with the exception only of Gelli and Cody. Looked at from the angle of the list of 17 characters in TLC, all but two appear in the synopsis of IGN. Those two are The Confessor and Thomas the Gardener. The Confessor is of course Wojtyla, later Pope John Paul II. Whilst Cardinal Wojtyla/John Paul II appears in IGN, it is not as Confessor. Thomas the Gardener can be seen to be a character based on Brother Clemente, who was working in gardens near the Vatican when engaged in conversation by Luciani [see IGN page 60]

26.     As already noted in paragraph 15(n) above, IGN includes characterizations of those individuals, which it is clear to me have been used by Mr. Crane for the purpose of his characterizations in TLC.

27.     Turning to the content and themes of IGN as categorized in paragraph 15 above, given the extensive similarity, indeed identicality, between content and themes of IGN as set out in paragraph 15 and content and themes in TLC, I have as a matter of conciseness and convenience identified below only the differences. ALL of the content and themes as set out in sub-paragraphs 15(a) to (o) above appear in TLC, with the following limited exceptions, which do not appear in TLC:

Sub-para (a)     The early life of Luciani;

Sub-para (e)     Masonic Lodge P2 and its head, Licio Gelli (IGN links Marcinkus with Calvi and Calvi with Gelli: TLC has the link between Marcinkus and Calvi)

Sub-para (f)     Cardinal Cody of Chicago (Marcinkus' links with Chicago being mentioned)

Sub-para (n)     Cody and Gelli

Sub-para (o)     Cody and Gelli were two of the shortlist of six suspects in IGN. Of the other four suspects in IGN, the suspects in TLC include Villot and Marcinkus, with Calvi, as well as Sindona, possible suspects linked via Marcinkus.

10

28.  A review of the remaining parts of paragraph 15 (i.e. most of that paragraph) demonstrates the very substantial similarities between IGN and TLC.

29.  Reverting to the Prologue of IGN [paragraphs 8-13 above], the three main figures there characterized are Pope JPI, Bishop Marcinkus and Cardinal Villot. Those characters are three of the main characters in TLC. Pope JPI is a central character in the Play and Marcinkus and Villot, as individuals about to be removed from office by Pope JPI are clearly portrayed in TLC as suspects with a motive to murder the Pope. The Prologue of IGN portrays Calvi and Sindona as characters "off stage", which is the same way as they are portrayed in TLC.

30.  In the various accounts of THC that Mr.Crane gives in his Declaration and in the Memorandum of Law, it is striking that he fails to mention the characters of Calvi (or Sindona) and the theme of the involvement of the Vatican Bank, headed by Bishop Marcinkus, with the corrupt Calvi and Banco Ambrosiano and their illegal financial dealings. This is a key theme of both IGN and TLC. In both works, Pope JPI is horrified by the Church's involvement with such financial illegality and determines to extricate the Church from it. For that reason, he decides to remove Marcinkus from office, to the obvious detriment of Calvi and his associates. That provides a motive for murder of the Pope. It is surprising that Mr.Crane has seen fit to exclude these important themes from his synopsis of TLC.

31.  Benelli is a key character in TLC. He appears on 56 pages of IGN, as the Index shows [para. 14 above], and his influence is expressed in IGN as significant, for example as the person who first proposes Luciani for the Papacy, the "Popemaker". In taking the character of Benelli, Mr.Crane has used the dramatic device of having a character act as storyteller, a role which in a book is that of the author, as the unseen storyteller. So, plainly the focus on Benelli is a difference between IGN and TLC, but is a classic technique used in the adaptation of a literary work into a drama.

32.  In summary, there is a striking identity and similarity between IGN and TLC as to selection of content and theme, and of characters and characterization.

### *My research for IGN*

33.  As explained in the Preface to the first edition of IGN (which also appears in the 2007 edition), I
     undertook nearly three years of intensive research for the purpose of writing IGN. This included
     the consideration of documentary evidence, both primary and secondary, and many interviews.

34.  In some instances, I named my sources but in others I did not, so as to respect their requests for
     anonymity. In the Preface, I acknowledged a long list of sources, but stated that they were "the tip
     of the iceberg". The risks that many of those who spoke to me took should not be underestimated:
     some of the men of whom I wrote would not shrink from extreme violence. Indeed, I personally
     took risks in the course of my research. I did not sit on my back porch to research and write IGN
     over a few weekends (the manner in which Mr.Crane is on record as stating he wrote The Last
     Confession). I travelled widely within Italy and beyond: the personal risks to an investigator
     asking awkward questions in places such as Sicily is considerable.

### *The nature of IGN*

35.  Much of what Mr.Crane contends in these proceedings is based on the assertion that IGN is a
     mere vehicle for setting out historical and unchallenged fact. That assertion is wrong and badly so.

