# EXHIBIT B

DLA Piper UK LLP
3 Noble Street
London
EC2V 7EE

jhw@hextalls.com
Direct Dial: 020 7265 4440

BY HAND

Your Ref: DCC/HG/TM&C/LON/2211091.1

Our Ref: JHW/T3776                                                      22 June 2007

Dear Sirs

**Our client: Poetic Products Limited**
**Your client: Roger Crane**
**"In God's Name" and "The Last Confession"**

Thank you for your letter of 20 June 2007.

As you are aware from our letter to your client of 15 June 2007, we are instructed by Poetic Products Limited ("PPL"), the owner of copyright in the book "In God's Name" ("IGN"), written by David A. Yallop. As we stated in that letter, PPL asserts that the "The Last Confession" ("TLC") infringes its copyright in IGN in that (with reference to section 16 of the Copyright, Designs and Patents Act 1988):

(i)     TLC is a copy of IGN or of a substantial part of IGN; and/or
(ii)    TLC is an adaptation of IGN or of a substantial part of IGN.

The issuing of copies of TLC to the public and/or its performance on stage constitute, and will constitute, further primary acts of infringement.

This letter is sent pursuant to the Civil Procedure Rules, Practice Direction on Protocols (Part 4). At this stage, we and our client have not completed our investigation and analysis of all instances of copying of IGN in TLC. However, the point has been reached at which the work done so far demonstrates a clear case of actual and/or intended copyright infringement by your client, his publisher and those responsible for the performance of the play. We are therefore writing to you now to set out the material currently available that supports the case on infringement. Further material may be provided subsequently under Part 4 of the Practice Direction or otherwise.

In instructing us to write to you at this point to set out our client's case, our client also has in mind the fact that the play is apparently due to commence its West End run on Thursday 28 June 2007. Whilst we are aware that performances of the play have been taking place outside

Hextalls is a Limited Liability Partnership registered in England & Wales
A list of Member Solicitors is open for inspection at this office
any reference to a Partner denotes a Member of Hextalls LLP
Regulated by the Law Society
Registered Office: Hextalls LLP, 28 Leman Street, London  E1 8ER ~ Registered No: OC311837

-2-

Hextalls LLP

London and that such performances will have damaged our client's rights (and have given rise to a right to damages or an account of profits and/or other relief), the performance of TLC in London causes our client the greatest concern, given that the London stage is in reality a stage not just for London, but also the world. Performance of the play in London will cause very substantial damage to our client and its rights in IGN. Our client's rights to seek interim remedies with regard to the proposed London performances of the play are therefore fully reserved.

Whilst there is no need, in the case of your client, to put him on formal notice with regard to the existing and intended infringements of PPL's copyright, you will be aware that breach of copyright is a serious matter. We therefore consider that it is right and proper to set out the case at the earliest point at which sufficient supporting material is available.

## The case on infringement

It is not feasible, in the space and time available, to refer to all the relevant legal authorities against which the facts of this case are to be measured. However, you will be familiar with the judgments of the Court of Appeal in <u>Baigent and Leigh v The Random House Group Limited</u> [2007] EWCA Civ 247 and we would draw your attention in particular to the judgment of Mummery LJ.

The relevant issues that we address below are:

(i)  What are the similarities between the alleged infringing work and the original copyright work?

(ii)  What access did the author of the alleged infringing work have to the original copyright work?

(iii) Did the author of the alleged infringing work make some use in his work of material derived by him, directly or indirectly, from the original work? (And if the Defendant contends that no such use was made, what is his explanation for the similarities?)

(iv) If use was made of the original copyright work in producing the alleged infringing work, did it amount, in all the circumstances, to "a substantial part" of the original work?

(v)  Further or alternatively, does the alleged infringing work amount to an adaptation of the original copyright work or any substantial part of it?

*(i)    What are the similarities between the alleged infringing work and the original copyright work?*

Whilst we are mindful of the warning from Mummery LJ to be wary of using loose non-statutory terminology when characterising the nature of copying alleged, it will assist at this stage to indicate some broad categories of copying that is alleged to have occurred:

(a)  There is much wording in LC that is identical or nearly identical to wording in IGN, raising a presumption of copying that we consider will be impossible to rebut, given the nature and extent of its verbatim or "slavish" nature.

(b)  Such "language" copying is, it is alleged, an infringement in itself, but is also strongly indicative of other copying that cumulatively amounts to infringement.

-3-

Hextalls LLP

(c)     There is copying of the expression in IGN of character and incident, where verbatim or close language copying has not occurred.

