Tamara Carmichael
Christelette A. Hoey
Joshua Krumholz (*Admitted Pro Hac Vice*)
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007
(212) 513-3200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROGER G. CRANE, JR., <br><br> Plaintiff, <br><br> v. <br><br> POETIC PRODUCTS LIMITED, <br><br> Defendant. <br><br> ——————————————— <br><br> POETIC PRODUCTS LIMITED, <br><br> Counterclaimant, <br><br> v. <br><br> ROGER G. CRANE, JR., <br><br> Counterclaimant Defendant. | <br><br><br><br><br><br><br><br><br><br><br><br> Case No.: 07 Civ. 7063 (BSJ)(FM) |

## DEFENDANT-COUNTERCLAIMANT, POETIC PRODUCTS LIMITED'S, OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

I.    INTRODUCTION. ...................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND...............................................1

   A.   FACTUAL BACKGROUND AND UK DEMANDS. ...................................................1

      1.   Subject and content of IGN. ..........................................................................1

      2.   Subject and content of TLC. ..........................................................................3

   B.   PROCEDURAL HISTORY ~ U.S. ACTION. .............................................................4

III.  ARGUMENT............................................................................................................6

   A.   SUMMARY JUDGMENT STANDARD. ......................................................................6

   B.   ELEMENTS OF COPYRIGHT INFRINGEMENT. ........................................................6

   C.   TLC INFRINGES UPON THE PROTECTABLE ELEMENTS OF PPL'S COPYRIGHT IN IGN.............8

      1.   PPL has copyright protection in the expression, selection, coordination, and arrangement in and of IGN. .............................................................................8

      2.   TLC is substantially similar to protectable elements of IGN.........................11

            a.   Copying of identical expression. ................................................11
            b.   Copying of selection, coordination and arrangement of acts, incidents and narrative. ............................................................................13
            c.   Copying of characters. ...........................................................13
            d.   Copying of selection and arrangement of protected expression, content, and theories. ...........................................................15

   D.   CRANE'S COPYING OF IGN IS NOT A FAIR USE. ................................................15

      1.   Purpose and Character of TLC......................................................................16

      2.   Nature of IGN and Amount and Substantiality of TLC in Relation to IGN as a Whole................................................................................................17

      3.   Effect upon the Market. ...............................................................................18

   E.   CLAIMS REGARDING INFRINGEMENT OF UK COPYRIGHT LAW ARE NOT AT ISSUE HERE. ....................................................................................................19

      1.   PPL did not allege infringement of UK copyright law. .................................19

      2.   Assuming, arguendo, the UK copyright is at issue, summary judgment should be denied. .................................................................................................20

IV.   CONCLUSION..............................................................................................24

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Arica Ins., Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) .....................................................9

*Brown v. Purdue*, No. 04 Civ. 7417, 2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005) ............9

*Burgess v. Chase-Riboud*, 765 F. Supp. 233 (E.D. Pa.).................................................9, 10

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*,
    150 F.3d 132 (2d Cir. 1998).......................................................................16, 17, 18, 19

*Clonus Associate v. Dreamworks, LLC*, 457 F. Supp. 2d 432 (S.D.N.Y. 2006) ................7

*Donald v. Zack Meyer's T.V. Sales & Serv.*, 426 F.2d 1027 (5th Cir. 1970)....................11

*Feist Publ'ns, Inc. v. Rural Telegraph Serv. Co.*, 499 U.S. 340 (1991)....................6, 9, 13

*Flaherty v. Filardi*, 388 F. Supp. 2d 274 (S.D.N.Y. 2005)..................................................9

*Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980)........................6, 10

*Hogan v. DC Comics*, 48 F. Supp. 2d 298 (S.D.N.Y 1999) ...............................................9

*Lone Wolf McQuade Associates v. CBS, Inc.*, 961 F. Supp. 587 (S.D.N.Y. 1997) .............6

*Nichols v. Universal Pictures Co.*, 45 F.2d 119................................................................11

*Repp v. Webber*, 892 F. Supp. 552 (S.D.N.Y. 1995) ...........................................................6

*Rogers v. Koons*, 960 F.2d 301 (2d Cir.1992) ...................................................................10

*Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987)............................................18

*Sheldon v. Metropolitan-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936) ................10

*Twin Peaks Products, inc. v. Publications International, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)...............................................................................11, 13

*Wainwright Securities Inc. v. Wall Street Transcript Corp.*,
    558 F.2d 91 (2d Cir. 1977)...............................................................................17, 18, 19

*Waldman Public Corp. v. Landoll, Inc.*, 43 F 3d 775 (2d Cir. 1994) .................................7

*Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1980 .........................................7, 10

*Warner Brothers, Inc. v. America Broad. Cos., Inc.*, 654 F.2d 204 (2d Cir. 1981).............7

*Whelan Associate v. Jaslow Dental Laboratories*, 797 F.2d 1222 (3d Cir. 1987) ............10

*Williams v. Crichton*, 84 F.3d 581 (2d Cir.1996) ................................................................6

*Williams v. Crichton*, 860 F. Supp. 158 (S.D.N.Y. 1994) ...................................................9

# 5305261_v7

I.    Introduction.

Plaintiff-counterclaimant defendant, Roger Crane ("Crane") has moved for summary judgment on defendant-counterclaimant, Poetic Products Limited's ("PPL") copyright infringement and unfair competition claims.

