3 of 5 DOCUMENTS

\*Baigent and another v Random House Group Ltd

CHANCERY DIVISION

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

**HEARING-DATES:** 7 APRIL 2006

7 APRIL 2006

**CATCHWORDS:**

Copyright - Infringement - Defence - Work intended as factual account of historical events - Repetition of facts by another author - Whether there had been non-textual infringement of claimant's literary work.

**HEADNOTE:**

This case digest has been summarised by LexisNexis UK editors.

The claimants were two of three authors of a book, entitled 'The Holy Blood and the Holy Grail' (HBHG), which was published in 1982. They alleged that their copyright in that work had been infringed by the novel, 'The Da Vinci Code' (the book), and commenced proceedings against the defendant publishing house which was responsible for the publication of the book in the United Kingdom. By those proceedings, the claimants sought the usual relief for copyright infringement, including an injunction and delivery up for destruction on the basis that the defendant had reproduced or authorised the reproduction of a substantial part of the copyright in HBHG.

The claimants acknowledged that there was a significant amount of material in the book which was not derived from HBHG but alleged that the 'central theme' of the book, namely the merging of Jesus' bloodline with the bloodline of the Merovingian dynasty in fifth-century Southern France, had been copied by the book's author, DB, from HBHG. They claimed that, in HBHG, they had been the first authors to identify a continuous link from the New Testament to the Merovingian dynasty and from there to the Crusades; that they had also been the first authors to propose that the Holy Grail was a metaphor for Mary Magdalene; that those concepts had been copied by DB and that, in so doing, DB had utilised the skill and labour expended by the claimants in creating HBHG. The defendant argued that, in so far as DB had used HBHG as a source, he had done so in conjunction with a number of other sources and had used it only at a later stage in the composition of the book. It contended, further, that the synopsis for the book had been written before DB or his wife, who carried out a great deal of the research for the book, had read HBHG. It was accepted by the claimants that the synopsis contained most of the ideas which they complained had been taken from HBHG. Moreover, it was contended that the 'central theme' identified by the claimants in their pleadings did not represent a theme which was presented as central in HBHG.

The issue for determination by the court was whether there had been a non-textual infringement of the claimant's literary work.

The claim would be dismissed.

Copyright protection was not confined to the literal text in literary work: changing a few immaterial words in a work that was otherwise the same would not escape liability. However, copyright should not protect against the borrowing of an idea contained in a work: the courts would not protect 'works' through an extreme level of abstraction. The line to be drawn was to enable a fair balance to be struck between protecting the rights of the author and allowing literary development. If what was asserted to have been infringed was so general that it could not be certain, that would lead to a conclusion that it was such a level of abstraction that no protection should be afforded to it. Where a book was intended to be read as a factual account of historical events and a defendant accepted it as fact and did no more than repeat certain of those facts, a claimant could not claim a monopoly in those historical facts. It was, accordingly, perfectly legitimate for another person to contrive a novel based on those facts, as otherwise that claimant would have had a monopoly of the facts. Although the facts, themes and ideas could not be protected, the way in which those facts,

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

themes and ideas were put together could be. It followed that, to establish infringement, the claimant had to show that there was a putting-together of facts, themes and ideas by him as a result of his efforts and that that putting-together had been copied.

In the instant case, on the evidence, DB did not use HBHG when he wrote the synopsis. Moreover, the alleged 'central theme' was not genuinely the central theme of HBHG and was merely a contrivance for the purposes of alleging that the book infringed a substantial part of HBHG.

Ravenscroft v Herbert [1980] RPC 193 applied.

APPROVED JUDGMENT

I DIRECT THAT PURSUANT TO CPR PD 39A PARA 6.1 NO OFFICIAL SHORTHAND NOTE SHALL BE TAKEN OF THIS JUDGMENT AND THAT COPIES OF THIS VERSION AS HANDED DOWN MAY BE TREATED AS AUTHENTIC.
INDEX

A          SETTING THE SCENE

1          Introduction

2          The Claimants

3          Writing and Publication of HBHG

4          The Mystery

B          HOLY BLOOD HOLY GRAIL

5          Analysis of HBHG

6          A Central Theme

C          DAN BROWN AND THE DA VINCI CODE

7          Dan Brown

8          Researching and writing DVC

9          Analysis of DVC

D          THE CLAIM

10         Complaints by Claimants

11         Proceedings

12         Defendants Seek Clarification

13         Lewison J Order

14         Changes in Pleadings

E          CENTRAL THEME

15         Changes

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

| 16 | Significance of Central Theme |
|---|---|
| 17 | Treatment of Central Theme |
| F | DEFENDANTS STANCE |
| 18 | Defence |
| 19 | The VSS |
| G | LEGAL MATTERS |
| 20 | Outline |
| 21 | Sawkins |
| 22 | Copying a Substantial Part of HBHG |
| 23 | IPC Media |
| 24 | Green v Broadcasting Corporation |
| 25 | Authorities in Non Textual Infringement Cases |
| 26 | Ravenscroft |
| 27 | Designers Guild |
| H | APPLICATIONS OF LEGAL PRINCIPLES TO THE FACTS |
| 28 | The Defendants Contentions |
| 29 | The Synopsis |
| 30 | Use of Books in Writing The Synopsis |
| 31 | Criticism of Dan Brown on Books Available when Synopsis written |
| 32 | Absence of Blythe Brown from the Trial |
| 33 | Use of HBHG by Blythe Brown/Dan Brown |
| I | THE CENTRAL THEMES AND ANALYSIS |
| 34 | General Observations |
| 35 | Non Protection for Ideas and Facts alone |
| 36 | Baigent on Central Themes |
| 37 | Destruction of Baigent's Evidence |
| 38 | Change of Course by the Claimants |

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

| 39 | Claimants Closing on Central Themes |
| 40 | Claimants Difficulties of Formulation |
| J | CONCLUSION ON CENTRAL THEMES |
| 41 | Reason for rejecting Central Themes |
| 42 | The Task of Analysis |
| 43 | Central Themes, What are they? |
| 44 | Natural Chronological Order |
| 45 | False Creation |
| 46 | Conclusion on Rejection of Central Themes |
| K | INDIVIDUAL POINTS ON CENTRAL THEMES |
| 47 | Use of HBHG |
| 48 | Central Theme 1 |
| 49 | Central Theme 2 |
| 50 | Central Theme 3 |
| 51 | Central Theme 4 |
| 52 | Central Theme 5 |
| 53 | Central Theme 6 |
| 54 | Central Theme 7 |
| 55 | Central Theme 8 |
| 56 | Central Theme 9 |
| 57 | Central Theme 10 |
| 58 | Central Theme 11 |
| 59 | Central Theme 12 |
| 60 | Central Theme 13 |
| 61 | Central Theme 14 |
| 62 | Central Theme 15 |
| L | CENTRAL THEME IN DVC |
| M | LANGUAGE COPYING |

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

| N | REFERENCES TO HBHG IN SOURCES USED BY DAN AND BLYTH BROWN |
|---|---|
| 63 | Jesus Survives |
| 64 | Langdon Reveals |
| 65 | Constantine |
| O | WITNESSES |
| 66 | Mr Leigh |
| 67 | Mr Brown |
| 68 | Blythe Brown |
| 69 | Mr Ruben |
| 70 | Mr Janson-Smith |
| P | OTHER MATTERS |
| Q | END GAME |
| R | THE CENTRAL THEME |

**INTRODUCTION:**

This is the first approved version handed down by the court. An edited official transcript or report will follow.

**COUNSEL:**

Jonathan Rayner James QC and Andrew Norris for the claimants.; John Baldwin QC and James Abrahams for the defendant.

**PANEL:** PETER SMITH J

**JUDGMENTBY-1:** PETER SMITH J

**JUDGMENT-1:**

PETER SMITH J:

A SETTING THE SCENE

1 Introduction

1. The two Claimants Michael Baigent and Richard Leigh claim that the novel The Da Vinci Code ("DVC") is an infringement of their copyright in their book The Holy Blood and The Holy Grail ("HBHG").

2. The Claimants are two of the three authors of HBHG. The third author, Henry Lincoln is not a claimant and does not participate in the claim. No point is taken about his non participation. Nor is there any claim that the Claimants' title to sue in respect of their interests in that copyright by reason that they had been two of the three joint holders copyright.

3. DVC was written by Dan Brown who lives and works in America. The Claimants' case is that in writing DVC he produced a book which is an infringing copy of HBHG. The Defendant to the proceedings is The Random House Group Ltd ("Random") which is responsible for the publication of DVC in the United Kingdom. Dan Brown is not a Defen-

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

dant, but Random relied upon his witness statements and his evidence in this action. In reality Mr Brown is on trial over the authorship of DVC.

4. By virtue of various mergers and acquisitions Random publishes both HBHG and DVC. Further a film production of DVC is apparently in the offing starring Tom Hanks with a scheduled release in May 2006. It is a testament to cynicism in our times that there have been suggestions that this action is nothing more than a collaborative exercise designed to maximise publicity for both books. It is true that the book sales of both books have soared during the course of the trial (in the case of HBHG it is said to be a tenfold increase).

5. I am not in a position to comment on whether this cynical view is correct but I would say that if it was such a collaborative exercise Mr Baigent and Mr Brown both went through an extensive ordeal in cross examination which they are likely to remember for some time.

2 The Claimants

6. The Claimants together with Mr Lincoln spent 5 years researching HBHG between 1976 and 1981 leading to its publication in 1982. As will be seen later in this judgment HBHG was preceded by a number of television documentaries. Mr Baigent said that he had spent 75% of his waking hours during that period researching various points underpinning HBHG.

