[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

## 26 Ravenscroft

160. The next case is probably the most important in the area of the present litigation Ravenscroft v Herbert [1980] RPC 193. This was a claim by the author of a non-fiction book called The Spear of Destiny. He alleged that the First Defendant James Herbert a well known author in writing a novel entitled The Spear had infringed his copyright. The central feature of both books was a spearhead which forms part of the Hapsburg Treasure exhibited in Vienna. It is described in the museum guide as The Holy Lance. After the 13th century it was venerated as the lance with which the side of Jesus was pierced at the crucifixion. It is said that the spear had been carried in important battles as an emblem and the victories were attributed to its power. The Plaintiff's book combined historical facts and a great deal of mysticism and purports to tell the story of the spear from the earliest times down to the end of the Second World War.

161. Mr Herbert's book is a thriller which weaves an improbable story it is alleged of neo Hitler terrorism in England around the supposed post war exploits of the spear. The Judge (Brightman J as he then was) was plainly unimpressed with the book. For example the fact that the spear is apparently in Vienna is dealt with by Mr Herbert simply describing that as a useless replica.

162. The Plaintiff's allegation was that Mr Herbert was alleged to have made extensive use of the Plaintiff's non fiction work in order to paint in a backcloth of apparent truth against which his own fiction story can be narrated. The question for decision in the case was whether he made a legitimate or illegitimate use of the Plaintiffs work.

163. The Plaintiff's book is summarised in the judgment. The judgment then went on to consider how Mr Herbert came to write The Spear. He discovered the Plaintiff's book, bought it, read it and thought it would make a splendid theme for a novel. He duly produced a novel which is summarised in the judgment and plainly did not as I say impress Brightman J "One must not underestimate the commercial attraction of the rubbish which I have attempted to describe. The book is written with much inventiveness and a racy flow of language and incident and the numerous scenes of violence exercise a strong appeal to certain readers. The Defendants novels have enjoyed great financial success. Mr Herbert does not think of himself as a serious novelist".

164. I make no such comments about either book in the present case as this is not as I have said a quest for truth of the speculative conjectures or an exercise in literary criticism of either book.

165. Mr Herbert conceded that he used the Plaintiff's book for the source of much of the material.

166. There were numerous examples of significant textual copying (up to 50). The Judge concluded that Mr Herbert had the Plaintiff's book in front of him when writing his own book (a point which Mr Rayner James QC attempted to put repeatedly to Mr Brown in cross examination). He also acknowledged he had no independent knowledge of medieval history and did no research of his own and as the Judge observed there was much language copying from one book to the other in the Defendants writing of (for example) the prologue. The prologue contains a long list of Emperors of the Roman Empire and the Holy Roman Empire and others (vis Alaric the Visigoth and Theodoric the Visigoth) who held the spear and were successful. These were identical reproductions of the Plaintiffs record save the Roman General Aetius and apparently St Francis of Assisi. I suppose the naming of Aetius is superfluous if the spear is held by Theodoric the Visigoth bearing in mind the result of the Battle of Chalons (as I prefer to call it). Perhaps the dying Theodoric passed it on to Aetius.

167. General Patton emerges in the story but that is not surprising given his apparent interest in mystical things and the surprising manner of his death. As the Judge pointed out the question to decide is the question of fact whether there has been substantial copying of The Spear of Destiny amounting to an infringement of the Plaintiff's rights. The first question is whether there has been copying and secondly whether the copying is substantial. That factual decision on the facts of that case has no significance in the present dispute. Thus merely because an author of a work of non fiction successfully sued an author of fiction based on his non fictional book provides me with no assistance whatsoever.

168. The judgment is important however in the analysis as between facts and ideas and copyright claims which involve facts or ideas. Thus at page 203 he said this:-

"Mr. Laddie, for the defendants, rightly says that an author has no copyright in his facts, nor in his ideas, but only in his original expression of such facts or ideas. He submitted that in deciding whether copying is substantial there are four principal matters to be taken into account. First, the volume of the material taken, bearing in mind that quality is more important than quantity; secondly, how much of such material is the subject-matter of copyright and how much is not; thirdly, whether there has been an animus furandi on the part of the defendant; this was treated by Page-Wood V.C. in

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

Jarrold v. Houlston (1857) 3 K & J. 708 as equivalent to an intention on the part of the defendant to take for the purpose of saving himself labour; fourthly, the extent to which the plaintiff's and the defendant's books are competing works.

Copyright protects the skill and labour employed by the plaintiff in production of his work. That skill and labour embraces not only language originated and used by the plaintiff, but also such skill and labour as he has employed in selection and compilation. The principles are clear from the cases. There is a helpful summary of the authorities in Harman Pictures N.V. v. Osborne ([1967] 1 W.L.R. 723). For my purposes it is sufficient to cite two passages from that case which are taken from earlier authority:

... another person may originate another work in the same general form, provided he does so from his own resources and makes the work he so originates a work of his own by his own labour and industry bestowed upon it. In determining whether an injunction should be ordered, the question, where the matter of the plaintiff's work is not original, is how far an unfair or undue use has been made of the work? If, instead of searching into the common sources and obtaining your subject-matter from thence, you avail yourself of the labour of your predecessor, adopt his arrangements and questions, or adopt them with a colourable variation, it is an illegitimate use".

This appears at page 730 of the report.

There is also this passage:

In the case of works not original in the proper sense of the term, but composed of, or compiled or prepared from materials which are open to all, the fact that one man has produced such a work does not take away from anyone else the right to produce another work of the same kind, and in doing so to use all the materials open to him. But as the law has been precisely stated by Hall V.C. in Hogg v. Scott, .the true principle in all these cases is that the defendant is not at liberty to use or avail himself of the labour which the plaintiff has been at for the purpose of producing his work, that is, in fact, merely to take away the result of another man's labour or, in other words, his property"': see page 732.

In this case the judge was confronted with the well-known book by Mrs. Cecil Woodham Smith entitled The Reason Why and also the script for a motion picture written by John Osborne. The question which the judge posed was this (at page 736):

... did John Osborne work independently and produce a script which, from the nature of things, has much in common with the book, or did he proceed the other way round and use the book as a basis, taking his selection of incidents and quotations therefrom, albeit omitting a number and making some alternations and additions, by reference to the common sources and by some reference to other sources?

That is the same test as was stated by Buckley L.J. in Elanco Products Ltd. v. Mandops (Agrochemical Specialists) Ltd. [1979] F.S.R. 46 which was heard on motion for interim relief. The facts, briefly, were that the plaintiffs had invented a herbicide and had carried out trials in order to discover how the product could best be used. Various research establishments had also conducted their own field trials. The results of both the plaintiffs' trials and of the independent trials had been published in certain scientific journals. The plaintiffs marketed the herbicide in tins with which they included a leaflet compiled by the plaintiffs which set out detailed instructions on how the herbicide should be used, upon what crops and when, and what weeds it would best control. The plaintiffs claimed copyright in the leaflet and asserted that it was a compilation of what they regarded as relevant information extracted from all the available literature and especially from their own. After the patent had expired the defendants began to sell the same herbicide with a leaflet which was alleged to be similar to the plaintiffs'. The substantial defence raised by the defendants was that they were entitled to take any information available to the public including that contained in the plaintiffs' literature provided that they did not adopt the same form or the same language, that is to say provided that they did not just copy the plaintiffs' literature. Buckley L.J. said this at page 57:

"As I understand the law in this case, the defendants were fully entitled to make use of any information of a technical or any other kind, which was available to them in the public domain, for the purpose of compiling their label and their trade literature, and they were not entitled to copy the plaintiffs' label or trade literature thereby making use of the plaintiffs' skill and judgment and saving themselves the trouble, and very possibly the cost, of assembling their own information, either from their own researches or from sources available in documents in the public domain and thereby making their own selection of material to put into that literature and producing their own label and trade literature".

The main thrust of Mr. Laddie's argument was that the plaintiff intended his book to be read as a factual account of historical events, that the defendant accepted it as fact and did no more than repeat certain of those facts. The plaintiff cannot claim a monopoly in historical facts. The law of copyright does not preclude another author from writing upon

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

the same theme. It is perfectly legitimate for another person to contrive a novel about the Hofburg spear, even about its supposed ancestry and supernatural powers. Otherwise one would be driven to the conclusion that the plaintiff has a monopoly of the facts. Members of the public are entitled to use The Spear of Destiny as a historical work of reference. Mr. Laddie conceded that if the plaintiff had research and selected which facts to use, and had expended substantial labour in making that selection, and a substantial amount of his labour had been taken by the defendant, then there might be infringement. In the present case, he submitted, the plaintiff's facts were selected by history or by Dr. Stein and not by the plaintiff. In the result, there had been no reproduction of the plaintiff's book in relation to a substantial part thereof. In the course of his copying the defendant confined himself to those matters which are represented in the plaintiff's book as historical facts, whether their origin is to be found in documented history or in the meditations of Dr. Stein.

In developing his argument Mr. Laddie drew a distinction between historical works and works of fiction. He said that if any author writes a history book he obtains copyright, but what amounts to an infringement of that copyright, i.e. substantial reproduction, depends to a great extent upon whether all the defendant has taken is historical facts or amounts to more than that. The degree of user which would amount to an infringement is different in the case of a historical work than in the case of a work of fiction. There is more freedom to copy in the case of the historical work.

I am inclined to accept that a historical work is not to be judged by precisely the same standards as a work of fiction. The purpose of a novel is usually to interest the reader and to contribute to his enjoyment of his leisure. A historical work may well have that purpose, but the author of a serious and original historical work may properly be assumed by his readers to have another purpose as well, namely to add to the knowledge possessed by the reader and perhaps in the process to increase the sum total of human experience and understanding. The author of a historical work must, I think, have attributed to him an intention that the information thereby imparted may be used by the reader, because knowledge would become sterile if it could not be applied. Therefore, it seems to me reasonable to suppose that the law of copyright will allow a wider use to be made of a historical work than of a novel so that knowledge can be built upon knowledge."

169. There is a further observation on Mr Laddie's submissions at page 206:-

"In my judgment, Mr. Laddie's proposition must not be pressed too far. It is, I think, clear from the authorities that an author is not entitled, under the guise of producing an original work, to reproduce the arguments and illustrations of another author so as to appropriate to himself the literary labours of that author: see Pike v. Nicholas (1870) L.R. 5 Ch. App. 251, Ladbroke (Football) Ltd. v. William Hill [1964] 1 W.L.R. 273 and the passages, which I have already read, from the Harman Pictures N.V. case.

Mr. Sheridan, for the plaintiff, invites me to view the matter in a different light. He submits that the plaintiff's work is not a historical work of the conventional type, because it is not a chronology. It is not a continuous methodical record of public events (which is the primary dictionary definition of "history"). The plaintiff's book is poles away from history. It is disjointed and unmethodical (no offensive criticism is intended of the literary technique that he employs) being composed of a variety of different events, recollections, quotations, philosophy, meditations and so on, designed to support the theory in which the plaintiff had come to believe. Vast areas of history are left out by the plaintiff in his attempt to persuade the reader that the Hofburg Spear has the ancestry and attributes which the plaintiff believes are to be ascribed to it. The book is a very personal insight into history. What the plaintiff has done is to select events from history and from his recollection of the meditations of Dr. Stein in order to present to the reader the credentials of the Hofburg Spear.

I accept Mr. Sheridan's analysis of the nature of the plaintiff's work.