36.  The number of undoubted, unchallenged facts in IGN is relatively small and they do not form a
     significant part of the essential aspects of the book. Many of the matters that I put forward in IGN
     as fact, and which I believe to be true, are based on inferences and conclusions which I believed to
     be proper to make and which I arrived at as a matter of interpretation and analysis of my research.
     In short, they are my theories as to facts.

37.  To take an example, it is undoubtedly a historical fact that Pope JPI died after 33 days in office,
     but the theory that he was murdered is not a "historical fact", albeit that I believe that that is what
     happened. Many others dispute that version of events, such as the Vatican itself and author John
     Cornwell, who claims that the Pope died of natural causes. I do not claim that I am the only
     person who has asserted that Pope JPI was murdered and I would not claim that the mere
     reference to that theory infringed the copyright in IGN: what I would and do claim is that my
     particular theories of how the Pope was murdered and by whom and why, and the material set out

in IGN that supports those theories, is the subject of copyright and has been infringed by Mr.Crane.

38.    As can be seen from paragraphs 16-23 above, where I set out my assessment of who may have been responsible for the murder of Pope JPI, that core part of IGN comprises my analysis of the evidence I have compiled and my conclusions. My views on which of the characters are more likely or less likely to have been responsible for the murder of the Pope are based on my qualitative judgment of them and of the relevant motives and circumstances. Those views are not fact, but my opinion. This is reflected in the Preface to IGN, where I state that *"I take the responsibility for putting the evidence together and for the conclusions reached"*.

39.    The position has been explained well by two reviews of IGN:

- *"I read this book with the absorbing interest aroused by an expert prosecutor at a sensational trial": The Times*
- *"He has surely proved that there is a case to answer": Irish Independent.*

What I have done is to set out a case, on which I ask the reader to deliver her or his verdict.

40.    To the extent that IGN contains historical facts, I used my skill and judgment in the collection, selection, compilation, arrangement, description and expression of such facts.

41.    A significant aspect of IGN is my depiction of the various characters in the story. Such characterisation depends partly upon factual matters, which I had discovered, such as their physical size, but more importantly upon my qualitative judgments about them based upon my research.

42.    As to dialogue, I state in the Preface that *"while the dialogue within this book is reconstructed, it is not fabricated"*. In that context, I am referring to information provided by secondary sources who had not been present at the conversation in question, but who had been told, by one of those who had been present, what had been said. In many instances, such sources provided me with the gist or effect of what they had been told a particular character had said and I then had to use my skill as a writer to create dialogue or reported speech that accurately reflected the source's

information. Such information was thus third hand by the time it reached me and very far therefore from a contemporaneous note or recording of what had in fact been said.

43.    This point about dialogue or reported speech is underscored by the fact that many of the conversations that I recount in English, were originally spoken in Italian or other languages. My "reconstruction" of what was spoken thus not only comprises my individual version of what was said, but also a language translation of what was originally said. It is therefore not possible to regard such "reconstructed" speech as a matter of historical fact.

44.    In short, IGN is not a conventional historical work, but puts forward a controversial compilation and interpretation of events and characters which has been heavily criticised and even derided. For instance, the Vatican has described IGN as *"infamous rubbish"* and *"taking fantastic speculation to new levels of absurdity"*.

## The Last Confession ("TLC")

45.    In about April 2007, I first heard of a Play called "The Last Confession" ("TLC") by Roger Crane, when my wife reported to me that a business acquaintance of her's had been to see TLC at The Chichester Festival Theatre, had assumed that the Play was based on IGN, which he had previously read, and had been surprised that copies of IGN were not for sale in the theatre foyer. He had previously given his copy of IGN away and had assumed that he would be able to purchase a copy of it at the theatre.

46.    I then investigated by accessing the theatre's website, from which I leant that TLC was a new play by a first time playwright, which had just had its very first performance at The Chichester Festival Theatre (in the south of England). The website contained copies of some reviews and other information, including a podcast of interviews of Mr.Crane and of the lead actor, David Suchet, and the director, David Jones. (I did not access the podcast, but my English lawyers did so later and provided me with a transcript of it, a true copy of which I attach as Exhibit 1. My lawyers also provided me later with a transcript of a broadcast on UK Radio 4 on 30 May 2007 of an episode of programme called "Front Row", in which Mark Lawson interviewed David Suchet and Roger Crane, a true copy of which I attach as Exhibit 2).

13

47.   Based on the report that I had received via my wife and the information I obtained from the theatre website, it appeared to me, even at that early stage, that there seemed to be significant similarity between TLC and IGN. Neither I nor anyone else connected with PPL had received any approach from Mr.Crane or anyone else connected with TLC, either to seek consent to make use of IGN or to notify me that a Play which, on Mr.Crane's case, used IGN as a legitimate source was about to open in the south of England, where I live.