(d)     There is copying of the selection, arrangement, structure and development in IGN of facts, incidents, theories, characters and narrative. For instance, in many instances scenes in LC adopt the setting of scenes in IGN and dramatic direction in LC follows closely description of behaviour in IGN.

(e)     There is copying of the conclusions drawn and of hypotheses postulated in IGN.

To a degree, IGN contains and recounts material of a historic or factual nature, but it is presented through the filter of the author's skill, expression and viewpoint. The author researched the material and in many instances his sources were not publicly available documents, but, for instance, interviews with individuals – some of whom died some years ago.

When recounting words spoken by "characters" in IGN, the author was in many cases reliant not on first hand accounts from the people concerned of what they recollected saying, but on second hand or more distant accounts of what had been said. In the Preface to the first edition of IGN, the author explained something of the years of intensive research that had been required. In its last paragraph he explained that the dialogue in the book is "reconstructed". That reconstruction inevitably involved the exercise of his skill and judgment.

A comparison between the texts of Act One of LC and that of IGN has been undertaken pursuant to Part 4 of the Practice Direction. Work on that has not been completed, but we are able to enclose a draft document that sets out the material from IGN and from LC that currently appears to be relevant for the purpose of such comparison. Two versions of this are enclosed. They are identical in terms of text, but one bears coloured highlighting to assist the language comparison, in particular, as explained in the notes at the beginning of the document. Work has also been done on comparing Act Two of LC with IGN, but we are not yet in a position to provide you with a draft of the document setting out the comparative passages.

*(ii)*   *What access did the author of the alleged infringing work have to the original copyright work? and*
*(iii)*  *Did the author of the alleged infringing work make some use in his work of material derived by him, directly or indirectly, from the original work?*

We are satisfied from what has been stated in a "podcast" of the Chichester Festival Theatre and in a Radio 4 "Front Row" broadcast, that your client had a copy of IGN and used it for the purpose of writing LC. We will refer to transcripts of those items if necessary. The extensive copying and its nature raises what we consider to be an irrebuttable inference that he used, in LC, material that he derived from IGN.

We also refer to an article in the Evening Standard of 19 June 2007, which reported on an interview of David Suchet by Fiona Maddocks. In that article, it is stated:

*The Last Confession is based on David Yallop's book In God's Name, which has already sold more than six million copies (and had its central tenet refuted by British journalist John Cornwell). Yallop argues that several cardinals – such as the shady Vatican banker Cardinal Marcinkus, a character in the play – stood to lose everything by John Paul's appointment.*

-4-

Hextalls LLP

It appears that that statement is likely to have emanated from David Suchet, whom, later in the article, is quoted as saying:

*"I first got involved with the play some five years ago, and spent some time working on the script with Robert (sic) Crane. Then nothing came of it. Suddenly David Jones came aboard ..."*

It seems likely, as David Suchet asserts that he worked on the script, that a statement from him that LC is based on IGN is authoritative.

We would be grateful if you would arrange, pursuant to Part 4 of the Practice Direction, for the copy or copies of IGN that your client used for the purpose of writing LC be produced to us for inspection and copying.

(iv)    *If use was made of the original copyright work in producing the alleged infringing work, did it amount, in all the circumstances, to "a substantial part" of the original work?*

(v)    *Further or alternatively, does the alleged infringing work amount to an adaptation of the original copyright work or any substantial part of it?*

We do not need to set out here the well known law as to what constitutes a substantial part and the approach to be taken in deciding the point. It is a qualitative rather than quantitative exercise and one essentially of impression.

We are in no doubt that a substantial part of IGN has been copied in LC. The extent of copying, both verbatim and otherwise, is an indication of this. The exercise involves a consideration of the copied material in relation to IGN. We consider that the verbatim and near verbatim copying itself amounts to a substantial part of IGN. To that is added the other forms of copying, as described above.

We also consider that the extent and nature of the copying results in LC constituting an adaptation of IGN or a substantial part of IGN. The enclosed colour highlighted comparison document is relevant to reaching that conclusion.

## Remedies

We have indicated above that our client has claims for damages or an account of profits in respect of infringements of its copyright that have already occurred. We have also indicated that our client reserves its right to apply for interim relief in respect of future advertised performances of the play.

We await hearing from you with your response under Part 4 of the Practice Direction.

We will be writing in similar terms to others involved in the publication and/or performance of LC.

Yours faithfully

-5-

Hextalls LLP

**HEXTALLS LLP**

Case 1:07-cv-07063-BSJ-FM     Document 31-4     Filed 05/07/2008     Page 6 of 6

-5-

Hextalls LLP

**HEXTALLS LLP**