II.    Factual and Procedural Background.

A.    Factual Background and UK Demands.

Poetic Products Limited is a limited company registered in England and Wales. It is the owner of a UK and a U.S. copyright in the book *In God's Name* ("IGN") authored by David Yallop. See Declaration of David A. Yallop ("Yallop Decl."), ¶ 1.[1]

1.    Subject and content of IGN.

IGN is accurately described in its sub-title, as *"An investigation into the murder of Pope John Paul I"* and sets out the theory that Pope John Paul I ("Pope JPI" or the "Pope") was murdered, with Mr. Yallop's expression of suggestions as to who may have committed the crime and how, together with their motives. See Yallop Decl., ¶ 7. It reflects the author's selection of views, scenes, characters and a plot and his expression thereof, not mere historical facts.

The Prologue of IGN sets the scene for the rest of the book. See id.¶ 8. The scene with which IGN begins is set in the Vatican, on the evening of Pope JPI's 33rd day in office, with the Pope having dinner with his secretaries, Fathers Lorenzi and Magee. Mr. Yallop uses this to refer back in time to the previous 33 days of his Papacy and to look forward to the action that he was intending to take the next day. Mr. Yallop paints a picture of Pope JPI's physical features and character as he views it. See id., ¶ 9.

---

[1]    Details of Mr. Yallop's illustrious writing career and the publishing history of IGN are set forth in paragraphs 2-6 of the Yallop Decl.

1

The next scene is a floor below within the Vatican, where Bishop Paul Markincus, the head of the Vatican Bank, is working late. Mr. Yallop expresses his description of him physically and by character, and presents his worries about the new Pope. Then, IGN moves to another scene in the Vatican, where Cardinal Villot, the Secretary of State, is still at his desk, considering the list of transfers, forced resignations and new appointments Pope JPI has handed to him an hour before. See Yallop Decl., ¶ 10. Then, without creating precise scenic locations and times, IGN refers to Italian banker Roberto Calvi in Buenos Aires, Sicilian banker Michele Sindona in New York, and Cardinal Cody in Chicago. IGN describes events concerning them, but not their physical appearance. Finally, IGN mentions Licio Gelli and describes the power he holds over some of those already mentioned, again without painting a picture of his appearance or location. See id., ¶ 11.

IGN sought to create a dramatic image in the mind of the reader as set in the Vatican, with three characters, in three separate rooms, on the evening of 28 September 1978. The reader is made aware of four other, less distinct characters elsewhere who are involved in the affairs at the Vatican that are about to explode. See Yallop Decl., ¶ 12. Next, IGN explains to the reader that *"these six men, Marcinkus, Villot, Calvi, Sindona, Cody and Gelli had much to fear if the Papacy of John Paul I continued. It is equally clear that all of them stood to gain in a variety of ways if Pope John Paul I should suddenly die."* IGN notes that sometime between the late evening of 28 September and the early morning of 29 September 1978, Pope JPI dies. *"Time of death: unknown. Cause of death: unknown."* Mr. Yallop states he is *"convinced that one of these six men had, by the early evening of September 28th, already initiated a course of action to resolve the problems that Albino Luciani's Papacy was posing. One of these men was at the very heart of a conspiracy that applied a uniquely Italian solution."* Yallop Decl., ¶ 13.

2

Following the Prologue are 7 chapters entitled: The Road to Rome; The Empty Throne; Inside the Conclave; Vatican Incorporated; The Thirty-three Days; We Are Left Frightened; and By Benefit of Murder – Business as Usual, followed by an Epilogue. See Yallop Decl., ¶ 14. There is also a useful and detailed Index. In the case of named characters, the references to them are sub-categorised into subject matter. For instance, if one wanted to find out about Cardinal Benelli, one would find 56 pages referencing him. If one wished to narrow that down, there are eight sub-categories, including *"and John Paul I" [20 page references]; "and Marcinkus" [six page references]; "as Papal candidate" [five page references] and "and the papal election" [six page references].* The IGN 2007 edition has a <u>Postscript to this Edition,</u> which is an updated version of that contained in earlier editions. See id., ¶ 14.

The themes and content of IGN are broadly categorized in paragraph 15 of the Yallop Declaration. In his conclusion, having described the broad content and themes of IGN (especially in view of the sub-title to the book), Mr. Yallop states that Pope JPI was murdered. He does not name the murderer, but leaves it to the readers to decide on their verdict, noting: *"The central purpose of my investigation has been the death of . . . Albino Luciani. Villot, Calvi, Marcinkus, Sindona, Gelli, Cody: one of these men was at the very heart of the conspiracy that resulted in the murder of Luciani. Before you, the reader, consider your verdict, let us take one final look at these men."* [page 284]. Yallop Decl., ¶ 16. Mr. Yallop then sets out a commentary on each of the six suspects and, on pages 302-303 as to his personal views, as further detailed in the Yallop Declaration. See id., ¶¶ 17-23.

### 2.    Subject and content of TLC.

PPL first heard of the play called *The Last Confession* ("TLC") during or about April, 2007. Yallop Decl., ¶ 45. TLC was showing in England and was assumed by some third-parties, there, to be based upon IGN. <u>See id.</u>, ¶ 46-51. Upon reading the script of IGN, PPL also

3

4

believed TLC was a copy of IGN, and its beliefs were further confirmed when Mr. Yallop saw the play. See id. ¶¶ 52-54. PPL disputes Crane's characterizations of TLC and his summary judgment statements regarding same, as well as the exhibits to Mr. Crane's declaration. See id., ¶¶ 62-67, 69-77.