7. He was born in New Zealand and moved to England in 1976 and had an interest in religion "esoteric" thought. After completing studies at university culminating in a BA in psychology with comparative religion and philosophy he developed a private interest in the Knights Templar.

8. Mr Leigh was born in New Jersey and after secondary education completed a BA in English Literature at Tufts University Boston. He became interested in the Grail Romances whilst an undergraduate and also steeped himself in comparative religions. Thereafter he completed an MA at the University of Chicago in comparative literature and studied for a PHD at the State University of New York. After various part time teaching jobs he moved to London so as to be able to maintain the lifestyle that he wanted (he describes it as genteel bohemianism). There he met Henry Lincoln at a lecture course held at the Wrekin Trust Summer School. During those lectures Henry Lincoln digressed about a village in the South of France called "Rennes-le-Chateau" and the mystery relating to the village. This led to Henry Lincoln showing to Mr Leigh a key document used for the writing of HBHG the "Dossiers Secrets". It was this document and its possible link to the Templars that interested Mr Baigent and led to the three of them collaborating in producing HBHG.

9. HBHG was written mostly by Mr Leigh. He had the benefit of input of research from Mr Baigent and discussions with him and Henry Lincoln.

10. A more detailed analysis of how they created HBHG is to be found in Mr Baigent and Mr Leigh's witness statements. None of this is in dispute.

3 Writing And Publication Of HBHG

11. The book was first published in 1982 and was a tremendous success. The Claimants described their book as being one of "historical conjecture". By this I understand them to be saying that they have researched the matter and as a result of that research are able to make hypotheses about various particular points and suggest that they might be plausible without actually committing themselves to whether or not they believe them to be correct. Mr Baigent hypothesised that the way in which they presented their research was not orthodox and used techniques which had been criticised by orthodox historians such as giving weight to folklore legends and using literary work to help strengthen the plausibility of the argument. It is therefore suggested by Mr Baigent that HBHG is a book written "for ordinary people" and that is why Mr Leigh used techniques usually seen in novels.

12. There were discussions following publication about making a film but these did not come to any clear conclusion.

13. Publication of HBHG was preceded by the preparation of the book proposal ("The Outline") by Mr Baigent, Mr Leigh (under the pseudonym Bardmont) and Mr Lincoln. The outline starts with a proposition that Jesus was not a poor carpenter from Nazareth but a Jewish aristocrat who was in addition a priest-king, married and he had children who after "the alleged crucifixion" were smuggled to a Jewish community in Southern France where the bloodline was perpetuated. It is said that in the late 5th century the Roman church seeking to establish its supremacy throughout Christendom made a pact with Jesus' line and bound itself forever to the Holy Blood but betrayed that 180 years later and con-

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

nived at the assassination of Jesus' lineal descendant and arrogated to itself the right to create Kings. Fortunately apparently, the Bloodline was not extinguished and continued through the centuries and played a major role in the instigation of the Crusades, was instrumental in the foundation of the Knights Templar and played a vital role in other historical enigmas then shrouded in secrecy. Finally it was asserted there was a secret order in France still in existence pledged to the protection and support of the Holy Blood with the avowed objective of establishing a new sacred and universal monarchy.

14. It also suggested that they approached research in a different way. They called this "synthesis" (a theme referred to in HBHG at page 324) which ascribes the benefits of looking at historical events not merely from the point of view of technical historical researches but also from the point of view of persons interested in literature. It was this combined interest they suggested that led them to the merger of the two lines of thought and to their "conjectural" proposition that the bloodline of Jesus not only survived in France but merged with the Merovingian bloodline around the 5th century and carried on. This possibility they suggest only occurred to them because of their specialist historical approach combined with their combined specialist literature approach (in the medium of Mr Baigent and Mr Leigh respectively).

4 The Mystery

15. The major part of The Outline sets out from a priest called Berenger Sauniere who was the parish priest at Rennes-le-Chateau. It is said that he found secrets hidden in a hollowed out Visi-Goth column in the Church which gave him access to great wealth far beyond what he could have earned from his living as a priest.

16. The investigation of this localised mystery featured in at least one of the television programmes preceding HBHG. The investigation of this story led according to The Outline to various other mysteries and to a collection of documents in the Bibliotheque Nationale called the Dossiers Secrets. The Dossiers contained one page attesting the existence of a serious organisation called the Ordre de Sion said to have been founded in 1090 by Godfroi de Bouillon 9 years before the First Crusade. It is alleged that in 1188 it was re christened the Preure de Sion et L'Ordre de La Rose Croix Veritas. The list of Grand Masters went down through a long list of names culminating in Jean Cocteau who was the Grand Master supposedly from 1916. The text then goes on to refer to the legend of the Holy Grail and their conclusion that there might be some linkage between the Merovingian bloodline and the Grail. It was speculated that it might be Joseph of Arimathea or Jesus and that it was suspicious that it appeared at the same time as the peak of the Crusades when Godfroi (a Merovingian descendant allegedly) had conquered the Holy Land and had been proclaimed King (sic) of Jerusalem. They led to the conclusion that Mary Magdalene was carrying the blood royal in fact Jesus' bloodline so she had Jesus' children. She then founded a line when taking refuge in the South of France which intermarried with the Franks (sic) to produce the Merovingians.

17. This outline led to HBHG.

B HOLY BLOOD HOLY GRAIL

5 Analysis Of HBHG

18. In the introduction to HBHG Mr Lincoln sets out how the idea for HBHG developed. It started with a "Chronicle" film created by him and screened in February 1972 "The Lost Treasure of Jerusalem?" This was based on the Sauniere discovery and the possible linkage of Rennes-le-Chateau to a painting by Nicolas Poussin "The Shepherds of Arcadia". It was suggested that the famous portrait was of a tomb near Rennes-le-Chateau. The Second Chronicle film "The Priest, The Painter and The Devil" expanded on the connections between Sauniere, Poussin and Devil worship. The third "The Shadow of the Templars" concentrated on the Templar role if any in the Rennes-le-Chateau mystery.

19. All of the films therefore centred on Rennes-le-Chateau. However HBHG was a follow up as he says when he closed the last film with "something extraordinary is waiting to be found... and in the not too distant future, it will be". HBHG is said to be what the something is and how extraordinary discovering of it had been.

20. Later editions had an additional 1996 introduction. It is interesting to see that in that introduction the authors recount the way in which HBHG attracted huge attention from religious groups and the extraordinary number of attacks that were made upon them. It also recounts their approach by a film director Paul Schrader on behalf of himself and Martin Scorsese about a film. It continues "we would like to think however that our book helped create a climate which made possible such works as Scorsese's adaptation of Nicos Kazantzaka's novel the Last Temptation.... Even before [HBHG] was published Liz Greene had drawn upon our research for the novel revolving around Nostradamus. She drew on it in her second novel "The Puppet Master". In later years that followed material from [HBHG] found its way into a multitude of other fictional narratives from tacky thrillers and pot boilers to very serious literature indeed. ......".

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

The introduction goes on to recount extensive translation and use made of HBHG. It then went on to refer to "fragments of gossip" about the latest activities of Pierre Plantard and the Priory of Sion and then said "in a very real sense we felt the story had passed out of our hands - had passed beyond us into the public domain and hands of other researchers. This, as we stated at the end of [HBHG] was just what we hoped would happen. We saw ourselves as merely having scratched the surface of something - of a mystery which extended over at least 20 centuries, and radiated out across the whole of western civilisation...."

21. That introduction is to be found only in the UK edition. It is not in the US edition which Mr Brown and his wife used.

22. It is certainly true that HBHG spawned a mass of literature. A look at the website "Priory-of-Sion.com" details the vast amount of literature which HBHG and DVC has spawned.

23. The paperback edition (US) contained an introduction which was similar to the 1996 UK paperback introduction.

24. This introduction shows the different types of audience that might be interested in HBHG. British interest it is suggested was concentrated on subjects like the Knights Templar and the Crusades, Freemasonry and cultural aspects like the significance of Poussin and others. This of course was strengthened by the whetting of the British audience with the chronicle programmes. In the United States however the response was more of a religious (and largely negative) attack. DVC as will be seen later in this judgment attracted a similar attack which apparently caught Mr Brown by surprise. The authors in this introduction spoke about HBHG in these terms "yet above and beyond these more specialised spheres remain three pervasive and overriding themes: the mystery of Rennes-le-Chateau; the bloodline or "Grail Dynasty"; and the Priory de Sion that exclusive secret society which from the middle ages to the present has figured prominently in our story. We believe our book has shaken a quantity of fruit from the trees of all three themes...."

25. HBHG is divided into three parts. The first part is "The Mystery". This recounts as I have said the finding of treasures by Sauniere, his apparent unexpected wealth and the treasures comprising some documents which on examination had some coded messages in them, one of them being linked to Dagobert II a Merovingian king "to Dagobert II king and to Sion belongs this treasure and he is there dead". Sauniere died on 22nd January 1917 (having had a stroke on the 17th January 1917 allegedly) without revealing his secrets. It is said that his wealth was passed to his housekeeper Marie Denarnaud but she too took the secrets to her grave in 1953. The story then meanders around Poussin's picture and the message pointed to on the grave by the shepherds: "Et in Arcadia ego". This, the book shows is a theme that has appeared more than once (the last one for example being in reverse on a bas relief at Shugborough Hall Staffordshire. (It has its own curious coded message).) This part then goes on to discuss the history of the Cathars a religious sect which lived in the area of Rennes-le-Chateau in the 13th century when they were eradicated as being heretics.