There was a suggestion by Mr. Laddie that some distinction should be drawn in the present case because much of what the defendant copied from The Spear of Destiny was merely information derived by the plaintiff from Dr. Stein. I do not think it matters whether the source of the plaintiff's book was painstaking research into documented history or painstaking recording and recollection of what Dr. Stein had told him. It was also suggested that a distinction should be drawn on the ground that The Spear of Destiny was, since the death of Dr. Stein, the only possible source of certain of the facts brought to light by the meditation of Dr. Stein. It does not, however, seem to me that the paucity of sources of information excuses the defendant from taking the trouble of assembling his own information and making his own selection of material. If that is not practicable, he can always apply to the plaintiff for a licence".

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

170. Not surprisingly the Claimants rely upon this case as being a strong pointer in their favour. Less surprisingly and equally understandable in its context is Mr Baldwin QC's reliance upon parts of the judgment for the defence (he was second junior Counsel on behalf of the Defendants).

171. First it seems to me that it is accepted that an author has no copyright in his facts nor in his ideas but only in his original expression of such facts or ideas. Original in that context does not mean novel of course.

172. Second the purpose of copyright is to protect the skill and labour employed by the Plaintiff in the production of his work.

173. Third in the case of works not original in the proper sense of the term but composed or compiled from materials which are open to all the fact that one man has produced such a work does not take away from anyone else the right to produce another work of the same kind "and in doing so to use all the materials open to him". What he cannot do however is avail himself of the labour of the Plaintiff.

174. Subject to what I say in the next paragraph where a book is intended to be read as a factual historical event and that the Defendant accepts it as fact and did no more than repeat certain of those facts the Plaintiff cannot claim a monopoly in those historical facts. It is accordingly perfectly legitimate for another person to contrive a novel based on those facts as otherwise a Claimant would have a monopoly of the facts. This was an argument put forward by Mr Laddie (page 205 above line 18). It seems to me that the Judge accepted that argument as far as it went (see the bottom of that page and on to page 206). This seems to me to mirror what the Claimants actually expected to occur when they published their book. I do not see Brightman J as such rejecting Mr Laddie's submissions.

175. It is true (page 206 above) that he accepted that Mr Laddie's proposition must not be pressed too far as he rightly set out in that part of his judgment although the historical contents and the arguments can be used they cannot be used through the medium of appropriating the literary labours of the original author.

176. In other words the facts and the themes and the ideas cannot be protected but how those facts, themes and ideas are put together (this is the Claimants' "architecture" argument) can be. It follows from this that the Claimants must show that there is a putting together of facts, themes and ideas by them as a result of their efforts and it is that which Mr Brown has copied. I should say on passing that there is no claim based on collocation.

27 Designers Guild

177. The next important decision is The Designers Guild case.

178. This was a claim by the Plaintiff to enforce its copyright in the artwork for the fabric design Ixia. The infringement complained of was the creation of the Defendants own design Marguerite. There were two issues namely what had the designers of Marguerite copied from Ixia and second did what had been copied amount to the whole or substantial part of Ixia. At first instance the trial judge (Mr Lawrence Collins Q.C as he then was) examined all the circumstances and the witnesses and disbelieved essentially the Defendants and concluded that they had used Ixia (despite their protests to the contrary). On the second issue he rejected the Defendants submissions based on a dissection of the Ixia design and suggestions that they lacked originality and concluded that what happened amounted to a copying of a substantial part of Ixia.

179. On appeal the Judge's findings as to copying were not challenged; the only issue was substantiality. The Court of Appeal overturned the Judge's view as to substantiality on the basis of three reasons namely visual comparison, dissection and ideas rather than expression.

180. Visual comparison has nothing to do with the present case.

181. Second dissection is relevant in the sense that the copied features must not be dealt with piecemeal but the copying as a whole and the cumulative effect (as the Judge had done at first instance) must be considered. However, as Lord Hoffman pointed out (paragraph 22) "if there had been no findings anything that had been copied except the notion of flowers and stripe, the conclusion in the Court of Appeal would have been unexceptionable, with this involved ignoring the findings of fact, both in their detail and their cumulative effect".

182. The key part of the judgment as regards to the present case concerns and observations on "ideas and expressions". Lord Hoffman said this (paragraph 23:-

"Ideas and expression

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

23 It is often said, as Morritt L.J. said in this case, that copyright subsists not in ideas but in the form in which the ideas are expressed. The distinction between expression and ideas finds a place in the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS) ([1994] O.J. L336/213), to which the United Kingdom is a party (see Article 9.2: "Copyright protection shall extend to expressions and not to ideas ..."). Nevertheless, it needs to be handled with care. What does it mean? As Lord Hailsham of St Marylebone said in L.B. (Plastics) Ltd v. Swish Products Ltd [1979] R.P.C. 551 at 629, "it all depends on what you mean by 'ideas'".

24 Plainly there can be no copyright in an idea which is merely in the head, which has not been expressed in copyrightable form, as a literary, dramatic, musical or artistic work, but the distinction between ideas and expression cannot mean anything so trivial as that. On the other hand, every element in the expression of an artistic work (unless it got there by accident or compulsion) is the expression of an idea on the part of the author. It represents her choice to paint stripes rather than polka dots, flowers rather than tadpoles, use one colour and brush technique rather than another, and so on. The expression of these ideas is protected, both as a cumulative whole and also to the extent to which they form a "substantial part" of the work. Although the term "substantial part" might suggest a quantitative test, or at least the ability to identify some discrete part which, on quantitative or qualitative grounds, can be regarded as substantial, it is clear upon the authorities that neither is the correct test. Ladbroke (Football) Ltd v. William Hill (Football) Ltd [1964] 1 W.L.R. 273 establishes that substantiality depends upon quality rather than quantity (Lord Reid at 276, Lord Evershed at 283, Lord Hodson at 288, Lord Pearce at 293), and there are numerous authorities which show that the "part" which is regarded as substantial can be a feature or combination of features of the work, abstracted from it rather than forming a discrete part. That is what the judge found to have been copied in this case. Or to take another example, the original elements in the plot of a play or novel may be a substantial part, so that copyright may be infringed by a work which does not reproduce a single sentence of the original. If one asks what is being protected in such a case, it is difficult to give any answer except that it is an idea expressed in the copyright work.

25 My Lords, if one examines the cases in which the distinction between ideas and the expression of ideas has been given effect, I think it will be found that they support two quite distinct propositions. The first is that a copyright work may express certain ideas which are not protected because they have no connection with the literary, dramatic, musical or artistic nature of the work. It is on this ground that, for example, a literary work which describes a system or invention does not entitle the author to claim protection for his system or invention as such. The same is true of an inventive concept expressed in an artistic work. However striking or original it may be, others are (in the absence of patent protection) free to express it in works of their own: see Kleeneze Ltd v. D.R.G. (U.K.) Ltd [1984] F.S.R. 399. The other proposition is that certain ideas expressed by a copyright work may not be protected because, although they are ideas of a literary, dramatic or artistic nature, they are not original, or so commonplace as not to form a substantial part of the work. Kenrick & Co. v. Lawrence & Co. (1890) 25 Q.B.D. 99, is a well-known example. It is on this ground that the mere notion of combining stripes and flowers would not have amounted to a substantial part of the plaintiff's work. At that level of abstraction, the idea, though expressed in the design, would not have represented sufficient of the author's skill and labour as to attract copyright protection.

26 Generally speaking, in cases of artistic copyright, the more abstract and simple the copied idea, the less likely it is to constitute a substantial part. Originality, in the sense of the contribution of the author's skill and labour, tends to lie in the detail with which the basic idea is presented. Copyright law protects foxes better than hedgehogs. In this case, however, the elements which the judge found to have been copied went well beyond the banal and I think that the judge was amply justified in deciding that they formed a substantial part of the originality of the work."

183. Lord Millet criticised the Court of Appeal in effect for attempting by considering that whilst copying had occurred a substantial part of the expression of the idea had not (paragraphs 34-35):

"34 The Court of Appeal began by making a visual comparison of the two designs. Their initial reaction was that it did not look as if the defendants' design involved the copying of a substantial part of the copyright work. As Morritt L.J. put it at para. 30:

On the broadest level they just do not look sufficiently similar.

Recognising that it would not be right to reach a concluded view "on so subjective and unanalytical approach alone", they proceeded to conduct a detailed analysis of the judge's findings of fact and recorded the many differences of detail in those features of the defendants' design which the judge had found to have been copied from the copyright work. This only served to confirm their initial impression. They concluded that, while the defendants had copied the idea of the copyright work and adopted the same techniques, they had not copied a substantial part of the expression of the idea. They accordingly allowed the defendants' appeal.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

35 It is difficult to avoid the impression that the Court of Appeal were not persuaded that the defendants had copied the copyright work at all. Unable to reverse the judge's unchallenged findings that they had, they thought that if the defendants had copied any features of the copyright work they could not have copied very much. By adopting this approach they not only went behind the judge's unchallenged findings of fact, which they were not entitled to do, but rejected his finding of substantiality which, being essentially a matter of impression, an appellate court should always be very slow to do".

184. He also gave guidance as to how a claim of the present type should be approached (paragraphs 38-41):

"38 An action for infringement of artistic copyright, however, is very different. It is not concerned with the appearance of the defendant's work but with its derivation. The copyright owner does not complain that the defendant's work resembles his, his complaint is that the defendant has copied all or a substantial part of the copyright work. The reproduction may be exact or it may introduce deliberate variations--involving altered copying or colourable imitation as it is sometimes called. Even where the copying is exact, the defendant may incorporate the copied features into a larger work much and perhaps most of which is original or derived from other sources. But while the copied features must be a substantial part of the copyright work, they need not form a substantial part of the defendant's work: see Warwick Film Productions Ltd v. Eisinger [1969] Ch. 508. Thus the overall appearance of the defendant's work may be very different from the copyright work, but it does not follow that the defendant's work does not infringe the plaintiff's copyright.

39 The first step in an action for infringement of artistic copyright is to identify those features of the defendant's design which the plaintiff alleges have been copied from the copyright work. The court undertakes a visual comparison of the two designs, noting the similarities and the differences. The purpose of the examination is not to see whether the overall appearance of the two designs is similar, but to judge whether the particular similarities relied on are sufficiently close, numerous or extensive to be more likely to be the result of copying than of coincidence. It is at this stage that similarities may be disregarded because they are commonplace, unoriginal, or consist of general ideas. If the plaintiff demonstrates sufficient similarity, not in the works as a whole but in the features which he alleges have been copied, and establishes that the defendant had prior access to the copyright work, the burden passes to the defendant to satisfy the judge that, despite the similarities, they did not result from copying.

40 Even at this stage, therefore, the inquiry is directed to the similarities rather than the differences. This is not to say that the differences are unimportant. They may indicate an independent source and so rebut any inference of copying, but differences in the overall appearance of the two works due to the presence of features of the defendant's work about which no complaint is made are not material. In the present case the disposition of the flowers and (except in one instance) the colourways of the defendants' design are very different from those of the plaintiffs' design. They were not taken from the copyright work, and the plaintiffs make no complaint in respect of them. They make a significant difference to the overall appearance of the design, but this is not material where the complaint is of infringement of copyright and not passing off.

41 Once the judge has found that the defendants' design incorporates features taken from the copyright work, the question is whether what has been taken constitutes all or a substantial part of the copyright work. This is a matter of impression, for whether the part taken is substantial must be determined by its quality rather than its quantity. It depends upon its importance to the copyright work. It does not depend upon its importance to the defendants' work, as I have already pointed out. The pirated part is considered on its own (see Ladbroke (Football) Ltd v. William Hill (Football) Ltd [1964] 1 W.L.R. 273 at 293, per Lord Pearce) and its importance to the copyright work assessed. There is no need to look at the infringing work for this purpose".