48.   The report of an independent third party assuming that TLC was based on IGN, with PPL's consent, was not the only such report. I attach as Exhibit 3 true copies of a number of reports and comments from the media and websites that have made that same assumption. It will be the intention of PPL, should this matter proceed to trial, to call evidence from some or all of these persons. The most notable comments are perhaps from David Suchet, the lead actor in the English production of TLC, which I will address below.

49.   The following comments have been made by David Suchet in the media and in the "podcast" and broadcast referred to above, as exhibited:

Radio 4:

*"he [Benelli] did exist but I wanted to know what sort of man he was and all I could find were documents within various books that had been written, from which obviously the story of this play has been taken".*

The Stage 25 April 2007:

*"This is not a docu-drama, but all the characters are taken from real life. It is all documented in the book, In God's Name, by Davis (sic) Yallop."*

The London *Evening Standard* dated 19.06.07:interview of David Suchet by Fiona Maddocks:

*"At the simplest level," Suchet explains, "this is a dark thriller about who murdered John Paul I, the Church's only really liberal, reforming and modernising Pope –if, indeed, he was murdered. On another, it's about one man's loss of faith, his bitterness and confusion, and a power struggle at the heart of the Catholic Church."*

*TLC is based on David Yallop's book In God's Name, which has already sold more than six million copies (and had its central tenet refuted by British journalist John Cornwell). Yallop argues that several cardinals – such as the shady Vatican banker Cardinal Marcinkus, a character in the play – stood to lose everything by John Paul's appointment.*

*"I first got involved with the play some five years ago [2002], and spent some time working on the script with Robert Crane. Then nothing came of it. Suddenly David Jones came aboard...."*

50.    The following statements have been made by Mr.Crane in the "podcast" and broadcast referred to above, as exhibited:

Podcast:

*RC:*    *Yes, it's about a murder and I'll go through the themes.*

.....

*RC:*    *I wrote it on a back porch in a house in upstate New York and now here I've ended up in what was once the National Theatre founded by Laurence Olivier.*

.....

*SL:*    *Is the play your version of what you think happened?*

*RC:*    *Yes, but it's, it's, it's the underlying facts are pretty indisputable, but obviously and actually if you go and look at the books you will see some lines of dialogue are quotes from people, and one of the things I like, no one can tell where I have written, what 99% is mine, where my writing is mine and where the quotes [inaudible]. But it's my, it's not a documentary, it's my view of the Church and what could have happened. Based on facts that did happen.*

*SL:*    *You use a lot of real names and characters in there. Have you had many troubles with them ...?*

*RC:*    *All real names, uh, which has caused me to try to be as accurate as I can.    Uh, fortunately, many of them are dead but not all.*

.....

*SL:*    *Where do you write?*

*RC:*    *Uh, I prefer with a pad of paper as long as it's, the temperature is nice, and the weather is like it is here today to sit in my back porch and write.*

*RC:*    *The play was written in twelve weeks over twelve weeks-ends because I was working full time.    I wrote it in longhand because I wrote faster that way and typed it in an evening on a computer.[2]*

---

[2] This account from Mr.Crane of how wrote the Play should be contrasted with the assertion in the introduction to the Crane chart [Exhibit C to his Declaration] of the alleged extensive research that he carried out and amalgamation from "a very large number of sources".

Radio 4:

*"So I started reading about this particular Pope John Paul the First and the Vatican, and I thought, well maybe it doesn't have to be so fictional after all and that's what led me to write what I wrote."*

*[Mark Lawson:]*
*"And [inaudible] as you will know from having done the research, that many people have written on this, there are varying versions. David Yallop, a writer, has stated quite clearly that he believes that Pope John Paul the First was murdered. John Cornwell, another writer, has suggested that he died from neglect as he wasn't given the proper medical attention, he had a heart condition and so on. You leave it to the viewers to judge very much in the play, but which do you tend towards, do you think he was murdered?"*

*[Roger Crane:]*
*"Well ... um ... I read obviously both of those books along with probably a dozen other books on the subject and I am a lawyer and there are contradictions in things that happened that are too coincidental to be explained away simply by saying it was natural causes, and I tried to put in the play facts and the possibility of murder that no one could really dispute. I just lay out those facts and to me when you look at those facts there is, well I don't think it's the way the English would put it, proven beyond reasonable doubt. I think there is a very strong case that it could have been murder."*

51.   Having reached the preliminary conclusion, based on the reports described above and my initial enquiries, that there appeared to be substantial similarity between TLC and IGN and that TLC had been based on IGN without authorisation, I obtained a copy of the script of IGN, which had been published in the UK by Oberon Books Limited. This asserted Mr.Crane's copyright in TLC as of 1997, identified him as the author of the work in accordance with the UK Copyright, Designs and Patents Act 1988 and asserted his moral rights (rights in the UK arising under the 1988 Act).