As a result of that performance in the UK, on or about June 18 and 22, 2007, Hexalls LLP (PPL's UK counsel) not Crane written notification of alleged copyright infringement in the UK. See Declaration of Jonathan Haydn-Williams ("Haydn-Williams Decl."), Exhs. A and B; Yallop Decl., ¶¶ 55-56; see also Counterclaim, ¶ 8 and Answer to Counterclaim, ¶ 8, respectively attached to the Declaration of Tamara Carmichael and ("Carmichael Decl.") as Exhs. B and C. Hexalls' letters: (a) were sent under UK Civil Procedure Rules, Practice Direction on Protocols (Part 4); (b) reference Crane's acts of copyright infringement in the UK; and (c) make no mention of PPL's U.S. copyright or U.S. - based infringements by Crane. See Haydn-Williams Decl., Exhs. A and B. A series of letters between the parties' UK counsel regarding the alleged UK infringement followed, some of which are attached to Crane's summary judgment motion.

**B.    Procedural History - U.S. Action.**

On or about August 8, 2007, Crane filed his claim for declaratory relief in this U.S. - based action. See Complaint, attached to Carmichael Decl. as Exh. A. On or about September 20, 2007, after Crane filed this case in the Southern District of New York and in response to an inquiry made by PPL at that time in connection with its determination of the appropriate

response to Crane's pleading, PPL was informed that:

[P]rior to the commencement of [his] action, and continuing through to the present, Mr. Crane has been in negotiations with two production groups in Los Angeles, California over movie rights to *The Last Confession*, one Los Angeles theatre production company who is interested in producing the play, as well as three Broadway producers who have expressed an interest in producing the play. Several of these groups are ready to go forward with Mr. Crane but for the cloud that [PPL] has placed over Mr. Crane's title. Thus, as [PPL] can see, subject

matter jurisdiction exists, and it would be a waste of both of our resources for PPL to make a motion regarding the same.

Carmichael Decl., Exh. D.

It was only upon PPL's receipt and review of the September 20, 2007 letter that PPL first learned Crane had published *The Last Confession* in the U.S. and that infringement of PPL's U.S. copyright had occurred. Prior to that time, PPL had only a mere suspicion or hunch of Crane's infringing acts in violation of PPL's U.S. copyright. See Yallop Decl., ¶ 56.

As a result, on October 16, 2007, PPL answered Crane's complaint and counterclaimed against Crane for "infringe[ment]" of [PPL's] U.S. copyright [IGN] by authoring and/or reproducing an infringing work, and further by marketing, promotion and/or distributing infringing materials in the U.S. without approval or authorization from Poetic Products." Counterclaim, ¶ 15. Any reference to UK issues was historical and for context. Count 1 is specifically limited to Crane's acts in the U.S., which violated PPL's U.S. copyright.

On November 13, 2007, Crane answered the Counterclaim and, that same day, moved for final summary judgment. On November 29, 2007, PPL moved to stay to summary judgment proceedings pending the completion of discovery, which motion Crane opposed. On April 23, 2008, Magistrate Judge Maas denied PPL's request for stay and directed PPL to respond to the summary judgment motion within ten (10) business days.

For the reasons set forth below, Crane's summary judgment motion should be denied under U.S. law. In addition, UK copyright law issues should not be considered and are not alleged in this case. Nevertheless, and without waiving this limitation, should this Court disagree and decide to consider summary judgment with respect to UK copyright issues, summary judgment should be denied. The factual and legal basis supporting these arguments are

set forth below and in the supporting declarations of Tamara Carmichael, Jonathan Haydn-Williams, Roberg Michael Englehart QC, and David A. Yallop, author of IGN.

**III.    Argument.**

**A.    Summary Judgment Standard.**

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). When deciding a summary judgment motion, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, which in this case would be (PPL). See Lone Wolf McQuade Assocs. v. CBS, Inc., 961 F. Supp. 587, 591 (S.D.N.Y. 1997) (citations omitted). In the copyright context, the Court may need to consider the substantial similarity of the copyright owner's work and the allegedly-infringing work. See id. at 592 (citation omitted).

"[B]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 976 (2d Cir. 1980), cert. den., 449 U.S. 841 (1980) (citation omitted). See, e.g., Lone Wolf, 961 F. Supp. at 595, 599 (denying parties' motions for summary judgment where disputed issues of material fact existed as to the substantial similarity of the relevant works); Repp v. Webber, 892 F. Supp. 552, 558 (S.D.N.Y. 1995) (same). The facts here require denial of Crane's summary judgment motion.

**B.    Elements of Copyright Infringement.**

To prevail on a copyright infringement claim, a plaintiff must prove "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Williams v. Crichton, 84 F.3d 581, 587 (2d Cir.1996) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). In this case, at least for purposes of summary judgment, Crane does

6

not challenge the validity of PPL's copyright in IGN. Rather, the focus of the court's inquiry is whether there is sufficient proof of "copying" to support PPL's counterclaim for copyright infringement.

Evidence of direct copying is rarely possible, thus copying is generally established by "showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." Waldman Pub. Corp. v. Landoll, Inc., 43 F. 3d 775, 783 (2d Cir. 1994) (finding the defendant's books were "substantially similar" to that of the plaintiff). "[T]he determination of the extent of similarity which will constitute a substantial and hence infringing similarity presents one of the most difficult questions in copyright law, and one which is the least susceptible of helpful generalizations." Warner Bros., Inc. v. Am. Broad. Cos., Inc., 654 F. 2d 204, 208 (2d Cir. 1981) (internal citations omitted). Rather than generalizations, a court must examine the alleged similarities "in such aspects as the total concept and feel, theme, characters, plot sequence, pace and setting." Clonus Assoc. v. Dreamworks, LLC, 457 F. Supp. 2d 432, 440 (S.D.N.Y. 2006) (denying summary judgment because questions of fact remained as to similarities between the two subject works) (internal citation omitted)

In determining whether two works are similar enough to prove actual copying, courts ask "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." Clonus, 457 F. Supp. 2d at 439 (citing Warner Bros., 654 F.2d at 208) (internal citation omitted). The Second Circuit has noted this is "a task generally performed after detailed examination of the works themselves." Id. at 440 (citing Walker v. Time Life Films, Inc., 784 F.2d 44, 48-49 (2d Cir. 1986) (internal citation omitted). The evidence in this

case, although not fully developed, shows there is substantial similarity here or, at a minimum, that questions of fact remain.