26. This section of the book then recounts what is described as the "orthodox" account of the foundation of the Knights Templars derived initially from the works of William of Tyre who wrote between 1175 and 1185. This area has attracted more recent attention see for example the film "The Kingdom of Heaven" which itself is a fine example of the adaptation of facts to create a "factional account". The authors recount the founding of the Templars conventionally in 1118, their linkage with St Bernard of Clairvaux and their expansion over the next 100 years culminating in their Grand Master's incompetent role in the battles of Cresson and the more well known one in July 1187 at the Horns of the Hattin. Over the next hundred years the Templars had a reduced role in the reduced Kingdom of Jerusalem but maintained themselves in France and elsewhere but were the subject matter of an attack by Philippe IV of France on 13th October 1307. It is asserted in HBHG all the Templars were simultaneously arrested "in a security operation worthy of the SS or Gestapo...." After the arrests various attempts were made to eliminate the Templars throughout Western Europe but of differing results. It is suggested (for example) that a sizeable contingent of English and French Templars fought on Robert the Bruce's side at the battle of Banockburn in 1314.

27. They then present a mysterious history of Templars. This has the Templars surviving via Freemasons and taking part in the French Revolution (it being asserted that on the execution of Louis XVI when he was guillotined an unknown man is reported to have leapt on to the scaffold dipped his hand in amongst the blood and cried "Jacques De Molay, thou art avenged!". (He was the last Grand Master of the Knights Temple burned at the stake in 1314).)

28. The secret history of the Templars goes on to recount that the Templars were accommodated in a part of the site of the Holy Temple and kept horses there; defiling the Holy Site in Muslim eyes. It is suggested that some secrets were discovered there by the Templars and this led to their apparent rapid rise to power and wealth. It is suggested that the

Templar treasure was buried in the region of Rennes-le-Chateau and for some reason the Templars in this area were excluded from the general order of Philippe IV.

29. The final chapter (4) of the First Part introduces the Dossiers Secrets. Discovering the name "Plantard" on the back of some photographs of Rennes-le-Chateau led the Claimants to track down Pierre Plantard. It is said that they had difficulties obtaining access to the Dossiers Secrets but ultimately they had access and this led to six "indisputable historical facts" as follows:-

1 There was a secret order behind the Knights Templar which created the Templars as its military and administrative arm and it was known as the Priory of Sion.

2 The Priory of Sion had been directed by a sequence of Grand Masters whose names are among the most illustrious in western history and culture.

3 Although the Knights Templars were destroyed and dissolved between 1307 and 1314 the Priory remained unscathed but acted in the shadows behind the scenes and orchestrated certain critical events in western history.

4 The Priory of Sion exists today and is still operative it is influential and plays a role in high level international affairs as well as in the domestic affairs of certain European countries.

5 The avowed and declared objective of the Priory of Sion is the restoration of the Merovingian dynasty and bloodline not only to the throne of France but the thrones of other European nations.

6 The Merovingian dynasty is sanctioned and justifiable both legally and morally via Dagobert, Godfroi De Bouillon and other royal families throughout Europe.

30. That summary set the scene for part 2 of HBHG "The Secret Society". This section starts with identifying a site in Jerusalem (Mount Zion) and the creation of an order there, the Abbey of Notre Dame de Zion. After the fall of Jerusalem in 1099 it is suggested that a group of anonymous figures convened in secret conclave but their identity has "eluded all historical enquiries". Despite a persuasive claim by Raymond Count of Toulouse this allegedly mysterious and influential body of electors promptly offered the throne to Godfroi who declined the title but accepted instead that of Defender of the Holy Sepulchre of which he was known until his death in 1100. He was then succeeded by his brother Baldwin who was crowned King of Jerusalem. It is speculated that this secret conclave could have occupied Mount Zion and would this be the Priory of Sion?

31. This is then linked to mysteries about the foundation of the Knights Templar and the suggestion that this Priory of Sion might have stood behind both St Bernard and the Knights Templar. Alternately according to the Priory of Sion documents it is suggested that there was a severance between the Priory and the Knights Templar in 1188. This was said to be as a result of the ineptitude of Gerard de Ridefort the Templars' Grand Master (see above) at Cresson and Hattin. It is described as the "the cutting of the Elm". This part then leads to a list of the Grand Masters of the Priory of Sion (reproduced at page 131 of the UK paperback edition). This list is said to have been copied by Mr Brown (contrary to his evidence that he obtained it from the internet). The list at page 131 (UK edition) is reproduced at page 430-431 of DVC. It includes a reference to "Les Nautoniers" and hyphenates the name Saint-Claire in two places.

32. The addition of the description of Grand Masters and hyphens the Claimants say are unique to them as they added them in their list. There was at the time that Mr Brown was writing DVC no reproduction of the original list on the internet so the only source of the list in DVC could have come from HBHG. This seems to me to be correct. This is one of the schedule of language similarities (No 5) secondarily relied upon by the Claimants.

33. The long list of Grand Masters (including Botticelli under the name Filipepi) includes names such as Robert Boyle, Isaac Newton, Victor Hugo, Jean Cocteau and most significantly (for the purpose of this litigation at any rate) Leonardo Da Vinci. At the end of HBHG a potted history of each of the Grand Masters is given. In the case of the earlier Grand Masters it is very sparse.

34. The Claimants suggest in HBHG that they were sceptical about the list initially. Once again the text meanders through the theme of Arcadia sidetracks round the Rose Croix, the Stuarts and numerous other wide ranging areas where questions are posed but no answers are offered culminating in chapter 8 "The secret Society today". This reintroduces the briefly mentioned Pierre Plantard. The authors discerned Mr Plantard's apparent key role in the Priory of Sion and were anxious to meet him. After some delays ultimately they met him in spring 1979. He apparently met them in neutral ground in a Paris cinema rented by the BBC. He was described as being dignified, courteous and of a discreetly

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

aristocratic bearing and unostentatious appearance with a gracious volatile but soft spoken manner. He apparently displayed enormous erudition and impressive nimbleness of mind. Significantly apparently he could not drive a car.

35. They had three meetings with Mr Plantard and he provided them with various declarations such as the fact that the Priory of Sion held the lost treasure of the Temple of Jerusalem (booty plundered by Titus's Roman legions in AD70 as recorded on the Arch of Titus in the forum). The treasure was spiritual and was a secret in some way. It was not explained how this treasure which was in Rome until it fell into the clutches of Alaric the Goth in 410 and was then hidden in Jerusalem to be found by the Templars some 700 years later. Maybe it was a different treasure. Maybe the Romans missed the best part of the treasure when the mount was destroyed and subsequently rebuilt. This is possible I conjecture.

36. The authors overcome their natural suspicion about dismissing the Priory of Sion as a minor "lunatic fringe sect" if not an outright hoax. Nevertheless they concluded that there was something in the Merovingian claim but speculated that there was something very special about the Merovingian Blood Royal which required it to be treated differently to all the other disinherited royal lines that litter Europe. Mr Plantard limited his claim to the restoration of the Merovingians via the Priory of Sion.

37. After the television series and after the publication of HBHG material emerged which suggested that the Rennes Le Chateau mystery and the Priory of Sion documents were all an elaborate hoax in which Mr Pierre Plantard had a significant role. I do not have to elaborate or even determine that issue. Anybody who is already not aware of the detailed denouement will find it at the website Priory-of-sion.com referred to above. Mr Baigent in his evidence before me said they were always suspicious of Mr Plantard but I do not find such suspicion in HBHG; it was essential for HBHG to have credibility that the Priory of Sion as introduced to them had a plausible basis because without that a large part of HBHG simply disappears as a credible basis if not an outright hoax or piece of fiction.

38. Part Three of the book "the Bloodline" starts at page 295 (UK edition). In that part they refer to the fact apparently that in earlier manuscripts concerning the Grail story it is called "Sangreal" or "Sangraal". They speculate that this might mean "Sang Raal" or "Sang Real" i.e. Sang Royal namely Royal Blood. From this series of speculative leaps and bounds the Claimants link the Grail with the royal bloodline i.e. the Merovingian line. This is summarised at page 328 (UK edition) "Our Hypothesis".

39. It is then suggested that Mary Magdalene brought the Holy Grail or blood royal to France and the grail is closely associated to Jesus and relates in some way to blood or more specifically to a bloodline and lineage. The Grail Romances however for the most part are set in Merovingian times but were not composed until after Godfroi de Bouillon a possible Scion of the Grail Family and actual Scion of the Merovingians was installed in everything but name as King of Jerusalem.

40. They observe that if they had been dealing with anyone other than Jesus this would have led to a self evident conclusion that they were all linked. They nevertheless drew the same conclusion by testing it as a tentative hypothesis which explained everything. It led to a bloodline descending from Jesus through Dagobert II and in effect ultimately to Pierre Plantard. At this tentative stage of their conjectures they ruled it out without any more evidence. This led to the proposition that Jesus being Jewish would have been married (as otherwise the fact would have been glaringly conspicuous). This would be the more so if he enjoyed the title of Rabbi and the reference in the fourth gospel to a wedding at Cana was it is suggested Jesus' own marriage to Mary Magdalene who is identified as his wife. They then carry their conjecture on to Jesus' dynasty, the strength of a marriage between the House of David (Jesus) and the tribe of Benjamin (Mary Magdalene) and the threat he posed by being married the rightful claim to the throne with children.