185. Finally Lord Scott stated that the court should consider whether the Defendant "has incorporated substantial part of the independent skill, labour etc contributed by the original author in creating the copyright work and that that test is based on the principle" a copier is not at liberty to appropriate the benefit of anothers skill and labour" (paragraph 64).

H APPLICATION OF LEGAL PRINCIPLES TO THE FACTS

186. It is with those unchallenged legal principles that I go on to consider the claim further. I have already set out how HBHG was written. I have alluded in general terms the way in which Mr Brown says DVC was written and I will set this out in more detail. I should however, point out at this stage that Mr Brown's version of events is challenged as shall be seen further in this judgment when I analyse the evidence that was given before me.

28 The Defendant's Contentions

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

187. The analysis of how it is alleged DVC was written is to be considered in light of the Amended Defence where it is denied that (1) there is any Central Theme in HBHG (2) if there is it cannot be readily found or (3) if there is any Central Theme in HBHG as alleged or (4) even whether HBHG has any Central Theme at all. The Defence also contends that HBHG contains a very large number of ideas and suggestions not all of which are consistent with each other and many of which appear to be marginal. The Central Theme it is suggested is an arbitrary selection of some of those ideas and suggestions with modifications and amplification to suit a presently unknown purpose. That was further expanded in the trial. The Defendants contend that the Central Theme is an artificial creation dovetailed to what can be found in the DVC. Thus it is submitted large parts of essential elements of HBHG are jettisoned from the Central Theme because they do not appear in the DVC and are thus inconvenient for the purpose of present play.

188. The Defendants further deny that DVC was copied from HBHG but if there are any similarities it is denied that any inference of copying or that DVC reproduced a substantial part of HBHG can be made. It is asserted that the Claimants have no monopoly over historical matters, ideas or theories. The matters set out in the VSS it is suggested are ideas or facts not capable of protection by copyright law as alleged by the Claimants.

189. It is also asserted that a number of other sources in particular WAJ, TR and Rule by Secrecy ("RBS") contain in substance at least as much as the Central Theme as does DVC. Mr Brown contends that he saw WAJ and TR before he referred to HBHG and saw RBS after he had seen HBHG.

190. The Defence then set out the way in which Mr Brown wrote his earlier books and then embarked upon research simulated first by Da Vinci and messages hidden in his paintings and they "together found thousands of sources to draw from including artwork, architecture, religious documents, rituals and other historical facts and artefacts and they met with historians and other academics and extended their travels from the Vatican and France to England and elsewhere. Much of this research founds its way into DVC albeit in a distilled form". (Paragraph 16). Little of this was produced at the trial.

191. He submitted the Synopsis (in January 2001) and gave evidence he had not seen HBHG prior to that submission.

192. The response to the VSS is set out in Schedule 1 to the Amended Defence. I will deal with this detailed response when I come to assess the VSS. However, it is important to note that the preamble is important. Mr Brown in the preamble states that he looked at numerous sources whilst researching and writing the DVC including HBHG. There was no single or primary source. The Hiram Key ("HK"), TR the Goddess in the Gospels ("GG") and WAJ were important sources although there were many others.

193. He also states "in relation to any particular fact or topic it is generally not possible to identify whether there was one particular source or whether matters became known to Mr Brown as a result of him consulting numerous sources. The latter is more likely."

194. Accordingly it is important to appreciate that Mr Brown has no positive case generally as regards which sources he relied upon when writing the parts of DVC about which the Claimants complain.

29 The Synopsis

195. Certain parts of the Synopsis were redacted due to grounds of commercial confidentiality. It is said of the Synopsis in the Amended Defence (paragraph 17) that it contains the entire framework and thematic crux of the novel as well as specific clues, locations and characters.

196. The Synopsis starts with the reference to Priory of Sion being a factual organisation and founded in 1188 and being active today and including illustrious past grandmasters such as Isaac Newton, Botticelli, Victor Hugo and Leonardo Da Vinci. It next refers to Opus Dei and the critical reports allegedly of that organisation with allegations of brainwashing, coercion, and other practices. Finally, it notes that all descriptions of artwork and architecture and secret rituals are accurate and or paintings and the codes hidden within them can still be seen today. This is the executive summary to whet the reader's appetite.

30 Use of Books in Writing The Synopsis

197. It is plain that the title The Da Vinci Code is taken from TR. The cover of the book describes it as being "the Secret Code of Leonardo Da Vinci revealed". Chapter 1 is headed "The Secret Code of Leonardo Da Vinci". Mr Brown's original copy as provided in this action has significant notes and markings on them. Most of these marks were done by his wife Blythe. Seven books are listed in a "partial" bibliography namely TR, GG, WAJ, History of Knights

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

Templar, HK, Knights Templar and Born in Blood. At that stage there is no reference to RBS. Nor is there any reference to HBHG. One book has been lost (The Knights Templar). Mr Brown says in his witness statement (paragraph 164) that he did not own a copy of HBHG at the time he wrote the Synopsis nor had he or Blythe read it.

198. When starting on the research which was started in May 2000 he started buying books. One of the first books he purchased was TR. The Synopsis he says was written long before they bought or consulted HBHG.

199. I have considerable difficulties with that statement. On the cover of TR is this statement. "One of the most fascinating books I have read since the Holy Blood and the Holy Grail" - Colin Wilson. HBHG is extensively cited in the text. After the first annotations at the front of the book in Mr Brown's copy of TR the next significant annotation is at page 39 where HBHG is referred to for the first time. The title of the book is actually underlined and along side it Blythe Brown has written "get this book". At page 46 where the text is dealing with HBHG again parts are highlighted. Finally in this context, TR reports on HBHG on page 48 as follows:

"the mass of evidence assembled by Baigent, Leigh and Lincoln in the Holy Blood Holy Grail for the historical existence of the Priory is unassailable. And yet more evidence - which has been amassed by other researchers - was published in the 1996 revised and updated edition of their book. (This is essential reading for anyone interested in this mystery.) "

200. Thereafter the text for a number of pages analyses what is said in HBHG. That part of the text contains markings.

201. At page 66 an express annotation of "HBHG" is made against underlined text showing that the source of that text is HBHG. Now I appreciate that the annotations have not all been made at the same time. TR was apparently purchased in May 2000. On the notes on the front there is a note apparently made on the 14 October 2000 (but still long before the Synopsis was written) reminding Blythe Brown of the fact that she has just heard a rumour of fact that Pierre Plantard died 13 June 2000. Mr Brown in yet evidence suggests that all his books are deeply and extensively and thoroughly researched. Having acquired TR in May 2000 (as is conceded) I cannot accept that HBHG was acquired at a much later time if it is going to be seriously contended that extensive research is gone into before DVC is written.

31 Criticism of Dan Brown on Books Available when Synopsis Written

202. The following exchange took place between Mr Brown and myself:-

"MR. JUSTICE PETER SMITH: Before you do, can I ask you to look at page 48 of Templar Revelation, second paragraph at the end. Do you see what they say about Holy Blood, Holy Grail?

A. The second paragraph?

Q. It starts: "The mass of evidence".

A. On page 49?

Q. 48.

A. "The mass of evidence", yes. (Pause for reading) Yes.

Q. How did you miss it?

A. How did I miss it?

Q. Templar Revelation tells you Holy Blood, Holy Grail is

"essential reading" for anyone interested in this mystery and yet that is the only book you did not look at.

A. Actually, I am sure there is an enormous bibliography here of material that we did not look at. In fact, on page 39 there is an actual note that says go and look at the Holy Blood Holy Grail.

Q. That would not really help you. The two things would suggest that you would actually go and get Holy Blood, Holy Grail as "essential reading", it says.

A. And, as I have said, yes, it was essential reading we used it at some point. The question here is when it entered the mix.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

Q. You get Templar Revelations around May 2000, you are preparing the synopsis ultimately leading to its release in January 2001. The Templar Revelations is a book that you heavily rely upon and it tells you that HBHG is essential reading. Yet when leading up to the synopsis you want me to believe that you did not look at it?

A. That is exactly what I want you to believe. It is a very short period of time. I am dealing with broad strokes. I have everything I need in the books in my synopsis, in that bibliography. I would not have been eager to pick up a book this thick about specifics when Templar Revelation so beautifully outlines the points I needed; the same with Margaret Starbird. I am in a synopsis phase. I am looking at the big picture, not the details".

203. I find his answer unconvincing. In this context the cross examination at T8/1061-1063 and T9/1198-1200 is important. What is extraordinary about Mr Brown's evidence is that he appears to have acquired all of the books that cover this area apart from the one that is described as essential reading.

204. As that cross examination phase shows Mr Brown has no positive case that he can put forward as to when he acquired HBHG. In reality his sole basis is on the fact that it is not included in the Synopsis. He makes the very good point that he was trying to impress the publishers with the depth of the knowledge that had gone into the book and its research and that it would have been of great assistance to him if he had the book at that time to have mentioned it. The same point could have been made about RBS which would have broadened his knowledge but he accepts that he did not have that until a later stage.

205. There is much force in this contention on his part.

206. Further, it is in my view supported by an analysis of the content of the Synopsis. It is true that there is reference to the Priory of Sion on the very first page and the list of Grand Masters. That however is to be found in TR page 41 (including the two names of Botticelli). The reference to Hiram Abif on page 5 can be found extensively in HK. The further references to the Priory of Sion at pages 9, 12, 15-16, 23 are all references that can be found in the books identified in the partial bibliography as opposed to HBHG. Further on page 23 there is reference to Mary Magdalene fleeing to France where she gave birth to Jesus' daughter Sarah "very persuasive historical evidence on this" (emphasise in the text itself). If there is any such persuasive evidence it cannot come from HBHG which makes no reference to the name of Jesus' daughter. Such a reference is to be found in WAJ (pages 60-62). Equally the reference to the Council of Nicea on the same page could be derived from HK page 64. I am not sure where the vote 5/4 came from (I suspect it was a literary invention to dramatise the effect of such a narrow vote on allegedly conferring divinity on Jesus). Certainly it cannot have come from HBHG where the correct vote of 218 for 2 against is given (footnote 5 to page 388).

207. The Claimants raised an important point in cross examination of Mr Brown arising out of paragraph 123 of his first witness statement. In that paragraph he gives as an example a point made in the Synopsis at page 48. As he said this was done in January 2001 "long before we bought or consulted HBHG". This paragraph helped him he said work out where the main sources were for the Bloodline point. He refers to the fact that at page 48 of the Synopsis is a reference to "extends from vine to sea". This at page 48 is said to be a cryptic reference to the more Royal Merovingian bloodline (in French, mer = sea and vigine = vine). This he said came from WAJ page 62. The paragraph then goes on to say that when the bloodline theory is being explained to Sophie by Langdon he included a note to readers that there are countless biblical references to Jesus as a bridegroom and Mary Magdalene as the bride and the vine bearing his sacred fruit. This is dealt with he says in the first three chapters of WAJ.

208. He is quite right in that respect generally. However, reference to page 62 of WAJ shows that the book breaks down Merovingian to be mer and vine as Mary and Vine i.e. not the Sea.

209. At the top there are handwritten pencil notes by Blythe Brown which make the same point. Mer - vin Mary - The Vine. There is therefore nothing in WAJ to analyse Mer = Sea.