52.   I then read the script of TLC and was astonished at the very great similarity between it and IGN. Having written IGN, I am of course very familiar with that work. The similarities are identified in detail elsewhere in this Declaration and Exhibits, but suffice it to say here that whilst, based on what I has already learnt, I had been expecting extensive similarity of theme and structure, and of compilation, selection and arrangement, I was taken aback by the very extensive amount of actual language copying, both of identical language and of language that was so similar as to be in effect paraphrase.

53.    I was initially reluctant to visit the theatre to see the Play. However, when it had completed its "run" in several provincial English towns and cities, I went to see it at The Theatre Royal Haymarket. My reluctance to see the Play is perhaps hard for anyone who is not an author to understand. To see one's work subjected to the most blatant plagiarism is an experience that I feel most personally and deeply. It feels like a form of violation and gives rise to feelings of anger, resentment and deep upset. I left the theatre that evening with a deep feeling of injustice about what Mr.Crane has done and his conduct since then has only served to strengthen that feeling.

54.    It was, however, important that I did see the Play, as it is not only confirmed my existing conviction that Mr.Crane has infringed the UK copyright of PPL in the most blatant way, but it gave me insight into aspects of the infringement that are not so obvious from the written page. This was relevant in that one of the complaints asserted in England in the pre-action correspondence is that the performance of the Play on the English stage amounts to an infringement of UK copyright, aside from the publication of the script. As an example, I mention that one of the driving forces of a Play (that is any many ways poorly dramatised) is the strong "one liners" of dialogue, many of which are copied from IGN, I say that in part because of the audience reaction to them.

## Legal action

55.    In view of the above matters, I placed the matter in the hands of PPL's English solicitors (lawyers). I prepared detailed comparison schedules between the text of IGN and TLC. In England, the Courts have requirements, specified in Protocols and like documents, as to how parties to disputes are to deal with each other in advance of commencing Court proceedings. Pursuant to those requirements, my solicitors sent letters to intended Defendants, including Mr.Crane/his solicitors setting out the complaint of infringement of UK copyright within England.

56.    Mr.Crane's English solicitors responded, both on a procedural and substantive level, giving the appearance that Mr.Crane was dealing with the complaint under English pre-action procedures and would continue to do so. It was a surprise therefore when, without prior warning, notification was received of the commencement of the current declaratory proceedings in the USA. It was only upon PPL's receipt and review of such notification that PPL first learned that Mr.Crane had published *The Last Confession* in the U.S. and that infringement of PPL's U.S. copyright had occurred. Prior to that time, PPL had only a mere suspicion or hunch of Crane's infringing acts in violation of PPL's U.S. copyright.

**The present application**

57.    I now turn to this application and deal with various aspects under different headings:

*Time limit for response*

58.    The Order to submit a response to Mr.Crane's application within 10 working days has placed me and my lawyers under extreme time pressure. In advance of the Magistrate's decision on PPL's application to stay the summary judgment application pending discovery, we did not consider it sensible to incur costs in preparing a response that might not be needed, or not needed at this stage.

*English law and jurisdiction*

59.    No submission is made at present by PPL to US jurisdiction in respect of English law. The submissions made as to English law are made, not by way of submission to US jurisdiction, but in support of PPL's contention that US Court should not assume jurisdiction to consider granting summary judgment in respect of English law issues. If this US Court declines to consider granting summary judgment over English law, PPL will consider whether then to submit to US jurisdiction in respect of English law for the purpose of a full trial. Non-submission at this stage is not indicative of lack of faith in the US Court. But PPL considers it inappropriate for a US Court to determine matters of English copyright law in a summary way.

*Substantial similarity*

60.    This is the issue on which, according to Mr. Crane's lawyers, his application for summary judgment turns [see <u>Memorandum of Law</u> page 2 *"The resolution of this motion turns on the presence or absence of substantial similarity between The Last Confession and the protectable elements of In God's Name"* and page 11 *"The parties have not engaged in any discovery[3], as none is necessary to decide the pivotal issue of whether the two works are substantially similar"*]. If the Court is satisfied that there is substantial similarity, I find it difficult to see how the Court could, without discovery and oral testimony, determine the issue of whether the similar elements of IGN are or are not protectable, as that would turn, according to Mr.Crane, on the issue of whether the material at issue is historical fact or not. I have addressed that issue in paragraphs 35

---

[3] I and PPL's English lawyers sought pre-action discovery from Mr.Crane in England, in connection with the complaint of infringement of UK copyright, which he improperly declined to give. In the USA, it was PPL's wish to have discovery.

to 44 above, to the effect that the amount of historical fact, properly so called, in IGN is relatively small and that much of what Mr.Crane chooses to call fact is theory, interpretation and, in lawyers' terms, advancing a case for the prosecution. Clearly, my book convinced Mr.Crane that much of what I put forward is correct and factual and, to that extent, his assertion that IGN is a historical fact might be taken as an unintended compliment. On the other hand, however, it did not convince the Vatican or others such as the author John Cornwell. What Mr.Crane calls historical fact is, in fact, controversial theory.