## C.  TLC infringes upon the protectable elements of PPL's copyright in IGN

It has been admitted by Crane himself (or his representatives) that TLC used (or "borrowed") at least some text from IGN. See Crane Decl., Exh. C § 4.4 and attachment.[2]  In fact, careful review of Crane's Motion shows he put forth little or no argument in denying the two works are similar.  Rather, the crux of Crane's summary judgment argument is two-fold, namely that: (a) IGN is a factual work with little or no copyright protection as public record sources contain the same factual information; and (b) any similarity is minimal and based entirely in fact.  Motion at. 22-28.  Crane's views are myopic and ignore the protectable elements of expression, selection, coordination, and arrangement he copied from IGN.

### 1.  PPL has copyright protection in the expression, selection, coordination, and arrangement in and of IGN.

Contrary to Crane's suggestions otherwise, PPL does not seek to protect the facts surrounding the history of the Vatican or the birth, rise to power, or the aftermath of the death of the Pope. See Motion at 2 and generally.  IGN is not a mere vehicle for setting out historical and unchallenged facts.  Rather, IGN is an investigative work that, while it may reference or draw from certain historical facts, those facts are not at issue.  Relevant, here, is the overall expression of David Yallop, the author of IGN, his creative expression, and the unique selection,

---

[2] Crane submitted two charts in support of his motion for summary judgment.  The first, attached as Exhibit C to Crane's Declaration, sets forth a brief response by Crane to PPL's draft of noted similarities between IGN and TLC. The second, Exhibit 3 to Duvdevani's Declaration, also highlights the similarities between the works.  Neither chart denies the facts of substantial similarity between IGN and TLC.  Both simply purport to list alternative sources where historical facts surrounding both IGN and TLC can or might be located.  Most telling, both exhibits highlight (without denial) the substantial similarity between IGN and TLC.  In fact, as stated, Crane's Exhibit C expressly acknowledges use of IGN in TLC.  Moreover, neither exhibit proves Crane copied from sources other than IGN, and the mere fact other sources were purportedly available for use does not prove that Crane actually and  such source(s) in addition or as an alternative to his copying of IGN.  Finally, PPL believes it could prove the unilateral and self-serving suggestion that Crane relied upon third party sources is untrue.  Without discovery from Crane and third-parties, however, PPL cannot make such an offering of evidence.

8

coordination and arrangement of facts, themes, plot and devices presented in IGN. PPL holds the copyright in and to those protectable elements of the work.[3] See Yallop Decl., ¶¶ 32-44 and accompanying exhibits.

The circumstances, here, present somewhat of a niche factual issue of substantial similarity involving expression contained in investigative written/textual work that, in part only, references historic fact.[4] Though Crane accurately states "copyright protection extends only to the expression of ideas and not the ideas themselves" and "historical facts contained in a factual work are not copyrightable," he ignores the fact that the "selection and arrangement" of these facts are afforded copyright protection. Feist Publ'ns, Inc., 499 U.S. at 348.

The facts in Burgess v. Chase-Riboud, 765 F.Supp. 233 (E.D. Pa.) nearly mirror those in the present case. In Burgess, an author of a play about Thomas Jefferson's mistress, Sally Hemings, brought an action against the author of a book on the same figure, seeking a declaratory judgment that his work did not infringe the book's copyright. See id. at 237. The author of the book cross-moved for summary judgment, arguing the play was "substantially

---

[3]      See Yallop Decl., Exhs. 4 and 5, for a detailed comparison of IGN to Acts I and II of TLC and certain of the author's notes regarding same.

[4]      Much of the case law cited by Crane is inapposite. For example, while the Supreme Court's decision in Feist is certainly relevant in any analysis relating to factual works, and for that reason cited below (and at page 23 of Crane's Motion), it is clear IGN is afforded significantly stronger copyright protection than the work in Feist because IGN is far more than a mere factual compilation, but, rather, the expression of Mr. Yallop's theories, opinions, and interpretations. In addition, the works in Arica Inst., Inc. v. Palmer, 970 F. 2d 1067 (2d Cir. 1992), involved training programs aimed at total development of the human being and relied upon theories regarding interconnected systems and imbalances therein. Arica, 970 F.2d at 1067, 1073, (noting also there existed only a few instances of copying of single words or short phrases that did not exhibit creativity for copyright purposes). Compare Brown v. Purdue, No. 04 Civ. 7417, 2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005) (granting summary judgment where (unlike here) the author of the first work could not assert protection in historical facts and basic general historical themes; where no allegation of copying of the expression of ideas was made; and where scenes and events showed no substantial similarity of expression); Hogan v. DC Comics, 48 F. Supp. 2d 298 (S.D.N.Y 1999) (comparing the two works before granting summary judgment and finding the works' sequence of events, plot, and character development have little similarity aside from the fact they are both vampires, while here, the sequence of events, plot, and storyline are substantially similar); Flaherty v. Filardi, 388 F. Supp. 2d 274, 287-88 (S.D.N.Y. 2005) (finding that the themes, concept and feel, characters, plot, and setting different were all different and that any similarity was "*de minimus*" at best); Williams v. Crichton, 860 F. Supp. 158, 168-69 (S.D.N.Y. 1994) (concluding plaintiff's collection of six books about dinosaurs, even if taken together, were aimed at different audiences and had different characters from one another).