41. It is suggested (although Mr Baigent denied this) (page 377) that there is a possibility of a fake crucifixion. In this context that is one of the bullet points attached to the back of the cover of the US edition of HBHG. However the survival of Jesus was not apparently considered to be important; what was more important was the arrival in Marseilles of Mary Magdalene bringing the Royal Blood along with Joseph of Aramathea (they do not follow the Glastonbury diversion).

42. Interesting although all this is no actual research is provided by the authors in their speculative travel. The possible questions are posed but why the questions can be posed and the basis of the material which led to them being able to pose them is not to be found in HBHG.

43. They go on to portray the inconvenience that this conjectural theory causes the established church. It stems from the deification of Jesus which flowed from the Council of Nicea which was presided over by Constantine the Great in 325 AD. Traditionally as they set out in the text Constantine was treated as adopting the Christian faith having seen

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

the Chi-rho sign in a prophetic dream shortly before the battle of Milvian Bridge when he defeated Maxentius in AD 312. Tradition recounts that the Chi-rho signal was emblazoned on the shields of his troops. As a consequence Constantine's victory over Maxentius came to represent a miraculous triumph of Christianity over Paganism. They suggest that the position was actually somewhat different. Constantine did not convert but headed the Pagan religion of Sol Invictus a Syrian cult in origin which was adopted by Roman Emperors a century before (possibly through contacts with the wife of Septimius Severus who was from Syria). This religion it is said harmonised with the cult of Mithras which was prevalent in Rome (especially in military circles) at that time. Thus for example the Christian religious day of Sunday was taken from the cult of Mithras and both celebrated a major birth on December 25th. Mithraism also stressed the immortality of the soul and a future judgment in the resurrection of the dead (there is not necessarily anything original in that as a faith).

44. Everything came together in the Council of Nicea when by a substantial majority (218 for and 2 against) it was decided that Jesus was a god not a mortal prophet. This led to the banishment of the contrary Arian tradition. This developed through the next century leading to the unification of the church and state control through Theodosius the Great. There were of course hiccups along the way (old traditions die hard). Julian the Apostate was such a hiccup.

45. The purpose of this discourse by the Claimants is to show why the establishment church was determined to suppress the bloodline history.

46. The rest of this part of the book leading to chapter 15 (conclusion and portents for the future) consists of a series of conjectures but with no real evidence showing any linking between the royal bloodline and the Merovingians as such. The conjectures are to be found at pages 410-412 and are at the far end of conjecture in my view.

47. In their final chapter they conjecture that Jesus' wife and offspring after fleeing the Holy Land found a refuge in the South of France with a Jewish community and preserved their lineage. That lineage in the 5th century intermarried with the royal line of the Franks thus engendering the Merovingian dynasty. The church had a pact with this dynasty but broke that and colluded in the assassination of Dagobert. However Jesus' bloodline or at any rate the Merovingian bloodline survived and carried on through to Godfroi. The secrets of this were discovered in an excavation in the temple in the so called stables of Solomon by the Templars. They speculate that it might have been the equivalent so to speak of Jesus' marriage licence and or the birth certificates of his children and that all of these might have been referred to as the Holy Grail. However the Grail could also mean Mary Magdalene as well.

48. For the future this might be a good idea in the modern world it is speculated because if Jesus was acknowledged as a mortal prophet he might well become acceptable to both Muslims and Jews and would therefore be able to implement one of the primary tenets of Templar policy alleged to be the reconciliation of Christianity with Judaism and Islam.

49. I will not depart from that last statement which seems somewhat surprising as a policy of the Templars (see for example the refusal of the Knights Templar en masse to convert to Christianity at the battle of the Hattins which led to their beheading). However they continued to speculate that it all collapsed with the loss of the Holy Lands finally in 1291 which then made the Knights Templar redundant and expendable. The protection of the Bloodline secret thereafter continued via the Priory of Sion. It is suggested (page 428) that the French Revolution was devastating blow to Merovingian hopes (see the statement alleged to be made at the execution of Louis referred to above).

50. At page 430 they maintained that their hypothesis whilst it could not be certain to be correct in every detail they were convinced that the essential outlines of their hypothesis was accurate. Their research has persuaded them that the mystery of Rennes-le-Chateau involved a serious attempt by influential people to re-establish a Merovingian monarchy in France if not indeed in the whole of Europe and that the claims of legitimacy of such monarchy rested on a Merovingian descent from Jesus.

51. There are three problems about that summary. First as I have said above the Rennes-le-Chateau mystery derives from the material provided ultimately via Pierre Plantard which has been strongly held to be fake. Second Pierre Plantard himself did not claim at any time to be descended from Jesus. No evidential material has been produced for these speculations. Third the Merovingians were never Kings of France; they were Kings in France.

52. I have set out at some length what in my opinion is an overall analysis of HBHG. I have done that (and will do the same further in this judgment in respect of DVC) because that is essential in my view to deciding this case. The key to solving the conundrum posed by this judgment is in reading HBHG and DVC.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

53. There was nothing original (in the non technical copyright sense) in the material the Claimants put forward concerning Rennes-le-Chateau and the Priory of Sion. As I have set out above it all ultimately emanated from pre-existing French writings and Pierre Plantard and people associated with him. Equally there was nothing original in the Claimants presentation of the Grail material.

6 A Central Theme

54. What was original was the merging of the Jesus bloodline with Merovingian bloodline as an idea. I have already set out above the hypothesis thus put forward (HBHG page 430). Mr Leigh confirmed this in cross examination (T6/842/2-13) when he had been cross examined about the 15 Central Theme Points. He expressed the view that there were certain key points among those which were uniquely theirs. The unique ones he suggested were Jesus' bloodline flowing in to the Merovingian line and second that the Grail was not only a thing or a phenomenon but was also a person and the bloodline. Mr Rayner James QC for the Claimants in his closing submissions (T11/1575/3) suggested other potential original ideas on the part of the Claimants namely Godfroi reclaiming his birth right and heritage and that the Priory of Sion were the protectors of the bloodline and equally the Holy Grail. I am not sure that the latter is much of a point because it is merely a consequence of linking the bloodline with the Merovingian line which would then have the consequential effect of the Priory of Sion protecting both. Nor is there much in the former point either. The major conjectural point seems to me to be the merger of the bloodline in the Merovingian line.

C DAN BROWN AND THE DA VINCI CODE

7 Dan Brown

55. DVC was his fourth book. Prior to that he had written Digital Fortress (1998), Angels & Demons (2000), Deception Point (2001) and DVC (2003).

56. The first three books were not successful in the sense of sales (the total sales for the three books was approximately 26,000) although they have revived following the success of DVC.

57. Mr Brown came from an academic background on the East Coast of the United States. In addition to developing an interest in literature he after spending time in Spain developed an interest in art as a communication between the artist and the viewer. He then developed interests in music and moved to Los Angeles to develop a career in song writing. He produced some limited albums of original music but was really dependent on working as an English teacher at Beverly Hills Prep School. He met his wife Blythe through the National Academy of Song Writers where she was the director of artistic development. Despite the Academy's effort to promote him his music career never took off.

58. In 1993 while on vacation in Tahiti he read a book by Sydney Sheldon and thought that he might be able to write a "thriller" of this type one day. Thereafter he wrote a humorous book (187 men to avoid) and then moved on to the publication of his four books.

59. In his witness statement he sets out how he writes his novels. First he selects a theme which is the "big idea". He suggests that his novels are research intensive so they can take up to two years to write. He chooses a subject which is not black and white but rather contains a grey area where there is no clear right or wrong no definite good or evil and makes for great debate. His writing process is very disciplined. He makes his books location driven and because of a fascination with codes likes to have codes and secrecy elements in all of his books.

60. In Angels & Demons he introduced Robert Langdon as a character for the first time. He is based on an artist and philosopher John Langdon.

61. In Angels & Demons he introduced the literary concept of academic lectures as part of the thriller.

62. Introduced in Angels and Demons also were religious architecture concepts. He and his wife Blythe loved researching these subjects and it enabled them to work together as a husband and wife team in creating the novels. It is clear that a lot of research material that he gathered for writing Angels & Demons was used in the DVC.

8 Researching And Writing DVC

63. In his evidence Mr Brown said that he and Blythe spent a year or so travelling and conducting research during the writing of DVC. During this exercise they met historians and academics and extended travels from the Vatican and France to England and Scotland in order to investigate the historical underpinnings of the notes. The research (taking in to the account the leftovers from Angels & Demons) on DVC apparently started in 2000. There are a number of docu-

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

ments which were created by Blythe which the Claimants contend were created in the period 25/7/2000 - 7/12/2000. I will deal with these documents further in the judgment. Not a lot of the research documents survived.

64. In early January 2001 Mr Brown prepared a number of short proposals to submit to Heidi Lange a new literary agent whom he was trying to encourage to take him on. He submitted a number of small synopses. One was "The Botticelli Code". Another was "The Da Vinci Code". None of these short proposals has survived.

65. Heidi Lange having received these was apparently very interested in the Da Vinci Code and asked him to submit a more detailed synopsis. He started this exercise around the 16th January 2001 and submitted it by 31st January 2001. This document ("the Synopsis") has survived and will be dealt with further in this judgment. It was apparently written in just 2 weeks or so.

66. In February 2001 Mr Brown's Editor (Mr Kaufman) moved to Doubleday and he showed the DVC synopsis to them. An exchange of internal emails dated 23rd April 2001 and 1st May 2001 showed that internally the publishers clearly linked the Synopsis to many of the books that had in effect sprung from HBHG.