210. Confronted with that in cross examination he acknowledged that there is no reference to Mer = Sea at that part of WAJ. His explanation (T8/1072/20) is that he took the French word Mer for Sea as it is much better rhymed for Mary. He said he was fairly certain that it was in other books (it is not). This is terribly weak and he looked like he was making the answer up.

211. Mr Brown walked into a trap that Mr Rayner James set for him. It was put to him that the reference to word Mer = Sea can be found in HBHG page 235. It is also underlined in blue pencil by Blythe Brown. It is worthwhile noting that on page 236 there is further underlining and the notes "Sauniere have long hair". It is unlikely in my view that the underlining on the two pages occurred at a separate time. They appear to be connected with an arrow.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

212. Sauniere linked to the curator of the Louvre did not come until after the Synopsis was written. Mr Brown accepted the logic as put to him by Mr Rayner James but disagreed with it. He reiterated that HBHG was not in the mix at that time. He speculated (in my view) that he drew from his knowledge of French that Mer equalled sea.

32 Absence of Blythe Brown from the Trial

213. All of this could have been clarified had Blythe Brown given evidence. As shall be shown further in this judgment there are serious issues over the use of HBHG which in reality only she could have explained. I raised her absence at the opening of the trial and drew to the parties' attention the Court of Appeal decision upholding my decision in Lennox Lewis v Eliades [2005] EWC 8 Civ1627. The Court of Appeal upheld my decision to draw adverse inferences from unexplained reasons as to why witnesses who were apparently available when their evidence was crucial to a case were not called. Blythe Brown clearly falls within that context. Faced with that observation the Defendant produced a third witness statement of Mr Brown on 3rd March 2006. In paragraph 19 of that witness statement he set out reasons why Blythe Brown was not called. First he said that he and his wife were very close and that he firmly believed that he could answer any questions regarding her assistance to him in the research of HBHG. Second whilst he felt it important to assist Random House in its Defence of what he regards to be a spurious claim he made it clear to Random House he did not want his wife to be troubled by it. She disliked public attention and he saw no reason why she should be put through the stress that the glare of publicity would cause. The coverage of the case has been wide spread and he had been thoroughly jostled by the press himself and his wife would have hated it.

214. It is undoubtedly the fact that the case has attracted lots of publicity. However that is hardly surprising given the success of DVC and Mr Brown's rise to stardom. I appreciate that a rise to stardom in the modern world creates intolerable pressures and intrusions into privacy. However it is quite clear that Mr Brown has not been able to provide all the answers as to the material which Blythe prepared for him. Second I do not regard the reasons put forward in the third witness statement for her absence as satisfactory. Whilst the litigation is against Random House it is Mr Brown's and his wife's writings which are effectively in the dock. He has just as big a stake in the outcome as the Defendants. How DVC was researched and created is vital to the issues in this case. Blythe Brown's role in that exercise is crucial and I do not accept that there are reasons of a credible nature put forward as to why she has not appeared to give evidence.

215. Accordingly I conclude that her absence is explicable only on the basis that she would not support Mr Brown's assertion as to the use made of HBHG and when that use occurred in that evidence.

216. With that in mind however I accept Mr Brown's evidence that he did not use HBHG when he wrote the Synopsis. The single point identified in this extract of cross examination referred to above is equally explicable on the basis of Mr Brown being caught out in paragraph 123 in being overly casual. I do not accept that this single point is sufficient to reject his evidence on this point. It is quite possible that the annotation occurred after the Synopsis was written when Sophie was linked to Sauniere.

217. He is supported in my view by an examination of the theme of the Synopsis. It seems to me that the theme of the Synopsis is clearly derived from WAJ, TR, HK and GG. It concentrates on the artistic elements of Leonardo da Vinci and the Sacred Feminine Line. I accept that this was down to Blythe Brown's beliefs in this area and I can see and determine in my view that those were the sources for the Synopsis.

33 Use of HBHG By Blythe Brown/Dan Brown

218. However that does not lead to the conclusion that Blythe Brown did not have HBHG at that time and had not prepared research based on it. In my view later evidence as I will set out in this judgment plainly demonstrates that she was using HBHG as a source of material to put to Mr Brown when the Synopsis was written and earlier. It is possible (and given the passage of time the omission is quite understandable) that in discussions between Blythe and Mr Brown the word "Mer" was discussed in the context the Merovingians. Mr Brown could easily then have incorporated that in the Synopsis without appreciating that she had taken it from HBHG already.

219. As appears further in this judgment there is significant other material which points inexorably to Blythe Brown having used HBHG extensively much earlier (as early as 2000 in my view) than Mr Brown admits. I do not accept that he necessarily knew that and I suspect that this is the area of difficulty which has led to Blythe Brown not giving evidence.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

220. Nevertheless the overall position in my view is that the most compelling pointer to the fact that Mr Brown did not use HBHG to write the Synopsis is his well made point that if he had it would have been in the Bibliography for the reasons that he gave.

221. The significance of the Synopsis is that it was provided to the Defendants as the basis for DVC. My view, as set out above, is that HBHG did not feature at that stage but I am firmly of the view that HBHG was the essential tool for the Langdon/Teabing Lectures which were written at a later stage. That stage is of course much later, but not as late as Mr Brown suggests in his evidence. The first 190 pages of the book were delivered in March 2002 and it is accepted that there is no use of HBHG in that part. It does not of course follow that whilst Mr Brown up until that stage, might not have used any HBHG material, that Blythe Brown was not already extensively researching the remainder of the book for subsequent use by him. This is, in my view, what happened. I find as a fact that Blythe Brown had HBHG (for reasons which will be amplified below in this judgment) since at least 2000 having been clearly pointed towards it by the extensive references in TR. At the end of the day her failure to give evidence without any reasonable excuse is determinative on this issue.

222. She then used that book (and other material doubtless) to provide assistance to Mr Brown to write the second remaining parts of DVC which process commenced in March 2002 and finished substantively in August 2002.

223. It follows that contrary to the impression given the Synopsis, in my view, was prepared on the basis of a very superficial analysis from a small number of books. Mr Brown in his own evidence said that it was meant to be a broad picture. It certainly was. Whether or not the research became more detailed when the relevant parts of DVC came to be written is a matter for debate.

I THE CENTRAL THEMES AND ANALYSIS

34 General Observations

224. I should make a number of general observations. The Claimants allege that the Defendants have infringed the copyright in the original literary work HBHG. The difficulty in presenting the case is that apart from a modest minimal number of textual copyings which are not alleged to be copyright infringement, there is no case based on text comparison to support the allegation of copying let alone substantially copying HBHG.

225. The Claimants seek to get round that problem by presenting the Central Theme. It is said that HBHG expresses its Central Theme and without it there is very little to be found in the book. The Central Theme is then used as a bridge to pass to DVC to show the Central Theme has been reproduced in DVC.

226. It is essential therefore, for the Claimants to show that the Central Theme is expressed in HBHG, that expression of Central Theme is capable of protection as a literary work under CPDA 88 and that Mr Brown has not only copied it but has substantially copied it.

35 Non Protection For Ideas And Facts Alone

227. Mr Rayner James QC acknowledged as I have set out above that ideas and facts of themselves cannot be protected but the architecture or structure or way in which they are presented can be. It is therefore not enough to point to ideas or facts that exist in the Central Themes that are to be found in HBHG and DVC. It must be shown that the architecture or structure is substantially copied. The only structure that has been identified in this case is the presentation of the 15 Themes in a chronological order. A single textual theme has no structure; it is just a piece of text which is the way the Claimants ultimately suggested the Central Themes should be considered.

228. The Claimants themselves in this case chose to dissect their Central Themes ultimately into 15 component parts. Having done that in effect they invited the Defendants to attack those component parts on an individual basis. This is not dissection as such in my view; it is a matter of responding to how the Claimants chose to present their case.

36 Baigent On Central Themes

229. The Claimants then chose to deploy Mr Baigent as a witness (inter alia) to demonstrate their case on the Central Theme on a theme by theme basis. In each case Mr Baigent in his evidence set out the theme, explained why it was important and the research that was undertaken. Finally in each case he summarised his evidence by attacking Mr Brown in sarcastic terms "amazingly Mr Brown ... reached exactly the same historical conjecture that we had done in HBHG" (paragraph 117 for example). Second he asserted that Mr Brown did not undertake his own original research in relation to the relevant Central Theme (he never said he did).

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

230. Having chosen to present their case in this way it is unsurprising that the Defendants attacked Mr Baigent's evidence. They had no choice. Had they not done so the failure to attack Mr Baigent's assertions would have been paraded as evidence of the Claimants' case. In other words the Claimants sowed the seed and reaped the whirlwind.

37 Destruction of Baigent's Evidence

231. Mr Baigent was a poor witness. Those are not my words: they are the words of his own Counsel in his written closing submissions (paragraph 111). Those words do not in my view do justice to the inadequacy of Mr Baigent's performance. His evidence was comprehensively destroyed by the thorough and searching cross examination of Mr Baldwin QC for the Defendant. It is no good for Mr Rayner James QC in closing submissions to say that Mr Baigent was "over awed by the circumstances and agreed almost without exception anything that was said by the Judge". Cross examination is one of the most important (if not the most important) part of any trial. It is what essentially distinguishes the Common Law from the Civil Law jurisdictions. It is the testing of witnesses in cross examination primarily which enables a Judge to assess the truth of the witness and thus the credibility of the case. Of course allowances have to be made for witness nerves in the witness box. One has to be alert to mechanistic and plainly wrong answers being given when a witness's performance has collapsed in the witness box. These were all summarised in the case of EPI Environmental Technologies Inc v Symphony Plastic Technologies Inc [2005] 1 WLR 3456. (The dismissal of the appeal from that decision did not touch on these points). They are also echoed in the Court of Appeal decision in Lennox Lewis referred to above. Merely because (for example) I disbelieve a witness on one point does not mean that I necessarily reject his evidence on other points. I must review the evidence overall.

232. I make allowances for the fact that Mr Baigent performed so badly he plainly missed obvious points when answering questions (these were mostly revived by Mr Rayner James QC in re-examination). Nevertheless the Defendants are right in their submissions even when taking in to account the factors mentioned above to submit that he was a thoroughly unreliable witness. They say that they do no know whether he was deliberately trying to mislead the court or was simply deluded and that he is either extremely dishonest or a complete fool. I do not need to decide that issue; it does not matter why he said what he did. I can place no reliance on any part of his evidence.

233. I accept the numerous examples that they give in paragraph 75 through to 89 of their closing submissions which show the comprehensive destruction of his evidence. I agree with that analysis by the Defendant.

234. I do not understand the implied criticism in the Claimants' closing that he accepted most of everything the Judge put to him. If it is to be inferred that he was somehow browbeaten by me in to meekly accepting everything I said I reject that suggestion.

235. Mr Baigent did not confine his wild evidence to matters concerning the subject matter of the litigation. He plainly attempted to bolster the credibility of his evidence by attempting to draw on other supposed factual areas to give credibility to his evidence. Thus in paragraph 318 he suggested that Sir Steven Runciman in an account of the dealing with the Crown of Jerusalem after its capture in the First Crusade suggested that in the account that Raymond of Toulouse was tricked. Having read Runciman and re read parts of it for this trial it seemed to me that he did not accurately summarise Runciman's paragraph. It was pointed out in Runciman that Raymond of Toulouse was offered the Crown and refused it. It was then offered to Godfroi. Mr Baigent acknowledged to me that his witness statement did not accurately reflect what was said in Runciman.