61.     In paragraphs 7 to 32 above I have set out a comparison between IGN and TLC in terms of content and themes, characters and characterisation and dramatic approach and structure. In terms of more painstaking linguistic (and other) analysis, as explained above, two detailed draft comparison schedules for Acts One and Two of TLC were sent to Mr.Crane's English lawyers last year, expressly on the basis that they were drafts and subject to amendment and development. Mr.Crane's lawyers mislead the Court when they state in their Memorandum of Law (page 10) that on June 22, 2007 my English lawyers sent him a letter that *"contains **the** alleged instances of copying that, according to Poetic Products, amount to infringement"* (emphasis added). The word *"the"* is the misleading one. In the limited time available since the Magistrate's decision was made, I have worked long hours, seeking to develop the schedules further. However, they are still "works in progress" and I would need at least ten further working days to develop them to a stage where the fully set out PPL's case and response to Mr.Crane's summary judgment application. The two schedules in their current form are exhibited as Exhibits 4 and 5. It will be seen that the Act One comparison is more advanced than that for Act Two. This is simply because of shortage of time. In due course, if the US Court grants me the time and opportunity to put forward PPL's case in a full manner, I would intend to colour code the Act Two comparison in a similar way to that for Act One. The quotations in columns one and two of those Exhibits are accurate quotations from *In God's Name* and *The Last Confession*.

## Responses to various of Mr. Crane's allegations (to the extent that responses have not already been set out above)

### Mr.Crane's Declaration

62.     In paragraph 3 of his Declaration, Mr. Crane states (no doubt in an attempt to distance TLC from IGN) that *"Although I started the journey thinking that I would write a murder mystery, I ended up not writing it as such, as the play is inconclusive about whether John Paul 1 was murdered"*. However, in the Podcast from the Chichester Festival Theatre [Exhibit 1], Mr.Crane stated *"it's*

19

*[i.e. the Play's] about a murder"*. In the Radio 4 interview [Exhibit 2], Mr.Crane stated *"...I tried to put in the play facts and the possibility of murder that no one could really dispute"* and *"I think there is a very strong case that it could have been murdered (sic)"*. Here is a direct contradiction between what Mr.Crane stated in his Declaration, on the one hand, and on two separate public occasions, on the other.

63.     It should be noted that Mr.Crane's assertion of the probability of the Pope having been murdered came in answer to a question from the interviewer, Mark Lawson, as follows:

> *"David Yallop, a writer, has stated quite clearly that he believes that Pope John Paul the First was murdered. John Cornwell, another writer, has suggested that he died from neglect as he wasn't given the proper medical attention, he had a heart condition and so on. You leave it to the viewers to judge very much in the play, but which do you tend towards, do you think he was murdered?"*

In giving the answer he gave, Mr. Crane was clearly preferring my theory that the Pope was murdered over the theory of John Cornwell (author of "Thief in the Night").

64.     In stating that there is a very strong case that the Pope John Paul 1 could have been murdered, Mr.Crane was placing his Play "on all fours" with IGN, in which, as explained above, I made the case that Pope JP1 was murdered. Anyone seeing or reading TLC would be left in no doubt that Mr.Crane intended the audience to conclude that the Pope was probably murdered. (See, for example, Benelli at page 97 of TLC *"Villot didn't murder the Pope. He isn't hard enough. But others are."* and Benelli to his Confessor at page 109 of TLC *"One way or another men defied him and then killed him, and you have done nothing about it"*).

65.     I do not accept the accuracy of Mr.Crane's description of the general story line of the Play, as set out in paragraph 4 of his Declaration, that *"The general story line of the play is the struggle for power between the liberal cardinals trying to implement the reforms of the Second Vatican Council and the reactionary cardinals who opposed them and ultimately won"*. I also do not accept that the themes and storyline as asserted by Mr.Crane in paragraphs 5 and 6 are complete and accurate. In particular, there is no mention of:

    •   The possible or probable murder of Pope JP1;

- The financial misdoings at the Vatican Bank;
- The head of the Vatican Bank, Bishop Marcinkus;
- The involvement of the Vatican Bank and Marcinkus with the crooked Roberto Calvi and Sindona;
- Pope JPI's decision to replace Marcinkus and Cardinal Villot, on the eve of his death and the clear suggestion that they had motive to murder the Pope.