9

similar" to her work. See id. at 240. Like Crane, the plaintiff in Burgess claimed he did "not infringe on [Defendant's] book because the Sally Hemings story is a matter of historical records, and does not belong to [the Defendant] or anyone else." Id. at 234. The court, after explaining "a copyright does not protect ideas, only the expression of ideas," found the alleged similarities between the two works was overwhelming. Id. at 239-40; Whelan Assoc. v. Jaslow Dental Lab., 797 F.2d 1222, 1234 (3d Cir. 1987). The "real issue" in the case was whether the "largely cosmetic alterations [Plaintiff] made from [Defendant's] novel are enough to successfully avoid a copyright infringement action." Id. at 242. The court emphatically said "no."[5]

The Burgess court cites to Judge Learned Hand and the seminal case of Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49 (2d Cir. 1936). In Sheldon, Judge Hand made it clear that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." Id. at 56. Crane's citation to various sections of TLC that allegedly do not infringe upon IGN is of no moment. As in Sheldon, this court "cannot avoid the conviction that, if the picture was not an infringement of the play, there can be none short of taking the dialogue." Id.

In short, PPL does not seek to protect "ideas, concepts, and the like found in the common domain [that] are the inheritance of everyone" and, therefore, available to everyone. Rogers v. Koons, 960 F.2d 301, 308 (2d Cir.1992). PPL seeks only to protect the "original or unique way that [Mr. Yallop] expresses those ideas, concepts, principles or processes." Id. As detailed further below, PPL's selection and arrangement of the "ideas, concepts, and the like" in IGN are copyrightable, and thus, can be (and are) subject to copyright protection and can be infringed.

---

[5] Like the defendant in Burgess, Crane's citations to Hoehling v. Universal City Studios, Inc., 618 F.2d 972 (2d Cir. 1980) and Walker v. Time Life Films, 784 F.2d 44, (2d Cir. 1986) are inapposite. See Motion at 14-15. In both Hoehling and Walker, the court found the similarities between the works in question were general, at best. The Hoehling court concluded a second author may make "significant use of prior work, so long as he does not bodily appropriate the expression of another." Hoehling, 618 F. 2d at 978In this case, Crane goes beyond the limitation in Hoehling and "bodily appropriate[s]" IGN. In Walker, the court found that only "generalized or otherwise nonprotectible ideas" were used, which sits in contrast with Crane's substantial use of IGN in TLC. Walker, 784 F. 2d at 48.

10

Turning now to the particulars of this case, it is apparent there are substantial similarities and Crane copied protectable constituent elements of IGN.

### 2.    **TLC is substantially similar to protectable elements of IGN.**

#### a.    **Copying of identical expression.**

As detailed in Exhibits 4 and 5 to the Yallop Declaration, there is a pervasive use of identical and paraphrased expression to that selected by Mr. Yallop for inclusion in IGN. The "borrowing" (as Crane has phrased it) or use of IGN content was not of historical fact, but rather creative expression, and the selection and arrangement of Mr. Yallop's writing. Such expression is protected under the doctrine of comprehensive non-literal similarity. See Nimmer, 3 Nimmer on Copyright § 13.03[A] at 13-24 to 13-25 (1992). Comprehensive non-literal similarity affords copyright protection where the infringer has appropriated the "fundamental essence or structure" of the copyright work, as Crane has done, here. Id. at 13-27. This doctrine is founded upon the principle that copyright "cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." Nichols v. Universal Pictures Co., 45 F.2d 119, 121 (2d Cir. 1930 (L. Hand, J.), cert. denied, 282 U.S. 902 (1931). Accordingly, "in copyright law[,] paraphrasing is equivalent to outright copying." Donald v. Zack Meyer's T.V. Sales & Serv., 426 F.2d 1027, 1030 (5th Cir. 1970), cert. denied, 400 U.S. 992 (1971). See, e.g., Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1372-73 (2d Cir. 1993) (affirming finding of substantial similarity through comprehensive non-literal similarity where chapter of infringing book essentially detailed recounting of first eight episodes of television series and "[e]very intricate plot twist and element of character development appear[ed] in the Book in the same sequence as the teleplays").

The extensive and pervasive use of Mr. Yallop's expression is in and of itself copying, and also evidence of substantial similarity of the works as a whole. PPL's comparison charts also

11

set forth strong evidence of copying of expression insofar as exact wording and parallel or paraphrased language in character is used to copy and communicate Mr. Yallop's expression in IGN.

For example, and without limitation to the instances of copying set forth in PPL's comparison charts, this opposition or the Yallop Declaration, see the single example Crane discusses in his Motion at pages 22-23. This example clearly shows the similarity of expression, selection and coordination of this provision between the TLC and IGN:

IGN: "The book is a delight" [Note, this is not an historical fact, but an expression of Mr. Yallop's opinion]
TLC: "I enjoyed your book"

IGN: "the most illustrious ones" [translation of Illustrissimi into English]
TLC: "very illustrious"

IGN: "Mark Twain, Jules Verne" [Note the order of the appearance of the names selected by Mr. Yallop]
TLC: "to Mark Twain, Jules Verne"

This similarity of expression, and Mr. Yallop's selection of words and persons discussed, is made despite a myriad of choices available to Crane. Clearly, Crane copied the expression set forth in IGN. The fact that Crane copied IGN is further highlighted when one looks at the other sources quoted by Crane at pages 23-24 of his Motion:

Hebblethwaite: Offers no comment on the book being enjoyable or delightful; there is no use of English word illustrious; and no reference to Twain, Verne or any names.