67. In mid May 2001 Mr Brown moved to Doubleday and at the same time started writing DVC.

68. Between that date and 15th March 2002 the Claimants suggest various other documents were created. I will again refer to these further in more detail later in this judgment.

69. On 15th March 2002 Mr Brown sent the first 190 pages of DVC to Mr Kaufman. That document has not survived. By 22nd March 2002 Mr Kaufman had edited the 190 pages down to 128 pages (apparently without consulting Mr Brown) and has distributed that 128 pages. That document has survived. On 24th April 2002 a document "final chapters" was created with 50 pages of material for the book in varying degrees of detail. On 29th April 2002 Mr Brown emailed Bill Scott-Kerr 141 pages of the start of DVC promising (perhaps optimistically) that another 600 pages would be ready. On 3rd May 2002 Mr Kaufman separately sent to Bill Scott-Kerr a further attachment of the first 128 pages of DVC.

70. On 16th August 2002 Mr Brown submitted the final DVC manuscript to Bill Scott-Kerr and delivered the final chapters to Mr Kaufman on 20th August 2002. He checked those chapters and Advance Reader Copies were published.

71. There were exchanges in October about why Mr Brown chose the surname Sauniere and why he chose the surname Teabing the latter is not particularly mysterious: it is part of an anagram of the two Claimants' names. Sauniere was chosen because that was the name of the priest who allegedly discovered the secrets in Rennes-le-Chateau. That is the only part of the Rennes-le-Chateau mystery incorporated in DVC.

72. In March 2003 DVC was published in the US (hardcover).

73. It is self evident that Mr Brown looked at HBHG before DVC was finished (he accepts that). It is equally self evident that Blythe Brown looked at HBHG extensively. The original copy of HBHG as disclosed contains numerous annotations and markings mostly by her but also by Mr Brown. The date of these annotations and markings is in dispute. Of all the books used it is the most heavily annotated.

74. At page 339 (chapter 60) of DVC in one of the Teabing lectures to Sophie he shows her his library. Three books are identified:- The Templar Revelations ("TR"), The Woman with the Alabaster Jar ("WAJ") and The Goddess in the Gospels ("GG").

75. Teabing refers to what he describes as "perhaps the best known tome". He refers to the cover "Holy Blood, Holy Grail the acclaimed international bestseller" Sophie observes that she has never heard of it, Teabing explains that is because she is young and it all came out in the 1980s. He criticises the authors as making some dubious leaps of faith in their analysis but suggests that their fundamental premise is sound and to their credit "they finally brought the idea of Christ's bloodline in to the mainstream". This is really intended to be reflective of his condescending character.

76. I have already observed the anagram in the name Teabing as being another example of how HBHG was clearly in the mind of Mr Brown when he finalised DVC.

77. Significantly the first 190 pages submitted in March 2002 do not have the Teabing character nor any of the material that is said to come from HBHG.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

78. Very little of the research material has in fact apparently survived. Between the writing of the first 190 pages and the delivery of the final draft in August 2002 the balance it is difficult to see at what stage precisely the relevant parts were written.

79. Mr Brown in his witness statement denies that he copied from HBHG and stated that he thought of the history and theory of the Da Vinci Code from text was readily available other than HBHG and these were the text that were studied prior to seeing it.

80. The research process started with the purchase of books. The first book apparently purchased was TR in May 2000 (cross examination T8/1060 et seq). He said in his witness statement that he did not have a copy of HBHG at the time that he wrote the Synopsis (paragraph 164). He conceded he might have acquired a copy fairly early in the writing process but was no more precise than that. He conceded that the acquisition of TR would lead him to buying HBHG. The Claimants contend that either Mr Brown or Blythe Brown had a copy of HBHG before the Synopsis was written and that it was used extensively for the purpose of preparing various information sheets by Blythe Brown in 2000. That is not accepted by Mr Brown and it is a point I will deal with further in this judgment.

9 Analysis Of DVC

81. The text is preceded by a page designed to clothe the book with authenticity headed "Fact". He refers to the Priory of Sion as being a European secret society founded in 1099 as being a real organisation identified in the Bibliotheque Nationale and the Dossier Secrets with various Grand Masters. The second part relates to the existence of Opus Dei a deeply devout Catholic Sect that has been the topic of recent controversy. Finally all descriptions of artwork, architecture, documents and secret rituals are accurate. Of course merely because an author of fiction describes matters of being factually correct does not mean that they are factually correct. It is a way of blending fact and fiction together to create that well known model "faction". The lure of apparent genuineness makes the books and the films more receptive to the readers/audiences. The danger of course is that the faction is all that large parts of the audience read and they accept it as truth.

82. DVC opens with the murder of a curator of the Louvre museum Jacques Sauniere. Mysteriously he is described as the last sole guardian of one of the most powerful secrets ever kept and he struggles to preserve this secret in some way. The scene then moves on to Robert Langdon's hotel late at night where his night is disturbed by a French policeman from an organisation said to be the equivalent of the FBI. He was shown a photograph of Sauniere's dead body and whisked along to the Louvre. There he is introduced to a Captain Fache. They discuss the fact that Sauniere failed to meet Langdon at a meeting earlier that night. He was taken to Sauniere's body on which Sauniere had apparently using his own blood drawn the symbol of the pentacle. Sauniere's body was also positioned in the form of a pentacle and had left a concealed message using a black-light pen.

83. In parallel with these revelations are chapters dealing with Sauniere's murderer a member of Opus Dei responding to the directions of a Cardinal Aringarosa. No part of the Opus Dei strands of DVC forms part of the Claimants' case. Sauniere's message comprises a series of apparently random letters and two bizarre texts. Further use of the black-light pen shows that Sauniere had drawn circles around his body leaving him in the position of a life size replica of Leonardo Da Vinci's most famous sketch the Vitruvian man. As part of the investigation Langdon is introduced to Sophie Neveu from the police's cryptology department. The numerically coded message of Sauniere is discussed. Langdon and Sophie form an alliance (I will not spoil the plot by revealing how). Sauniere is actually her grandfather. They had become estranged some ten years earlier as a result of a bizarre ceremony she had accidentally witnessed. Langdon deciphers the odd textual message left by Sauniere and it leads him to Leonardo Da Vinci's work the Mona Lisa.

84. Langdon in discussions with Sophie introduces a secret society of which he alleges Sauniere was a member. He reveals it as the Priory of Sion. He summarises the history of the Priory of Sion to her and its Grand Masters (page 158). This is the first serious lecture in DVC. At a later stage he continues the lecture concerning the Priory of Sion by stating its belief that Constantine and his male successors converted the world from a matriarchal paganism to patriarchal Christianity by waging a campaign of propaganda that demonised the sacred feminine. It obliterated the goddess from modern religion forever.

85. Various chases around sites in Paris ensue and during a taxi drive Langdon carries on his lecture about the Priory of Sion (page 217). He reveals its foundation by Godfroi, the fact that he was the possessor of a powerful secret that had been in his family since the time of Christ and that founded the Priory of Sion as a secret brotherhood charged with protecting the secret by quietly passing it on from generation to generation. The Priory whilst in Jerusalem learned of a stash of hidden documents buried beneath the ruins of Herod's temple which had been built on the top of earlier ruins of

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

Solomon's temple. These documents were corroborative of Godfroi's secret and so explosive in nature that the church would stop at nothing to get them. The Priory vowed that no matter how long it took these documents must be recovered from the rubble and protected forever so that the truth would never die. The Priory created a military arm the Knights Templars to recover the documents. It is speculated by Langdon that the Knight Templars found something and took it to Europe (not Titus' treasure presumably). They were given unprecedented powers by the then Pope Innocent II (he speculates because of the explosive nature of the material they had obtained).

86. Thereafter the Templars expanded massively but were then the subject matter of an attack in the 1300s instigated by the then Pope Clement V and carried out in consort by Philippe IV. The operation is described as being a military manoeuvre "worthy of the CIA". Langdon explained that the documents were smuggled away from Paris on one of the Templar ships in La Rochelle before they could be seized by the agents of Philippe IV. He then draws the link with the Holy Grail and that the documents are only half of the Holy Grail treasure and poses a speculative question that the Holy Grail may not be a cup but something else. Langdon recalls a similar surprised expression of an editor of his when he presented a book making the same point. The editor is called Faukman (an anagram of Mr Brown's own editor Mr Kaufman, one of Mr Brown's literary devices that he likes using).

87. In a later discussion Sophie reveals that she believed Sauniere was the top member of the four Grand Masters of the Priory of Sion who were guardians of its secrets. Langdon recalls the Dossiers Secrets and the catalogue number at the Bibliotheque Nationale.

88. Langdon then decides to invoke the assistance of a religious historian he knows who lives near Versaille whose name is Leigh Teabing. This (page 293) is the first appearance of Teabing in DVC. Sophie speculates about whether or not Teabing is a member of the Priory of Sion but Langdon rejects that pointing out his whole life has been trying to broadcast the truth about the Holy Grail whereas the Priory's oath is to keep its nature a secret.

89. They meet Teabing and he delivers a lecture to Sophie about what is the Holy Grail and how Da Vinci painted the Holy Grail. He goes on to discuss how Christianity was shaped by Constantine but not in a traditional way pointing out that Constantine as I have said earlier only became baptized on his deathbed "too weak to protest". He sets out the changes to Christianity starting with the Council of Nicea and the deification of Jesus (changing the vote 218 for 2 against to "a relatively close vote at that").