236. Second at paragraph 328 he stated that any good history of the Holy Land will talk about the Order of Sion. In fact the "good histories" do not refer to the Order of Sion at all. Runciman's book for example (which is generally regarded as a leading authority on the Crusades in English) makes no mention of it. This too he was forced to concede.

237. I was criticised by Rayner James QC for putting these points to Mr Baigent. It was suggested that I should confine my observations to the material that was deployed in front of me. Even if that is a valid criticism (which I do not accept) Mr Baigent chose to bolster his evidence by spurious references to a well known text on the Crusades. It is not unreasonable for the Judge to examine those references himself provided of course that the parties are aware that he is doing it. I fully accept that a Judge should not privately decide a case by reference to his own private researches without telling the parties what he is referring to. I pointed out to Mr Rayner James QC that I had drawn to the attention of his side that I had read Runciman and it was open to them to check whether what I had said was true (of course Mr Baigent agreed with it). Mr Rayner James' response that he had had enough books to read already was somewhat lame to put it mildly. It is not a difficult exercise to cross check what is said in Runciman. I do not think a Judge should accept as truth something that he knows is untrue provided the parties are given an opportunity to deal with it. It was not suggested I was wrong.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

238. This is important because it is a separate example of the way in which Mr Baigent exaggerated his evidence for effect.

### 38 Change of Course By The Claimants

239. Faced with the patent inadequacy of Mr Baigent's evidence the Claimants in their written closing submissions retreated to the stance that his evidence on the Central Theme s was irrelevant anyway as it was a matter for the Court to decide as to whether or not there was a Central Theme. I wonder whether such a stance would have been taken if Mr Baigent had performed well as a witness?

240. It seems to me that if the Claimants as authors are going to assert in their case what the Central Theme of their book is and give evidence of that the Defendants are bound to respond by testing that evidence in cross examination. Further I am entitled to see whether or not the Claimants evidence about their Central Theme is credible. At the end of the day if they are unable to say in a coherent way what their Central Theme is that is strongly supportive of the proposition that there is no such Central Theme as alleged. In addition by dividing their Central Theme up they invited dissection and attempts at elimination of parts by the Defendants.

### 39 Claimants Closing on Central Themes

241. Despite that dissection the Claimants in their closing submissions retreated to the submission that the Central Theme should be read as a whole it being the Central Theme of HBHG. They submit that it does not have to be the only possible description of what is to be found in the book in that there can be other themes that are dealt with in the book. It was not intended to be a pr cis full or partial nor was it to be approached as if it were a substitute for the book. Nevertheless they acknowledge that without the Central Theme there is little left for HBHG. The Claimants also retreated from the 15 point division. It was stated not to be critical and was there merely to make the resulting analysis of HBHG and DVC more manageable.

242. They then submitted that if the Central Theme is dissected into 15 separate and discreet points in the course of analysis it should "not ultimately be left dismembered on the mortuary slab. It or at least those parts which survive the analysis (i.e. as to whether they appear in HBHG) should be re-assembled in to a whole and read as a whole". They did not say how many of the Themes could be attacked before they become too generalised or too low a level of abstraction.

243. Further they deal with the fact that significant parts of the Central Themes were successfully attacked by the Defendants in cross examination of Mr Baigent. That does not pose a problem for the Claimants; they simply excise those words as being irrelevant (see the abandonment of parts of CT6 and CT15 in paragraph 71 of their closing submissions).

244. Finally it is asserted that the Central Theme is merely intended to be an aid. It is not to be construed as if it were a statute let alone by adopting a literal approach (I agree with that). The language of the Central Theme should be understood to be ordinary language to see what it is saying (I agree with that). If the idea or concept to what it is saying is understood then the exercise is to see whether that idea or concept considered in the context of other Central Theme points is found expressed in HBHG and in DVC (I agree with that). Equally the precise language is not to be necessarily found in either book and indeed will probably not be found in most cases in either book. Given the use of the VSS by the Claimants that is in my view an extraordinary submission to make and I fundamentally disagree with that.

245. All of this analysis by the Claimants arises out of the way in which they chose to present their case and their attempts, to recover their position following the destruction of Mr Baigent's supporting evidence. It seems to me inevitable that one starts with the Claimants' proposition that HBHG always expressed a Central Theme and that is the Central Theme as presented to the court. The Claimants second proposition is that without the Central Theme there is very little in HBHG. It follows therefore that if overall the Central Theme cannot amount to any literary work because it is too general or too low a level of abstraction or because it is a collection of facts and ideas without any architecture or structure then the same must be said of HBHG which is allegedly copied. The Claimants cannot avoid the consequences of their submission and the way the case is presented.

246. Equally it seems to me that if I reject their submission that the Central Theme as put by them is the Central Theme of HBHG it cannot be said that even if Mr Brown copied it that he has thereby copied HBHG or a substantial part thereof.

### 40 Claimants' Difficulties of Formulation

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

247. I accept the Claimants submissions that one should not overly dissect the literal language of the Central Themes. Thus the use of casual words by the Claimants should be disregarded. There are a number of examples where the Claimants are casual in their Central Themes or are trying to be too clever. For example the reference in CT8 to "Pauline" Christianity is simply too clever. It is not to be found anywhere in HBHG or DVC but its absence from CT8 does not detract from CT8 overall. Equally the abandonment of part of CT6 and CT15 do not diminish the overall impact of those themes. The detailed cross examination of Mr Baigent about CT12 "administrative and executive arm" did not advance the overall understanding of the case. It is well known the Knights Templar was a military order and the importance of CT12 is the assertion that the Priory of Sion created the Knights Templar as a front for their activities. This was an example of Mr Baigent becoming over elaborate and confused as a result of the cross examination when he entered in to a debate about the Knights Templars having clerks and administrators. He was led down this path in my view by an over dissecting cross examination by Mr Baldwin QC.

248. Nevertheless for the Claimants case to have any credibility the Central Theme has to be found in HBHG at the first stage before one even comes to consider whether Mr Brown copied it or even substantially copied it because that is the medium through which it is asserted that HBHG itself has been substantially copied.

249. The fact that the Claimants had difficulty formulating their own Central Theme which was allegedly always in their minds when they wrote HBHG is incredible. I can forgive the obvious blunder of missing the Grail out of the first 19 but there are limits to forgiveness. No satisfactory explanation has been given as to why the original CT16 (colloquially "the Splitting of the Elm at Gisors" in 1188) has disappeared. I would have thought that that was important. Old CT14 and 15 which dealt with Godfroi and his special circle of counsellors (allegedly the Order of Sion) and the creation of the Knights Templar by the Order of Sion to act on their behalf (now CT11 and 12) show the chronological development of the Order of the Sion. I cannot see how the dissolution of the relationship between the Order of Sion and the Knights Templar is so insignificant compared with the creation of the two that it disappears as a Central Theme. Equally the removal of old CT9 with the collapse of "the empire" (unspecified) (Roman or Byzantine) is not explained either. It is a significant part of that theme that the Church of Rome made a pact with Clovis the most powerful of the Merovingian monarchs. In return for that conversion it is alleged the church pledged itself in perpetuity to his bloodline. The betrayal of that pledge survives in new CT9 which was a distillation of old CT10, 11 and 12. This is the converse of the splitting of the Elm problem. The surviving parts are the breaking of the pact between the Church and the Dynasty but the creation of the pact is left out. This is unbelievable in my view.

J CONCLUSION ON CENTRAL THEMES

250. What is going on I conjecture? It seems to me (and this is what the Defendant submit) is that the Central Theme is not a genuine Central Theme of HBHG and I do no accept that the Claimants genuinely believe it is as such. In my view it is an artificial contrivance designed to create an illusion of a Central Theme for the purposes of alleging infringement of a substantial part of HBHG.

251. I come to that conclusion for a number of reasons.

41 Reasons for Rejecting Central Themes

252. First I reject the suggestion that the Central Theme as such exists in HBHG. I have read HBHG many times (over the 20 years since its publication) and to attempt to find the Central Theme as one cohesive statement as representing in effect the major substantial part of HBHG by reading the text is a task in my view beyond any reader. One simply cannot read HBHG and then having read it discern from that reading that the Central Theme (whether dissected or not) is the Central Theme of HBHG. If it was one would have expected at least to find somewhere a statement that this is the Central Theme. This is where the Green case is relevant.

253. To suggest HBHG has very little in it apart from this Central Theme does a great disservice to the Claimants and I do not believe for one minute they genuinely believe it. It is impossible in my view to dismiss Part One for example which was of course the original platform for their investigations. It is impossible to dismiss the substantial parts of Part Two that are omitted viz Louis VII, the Cutting of the Elm (chapter 7). Chapters 6, 7, 8 and 9 which are largely omitted from the Central Theme.

254. If there is a Central Theme it is the one adverted to by Mr Leigh namely the merger of the Merovingian bloodline with the Royal Bloodline of Mary Magdalene. As such it is self evident in my view that is an idea which is of a too general level of an abstraction to be capable of protection. Nor is there any architecture or design in HBHG if that were the theme which can be said to have been appropriated. The Claimants simply do not reveal how they came to their idea or conjecture as they prefer to call it. It not being revealed it cannot be appropriated.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

42 The Task of Analysis

255. I adopt the Claimants analysis of my task in paragraph 33 and 34 of their closing submissions. Copyright should not protect against the borrowing of an idea contained in a work. It is necessary to strike a fair balance between protecting the rights of the author and allowing literary development. It is that fair balance which is in question in my view in this case. Of course it is dependant on the facts of any particular case.

256. Having read the Central Theme as I have said I am unable to find the Central Theme expressed as such in HBHG.

257. The reason is obvious from a reading of the Central Themes individually and as a whole. They consist of a series of generalised ideas, assertions or facts. Some are incredibly general (CT1-3 and 5 for example).

258. As I have said as a Central Theme they cannot as a whole or individually be found in HBHG. It has many other facts, ideas or assertions which are not in the Central Theme. It is quite wrong to assert that HBHG has very little apart from the Central Theme.

43 Central Themes, What Are They?

259. Even if there is a Central Theme as alleged by the Claimants in HBHG its expression in the Central Theme it is merely an expression of a number of facts and ideas at a very general level. There is nothing in them in my view that goes beyond that proposition. It follows therefore that the Central Theme as expressed is not such as to justify being protected against copying.

260. In this context I follow the accepted submissions of Mr Laddie in Ravenscroft and the expansion in Lord Hoffman's speech in Designer Guild. When a book is put forward as being a non fictional book and contains a large number of facts and ideas it is always going to be a difficult exercise in trying to protect against copying of those facts and ideas because as such they cannot be protected. It is the effort and time that has gone into the way in which those ideas and facts that are presented that is capable of protection.

44 Natural Chronological Order

261. Even if the Claimants can overcome the fundamental primary difficulties which I have set out above, I do not see that there is a role of "natural chronological order". That in my view is a meaningless expression. It is significant that the Claimants have always been coy about their structure and architecture. It is clear that they were alert to the difficulties of their case and the need to identify such matters to formulate a claim. They never formulated any such basis for a claim in a coherent way. That is why the Defendant sought a strike out claim and that is why Lewison J's order required them to do it again. They singularly failed to do so. Instead suggested non lineal connections were dangled in front of the Defendant in Mr Baigent's witness statement and expanded on in the Claimants' opening submissions. When they were ordered to explain it all of the complicated inter-relating adverted to in Mr Baigent's witness statement and the Claimant's skeleton fell away leaving in my view a complete denouement with a lame chronological order. It is not significant in my view that a series of stated factual events or asserted factual events is listed in a chronological order. What other order could there be? It is itself too general and a low level of extraction itself to justify protection against copying.