Those themes occupy substantial parts of the Play and form crucial parts of its storyline, yet there is no mention of them in the playwright's own Declaration. It is also the case that they are important themes in IGN and a substantial amount of the text from IGN which is alleged to have been copied in TLC relates to those themes.

66.    In paragraph 9 of his Declaration, Mr.Crane states that *"The script had even been set to David Suchet in about 2001 or 2002, but at that point he was not interested"*. However, in the article in the Evening Standard newspaper of 19 June 2007 [part of Exhibit 3] David Suchet is quoted as saying *"I first got involved with the play some five years ago [2002], **and spent some time working on the script with Robert (sic) Crane**. Then nothing came of it. Suddenly David Jones came aboard...."*. Thus, according to Suchet, far from not being interested, he was interested enough to actually work on the script with Mr.Crane. Which is the correct story?

67.    In paragraph 16 of his Declaration, Mr.Crane states that by reason of its English lawyers writing to complain of copyright infringement (of UK copyright infringement I would note) *"Poetic Products effectively placed a cloud over my title, both in England and the United States...."*. He goes on to complain that PPL has prevented him from proceeding with a Broadway theatrical production and a film. However, it is obvious to me that, by his actions in copying IGN, Mr.Crane has to borrow the words that he has levelled at me, *"effectively placed a cloud over PPL's title"* in that PPL's prospects of marketing film and theatrical rights in IGN will be damaged for as long as the infringement remains unremedied.

*Exhibit A to Mr.Crane's Declaration*

68.    Exhibit A to Mr.Crane's Declaration contains a copy of a detailed comparison chart that was served on PPL's behalf on his English lawyers. When served it was in colour, with different types of copying indicated by three different colours. The copy of the chart in Exhibit A that I have seen

21

is a black and white copy. I trust that the version that Mr.Crane has filed with the Court is in colour, otherwise it would not be a true and accurate copy of the document.

_Exhibit C to Mr.Crane's Declaration_

69.     Exhibit C to Mr.Crane's Declaration contains a letter from his English lawyers to PPL's English lawyers dated 9 November 2007, with an accompanying 84 page document (the "Crane chart") that, according to Mr.Crane in paragraph 15 of his Declaration, listed _"my sources for the various facts I used to write my play"_. That is an unequivocal statement that he used the sources listed as the sources for the facts used to write TLC. However, elsewhere, his case on that point is put in less clear terms. In the Memorandum of Law, page 10, there is reference to a chart exhibited to the Duvdevani Declaration [Exhibit 3] (the "Duvdevani chart"), which sets out, it appears, the same sources referred to by Mr.Crane, with some additional sources, all in a column that is stated, in the introduction to the chart, to _"contain examples of other books or articles[other than IGN] where this same information **can be found**"_ (emphasis added). Furthermore, at the third line from the end of page 10 of Duvdevani Declaration, the submission is that the Duvdevani chart shows that a lot of the material _"is easily found in other published sources"_ and not that it **"was** easily found in other published sources" by Mr. Crane himself. It is thus an allegation of what Mr. Crane could have done, not what he actually did.

70.     The point made in the preceding paragraph can be illustrated by comparing page 2 of the Crane chart with page 1 of the Duvdevani chart, where each is concerned with the same passage from page 11 of TLC. In the Crane chart, four sources are quoted as the sources from which Mr. Crane claims he actually obtained the so called facts for that passage. In the Duvdevani chart, the same four sources appear, but the first of them (Illustrissimi) is stated to have been read by Mr.Crane , but that is not stated of the other three sources.

71.     The Crane chart is not of any relevance to the issue that Mr.Crane's lawyers have stated is the _"pivotal issue"_ in his application for summary judgment, namely whether IGN and TLC are substantially similar. It simply does not address the point. Instead, it purports to address a separate issue, namely whether Mr.Crane **in fact** used IGN as his source or whether he used other books as his source(s). Whether or not he did so is a question of pure fact that cannot be resolved without evidence being put forward in support of Mr.Crane's mere contention and being subject to scrutiny such as cross examination. Mr.Crane will need to give discovery of his notes and copies

of the alleged sources, which may shed light on whether he did in fact use the sources he claims in the Crane chart, rather than IGN. The comparison charts between IGN and TLC that my English lawyers submitted last year [Crane Exhibits A and B] are not challenged by the Crane chart, or indeed the Duvdevani chart. Indeed, they are not challenged at all and it is beyond argument that they do show substantial similarity between the two works.