Greely: Mentions "Jules Verne, Mark Twain", but not in same order as in IGN and copied in TLC; there is no mention of the book being enjoyable or delightful; and no use of the word illustrious.

Murphy: Mentions only "Mark Twain," no mention of Jules Verne; no mention of the book being enjoyable or delightful; no use of word illustrious.

Yallop Decl., ¶ 77 at 27. This is but one example of many from those in Exhibits 4 and 5 to the Yallop Declaration and highlighted further therein.

12

**b.**     **Copying of selection, coordination and arrangement of acts, incidents and narrative.**

Even assuming, *arguendo*, IGN is a purely factual work that is simply organized in some fashion, PPL's comparison charts, attached as Exhibits 4 and 5 to the Yallop Declaration, evidence substantial overall copying by Crane of the selection, coordination and arrangement of expression, facts, incidents and narrative. *Feist* 358-359 (noting, although facts are not copyrightable, the selection, coordinate and arrangment are); *Twin Peaks*, 996 F.2d at 1372-73 (affirming finding of substantial similarity through comprehensive non-literal similarity where chapter of infringing book essentially detailed recounting of first eight episodes of television series and "[e]very intricate plot twist and element of character development appear[ed] in the Book in the same sequence as the teleplays").

**c.**     **Copying of characters.**

In his Declaration, Mr. Yallop presents a synopsis of the characters he selected for inclusion and development in IGN. With respect to that selection, all of the characters mentioned in IGN appear in TLC either as actual characters in the play or as persons mentioned in dialogue, with the exception only of Gelli and Cody. *See* Yallop Decl., ¶ 25. In addition, of the list of 17 characters in TLC, all but two appear in the synopsis of IGN, namely, The Confessor and Thomas the Gardener. The Confessor is, of course, Wojtyla, later, Pope John Paul II. While Cardinal Wojtyla/John Paul II appears in IGN, it is not as Confessor. Thomas the Gardener, however, can be seen to be a character based on Brother Clemente, who was working in gardens near the Vatican when engaged in conversation by Luciani. *See* Yallop Decl., ¶ 17 (citing IGN at 60).

In addition, as set forth in paragraphs 8-13 of the Yallop Declaration, a review of the Prologue of IGN shows the three main figures in IGN are Pope JPI, Bishop Marcinkus, and

13

Cardinal Villot -- selected by Mr. Yallop from a number of possibilities. Those characters are also the three main characters in TLC. Pope JPI is a central character in the TLC and Marcinkus and Villot, as individuals about to be removed from office by Pope JPI, are clearly portrayed in TLC as suspects with a motive to murder the Pope. The Prologue of IGN portrays Calvi and Sindona as characters "off stage," which is the same way Crane portrays them in TLC. See Yallop Decl., ¶ 29.

Moreover, in the various accounts of TLC that Crane portrays in his summary judgment papers, it is striking that he fails to mention the characters of Calvi (or Sindona) and the theme of the involvement of the Vatican Bank, headed by Bishop Marcinkus, with the corrupt Calvi and Banco Ambrosiano and their illegal financial dealings. This is a key theme selected and presented in IGN -- and also in TLC. In both works, Pope JPI is horrified by the Church's involvement with such financial illegality and determines to extricate the Church from it. The development of these characters in IGN provides a motive for murder, similarly portrayed by Crane in TLC. Not surprisingly, Crane has excluded this discussion from his summary presentation. See Yallop Decl., ¶ 30.

Furthermore, Benelli is a key character in TLC, and he appears on 56 pages of IGN, as the Index to the Yallop Declaration shows in paragraph 14. Benelli's influence is expressed in IGN as significant, for example as the person who first proposes Luciani for the Papacy, the "Popemaker." In taking the character of Benelli, Crane has used the dramatic device of having a character act as storyteller, a role which in a book is that of the author, as the unseen storyteller. Thus, while the focus in TLC upon Benelli is arguably a difference between IGN and TLC, it is insignificant and a classic technique used in the adaptation of a literary work into a drama. Yallop Decl., ¶ 31.

15

**d.    Copying of selection and arrangement of protected expression, content, and theories.**

As set forth above, TLC copies Mr. Yallop's expression of his opinions -- not facts -- set forth in IGN. This expression represents the author's expression as to the presentation of information, hypotheses, and conclusions therefrom that are reconstructed -- neither fact nor fabrication. This is the essence of the expression Crane copied in TLC.

Moreover, there is substantial similarity of Mr. Yallop's selection and expression of content and theme included in IGN, choices made to the exclusion of others. In paragraph 15 of the Yallop Declaration, the content and themes selected by Mr. Yallop for inclusion in IGN are summarized in broad terms. See also, Yallop Decl., ¶¶ 16-23. In TLC, distinct from the verbatim copying in Mr. Yallop's expression of many of these points, Crane selected and used nearly all of the content and themes set forth in paragraph 15 resulting in extensive similarity, indeed identically, in content and themes. In fact, only a few differences. See Yallop Decl., ¶ 27.

**D.    Crane's copying of IGN is not a fair use.**

Contrary to Crane's contentions, TLC is not a fair use of PPL's copyrighted work IGN. Fair use of a copyright work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107 (2007). In determining fair use, courts must consider the following four factors: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect on the market. See id. Based upon these criteria, a comparison of the two works shows Crane unfairly used PPL's copyrighted material.