90. He then goes on to discuss Da Vinci's portrait of the Last Supper. None of this of course is derived from HBHG. He identifies various anomalies in the portrait starting with the omission to paint the cup of Christ. He points out tantalisingly that the Holy Grail is a person not a thing and is a woman. He adjourns to his study and pointing out an 8 foot long print of the Last Supper suggests that the apostle John is actually a woman, Mary Magdalene. He points out that the juxtaposition of Jesus and Mary Magdalene is in the figure of a V which leads to a creation of the letter M standing for Mary Magdalene. All of this is self evident because Jesus was a Jew and could not therefore be unmarried. He would also be expected to have children. If any of this was not correct one would have expected comment on that to have been in one of the bible gospels. He refers to some of the Gnostic gospels which were found in Egypt in the 20th century and the Gospel of Philip which refers to Mary Magdalene as being the companion of Jesus. He points out that the union of Jesus and Mary Magdalene was a powerful union of the House of David and the House of Benjamin creating a fusion of two royal bloodlines and that Mary Magdalene carried the bloodline of Jesus. He explains the true meaning of Sang Real as meaning Royal Blood.

91. He continues the lecture after referring to the books in his library and that according to Priory of Sion records Mary Magdalene was pregnant at the time of the crucifixion and she fled the Holy Land with Joseph of Arimathea and arrived in France where she gave birth to a daughter whose name was Sarah. (I should point out that this information could not have been obtained from HBHG).

92. He then recounts the duties of the Priory to preserve the documents and to protect the bloodline itself setting out the growth of Christ's bloodline under cover in France until a bold move in the 5th century when it intermarried with the Merovingians. A short recounting of the Merovingian bloodline is then set out including reference to Godfroi who as Langdon points out ordered the Knights Templars to recover the Sanggeal documents from beneath Soloman's temple. At page 347 it is pointed out that two direct Merovingian lines remain in the Plantard and Saint-Clair family. Both are in hiding protected by the Priory.

93. There then ensues various chases with Sophie and Langdon fleeing to England. The police follow up and visit Teabing's house. There the list of the Priory Grand Masters is referred to by the policeman.

94. Sophie and Langdon visit the temple church and archives held at Kings College. They visit Westminster Abbey. All the time they are being pursued by the assassin from Opus Dei (now called Silas a change from Oedipus in the Synopsis). They then arrive at Rosslyn also associated with the Templars and the Saint-Clairs. There they receive a lecture from Sophie's grandmother and she makes the important statement "in fact the Priory had always maintained that the Grail should never be unveiled" (page 581). The final secret is revealed at the end of the book.

95. I have understated the intervening roles of Opus Dei and Teabing and the ending of the book.

96. The Claimants acknowledge that there is a significant amount of material in DVC which is not derived from HBHG.

97. The books are of course very different. HBHG is presented as a non-fictional book whereas DVC is a classic thriller work of fiction dressed up with "facts" to give it an air of authenticity and to arouse the interest of the readers.

98. Both books have created storms of controversy. Somewhat surprisingly in my view both sets of authors were apparently surprised at the storm of controversy that their books created. This can only be naivety if true. I cannot believe that if books are going to be written which challenge vital tenets of the established church that they are not going to attract attention.

99. The storm created by DVC has been even greater than that created by HBHG. It has developed a huge publication of books attacking the facts from the establishment's point of view. The sensitivity of the established church is somewhat surprising given that the book is a work of fiction. That might be of course because the public nowadays tends to equate works of fiction with factional context as being correct. This is of course not confined to books. One sees similar blurrings in films take the well known films U571 and The Patriot. The former lists the capture of a U boat by a British Navy destroyer before the United States was in the Second World War and transposes it to the capture of a U boat by an American crew. The latter in context of the American War of Independence takes an SS massacre at Oradour Sur Glane in June 1944 and transposes it back to a massacre allegedly carried out by the British in the American War of Independence.

100. Dan Brown found himself assailed at numerous book signings. He found himself unable to answer these charges (because his wife had done all the research in reality). He revisited the research to arm himself against the onslaught.

101. DVC has been extremely successful. Its sales have allegedly been 40 million in its first year. Film rights have ensued and there maybe even a further book written by Mr Brown drawing on similar material in the not to distant future. DVC has certainly led to a revival of HBHG and its sales culminating in the increase arising from this trial.

102. The Claimants apparently are upset at the way in which they have been treated in DVC. For my part I find that surprising. I suppose it is a matter of subjectivity but it seems to me their book is given a true level of prominence when Teabing's library is inspected and I do not see the anagram of their names as being anything other than a compliment to them. I do not suppose Mr Kaufman was offended.

103. As is usual with books that attract a lot of publicity they have attracted the wrath of the literary experts of the world. Fortunately it is not part of my judgment to assess the literary worth of the books or even the truth behind them. I simply observe that the Observer for example in the style for which it and its sister publication the Grauniad is justly complimented in Private Eye provides both sides of the argument. "[I pity] what led him to having to listen to such a load of tosh" (Nick Cohen 12 March 2006). Contrast Viv Groskop "pen a best seller and wait for the sneers" (19th March 2006 The Observer). I suppose in the world of publication 40 million buyers cannot be wrong. This seems to be the view of Mr Ruben the President of Doubleday and various other companies in the Random House Group when he says "....I have certainly never read anything like Mr Brown's work. I believe then, and still believe now, that this type of book had never been written before". (Paragraph 78 of his witness statement) (query Dune for example). However these questions are not for me.

D THE CLAIM

10 Complaints by the Claimants

104. The Claimants made a first letter of complaint on 5th February 2004 (a year after the publication). It was asserted that the Claimants made a sequence of connections that no-one had made before drawing on expertise in a number of diverse areas and that for the first time they expressed a continuous linkage running from the tribe of Benjamin through the New Testament, the Merovingian dynasty and from there to Godfroi de Bouillon and the Crusades. It was

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

asserted that this is the Central Theme also of DVC and had been copied by Mr Brown. In addition it was asserted that they were the first authors to propose the highly material thesis that the Holy Grail was a metaphor for Mary Magdalene rather than it being merely an artefact which concept again it was asserted had been copied by Mr Brown. It was then asserted that Mr Brown in effect "shortened the way" by lifting everything out of HBHG rather than doing his own research, and that he had appropriated the literary labour of the Claimants.

105. In a later letter of clarification dated 12th March 2004 it is asserted that put simply Mr Brown used HBHG as the basis for DVC and at regular intervals the plot comes to a halt and Mr Brown reveals pellets of information concerning a centuries old conspiracy. These pellets are not available it is asserted from public sources but are rather the result of years of research undertaken by the Claimants which form the basis of HBHG and these have been lifted from HBHG and Mr Brown has thereby used all of the Claimants skill and labour expanded in creating HBHG.

11 Proceedings

106. The Claim form was issued on 1st October 2004 and sought the usual relief for infringement of copyright including an injunction and delivery up for destruction on the basis that the Defendant had reproduced or authorised the reproduction of a substantial part of the copyright in HBHG.

107. Originally the Particulars of Claim asserted that HBHG had expressed a single Central Theme that the Holy Grail was a person, Mary Magdalene that had given rise to a continuous bloodline of David deriving from a relationship with Christ through time running from her to the Merovingians and then on to Godfroi and the Crusades. As part of the Central Theme it was asserted that HBHG set out a secret move of Mary Magdalene with the Grail to a refuge with a Judaic community in Gaul an originating function of the structure of the Priory of Sion and the Knights Templar in their role as guardians of the bloodline and the state of religion and subsequent conversion of Constantine and the significance of celibacy in the Judaic system. The original Particulars of Claim was served on 15th October 2004.

12 Defendants Seek Clarification

108. The Defendants sought a clarification of the Particulars of Claim under CPR part 18. Part of that response was to identify the Central Theme by reference to 19 numbered points. The Defendants tried to strike out the response.

13 Lewison J Order

109. Shortly before the hearing of the Application before Lewison J on 27th October 2005 the Claimants served a document called the Voluntary Supplemental Schedule ("VSS"). This presented a different Central Theme broken down into 15 numbered points. On 27th October 2005 Lewison J made an order by consent. The recitals contained confirmations by the Claimants (1) the only matter complained of by the Claimants is the matters expressly set out in the 15 Central Theme points of the VSS (2) the only purpose of the contents of the column on the left hand side of the VSS is to establish that the matter contained in the corresponding Central Theme point does appear in HBHG and (3) the only purpose of the contents of the column on the right hand side of the VSS is to establish the matters contained in the corresponding Central Theme point does appear in DVC and supports the allegation of copying of the matter in the corresponding Central Theme point.

110. Recital 4 stated that any matter which is contained in the passages quoted in the VSS is irrelevant to the extent that it does not relate to the corresponding Central Theme point and an example is given about the date of the birth of Mithras. Finally recital 5 states that the Claimants do rely on some instances of similarities in language to prove copying which they are required to set out by 10th November 2005.

111. By consent the Schedule to the Particulars of Claim, the additional Particulars of copying attached to the Claimants response for request for information, the general statements document and the summary of the Central Theme attached to the Claimants response were struck out.

112. On 10th November 2005 by letter the Claimants solicitors set out 5 copying points. On 17th February 2006 the Claimants set out further copying points making a total of 17.

113. In the meantime on the 19th January 2006 the Particulars of Claim were amended. The Central Theme as set out in paragraph 3 was abandoned and was replaced with an annex to the Particulars of Claim. This is the Central Theme ("CT") relied upon by the Claimants. It was broken up by the Amended Particulars of Claim to 15 points. At the start of the trial this was transformed in to one single page of text. Nevertheless the trial proceeded and the cross examination and re-examination took place around the 15 broken down themes.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

114. In addition by paragraph 3 A the Claimants asserted that HBHG contained the Central Theme on the basis of the VSS served on 14th October 2005.