45 False Creation

262. Further there is no such chronological order in HBHG as an examination of the location of the themes in the VSS demonstrates. This too demonstrates the falsity of the Central Theme and provides clear indication that they are an artificial creation simply to provide a platform for the present litigation. The Claimants know that their idea of the merger of the two lines of itself is not protectable. Equally they know that mere statements of ideas and fact are not protectable. It is necessary therefore to create a pretence of a structure to found the cause of action. That is what the Central Theme is about and their repeated re-drafting of it is demonstrative again of its falsity.

46 Conclusion on Rejection of Central Themes

263. The conclusion I draw from this is that the Claimants started with DVC to find things in it and worked backwards from that exercise to create the Central Theme in HBHG rather than identifying the Central Theme in HBHG and seeing whether it was to be found in DVC.

264. It is equally the case that when one looks at the counterpart asserted infringements in DVC there is no chronological deployment in that book either.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

265. Once again this demonstrates that the chronological order is a lame attempt to find an architectural structure to protect something which is otherwise not protectable.

266. It follows therefore that the Claimants case fails at this preliminary stage. Mr Brown is perfectly entitled to copy these themes. Further these themes do not in my view amount to a substantial part of HBHG for the reasons that I have set out above.

267. The changes of the Central Themes and Mr Baigent's inability to support even the revised Central Themes support this conclusion also. I reject any suggestion that HBHG was always about these Central Themes as alleged by him in his evidence.

268. Why do the Claimants bring the claim I conjecture? I reject Mr Leigh's reason. It seems to me that they have received a genuine and handsome recognition of their role in DVC. Further of course as I have said that recognition accrued benefits to them in financial terms. They may be disappointed that Mr Brown has done so well by DVC. There are a number of reasons for that. First the Claimants' book is categorised as a book of non fiction (although many would suggest it should be truly categorised as fiction). Even as non fiction it is doubtful whether the Claimants have any genuine belief in the conjecture they present. That is why they call it historical conjecture. It is also why the fruits of their labour are hidden away. In truth as I have said the Rennes-le-Chateau material which leads to the Priory of Sion and which therefore comprises a substantial part of HBHG derives from material delivered to them via Pierre Plantard and his associates. The other major part is of course the Grail legacies of which Mr Leigh clearly has a profound knowledge but which is material well in the public domain. I accept the originality of their thought is in the blending of the two theories.

269. This makes HBHG a very interesting book to read whether or not it is credible. It is unfortunate that the Claimants were not willing to bask in the glow of recognition that the book gave them when it was published in 1982 and the subsequent revival of interest in their book entirely as a result of DVC.

270. The latter is of course a work of fiction and its special attractiveness is the way in which Mr Brown has put together these generalised facts and ideas in to a well received thriller. By writing in such genre he hugely increases the available audience. That is something in my view that the Claimants cannot complain about.

271. My assessments above and determinations marks the end of the Claimants' case. However I should not avoid dealing with the other parts of the case because of the possibility that the Claimants might try to overturn my factual determination. In that eventuality it is essential that I address the remaining issues as well.

K INDIVIDUAL POINTS ON CENTRAL THEMES

47 Use of HBHG

272. I will now analyse the individual components of the Central Themes by reference to the relevant component, its supplementing in VSS and in the light of the evidence.

273. I place no reliance on Mr Baigent's evidence as it was in the light of the destructive cross examination completely useless. I was greatly helped by Annex 5 to the Claimants' closing submissions which is a shorter version of the VSS with references to Mr Brown's US HBHG. As I have said my firm view is that the Langdon and Teabing lectures were written at stage 2 of writing DVC. When Mr Brown wrote stage 2 which in my view is when the character of Teabing was created the US copy of HBHG possessed by Mr Brown and Blythe Brown was used as the primary vehicle for those lectures almost exclusively. I accept that they had recourse to the other material but I do not believe that other material was used significantly for that part of DVC. When I say "used" it is my firm view that HBHG was used by Blythe Brown to provide the material. I am unsure as to whether or not Mr Brown knew that, but it does not matter as he incorporated it whether he knew its source or not. I make no finding in that regard.

274. With that in mind I revert to the Central Themes in order. However I should indicate that I am considering them in the context of language similarities and the source of such similarities. I am not considering them in the context of textual infringements as there are not to be any textual infringements. Although in this judgment when analysing the Central Themes I am using that description as a shorthand description I am not intending to imply that the texts identified in DVC are thus evidence of textual or non textual infringement. With that in mind I now consider the Central Themes in the light of the VSS and the evidence.

48 Central Theme 1

275. It is plain that this theme is to be found extensively in HBHG and is also to be found in DVC. Further the Brown's US HBHG has been extremely annotated in this area.

49 Central Theme 2

276. Once again I accept that this is to be found in HBHG and DVC. Further more I accept that the relevant parts of Mr Brown's US HBHG are annotated. On page 331 for example there is a pink sticker marked "the marital status of Jesus".

50 Central Theme 3

277. Once again there is the linkage as between HBHG, DVC and the annotations in HBHG.

51 Central Theme 4

278. Once again in my view there is a connection of this theme in both HBHG and DVC. Annotations are to be found. There is a further significant annotation at US HBHG 283 where a corner has been turned down and Blythe Brown has written "what is Grail?"

52 Central Theme 5

279. There is the same connection in this theme also.

53 Central Theme 6

280. This too is made out in my view in favour of the Claimants.

54 Central Theme 7

281. I disregard the loose use of the word "Franks". The essence is the inter marriage between Jesus' bloodline and the Merovingian dynasty, and that is to be found both in HBHG and DVC and the in the annotations at pages 313 and 399 of Mr Brown's US HBHG as asserted by the Claimants. In addition there are further annotations at page 314 which support the Claimants' case.

55 Central Theme 8

282. I have already discounted the unhelpful word "Pauline". Once again the linkage between HBHG and DVC and the annotations in US HBHG is made out.

56 Central Theme 9

283. I have already commented on the disappearance of the making of the pact with Clovis as opposed to the church reneging on it earlier in this judgment. Once again, the Claimant's case is made out. The annotations are in US HBHG at page 257 and carry on to page 258.

57 Central Theme 10

284. I do not see that this theme is made out. It is based on the assumption that Godfrey embarked to reclaim his birthright. I do not find that in the passages in DVC.

58 Central Theme 11

285. Whilst this Central Theme can be discerned from the text of HBHG I do not find it is correspondingly discernable from DVC.

286. The essence of the theme seems to me, to be Godfrey surrounding himself with a circle of special counsellors; something more than merely the founding of the firing time, the latter part is there to be found, but the former part is not.

59 Central Theme 12

287. I have already disregarded the slackness as regards military in this theme. Mr Baigent should have simply said that he'd made a mistake. The important part of this theme is that the Priory if Sion created the Knights Templar. That is to be found in both HBHG and DVC. Further the annotations at US HBHG page 106 cross refer to further annotations at page 214.

60 Central Theme 13.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

288. I do not see that this theme is found in DVC.

61 Central Theme 14.

289. I do not see that page 106 HBHG supports Central Theme 14 which is concerned with the protection of (and thus keeping secret) the Merovingian bloodline, the blood royal and the so call Holy Grail (see declaration of Sophie's grandmother referred to above). In contrast that part of the text declares an avowed intention to restore merely the Merovingian Dynasty and bloodline to the whole of France. It will be recalled that one of the criticisms of HBHG was that the Merovingians were not kings of France but were merely kings in France, so there was nothing to restore. Mr Plantard, of course, denied that he was any part of the royal bloodline descended from Mary Magdalene. I do not see that the text in HBHG supports the Central Theme although it is fair to say that that Central Theme as alleged is to be found in the text of DVC identified.

62 Central Theme 15.

290. I have already dealt with the additional hyphens and the word "Nautonniers". It is plain that the list in DVC was created from the list set out in US HBHG at page 131. The annotations of Blythe Brown on that page in pencil show the completion of the list by the date of death of John Cocteau in 1963 and the change of the name from Filipepi to Botticelli.

291. There are however annotations on the page also in red biro which continue the list of Grand Masters, starting with Abe Francois Du Cord - Borguet (a misspelling of the name to be found at page 211 HBHG). The next Grand Master is stated to be Pierre Plantard, 1981-1984. It has a note "died June 2000" and the Grand Masters since 1984 are "a matter of speculation". These notes the Claimants suggest (their closing appendix 6 on language similarities) have come from page 211-214 HBHG. I cannot see that. Pierre Plantard was not dead when HBHG was written. Nor is there any reference to the "matter of speculation" elsewhere in HBHG. I have already observed Blythe Brown's notation earlier, 14th October 2000 the discovery of the death of Pierre Plantard. These additional notes did not find their way into DVC (see page 431). What they do show, however, is that Blythe Brown was not working exclusively from HBHG. I do not see that it can therefore be said that the DVC text is drawn exclusively from HBHG; all it provided was 2 hyphens and the date of the death of Jeanne Cocteau at all.

292. It is plain from my analysis above that a majority of the individual Central Theme points can be found both in HBHG and DVC in terms of language similarity. That does not take the claimant's case very far for the reasons that I have set out earlier in this judgment.

293. The failure to establish 4 and possibly 5 of the Central Themes as being either in HBHG or replicated in DVC weakens the Claimants' case even further. It makes the residual Central Themes even more general and of an even lower level of abstraction and therefore less Central and less a substantial part of HBHG. It reinforces the lack of genuineness of the Claimants case; even after 3 attempts they still cannot get their Central Themes correct to a significant degree.

294. Further, the Defendant deny that these themes are to be found exclusively in HBHG. They have no positive case because Mr Brown has no clear recollection with the passage of time and an unfortunate loss of documentation when the cellar of the house was flooded. Elucidation could have been provided, in my view, to a significant degree by Blythe Brown. I have already determined that when he wrote the Synopsis, Mr Brown did not use HBHG. The Synopsis does not, in reality, have what is in effect the Claimants' case of the Langdon and Teabing lectures. As I have set out above those lectures are where the Central Themes are found. I have rejected Mr Brown's evidence that he acquired HBHG late in the process of writing DVC.

295. Having rejected that evidence I go on to consider whether he copied from HBHG. I bear in mind that the Claimants do not rely upon textual copying as a basis for primary liability. They say that there are four grounds for saying that Mr Brown has been copying:-

296. Points of Central Theme appear in DVC (I agree in a language sense).

297. Language copying occurred and Mr Brown admitted it (see below).

298. There are numerous references to HBHG and the sources used by Mr Brown and his wife (see below).

299. There are two instances of use of supporting arguments (see below).

L CENTRAL THEME IN DVC

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

300. As I have said I accept that submission as regards language but I must also deal with the Defendant's claim that those Themes are to be found in the other books which Mr and Mrs Brown undoubtedly relied upon. The Claimants in their closing (appendix 3) helpfully set out the quotes provided in schedule 1 to the Amended Defence being the book cited. They face a difficulty in relying upon TR because it plainly draws from HBHG as the source of a lot of its contentions. It is of no defence to say "we copied from TR" if TR itself was copied from HBHG. However for this case of indirect copying to be made out the Claimants must prove if TR is the sole source that TR has been copied from HBHG. Although there are many attributed references it does not follow from that the authors of TR did not do their own research. The text suggests they did. I do not accept the Claimants can prove indirect copying on the evidence before me via the use of TR.