72.    As it is convenient to do so here, I will also make good that same point with regard to the Duvdevani chart. That chart, unlike the Crane chart, includes the material from IGN which PPL alleges is similar to TLC. However, there is no challenge to the issue of similarity. The express and only purpose of the Duvdevani chart is to try to show that there were public domain sources available from which the facts on which the passages at issue in TLC could have been based. However, page 1 of the Duvdevani chart is a useful illustration of how that chart cannot achieve even its expressed purpose of showing on a summary basis that there were public domain sources available:

- As noted in Exhibit 4 to this Declaration, the three alleged sources other than Ilustrissimi do not contain all the words which appear in TLC page 11 and which it is alleged by PPL are similar to and have been copied from IGN.
- Even if the sources were publicly available as alleged, PPL does not complain that Mr.Crane has copied facts in themselves, but that he has copied from IGN the **expression** of those facts.

73.    It is also worth examining page 2 of the Duvdevani chart:

- A section is quoted, allegedly from the Economist of September 1978. This is quoted as referring to Luciani dispensing with the traditional "entry by water". However, as I understand that tradition, it is a one off ceremony and not about Luciani having a boat and gondolier to go around Venice on a regular basis. The alleged source is thus not applicable to the point.
- This brings to focus a more general point, namely that all of the sources alleged to provide publicly available facts have not been produced. We are supposed to take it on trust that they state what they are quoted to state. It is also important to see not just the particular passage, but also the surrounding words and context, as it is easy for a quote to be misleading when not read in context.

- The Duvdevani chart is wrong when it states that IGN does not refer to a car. Such reference is made in IGN albeit in a part other than page 25.

74.     Both the Crane and Duvdevani charts refer extensively to the book "A Thief in the Night" by John Cornwell as a source. However, that book postdated IGN and, as I have very publicly stated on previous occasions, John Cornwell's book substantially plagiarised IGN. Thus, to cite "Thief" as a source does not assist Mr.Crane because "Thief" is itself an infringing work and by copying from it, Mr.Crane would have been indirectly copying from IGN. I appreciate that that issue cannot be resolved on a summary basis without evidence being heard, but evidence will be adduced should the current application for summary judgment be rejected.

75.     Prior to the delivery of the letter of 9 November 2007 and the accompanying Crane chart, Mr. Crane's English lawyers wrote to PPL's English lawyers attaching a document which they explained in their letter set out the sources used by Mr.Crane in writing TLC. That document was proferred on the basis that it would be kept confidential. As the terms of confidentiality were not acceptable to PPL, the document was returned without being read. However, it was noted from the fax cover sheet that it was a document comprising 21 pages. Now, the document with the same purpose – of setting out Mr.Crane's actual sources – supplied on 9 November 2007, without any confidentiality restrictions, is a much longer document of 84 pages. The only sensible conclusion to be drawn from this is that the 9 November 2007 document contains many more alleged sources than the document that was returned. How could it be that Mr.Crane had recalled so many more sources that he had not recalled a short while earlier? Mr.Crane should now produce the document that was provided on 6 July 2007, but returned, so that it can be compared with that supplied on 9 November 2007 and exhibited to Mr.Crane's Declaration.

76.     I attach as Exhibit 6 some further comments that I have made in relation to the Crane chart that appears as Exhibit C to his Declaration.

*Nixon Peabody Memorandum of Law*

77.     To the extent that this does indeed relate to law, it is not for me to comment on. To the extent that it purports to be factual or to describe IGN and TLC, I have dealt with many, if not all, of the points with which I disagree elsewhere in this Declaration or in the Exhibits to it. However, I will

24

make the following points by way of emphasis or in case I have, under pressure of time, not included them elsewhere:

Page 1

Mr. Crane seeks to portray a virtual conveyor belt of published works that primarily deal with the central events recorded within *In God's Name*. While it is true that a couple of books refer to these events in passing, none prior to the publication of *In God's Name* were either comprehensive or revelatory. That is a self-evident fact that can be gauged from the reaction to the publication of IGN in June 1984: to its global success in between 30 and 40 languages: to the fact that it has been continuously in print since 1984 and has sold to date in excess of 6 million copies. Demonstrably, if the ground that is explored with IGN had been as Crane claims so well trodden before 1984, the international success and longevity of IGN is inexplicable. The book has inspired consistent and regular plagiarism to lesser and greater degrees. Crane's opinion that my book is unoriginal would appear to be rather contradictory with the above facts. I would ask Mr Crane to list these many works that deal with the alleged **murder** of Albino Luciani.

What this underscores is that IGN is unique. Its uniqueness arises from my selection, arrangement, presentation and expression of the content and themes and characters, as set out in paragraphs 7-23 above, out of a mass of information and research. I used my judgment to select the particular elements expressed in IGN, for example the individuals whom I selected as suspects for the conspiracy alleged to murder Pope JPI. It also underscores that Mr. Crane has taken and copied a substantial part of that uniqueness.