### 1.    Purpose and Character of TLC.

The first fair use factor involves a consideration of the "purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1) (2007). TLC is a commercial use, which "tends to weigh against a finding of fair use." Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 141-42 (2d Cir. 1998) (citations omitted). Notwithstanding, the more critical inquiry under this factor of a fair use analysis is "whether and to what extent the new work is 'transformative.'" Id. at 142 (citation omitted). In other words, if "the secondary use adds value to the original – if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." Id. (citation omitted). That was not the case in Castle Rock.

In Castle Rock, the Second Circuit affirmed a grant of summary judgment for copyright infringement where the producers of the television series *Seinfeld* established a prima facie case of infringement against an infringer whose book constituted unfair use of the copyrighted work. See Castle Rock, 150 F.3d at 141-46. The defendants claimed the work, a book of trivia, qualified as "criticism, comment, scholarship, or research, or such" and "decod[ed] the obsession with . . . and mystique that surround[s] 'Seinfeld.'" Id. at 142. The Court disagreed finding that the book's minimal alteration of *Seinfeld*'s original expression further evidenced the book's lack of transformative purpose. See id. at 143.

Crane argues, in conclusory fashion, that his mere use of an investigative, factual work such as IGN for the creation of TLC as a two-act play makes it a transformative work. See Motion at 30. Such explanation is insufficient and untrue; it ignores the protection afforded to

16

Mr. Yallop's expression, selection, coordination, and arrangement of information in IGN; and the substantial similarity between the works. Like the infringing work in Castle Rock, supra, "[a]ny transformative purpose possessed by [TLC] is slight to non-existent." Castle Rock, 150 F.3d at 142. Rather, as clearly evidenced by Crane and the play itself, TLC's purpose is to repackage the expressions contained in IGN to entertain the book's audience. In doing so, Crane has unfairly copied the vivid expressive content of PPL's copyrighted work. "Indeed, 'vividness of description' is precisely an attribute of the author's expression that he is entitled to protect." Salinger v. Random House, Inc., 811 F.2d 90, 96 (2d Cir. 1987). As a result, the first fair-use factor weighs in favor of PPL.

**2.    Nature of IGN and Amount and Substantiality of TLC in Relation to IGN as a Whole.**

The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Castle Rock, 150 F.3d at 132 (citation omitted). Though fair use is somewhat broader with respect to factual works, "it is important to differentiate between the substance of the information contained in the [factual] report, i.e., the event itself, and the particular form or collocation of words in which the writer has communicated it." Wainwright Securities Inc. v. Wall Street Transcript Corp., 558 F.2d 91, 95 (2d Cir. 1977) (citation and internal quotations omitted).

As stated, IGN is far more than a factual work or compilation. Pursuant to the third fair use factor, "[w]hat is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments." Wainwright, 558 F.2d at 96 (citation omitted). "The 'ordinary' phrase may enjoy no protection as such, but its use in a sequence of expressive

words does not cause the entire passage to lose protection. And though the 'ordinary' phrase may be quoted without fear of infringement, a copier may not quote or paraphrase the sequence of creative expression that includes such a phrase." Salinger, 811 F.2d at 98. Hence, "the essence of infringement lies not in taking a general theme or in coverage of the reports as events, but in appropriating the particular expression through similarities of treatment, details, scenes, events and characterization." Wainwright, 558 F.2d at 95 (citation and internal quotations omitted).

In his summary judgment motion, Crane conspicuously fails to distinguish between any historic fact and the manner of expression used by Mr. Yallop in IGN. Crane failed to provide an independent analysis or research of the relevant facts; he did not solicit comments on the same topics from other sources; and he did not include any new aspects permitted under the Copyright Act. Rather, Crane appropriated almost verbatim significant and creative and original aspects of IGN. See Wainwright, 558 F.2d at 96 (affirming finding of unfair use where infringing newspaper abstracts appropriated, almost verbatim, data contained in copyrighted financial analytical research). As a result, the third fair use factor weighs in favor of PPL.

### 3.    Effect upon the Market

In assessing the fourth fair use factor, courts "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." Castle Rock, 150 F.3d at 145 (citation omitted). Courts must also consider "harm to the market for derivative works, defined as those markets that creators of original works would in general develop or license others to develop." Id. (citation and internal quotations omitted). Thus, the key concern is "whether the secondary use usurps or substitutes for the market of the original work." Id. (citation omitted).

18

The less transformative the secondary use, the more likely that the secondary use substitutes for the original. For example, in Castle Rock, supra, the Second Circuit found "[b]ecause *The SAT* borrows exclusively from *Seinfeld* and not from any other television or entertainment programs, *The SAT* is likely to fill a market niche that Castle Rock would in general develop." Castle Rock, 150 F.3d at 145. Moreover, the Court noted that the infringing book added nothing new to *Seinfeld* but, rather, paid homage to the television show. See id. The Court further noted that although Castle Rock expressed little interest in exploiting the market tapped into by the infringer, "the copyright law must respect that creative and economic choice." Id. at 145-46. "It would . . . not serve the ends of the Copyright Act – *i.e.*, to advance the arts – if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." Id. (citations omitted).

Similarly, TLC serves as a substitute for IGN and does not fall within the purview of the fair use defense. The defense "distinguishes between a true scholar and a chiseler who infringes a work for personal profit." Wainwright, 558 F.2d at 94 (quoting "Hearings on Bills for the General Revision of the Copyright Law Before the House Comm. On the Judiciary, 89th Cong. 1st Sess., ser. 8, pt. 3, at 1706 (1966) (Statement of John Shulman) (internal quotations omitted). Indeed, Crane's non-transformative use of TLC constitutes nothing other than chiseling for personal profit. Thus, the fourth fair use factor also weighs in favor of PPL.