14 Changes In Pleadings

115. It is important to note that in the struck out general statements (paragraph 2) it was asserted that HBHG consisted of more than just a sequence of suggestions, contentions, arguments and hypothesis but also consisted of copiously researched documented evidence to support the suggestions, contentions, arguments and hypothesis. It was asserted that there was a unique and specific manner in which these were connected to each other and the manner whereby they were assembled in a coherent organisation was a structure ("an architectural edifice of ideas"). The manner in which the material was assembled was asserted to constitute the books design and that while some of the elements of design might be in the public domain the design itself was not. It was then asserted that Mr Brown appropriated the various components of a massive jigsaw puzzle but in addition the altogether original way in which those components were fitted together and he plundered not only the facts but more importantly the relationship between the facts, the evidence that supports such relationships, the interpretation of such relationships and the conclusions to be drawn from such relationships.

116. That disappeared from the Claim by virtue of paragraph 1(C) of Lewison J's order.

E CENTRAL THEME

15 Changes

117. A comparison of the original Central Themes (1-19) with the final version is illuminating. Thus Themes 4 and 5 were heavily re-written and introduced the concept of Mary Magdalene fleeing with the Royal Bloodline and that the Grail might have meant two things simultaneously, first the bloodline and second Mary Magdalene herself. These are somewhat fundamental omissions from the Central Themes as now portrayed by the Claimants. The explanation for the omission namely that it was a blunder is not really satisfactory.

118. The original Central Theme 9 (the collapse of the Roman Empire and the church of Rome and the making of a pact with Clovis the most powerful Merovingian monarch coupled with the counter promise to the church pledging itself to his bloodline in perpetuity) disappeared. This omission in this case also seems somewhat surprising as it seems to me that it is part of the way in which their historical conjecture has developed. Why I conjecture eliminate the formulation of the pact but retain its breach?

119. Original Theme 16 (the relationship between the Priory of Sion and the Templars and their separation in 1188 also disappears). This too seemed to me to be a surprising abandonment given the significance attached to the continuation to the Priory of Sion after the demise of the Templars.

120. It follows that there are in my view significant changes to the Central Theme exhibited by the change of heart of the Claimants.

121. I attach to this judgment a copy of the Central Theme. It will be seen that the architecture and structure arguments referred to in the letters of claim and in the original general statements have disappeared.

16 Significance Of The Central Theme

122. The Amended Particulars of Claim assert that the Central Theme is expressed in HBHG. Although the Central Theme as drafted is a construct for the purpose of this litigation only nevertheless the primary case is that the Central Theme is to be found in HBHG. In closing Mr Rayner James QC said it was "the bridge" between HBHG and DVC. He acknowledged that the Central Theme had to be in HBHG for the Claimants to establish their case. In paragraph 96 of his witness statement Mr Baigent stated that this was a summary of their hypothesis and for the purpose of the litigation was given the title Central Theme. After reviewing the various Central Themes he concluded (paragraph 379) that an extraordinary amount of skill and effort had been expended by the Claimants and Mr Lincoln in researching and writing HBHG and in the expression of the Central Theme. In the next part of his witness statement he expressed the view that the 15 points should all be read together and that they all form an integral part of the Central Theme and they were all inter-related. He expressed the view that authors always considered HBHG to be about the Central Theme . I have a little difficulty with this given the changes to the Central Theme made during the course of this action. In paragraph 382 he stated that the themes must be read together because they are intrinsically related and "they all work together to form the architecture of our book". The themes he then suggests are not numerically significant but are inter-related in different ways.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

123. This of course is the struck out architecture point. Objection was taken to this evidence at the opening of the trial by the Defendants and rightly so. If there is going to be a case based on the architecture and structure and the inter-relation of the themes, given the effect of Lewison J's order I ruled that it was not made out in the pleadings and I ordered the Claimants to provide further clarification on this point as it had been referred to again and expanded in the Claimants opening skeleton argument (paragraph 61). The answer provided was somewhat tame "the Central Theme ....describes a Central Theme expressed in HBHG .... that description sets out the progression of the Central Theme through the points numbered 1-15. That progression follows a natural chronological order and as a progression each point depends for its place on the progression on the preceding and succeeding points". Other than that no argument was to be put forward in relation to order, linkage, connection and the like beyond that natural linkage.

124. So the natural linkage was the fact that they were numbered 1-15 and the events identified in each was in a chronological sequence. This in my view hardly falls within the idea of architecture but I will deal with this further in this judgment. It is of course also contrary to the way in which Mr Baigent expressed it in (for example) paragraph 382 of his witness statement. Nevertheless anymore detailed structure disappeared from the case as a result of this answer.

125. In addition as I have set out above I permitted the number of textual copies to be expanded. It is not suggested by the Claimants that these establish their case of copyright infringement. They are secondary "footprints" to support a primary case which is based on the copying of the Central Theme. They are not said to be infringing copies.

126. The Claimants (see paragraph 65 of the opening skeleton on their behalf) submit that there is little left to HBHG without the Central Theme and as DVC reduces the Central Theme its reproduction is therefore an infringement of the copyright existing in HBHG.

17 Treatment of Central Theme

127. In their closing (section 3) the Claimants reverted to the analysis of the Central Theme. As is set out in that part the Claimants' case is based on copying from HBHG something other than is in the text i.e. a non-textual infringement case. It is asserted that the purpose of the Central Theme is to identify what is in the work which has alleged to have been copied but that the test of infringement remains always a comparison of what is expressed in DVC with what is expressed in HBHG. It is asserted that the Central Theme acts as a bridge between the two works.

128. I have difficulty with that. As was said in the opening the Central Theme is HBHG and without it, it is said there is little left. Whilst the Central Theme may be a bridge it is plainly more than that. It is the Central Theme that is alleged to have been copied. The Central Theme therefore must be found in HBHG and it must be that that must be copied and found in DVC. Indeed that is the purpose of the VSS. This necessarily in my view involves a careful analysis of the Central Theme to see what the Central Theme actually comprises and consequently once it is correctly analysed whether it is of such substance that it can be protected by the action when it is established that the Defendants have copied it. It is insufficient in my view to attempt to devalue the Central Theme (paragraph 56 of the Claimants' closing) as a tool in identifying what is alleged to have been copied. This does not do justice to the way in which the Claimants assert the relevance of the Central Theme as set out in the pleading and the evidence set out above. As it is not based on textual copying it is necessary to identify precisely what it is as a first step before it can actually be considered whether it is actually capable of subsisting as a literary work which can be infringed by copying. The reason why this is important is that Mr Brown has admitted that he made use of HBHG at some stage in the writing of DVC. His case is however in so doing he did not copy a substantial part of HBHG and that he did not copy the Central Theme as identified and claimed to exist by the Claimants.

F DEFENDANT'S STANCE

18 Defence

129. First Mr Brown denies that he copied HBHG. In so far as he used it as a source he did so in conjunction he contended with a number of others and generally after those others. All he got from these sources were ideas of a general nature. The Defendants submit that is not infringing in a copyright sense.

130. Second Mr Brown contends that he wrote the Synopsis for DVC before either he or his wife ever looked at HBHG. Yet it is accepted that the Synopsis contains most of the ideas complained of as having been taken from HBHG.

131. Third the Defendants contend that the Central Theme is not in HBHG nor in DVC and that substantial parts are missing from both books. Further it is contended that the Central Theme does not represent a theme which is presented by HBHG as it is neither central nor any theme of HBHG. In this context it is contended that the 15 points are

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

not presented in HBHG in a way that they are differentiated from or distinguished from a mass of other material and is not apparent to a reader that 15 Central Theme points are the Central Theme of HBHG.

132. Finally if it is established that any information which happens to be in HBHG a reproduction of that is not an infringement of copyright because information is not protected by copyright.

133. In this context I should note that a substantial amount of time was deployed in trying to establish precisely when Mr Brown and/or his wife possessed and used HBHG. This is relevant for two reasons. First, the Claimants contend that if they establish that Mr Brown is not telling the truth as to when he copied and that in fact he copied earlier it can be used to infer that he has something to hide. This ought to lead to a conclusion that he would only copy if it was worthwhile and a conclusion therefore that he substantially copied HBHG.

134. Second, it shows that contrary to Mr Brown's contention that HBHG was the primary source of the material to DVC and not the other sources which he identifies in the Defendants defence and in his evidence.

19 The VSS

135. As I set out above the VSS is the material which the Claimants contend shows by comparison between HBHG and DVC that supports their contention that HBHG contains the Central Theme and is also contained in DVC.

136. It is an unwieldy document and has been changed from time to time. I was provided with a copy of both HBHG and DVC with the relevant passages marked up. Some passages are very long. Thus for example CT4 is supported as regards HBHG by one track of 24 pages. To address this complaint the Claimants produced a "condensed" VSS as document 5 annexed to their closing submissions. I propose in this judgment to analyse the Central Themes by reference to the final 15 sections and deal with the evidence of witnesses and documents and the shortened VSS at that time.

G LEGAL MATTERS

20 Outline

137. Fortunately I was told by both parties that there was no significant point of law involved in this case to trouble me.

138. That led to the production of two folders containing only (sic) 20 authorities and the citation of further authorities in the parties' respective closing speeches. My initial feeling on the statements of both Counsel was "Timeo Danaos et dona ferentes". I feel having analysed the authorities in the light of the submissions that my thought was correct.