301. It is even clearer in the case of WAJ where Margaret Starbird, in her preface, sets out why she came to write the book. As part of her interest in Judeo - Christian Scriptures in 1985 she read HBHG. She says she was frankly appalled and believed that the authors of HBHG were not only wrong but their book bordered on blasphemy. She says (rightly in my opinion) that the core of HBHG was the marriage of Jesus and Mary Magdalene. She, being a catholic, assumed the authors of the heretical book were mistaken and that therefore it is quite wrong to believe that the established church had suppressed ruthlessly the important female role in the early church. She set about finding the truth. She believed it would be an easy exercise and interestingly she started at the paintings and the symbolism to be found in paintings. After her detailed investigations she completely turned round and came to the conclusion that "there was real substance in their theories set forth [HBHG]". It is clear, therefore, that WAJ is the product of an independent process of reasoning on the part of Margaret Starbird. One example suffice is to show that this is the case. She refers (page 61) to the child of Jesus and Mary Magdalene being called Sarah. That is plainly the product of her researches; as I have already said it is not to be found in HBHG. I have already observed that that aspect is also to be found in DVC.

302. Looking at the Claimants' appendix 3 analyses the other books referred to in Amended Defence theme by theme (taking into account the above mentioned themes which I have identified as either not being in HBHG or not being in DVC) it will be seen that themes 1-4 and 5 can be found in TR, WAJ, and GG. They can also be found in DVC. The reference to the womb on page 335 DVC is in my view (theme 4) plainly from page 60 of WAJ which also is where the reference to Sarah is to be found.

303. Theme 6, in my view, is derived from WAJ. Theme 7 is to be found in TR, WAJ and GG.

304. I did not find any parts of themes 8, 9 or 15 in any of the books. The position is equivocal as regards themes 10 and 11. There are references in TR and WAJ for themes 12 and 14 and TR for theme 13.

305. As the analysis at appendix 3 of the Claimants' closing shows, HBHG is heavily annotated mostly by Blythe Brown. In the case of the copying text Mr Brown conceded that it appears that most of those were drawn from HBHG (see below). In addition there are separate documents prepared by Blythe Brown which, in my view, the Claimants establish were also drawn from HBHG (again see below). The picture in respect to the source of the books for the Central Themes is a difficult one. The major reason for this is the generality of the themes. As they are general it not surprising to find them in such a general way in different books. Equally, it is not surprising to find those generalised statements being drawn from HBHG by other books (TR is a possible but not proven example of this). Some items clearly come from HBHG. Some items plainly do not come from HBHG. Mr Brown's evidence is of no assistance because of his vagueness. The person who could have unlocked this complex area is Blythe Brown. She is not here.

306. Taking into account the generality of the central themes and the repeated references to them, not only in HBHG and DVC, and bearing in mind that Blythe Brown has not come to explain how she did her research, I conclude that, in the main, the majority of the Central Themes were drawn from HBHG in a language sense but it was not the sole source of Blythe Brown's efforts. She had the other books and they were used for the Synopsis. However, it seems to me clear that when it came to providing the Langdon and Teabing lectures a different pattern emerges. The Teacher, so called in the Synopsis, had no name. When it came to write the rest of the book at a later stage he was given the name Leigh Teabing, which is drawn from HBHG. It is logical, in my view, that having drawn the name from the authors of HBHG, Mr and Mrs Brown would do that at the time when they were writing the lecture parts of the second part of DVC. That is when they introduce HBHG into the list of books and it is in my view when the detail of the language of the Themes is created. I have already observed that in my view Blythe Brown had done significant research using HBHG from some time in 2000. I do not believe Mr Brown used it, as I have said, for the Synopsis, but it was deployed at this later stage when these lectures were written. As the bulk of the material set out in the themes is to be found in HBHG, I can not believe that Blythe Brown would have adopted a scatter gun approach to find these various themes in a series of other books. She used the other books to expand slightly the material which came from HBHG.

307. If it was otherwise she should have come to Court and said so. Mr Brown in reality as the cross examination showed had no idea what Blythe was researching and when. He just incorporated it. At that stage they might discuss what to incorporate but only in the context of writing the book not in the context of evaluating her research material and its sources.

308. I therefore conclude that the historical parts in the Synopsis were written using TR, WAJ and GG mainly and not using HBHG. When the later material was deployed, however, I find that it was done using HBHG possibly supplemented by already accrued material from, mainly, WAJ.

309. That I deduce from the language of the remaining parts of the Central Themes as they appear in the DVC. I therefore accept the Claimants' first point to show that there are grounds that Mr Brown copied language from HBHG. I do not accept they are evidence of copyright infringement by substantial copying of HBHG whether textual or non textual as they are as I have said too general and too low level of abstraction.

M LANGUAGE COPYING

310. I stress again that it is no part of the Claimants case that any language copying is a copyright infringement in respect of HBHG.

311. Mr Brown was extensively cross examined on the copying examples. I permitted the Claimants to add to those copying examples at the opening of the trial by which time they numbered 9.

312. Mr Rayner James QC's careful and cumulative cross examination forced Mr Brown in my view to accept that the 9 language similarities were drawn from the corresponding text in HBHG.

313. This is self evident in my view when one compares the annotations on the US HBHG and the subsequent counterpart text in the manuscript of DVC of 15th August 2002 which led to the final DVC. It was reinforced by the concessions that Mr Brown made. He was driven to deny matters only when a page was not marked (item 3 for example).

314. Once again the overwhelming majority of the annotations are from Blythe Brown and she is not before me. If there are any residual doubts as to the source of the language similarities (and I have none) her absence would be the final justification for rejecting the Defendant's case on the language similarities.

315. In so doing I reject Mr Brown's evidence that HBHG was acquired later and was not used in any significant way. Blythe Brown's underlinings (absent any other explanation from her) tell their own story. In my view as I have said this is overwhelmingly supportive of the view that when Mr Brown came to write the second part of DVC the historical context that was then inserted was the Langdon and Teabing lectures. At that time Sophie was linked to Sauniere (he was then given a name). Teabing was similarly created from the anagram of the Claimants and the textual insertions show that they were drawn from HBHG.

316. I regard the suggestion that Mr Brown and Blythe Brown created the Langdon/Teabing lectures from the other sources as completely unsustainable. It flies in the face of logic and the documents as carefully demonstrated by the Claimants in the annex of language similarities set out in their closing submissions. The conclusion is irresistible. Blythe Brown provided the material for the lectures with HBHG in her hands.

317. Once again I do not necessarily accept that Mr Brown knew that is what was happening. Much of the material provided by Blythe Brown is unattributed. I do not accept he knew necessarily where she was obtaining her material form. I do not think for one minute he cross-checked his wife's work. That was her valuable input in to DVC. Mr Brown has always acknowledged this and it would be a pointless waste of exercise if he went over the same ground. As I have said elsewhere the fact that Blythe Brown was the true researcher of historical facts and not Mr Brown has certainly caused him difficulties when he submitted to the glare of publicity.

318. None of this actually matters very much in the overall scheme. First, Mr Brown has always acknowledged that he used HBHG at some stage. Second, the use of HBHG for copying of these generalised parts of the text is not of itself actionable. They have no independent cause of action. They fall with the primary decision that I have made above.

319. The Claimants were right not to rely upon these as evidence of textual infringement because an examination of them shows they are extremely generalised. Many of them are in effect the only way in which they can be expressed. The Claimants were alive to this as Mr Leigh's evidence showed when he was cross examined about his approach to

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

lifting sentences and text from other books, as he acknowledged in cross examination (he really put it forward as a matter of pride).

## N REFERENCES TO HBHG IN SOURCES USED BY DAN AND BLYTHE BROWN

320. As I have said I am firmly of the view that Blythe Brown at least had access to HBHG before the Synopsis was written. It does not actually matter when she used it or had access to it or when Mr Brown saw it or had access to it. The real question to be answered is the extent to which it was used. I have already set out my finding as to when HBHG was used by Blythe Brown.

321. This is supported in my view by reference to three research documents provided by the Defendants in disclosure namely "Jesus survived", "Langdon reveals" and "Constantine".

### 63 Jesus Survived

322. This is a composite document. The first part came from the internet an article at www.proaxis.com.

323. The second part of the document (which starts at page 13) is headed "Jesus the Man". The source of pages 13-25 has been largely agreed. In a copy produced for the trial the words coloured red have been agreed as being drawn from HBHG. That represents the vast amount of that part of this document. It is reflected in the fact that on page 352 of US HBHG there is a pencil marking and the page is turned over and in pencil is written "Jesus survived" in Blythe Brown's handwriting.

324. Faced with this Mr Brown wriggled in the witness box. He picked on the word "behaviour" in the last line on page 25. This was spelt in UK style and he opined that Blythe would not write a piece of text using an English spelling. He suggested there were instances of English style in the text. He expressed the view that this was a complete document which had been downloaded from the internet. He was unable to identify the relevant internet document and none has been identified. This is a classic example of where Blythe's absence in my view tells against the Defendants. I should observe that in the text at page 19 the word "behavior" is spelt in US style. This is a US spelling out of the US version of HBHG.

325. I was unimpressed with Mr Brown's attempts to explain away this document. It is plain that the document was drawn from HBHG and I am satisfied that the Claimants' case is made out that this document was created by Blythe Brown before the Synopsis using HBHG.

326. In the "properties" of "Jesus Survived" it is stated that it had been edited for a total of 18 minutes. The Defendants rely on this point as showing that it is far more likely that the complete document had been downloaded from the internet which could reflect 18 minutes. That length of time cannot possibly reflect copying out by Blythe Brown and creating "Jesus The Man" (I agree). There maybe something in that point but I have not had a full and complete explanation. If I had been shown internet documents that would have been of assistance. If I had had evidence from Blythe Brown on this point that would have been of considerable assistance. There remains the possibility that the final produced document was downloaded in 18 minutes or copied in 18 minutes from another document which reflects Blythe Brown's true work and is now lost. Once again in my view Blythe Brown's absence counts against the Defendants and this point cannot be used against the Claimants detailed analysis in the respect of the balance of the document.

327. Nevertheless once again this does not take the matter much further. I do not accept that Mr Brown used it when he wrote the Synopsis. I am not convinced that it can be established that he was aware of it at the time he wrote the Synopsis.

### 64 Langdon Reveals

328. This document is agreed to have been distilled from three sources, namely the History of the Knights Templar, HK and HBHG. The Claimants' case has this dated after the Synopsis. Once again the document was put extensively to Mr Brown in Mr Rayner James QC's careful and cumulative cross examination and I accept what the Claimants say about it. However this too does not advance the matter any further for the same reasons. That is further reinforced by the fact that HBHG (with other books) is acknowledged in the notes to the text.

### 65 Constantine

329. This document too is virtually entirely drawn from HBHG. This document also the Claimants contend post-dates the Synopsis.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

330. I accept that these are instances which show the text of HBHG was copied by Blythe Brown when she prepared research material for Mr Brown to write the second part of DVC.

331. However these are not relied upon by the Claimants as evidence of textual infringement.

332. The point however is that all these matters do not lead to a conclusion that Mr Brown copied the Central Theme. Indeed as the Defendant in its closing point out (paragraph 320 and following) it was never put to Mr Brown that he had copied the Central Themes. That in my view is a surprising failure. It may be capable of being explained away on the grounds of something that can be inferred. Nevertheless it is something in my view which should have been put to Mr Brown as it is central to the Claimants' case.