Pages 1 and 2:

I challenge the claim that TLC is *"a work of fiction based on historical events"*. It is fictional, but largely based on interpretation of facts and theories. To the extent that it is based on facts, it is based on the compilation, arrangement and expression of facts.

Page 2:

I do not accept that *"The dialogue is mostly fabricated by Mr. Crane, with a sprinkling of historical quotations"*. I assert that the similarity or identicality that I have shown between the dialogue in the IGN and TLC demonstrates extensive copying from IGN.

Mr.Crane tries to distance TLC from IGN by asserting that IGN *"...spans ...the Pope's ...rise to power, days at the Vatican, and the aftermath of his death, with an emphasis on the financial and political corruption that plagued the Vatican in the late 1970's"* and that IGN aims *"to prove to the reader that Pope John Paul I was murdered"*. However, whilst those statements are not applied by Crane to TLC, it is clearly the case that they apply to TLC as much as to IGN.

Pages 3-10:

Having already set out above my synopsis of IGN and compared it with TLC, it would not be helpful for me to set out a long, point-by-point analysis of the accuracy or otherwise of the alleged synopses of TLC and IGN set out at length on these pages. However, I mention the notable omissions from the description of TLC of possible murder of the Pope, of any reference to Calvi and Banco Ambrosiano, and the inadequate references to the illegal financial dealings in which the Vatican Bank was embroiled.

Pages 10-11

With regard to the 22 June 2007 letter referenced at pages 10-11 of the Memorandum, and at paragraph 6 of Mr. Crane's Declaration of fact, I respond as follows:

- the letter was sent with respect to Mr. Crane's violations of UK copyright which violations and infringements occurred in the UK, not the U.S.;
- the letter was sent by PPL's English lawyers in accordance with English law and procedural requirements;
- the attachments to the letter are mere drafts of the alleged infringement, and not complete with regard to all infringing portions of IGN and TLC.

Pages 22-28

I do not intend to make exhaustive comments on these pages as many of the points asserted are addressed by me elsewhere. However, I make the following observations:

1.    Alleged Similarities

PPL understands that facts are not copyrightable. Rather, PPL is seeking to enforce its copyright in the expression, selection, coordination and arrangement of those facts, not the historical fact

26

itself. Take, for example, the single example discussed by Mr. Crane at pages 22-23 of his memorandum. Note the similarity of expression, selection and coordination of this provision between the Play and IGN:

IGN: "The book is a delight" [Note, this is not an historical fact, but was my expression of my opinion]
Play: "I enjoyed your book"

IGN: "the most illustrious ones" [translation of Illustrissimi into English]
Play: "very illustrious"

IGN: "Mark Twain, Jules Verne" [Note the order of the appearance of the names selected by me]
Play: "to Mark Twain, Jules Verne"

This similarity **of expression** and the evidence that Mr. Crane copied from me in this particular section is in fact further highlighted when one looks at the other sources quoted by Mr. Crane at pages 23-24 of his memorandum:

Hebblethwaite: no comment on the book being enjoyable or delightful; no use of English word illustrious; no reference to Twain, Verne or any names;

Greely: mentions "Jules Verne, Mark Twain", but not in same order as in the Play and IGN; no mention of the book being enjoyable or delightful; no use of word illustrious;

Murphy: mentions only "Mark Twain"; no mention of Jules Verne; no mention of the book being enjoyable or delightful; no use of word illustrious.

This is a simple example of many similar instances, which are not intended to be viewed only in isolation, but in tandem with the many, many other incidents of copying of my protectable expression as reflected in the attached charts attached as Exhibits 4 and 5 to my Declaration. For additional detail, I direct to you to the "Summary Notes" column of the charts.

Page 29

Mr. Crane's work is not "transformative" of IGN. Mr. Crane has described his work as one of fiction, while intertwined with historic facts. It is a commercial work. It is not a commentary on my work for purposes of bringing new claims forward, but rather a self described fictional work that incorporates a substantial amount of the protectable expression of IGN.

Pages 30-31

Mr. Crane here discusses copyright claims that lie in either or both of of the U.S. or the United Kingdom. I do not have full knowledge of what infringing acts Mr. Crane committed in the United States versus in the United Kingdom. Without discovery, PPL is unable to discern an analysis of the full scope of infringing acts and/or in what country(ies) such wrongdoing occurred. In addition, it is my understanding that Mr. Crane has misapprehended or misapplied UK copyright law and PPL relies upon the submission of Mr. Robert Englehart QC with regard to legal opinions in this regard.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury the foregoing is true and correct.

Executed on this 7th day of May, 2008

David Anthony Yallop

H 1792093 v2

28