### E. Claims regarding infringement of UK copyright law are not at issue here.

#### 1. PPL did not allege infringement of UK copyright law.

PPL has not alleged infringement of its UK copyrights in this U.S. action. Rather, the claims for relief in Count I and the counterclaim are limited to Crane's recently disclosed acts of

19

publication and shopping of IGN within the U.S. See Counterclaim generally and, specifically,

Count I.

As set forth above, PPL's copyright infringement claim (Count I) is specifically limited to

violation of the U.S. Copyright Act. PPL counterclaimed against Crane for "infring[ement] of

[PPL's] U.S. copyright [IGN] by authoring and/or reproducing an infringing work, and further by

marketing, promotion and/or distributing infringing materials in the U.S. without approval or

authorization from Poetic Products." Counterclaim, ¶ 15. Any reference to UK issues was

historical and for context. The claim specifically is limited to Crane's acts in the U.S. which

violated PPL's U.S., copyright.

Notwithstanding this position and without waiving this limitation, however, should this

Court disagree and decide to consider summary judgment with regard to UK copyright issues,

PPL responds below with regard to denial of Crane's motion insofar as he seeks to litigate the

UK copyright claims here. Any evidence on this point is submitted in support of PPL's position

that this Court should not assume jurisdiction over PPL's UK copyright claims, at a minimum, in

a summary manner.

**2.    Assuming, *arguendo*, the UK copyright is at issue, summary judgment should be denied.**

Crane's assertions with respect to UK copyright law misconstrue the law of England. See

Motion at 20-22, 30-31. First and foremost, Crane is neither an expert in UK copyright law nor

does he practice English copyright law. On the other hand, Mr. Robert Michael Englehart is

highly qualified to opine on this subject. Mr. Englehart obtained his law degree from Oxford

University and an LL.M. from Harvard Law School. See Declaration of Robert Michael

Englehart QC ("Englehart Decl."), ¶ 1. Since 1970, he has been a barrister at the Bar of England

and Wales. See id. He was appointed to the Queen's Counsel in 1986, and since 1992, Mr.

Englehart has been sitting as a deputy High Court Judge in the Chancery Division where he practices English copyright law. See id.

In his Motion Crane makes fundamental misconceptions about the English law of Copyright. See Englehart Decl., §§ 2, 2(i). Apparently, Crane incorrectly appears to believe the laws are the same and based upon a misapprehension or misstatement of English court decisions. See id.

The English courts have found some potential real differences, particularly in relation to the concept of ideas not being protected by copyright law. See id. Crane is correct to state that UK copyright law protects the expression of an idea rather than a bare idea. (See id., ¶ 4.), the test, is "a question of degree where a good guide is the notion of overborrowing of the skill, labour and judgment which went into the copyright work." Id. (quoting Ibcos Computers Ltd. v. Barclays Finance Ltd. [1994] FSR 275 at 301). Thus, while English law does not offer copyright protection to general ideas, it does afford protection to "detailed" ideas if such ideas are substantial parts of the copyrighted work. See id.

Crane also places an undue reliance upon Baigent v. Random House [2006] FSR 44, which the English Court of Appeal heavily criticized. See Englehart Decl., ¶ 2(ii) (citing Court of Appeal [2007] FSR 24). Although English law does not afford copyright protection to facts, said law will protect an author's collection, arrangement, treatment, and description of facts. See Englehart Decl., ¶ 5. Thus, in the UK, one infringes the copyright if he takes a substantial part of the author's treatment irrespective of the fact that the work addresses actual or assumed historical facts. See id.

Accordingly, the correct application of UK law would show that there is copyright in the literary work IGN. See Englehart Decl., ¶ 7. Because IGN is a book whereas TLC is a play,

21

there will be obvious differences. The fact that IGN is in some part an historical or factual work does not mean under UK law that Crane can take for himself the product of PPL's research and expressions. See id. ¶¶ 11-23 (citing, in part, at ¶ 12, Harmon Pictures v. Osborne [1967] 1 WLR 723). There is a remarkably similar use of language between IGN and TLC, and a close proximity between the work and its portrayal for consideration under UK law. See id., ¶ 18. Under English law, it would not be a sufficient responses (as Crane has submitted) to say he similarity concerns matters of fact, or is available from other sources. See id.

In England, the concept of summary judgment without a trial in the form of the summary judgment submitted by Crane would "seem strange." Englehart Decl., ¶ 18. In other words, a review by the UK courts of the summary judgment request made by Crane would likely show Crane's motion for summary judgment is inappropriate. See id., ¶¶ 18-19. Crane's summary judgment request under UK law would be denied because, at a minimum, significant issues of fact and appropriate application of English copyright law are in dispute.

**IV.    Conclusion.**

For the foregoing reasons, PPL respectfully requests that this Court deny Crane's motion

for summary judgment, plus any and all other relief this Court deems just and proper.

Dated:  New York, New York
        May 7, 2008

Respectfully submitted,

HOLLAND & KNIGHT LLP

By _____
        Tamara Carmichael
        Christelette A. Hoey
        Joshua Krumholz (*Admitted Pro Hac Vice*)
    195 Broadway, Floor 24
    New York, New York 10007
    (212) 513-3200

*Attorneys for Defendant-Counterclaimant*
*Poetic Products Limited*

23