139. To emphasise the points the Claimants produced for me as annex 1 to their closing submissions a flowchart as to how I should approach the issues in this case.

140. In their closing submissions the Claimants say that the claim is for infringement of copyright in a literary work HBHG by the writing of another literary work DVC. The claim is about applying existing established principles of UK copyright law to the facts as they have emerged. The claim is of non-textual infringement in literary work. It is conceded that such a claim is unusual and because of its nature presents a greater difficulty of analysis than a textual infringement claim.

141. I follow the Claimants "golden mean" as set out in their closing submissions. The first point is to identify the work that is relied upon. It is the book HBHG meaning the text that appears reproduced in the published work. It falls within the class of literary works for the purposes of the Copyright Design and Patents Act 1988 ("CDPA88"). The conditions for subsistence of copyright in this work (originality of skill and labour in expression of the work) are admitted by the Defendants (paragraph 5 of the amended Defence). There is a reservation as to the extent of the originality of HBHG and no admission is made as to the originality of any part or element of HBHG.

142. The use of the word "originality" in that paragraph of the Defence is potentially confusing.

21 Sawkins

143. "Originality" for the purposes of CDPA does not equate to novelty see Sawkins v Hyperion Records Ltd [2005] 1WLR 3281 paragraphs 27-36. A work "need only be "original" in the limited sense that the author originated it by his efforts rather than slavishly copying it from the work produced by the efforts of another person". One looks at the labour expended in achieving the relevant work. Copyright is designed to protect a person from others taking the fruits of his labour and thus short circuiting the work that they must put in to it.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

144. Thus it can be said to be irrelevant that the vast majority of the material in HBHG for example is itself derived from other sources. What is protected is the effort put in by the Claimants in researching those sources and the ultimate presentation in the form of HBHG it reflects it is submitted more than slavish copying from those other sources.

145. There is an immediate collision when the material that is produced contains much that is fact or ideas. As Mummery LJ said in Sawkins (paragraph 29) "the important point is that copyright can be used to prevent copying of a substantial part of the relevant form of expression, but it does not prevent use of the information, thoughts or emotions expressed in the copyright work. It does not prevent another person from coincidentally creating a similar work by his own independent efforts. It is not an intellectual property monopoly in the same sense as a patent or registered design. There is no infringement of copyright in the absence of a direct or indirect causal link between the copyright work and the alleged copy".

146. It is important to appreciate that because of various expressions about what this case was alleged to concern. Similar expressions plainly occurred in the Sawkins case (see paragraph 15). There is nothing for example in this case (as the Claimants rightly point out in their closing) which if decided in their favour would stultify creative endeavour, obtain a monopoly on ideas or historical information or create a precedent which extends the boundaries of copyright protection in sphere of literary works. As I have set out above the Claimants by HBHG intended to create discussion and intended that discussion to manifest itself in other books articles and television programmes. It seems odd that they have only chosen to attack the DVC. I cannot accept Mr Leigh's observation that the action was only started because their efforts were not properly acknowledged in DVC. First I believe (contrary to his belief) that their work was genuinely and clearly acknowledged. Anybody reading DVC and who had their thoughts stimulated to read further in this area would on looking at chapter 60 go to HBHG as the best source of the material. It is a fact that the Claimants' book sales have benefited from DVC (and this litigation).

147. Second, I do not believe that the litigation would have been commenced because of a lack of acknowledgment. An acknowledgment is an irrelevance from the point of view from infringement of copyright save in limited perhaps statutory defences which are not raised in this case.

148. It is important to appreciate that the Claimants do not claim a monopoly in respect of facts or ideas as expressed in HBHG.

22 Copying A Substantial Part Of HBHG

149. By section 16 (3) CDPA88 copying a copyright work is an infringement if the work or "a substantial part of it" has been copied. The Claimants' case is not that a substantial part of the text of HBHG has been copied but there has nevertheless been copying of a substantial part of the work to produce an altered copy or a colourable imitation.

150. There have been a number of important decisions concerning copying of the nature alleged in this case (i.e. non-textual). Before I analyse those however I should make some preliminary observations. First it is necessary to identify features that have been allegedly copied. In this case it is said that the Central Themes are the features allegedly copied.

151. The differences between the two copyright works are not relevant and while the copied features must be a substantial part of the copyright work relied upon there is no need for them to be a substantial part of the Defendant's work (see Lord Millet Designers Guild v Russell Williams (textiles) Ltd [2001] FSR 11 citing Warwick Film Productions Ltd v Eisinger [1969] 1 Ch 508.

152. There is much in DVC that is the original (in the non copyright sense) effort of Mr Brown with the assistance of his wife Blythe. There is much in the text and plot of DVC which is not in HBHG. The part that is copied from HBHG must be a substantial part of it but it does not have to be a substantial part in DVC.

153. The Claimants nevertheless acknowledge that absolute protection against copying is not available. I refer to paragraph 33 of their closing submissions. Copyright protection is not confined to the literal text in literary work and changing a few immaterial words in a work that is otherwise the same will not escape liability as they rightly observe. At the other end of the spectrum however they acknowledge copyright should not protect against the borrowing of an idea contained in a work. The courts will not protect "works" through this extreme level of abstraction. An extreme level of abstraction was shown in paragraph 111 of the Defendant's opening skeleton argument. There they say that if there was any scheme of the 15 central points it is that Jesus was father of a bloodline which married into the Merovingians in France and his descendants who have been protected since the Middle Ages by a secret society have a claim to the throne of Palestine. As the Claimants set out in their closing submissions, the extreme points are easy to identify but

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

there is a point on the spectrum which the complexity of the expression warrants protection. The line to be drawn is to enable a fair balance to be struck between protecting the rights of the author and allowing literary development. That seems to me to be a fair stance to take.

23 IPC Media

154. It can be drawn (for example) from the judgment of Laddie J in IPC Media Ltd v Highbury-Pleasure Publishing Ltd [2005] FSR 20 at page 444 "It is impossible to define the boundary between the mere taking of general concepts and ideas on the one hand and copying in the copyright sense on the other".

24 Green v Broadcasting Corporation

155. However as part of the assessment of the level of abstraction it seems to me clear that there must be certainty in the subject matter of such monopoly given by copyright in order to avoid justice to the rest of the world see IPC Media paragraph 7 referring to Green v Broadcasting Corporation New Zealand [1989] RPC 700.

156. The Claimants criticised that submission (see paragraph 57 of their closing submissions). I do not accept the criticism is valid. What the Defendants are saying is that if what is asserted to be infringed is so general that it cannot be certain that would lead to a conclusion that it is such a level of abstraction that no protection should be afforded to it. It is important to appreciate the context in which the Defendant raised this issue, namely the uncertainty created by the Claimants' own inability clearly to state what the Central Theme is by reason of their changes of the Central Theme. The point is that if Claimants do not know with certainty what their Central Theme is how can anybody else possibly know? The fact that the Defendants have conceded (with the reservation) copyright in HBHG as a whole is nothing to the point. It is for the Claimants to establish that what has been copied is a substantial part of HBHG and in this context that means a substantial part of the Central Theme in a way which seeks to exploit for the Defendant's own benefit the Claimants' work in producing it.

25 Authorities In Non-Textual Infringement Cases

157. It is particularly important when a literary work is dealing with actual events to see what it is alleged is protectable and what is infringed.

158. In Harman Pictures NV v Osborne [1967] 1 WLR 723 the Plaintiffs owned the copyright in a reproduction in cinemagraphic form of a book "The Reason Why" dealing with the Charge of the Light Brigade and the events connected with it. Discussions ensued between them and the Defendants about the possibility of purchase of the Plaintiffs rights or a joint production based on the reason why but they came to nothing. Later the Plaintiff discovered the Defendants intended to produce on their own account a film called "The Charge of the Light Brigade" based on a screenplay written by John Osborne the first Defendant (a well known author). The Plaintiffs issued a writ claiming that there was a marked similarity in the choice of incidents in the book and the screenplay although besides any similarities there were many dissimilarities. They applied for an interlocutory injunction. In the course of giving judgment Goff J dealt with the situation where ideas or schemes or systems or methods are sought to be protected see:-

"It is common ground that there can be an original work entitled to protection although the subject matter is not original, but is for example, as in the present case, some well-known event in history. The precise amount of knowledge, labour, judgment or literary skill or taste which the author of any book or other compilation must bestow upon its composition in order to acquire copyright in it within the meaning of the Copyright Act, 1911, cannot be defined in precise terms: per Lord Atkinson in Macmillan & Co. Ltd. v. Cooper. There is, however, no dispute that Mrs. Woodham-Smith displayed all these qualities in amply sufficient measure and acquired copyright in her book, whilst the plaintiffs' title to the film rights by assignment is also not disputed. What is much more difficult is whether the plaintiffs have made out a sufficient prima facie case of infringement, or rather intended infringement, and before considering the facts, I must refer at some length to the relevant law.

There is no copyright in ideas or schemes or systems or methods: it is confined to their expression.....

One must, however, be careful not to jump to the conclusion that there has been copying merely because of similarity of stock incidents, or of incidents which are to be found in historical, semi-historical and fictional literature about characters in history, see Poznanski v. London Film Production Ltd. In such cases the plaintiffs, and that includes the plaintiffs in the present case, are in an obvious difficulty because of the existence of common sources, as was emphasised in the case of Pike v. Nicholas..."

159. On the facts Goff J granted the interlocutory injunction.