333. As I have said above there are no Central Themes in HBHG. Mr Brown cannot have copied the Central Themes in any event. It is true that aspects of the Central Themes can be traced through the textual parts identified by the Claimants. That is because the Central Themes are too general and nothing significant is to be concluded from that identification. If it was the Claimants would have elevated the textual citings of the Central Themes to evidence of textual infringement. However they have studiously avoided doing that.

334. All of this material therefore shows simply that as part of a mechanistic exercise Blythe Brown used HBHG in providing generalised and low level abstract material primarily from HBHG but also from other sources as background material for Mr Brown when he wrote DVC.

335. It follows therefore that there has been no copying of the Central Themes and the Claimants' case is not made out based on this material. If there is no copying of the Central Themes there is no copying of the Central Themes when they are to be found in HBHG.

336. Equally there can be no substantial copying of the Central Themes for the same reason and thus no substantial copying of HBHG.

337. None of this material even though established by the Claimants, assist them in their case because they do not lead to a direct allegation of textual infringement.

338. The destruction of Mr Baigent's evidence shows that the Claimants have not in my view created the Central Theme as alleged as a substantial part of HBHG by their time and effort (as opposed to writing HBHG generally). It is true that the determination of that issue is for me and not Mr Baigent but the destruction of his evidence reinforces my own view that the Central Themes are not a substantial part of HBHG and they have not been substantially copied by Mr Brown in DVC.

O WITNESSES

339. I should say something about various witnesses in addition to the specific points I have made. I will exclude Mr Baigent from that analysis as there is nothing more that can be said about his evidence.

66 Mr Leigh

340. I am not sure what Mr Leigh thought was the purpose of his evidence. He seemed to want to have a fight over something and was clearly disappointed at the relative shortness of his cross examination. I did not find his evidence of any significant use in the case save the telling observations that I have already referred to, namely that there is one theme only of HBHG and that he will lift textual matters if he likes them and it suits him.

341. Other than that his evidence did not in my view assist me in the overall evaluation of the case.

342. Mr Lincoln did not give evidence. He is a key part of the saga of HBHG but I do not see that his absence has any significant impact on the overall case.

67 Mr Brown

343. The Claimants say I should treat his evidence with caution. That is too high in my opinion. He started confidently enough but ultimately his confidence was gradually eroded by Mr Rayner James QC's protracted and carefully measured cross examination. In that cross examination Mr Rayner James QC established that in reality Mr Brown knew very little about how the historical background was researched. He in my view simply accepted Blythe Brown's research material when incorporating it in to the writing of part two of DVC. I do not believe for one minute he was analytical of it or critical of it; he simply accepted it.

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

344. The Claimants in cross examination also in my view as I have said established that HBHG was possessed by the Browns far earlier than Mr Brown was stating in his evidence. However I do not believe that those failures of Mr Brown's evidence lead me to conclude that I must reject everything he says. For the reasons already set out for example I have accepted his evidence concerning the books he had when he wrote the Synopsis.

345. It ought to have been obvious to Mr Brown that if he had carefully prepared his witness statement that his case on HBHG as he put it would simply fall apart on an examination of the US HBHG, the copying similarities and the other documents to which I have referred. I do not believe he consciously lied. His failure to address these points in my view shows once again that the reality of his research is that it is superficial. This in my view is the explanation for his evidence. He has presented himself as being a deep and thorough researcher for all of the books he produced.

346. The evidence in this case demonstrates that as regards DVC that is simply not correct with respect to historical lectures. The Synopsis was prepared using a minimal amount of material from the books TR, WAJ and GG primarily. The major part of the writings of the lectures at a later stage have substantially come from HBHG.

347. I am aware (this may be an understatement) that the case has wide interest. It is very important that people do not take parts of the judgment out of context.

348. Mr Brown is a fiction writer. As a device to writing fiction he is perfectly entitled to dress up factual scenarios to give an illusion that supports his fiction. He is not (contrary to the complaints of the Claimants) going into deep and detailed research for these factual matters. Indeed as he said in his evidence that would be counterproductive; he wishes to create "grey" areas not black and white. He simply needs therefore a mystery and a series of unanswered questions. He can do that without deep research and that he has done. As he has taken matters at a general and low level of abstraction and he has only taken ideas and facts without any of the architecture (if any) he has done nothing wrong. It would be quite wrong if fictional writers were to have their writings pored over in the way DVC has been pored over in this case by authors of pretend historical books to make an allegation of infringement of copyright. I accept that if that was allowed to happen it would have a serious impact on writing. This case whatever its result would not have that impact in my view. However cases can be used for improper purposes.

349. It should also be appreciated that this case is about the taking a substantial part out from HBHG and placing it in DVC. It does not cover the large significant other aspects of DVC. First there is the material from other sources vis the detail about Leonardo da Vinci and the art forms. Second there is the input of the locations and finally there is the interweaving of these factual and locational parts with the thriller elements. This is where the effort and skill really lies. This judgment should have no impact on Mr Brown's reputation as a thriller writer.

350. Mr Brown should not be denigrated because of the adverse findings I have made against him in respect of some aspects of his evidence. Nor should his book be criticised or his writings skills be criticised because of those matters. They reflect but a part of the overall package. The package has proved to be extremely successful and like everything (in any sphere) that is successful when one reads Mr Brown's evidence it seems very easy to do.

351. It was said in evidence that there is at least one book in every person. The skill of the great is always (in whatever area is being talked about) in making it all seem very easy.

### 68 Blythe Brown

352. I have already commented on her absence in certain areas.

353. This case does not involve any further examination of how she did her research. Nor does it involve any criticism of that research and none should be drawn in my view from this judgment.

### 69 Mr Ruben

354. Mr Ruben's evidence in my view simply demonstrated how important the art of publicity is in the world of publishing. His enthusiasm of the book knew no bounds. I am not sure that it is as good as he says but then I am no literary person.

### 70 Mr Janson-Smith

355. His evidence did not assist me at all in the overall pattern except to suggest there might have been discussions between him and Mr Leigh when Mr Leigh may have given an impression that litigation was brought for the purpose of extracting money in the expectation of settlement. I do not need to form a view as to that. All I will say is that if Mr Leigh believed that he demonstrated a folly which inflicts Claimants from time to time. It is a very dangerous exercise

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

to commence litigation in the hope that the other side will settle and make a payment. I rather suspect this will be driven home to Mr Leigh (if that was his thought) at the conclusion of this judgment.

### P OTHER MATTERS

356. Both sides left no stone unturned in attempting to reconcile every part of the Central Themes, every part of the text of HBHG and DVC and to recreate a factual scenario in a complete way.

357. This provides assistance for me in writing a judgment but it does not mean that all of the material will be used.

358. A judgment is not a work of fiction (I hope) nor is it a piece of conjectural fact. It is a document which ought to deal with the major facts to resolve the dispute. That necessarily involves distillation. It means that unlike literary works of the type featured in this case it is not necessary or productive to attempt to resolve every factual disagreement that arises. Indeed it is quite wrong for a Judge to attempt to reconcile everything and to create his own account. A Judge distils the facts and determines those facts which he concludes are necessary to enable him to come to a decision in the case. That is what I have attempted to do.

359. I am nevertheless grateful for the great amount of work that has gone in to the presentation of the case by both sides.

### Q END GAME

360. For the reasons set out in this judgment I dismiss the Claimants' action.

### R THE CENTRAL THEME

Central Theme Point

1. Jesus was of royal blood, with a
legitimate claim to the throne of Palestine

2. Like any devout Jew of the time, and especially
like a Rabbi and any royal or aristocratic
claimant, he would have been married.

3. As expected of any Jew at the time,
 he would have children.

4. At some time after the crucifixion, Jesus'
 wife, the figure known as Mary Magdalene,
fled the Holy Land and found refuge in one of many
 Judaic communities then scattered around the
south of France. When she fled the Holy Land,
the Magdalene might have been pregnant with Jesus'
offspring, or such offspring might already have
been born and brought with her. We concluded
from studying the Grail Romances and early
manuscripts that Mary Magdalene fled the Holy
Land with the Sangraal and that by turning
Sangraal into 'Sang Raal' or 'Sang R al'
we suggested that Mary Magdalene fled
with the royal blood.

5. We considered what the Holy Grail was, whether
the Holy Grail was a cup or whether the Grail
was in some way related to Mary Magdalene
and the Sang Real. We concluded that the Grail
would have been at least two things simultaneously.
On the one hand it would have been Jesus's
bloodline and descendants and it would have
been quite literally the vessel that contained

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

Jesus's blood. In other words it would have been the womb of the Magdalene and by extension the Magdalene herself.

6. In a Judaic community in the South of France, the bloodline of Jesus and the Magdalene would have been perpetuated for some five centuries - not a particularly ong time, so far as royal and aristocratic blood lines are concerned.

7. Towards the end of the 5th century, Jesus' bloodline intermarried with that of the royal line of the Franks. From this union, there issued the Merovingian dynasty.

8. In the meantime, the Roman Empire in the fourth century AD, under the auspices of Constantine, had adopted "Pauline" Christianity as its officially sanctioned and tolerated form of Christianity. This was done as a matter of convenience to foster unity; and once "Pauline" Christianity became the official orthodoxy, all other forms of Christianity became, by definition, heresies. By the end of the century Christianity had become the official religion of the Roman Empire. The Church's dogmatic religious stance thus benefited from the support of secular authority.

9. When the Merovingian dynasty grew weaker under Clovis' successors, the Church reneged on its pact and colluded in the assassination of Dagobert II, last of the Merovingian rulers. Although Dagobert died and the Merovingians were deposed, Dagobert's son, Sigisbert, survived and perpetuated the Merovingian bloodline through a number of noble houses. Towards the end of the 11th century, the Merovingian blood line emerged on the central stage of history in the person of Godfroi de Bouillon, Duke of Lorraine.

10. When Godfroi embarked on the first crusade in 1099, he was, in effect seeking to reclaim his birthright and heritage, the throne of Palestine to which his ancestors had possessed a claim a thousand years before.

11. Godfroi surrounded himself with a circle of counsellors, who were endowed with the Abbey situated on Mount Sion in Jerusalem and became known as the Ordre de Sion, or, subsequently, the Prieur de Sion (Priory of Sion).

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)

12. The Ordre or Prieur de Sion
created the Knights Templar as their
administrative and executive arm.

13. In the mid-12th century, members of the
Ordre de Sion established themselves
in France, from where they subsequently
spread out to own properties across the
whole of Europe. When the Holy Land was
lost, France became the Prieur 's
primary base and headquarters.

14. The Prieur continued to act as
protectors and custodians of the
Merovingian bloodline, the "blood royal"
or "sang r al", the so-called
"Holy Grail".

15. During its early history - until the
14th century - the Grand Masters of the Prieur
were drawn from a network of interlinked families,
all of whom could claim Merovingian descent.
From the 14th century on, the Prieur
(according to its purported statutes,
which Brown would appear not to have seen)
would, for complicated reasons, move outside
the family. Grand Masters would then be,
on occasion, illustrious names - Leonardo,
for example, Botticelli, Sir Isaac Newton,
Victor Hugo, Debussy, Cocteau. Sometimes,
however, the names would be rather more
obscure, like Charles Nodier. In any case,
all "outsiders" listed as Grand Masters still
have close connections with the network
of families claiming Merovingian descent.

**SOLICITORS:**

Orchard Brayton Graham LLP; Arnold & Porter (UK) LLP

[2006] EWHC 719 (Ch), [2006] All ER (D) 113 (Apr), (Approved judgment)