EXHIBIT 2

1 of 5 DOCUMENTS

Baigent and another v Random House Group Ltd

COURT OF APPEAL (CIVIL DIVISION)

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

**HEARING-DATES:** 16, 17, 18, 19 JANUARY, 28 MARCH 2007

28 MARCH 2007

**CATCHWORDS:**

Copyright - Infringement - Defence - Work intended as factual account of historical events - Repetition of facts by another author in novel - Claimants arguing that central theme of their work copied by novelist - Whether non-textual infringement of claimants' literary work - Whether substantial part copied by novelist

**COUNSEL:**

J Rayner-James QC and A Norris for the Appellants; J Baldwin QC and J Abrahams for the Respondent

**PANEL:** MUMMERY, RIX, LLOYD LJJ

**JUDGMENTBY-1:** LLOYD LJ:

**JUDGMENT-1:**

LLOYD LJ:

INTRODUCTION

[1] The Claimants are two of the three authors of a book published in 1982, The Holy Blood and the Holy Grail (HBHG). The Defendant is the publisher in the UK of a book written by Dan Brown, the Da Vinci Code (DVC), first published in 2003. The Claimants' contention is that, in writing DVC, Mr Brown infringed their copyright by copying a substantial part of HBHG in the course of writing six chapters of DVC. The case came to trial over 11 days in February and March 2006 before Peter Smith J. In his judgment, delivered on 7 April 2006, he dismissed the claim: [2006] EWHC (Ch) 719. He also refused permission to appeal, but on the Claimants' application to the Court of Appeal, I granted permission to appeal on 13 June 2006.

[2] It is not in dispute that HBHG is an original literary work in which copyright subsists, nor that the Claimants are two of the joint holders of the copyright. No point arises from the failure of the third, Mr Lincoln, to join them in bringing the proceedings. By virtue of s 16 of the Copyright, Designs and Patents Act 1988, it is an infringement of the Claimants' copyright for another person, without their licence, to copy HBHG or any substantial part of it, directly or indirectly. The Claimants' case is that Mr Brown derived the majority of six chapters of DVC from HBHG, that in so doing he copied part of HBHG, and that what he copied was a substantial part of HBHG.

[3] The judge appears to have held that the six chapters were largely derived from HBHG, but he rejected the claim of copying. Not surprisingly after a lengthy trial, his judgment is long, running to some 70 pages. Remarkably, he delivered it less than three weeks after the end of the hearing. As was noted at the time, he was prompted by the extensive use in DVC of codes, and no doubt by his own interest in such things, to incorporate a coded message in his judgment, on which nothing turns. The judgment is not easy to read or to understand. It might have been preferable for him to have allowed himself more time for the preparation, checking and revision of the judgment.

[4] The claim for breach of copyright is in some respects unusual, but it has to be tested by reference to the same principles as would be relevant in a more conventional case. If material is found in a later work which is also in an ear-

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

lier copyright work, and it is shown that the author of the later work had access to the earlier work, an inference of copying is raised. Then it has to be considered whether there was in fact any copying, in relation to which the later author may say that he obtained the material from his own unaided efforts or from a different source. If it is found that any of the material common to both works was copied from the earlier work, then the question arises whether what was copied was a substantial part of the earlier work.

[5] If the copyright work in question is a literary work, the allegation will normally be that part of the text of the earlier work was copied, exactly or with some modification, in the creation of the later work. In the present case that is not what is alleged as the basis for the claim in copyright infringement. What is said to have been copied is a theme of the copyright work. Copyright does not subsist in ideas; it protects the expression of ideas, not the ideas themselves. No clear principle is or could be laid down in the cases in order to tell whether what is sought to be protected is on the ideas side of the dividing line, or on the expression side.

[6] The point was mentioned by Lord Hoffmann in the House of Lords in Designers' Guild Ltd v Russell Williams (Textiles) Ltd [2001] 1 All ER 700, [2000] 1 WLR 2416, at para 24, [2001] FSR 113, which concerned artistic copyright:

'there are numerous authorities which show that the 'part' which is regarded as substantial can be a feature or combination of features of the work, abstracted from it rather than forming a discrete part. That is what the judge found to have been copied in this case. Or to take another example, the original elements in the plot of a play or novel may be a substantial part, so that copyright may be infringed by a work which does not reproduce a single sentence of the original. If one asks what is being protected in such a case, it is difficult to give any answer except that it is an idea expressed in the copyright work.'

Lord Hoffmann addressed the point usefully in paras 25 and 26 as well:

'25 . . . The other proposition is that certain ideas expressed by a copyright work may not be protected because, although they are ideas of a literary, dramatic or artistic nature, they are not original, or so commonplace as not to form a substantial part of the work . . . .

26 Generally speaking, in cases of artistic copyright, the more abstract and simple the copied idea, the less likely it is to constitute a substantial part. Originality, in the sense of the contribution of the author's skill and labour, tends to lie in the detail with which the basic idea is presented.'

Lord Scott made a similar point at para 64, quoting first a test proposed in Laddie, Prescott & Vitoria, The Modern Law of Copyright, to determine whether an altered copy constitutes an infringement:

'Has the infringer incorporated a substantial part of the independent skill, labour etc contributed by the original author in creating the copyright work?

My Lords, I think this is a useful test, based as it is on an underlying principle of copyright law that a copier is not at liberty to appropriate the benefit of another's skill and labour.'

[7] Accordingly, the judge had to consider:

i) what relevant material was to be found in both works;

ii) how much, if any, of that had been copied from HBHG;

iii) whether what was so copied was on the copyright side of the line between ideas and expression; and

iv) whether any of the material that was copied and did qualify as expression, rather than as ideas, amounted to a substantial part of HBHG.

The third and fourth of these issues, as often, are interconnected.

[8] If, by applying those tests, the judge found that a substantial part of HBHG had been copied by Mr Brown in writing DVC, it was irrelevant to consider Mr Brown's intention in so doing. Breach of copyright does not depend on the intention or state of mind of the alleged infringer.

[9] Each of the two books in question contains a great deal of material which is not in the other. It was necessary for the Claimants to identify what they said had been copied, and to identify the material which they relied on as supporting their allegation of copying. It was all the more necessary for this to be done, and done clearly, given the non-

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

textual nature of the infringement which they alleged. The judge referred to the history of the Claimants' attempts to formulate their case in this respect. I do not need to go further back than the Claimants' Voluntary Supplemental Schedule (VSS) and an order made by Lewison J on 27 October 2005. In para 3 of the Amended Particulars of Claim the Claimants allege that HBHG 'expresses a central theme', set out in an Annex to the statement of case. (It is also set out as an Appendix to this judgment.) The VSS sets out the Central Theme in 15 elements, and identifies in separate columns in relation to each element the passages relied on in each work for showing that the particular element is in it. Lewison J's order recorded that

'the only matter complained of by the Claimants in this case is the matter expressly set out in the 15 Central Theme points of [the VSS]' and that the only purpose of the material in the respective columns was to show that the matter contained in the particular element is in each work and, as regards DVC, to support the allegation of copying that material. Any matter set out in the passages quoted which does not relate to the corresponding Central Theme point is recorded to be irrelevant.

[10] In the course of the trial the formulation of the Claimants' case underwent further scrutiny and clarification. They confirmed that they did not rely on any special feature by way of the architecture of the Central Theme, or the collocation of the several elements in it, other than the natural chronological sequence of the elements.

[11] In s K of his judgment, paras 272 to 292, the judge compared the two books by reference to the fifteen Central Theme elements. He came to the conclusion that elements 10, 11 and 13 were not to be found in DVC, and that element 14 was not to be found in HBHG. On that basis, those four elements were to be disregarded as regards any question of copying. In effect, the judge was there going through the task of establishing whether the material said to have been copied was (a) in the copyright work itself and, if so, (b) also in the work alleged to infringe that copyright.

[12] As regards the other eleven elements, since they were to be found in both works, and since it was not denied that Mr Brown had access to HBHG when he was writing DVC, an inference of copying arose, so that the evidence had to be examined as to how the common material got into DVC.

[13] The judge considered that evidence and made findings of fact on the basis of it. The parties were at odds before us as to what findings he had made on the relevant points. I will deal with that later. The Claimants also contend that he misdirected himself in law as to what was necessary for the Central Theme to constitute a substantial part of the copyright work such that, if it was copied, that would be an infringement of their copyright.

[14] The Claimants' case for showing that Mr Brown infringed their copyright relied on four different factors. The first was the presence in DVC of the Central Theme elements which they said were in HBHG as a central theme. The second was nine examples of language similarity, too minor to constitute a substantial part in themselves, but relied on to show that Mr Brown had HBHG at hand when writing DVC and did copy something from it. The third was a number of references to HBHG in material used by Mr Brown and his wife: there is a prominent reference to HBHG in the text of DVC itself. Fourthly, they relied on two supporting arguments, of minor significance in themselves.

[15] The Defendant did not suggest that Mr Brown had not used HBHG. It did deny that he had derived any of the Central Theme elements from it rather than from other books. Part of its case was that all the relevant Central Theme elements were already present in a Synopsis which Mr Brown wrote at an early stage, the case being that he did not have access to HBHG at all at that stage. The judge did not accept the proposition that Mr Brown did not have at least indirect access to HBHG at that stage, but he appears to have held that the Synopsis was written without any use of HBHG. On the other hand he also appears to have held that HBHG was used as a, or the, principal source at the later stage of writing the text of the relevant part of DVC itself.

[16] The Defendant also contended that, if anything was taken from HBHG in the course of writing DVC, it was at too high a level of abstraction and generality; in other words, it was on the wrong side of the line between ideas and the expression of ideas. It was also said to be not a substantial part of the copyright work, principally for the same reason.

THE TASK OF AN APPELLATE COURT

[17] In Designers' Guild the House of Lords provided guidance not only as to the basis of a claim for infringement of copyright, but also as to the functions of an appellate court in such a case. In that case the judge had held that there had been copying (contrary to the Defendant's strenuous denial) and this finding of fact was not appealed. The appeal was limited to the question whether what had been copied amounted to a substantial part of the copyright work. The Court of Appeal allowed the appeal, holding that it was not, but the House of Lords restored the judge's contrary conclusion. The House of Lords held that the judge's finding on substantiality involved findings of fact, albeit not findings

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

which depended on resolving conflicts of factual evidence between witnesses and determining the relative credibility of such witnesses, and that the Court of Appeal had:

'approached the issue of substantiality more in the manner of a first instance court making original findings of fact than as an appellate court reviewing findings of fact already made and in very important respects not challenged. It was not for the Court of Appeal to embark on the issue of substantiality afresh unless the judge had misdirected himself, which in my opinion he had not' (see Lord Bingham at paragraph 6).

[18] So here, Mr Baldwin QC, for the Respondent, submitted, the judge's conclusions involved findings of fact which were not challenged in the Appellant's Notice, and were therefore not open to review. The parties were at odds as to what findings of fact the judge did make but, subject to that, Mr Rayner James QC, for the Appellants, implicitly accepted that he had to show that the judge erred in principle in order that he could succeed on the appeal.

THE TWO BOOKS

[19] With that by way of introduction, I must now say something about the two books, and about the way in which DVC was written. The court was supplied with copies of each book marked to indicate the material relied on by the Claimants in the VSS. The copy of HBHG used is of the UK paperback edition published in 1996. This includes some material which was not available to Mr Brown when he was writing DVC, but the main text is identical to that which he saw. The edition of DVC used is the UK paperback edition, first published in 2004.

[20] The books are very different one from the other. HBHG is described by the Claimants as a work of historical conjecture. It draws on a good deal of pre-existing material, for example about the Cathars and the Albigensian Crusade, about the Knights Templar and, farther back in time, about the Merovingian kings. It draws on writings about the Holy Grail, and on material concerned with the early history of the Christian Church. The material is presented as the story of a quest on the part of the authors, describing how their investigation of one mystery led them to explore other aspects of history, and to form conjectures and hypotheses of which, by the end of their work, they had become convinced. The judge at paragraph 46 describes the authors' thesis as being at the far end of conjecture, but nothing turns on how realistic or plausible their conclusions may be. By contrast DVC is a thriller, but one which draws on some themes similar to and overlapping with the content of HBHG to add interest, colour and tension.

HBHG - A SUMMARY

[21] HBHG is divided into three parts: The Mystery (chs 1 to 4), the Secret Society (chs 5 to 10) and the Bloodline (chs 11 to 15). Very little of the material relied on by the Claimants in the VSS is to be found in Pt 1, whereas extensive passages in each of Pts 2 and 3 are relied on, together with the whole of the Appendix.

[22] The judge summarised HBHG at paras 25 to 50 of his judgment, after first describing three films which Mr Lincoln made, and referring to the introduction to the 1996 UK paperback edition (to which Mr Brown did not have access). For the purposes of this appeal I set out my own summary below. Any summary of a book such as HBHG, the main text of which runs to more than 400 pages, and which teems with ideas, is bound to be over-simplified if it is confined to a length compatible with inclusion in a judgment. I dare say that many points which I do not mention could be said to be of importance in the context of the book as a whole. I have no doubt been influenced in what I choose to refer to by the issues which were argued before the court on the appeal.

[23] The Mystery which provides the title to Pt 1 is, at least to start with, that which surrounds one Berenger Sauniere, parish priest of the small village of Rennes-le-Chateau, not far from Carcassonne in southern France, from 1885 to his death in 1917. He is said to have discovered four ancient documents hidden in a pillar in his church, two of which have been made public and which contain ciphers. He is said to have had an altogether unexplained ability to spend large amounts of money on the church and on building for his own benefit and for that of the village. He died suddenly in 1917 without disclosing his secret, which was thought to be known only to his housekeeper, and without leaving any wealth on his death. His housekeeper in turn died suddenly in 1953 without disclosing a secret which she had said she possessed. The authors recount a connection with Nicolas Poussin, and in particular with a painting by Poussin, the Shepherds of Arcadia, which is now in the Louvre. They speak of the Cathars, active in that part of France until suppressed in the thirteenth century in what was known as the Albigensian Crusade, though they contend that, in mysterious circumstances, the Cathar treasure was removed just before their final defeat and thereby escaped capture and confiscation. They then discuss the Knights Templar, and the operation ordered by Philip IV of France to arrest them in 1307. They say that this operation was not quite as comprehensive and successful as it may have seemed, and that not only did some Templars survive, but so did the treasure of the Templar Order. They then describe a number of documents which were published or otherwise became available from the 1950's onwards in France relating to Rennes-

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

le-Chateau and M. Sauniere, including the so-called Dossiers Secrets deposited in the Bibliotheque Nationale in Paris. This led them to put forward six propositions as key points which constitute a foundation for further research, and which they present as indisputable historical facts. I adapt the judge's summary of them at para 29 of his judgment, as follows:

1. There was a secret order behind the Knights Templar, which created the Templars as its military and administrative arm; it was most frequently known as the Priory of Sion.

2. The Priory of Sion has been directed by a sequence of Grand Masters, whose names are among the most illustrious in Western history and culture.

3. Although the Knights Templar were destroyed and dissolved between 1307 and 1314, the Priory of Sion remained unscathed. It acted in the shadows behind the scenes and orchestrated certain critical events in Western history.

4. The Priory of Sion exists today and is still operative. It is influential and plays a role in high level international affairs as well as in the domestic affairs of certain European countries.

5. The avowed and declared objective of the Priory of Sion is the restoration of the Merovingian dynasty and bloodline - not only to the throne of France but to the thrones of other European nations.

6. The restoration of the Merovingian dynasty is sanctioned and justifiable both legally and morally. It has survived in a direct line from Dagobert II, via Godfroi de Bouillon and other royal and noble families throughout Europe.

[24] The Secret Society, the title of Pt 2, is the Priory of Sion. The authors speak of the Priory as being behind the Knights Templar, they describe the succession of Grand Masters (about each of whom more detail is set out in the Appendix), and then turn to the suggested activity of the Priory in France over the centuries. They discuss the notorious document, the Protocols of the Elders of Sion. Among many topics covered in this part of the book, they touch on the activities of the family of the Dukes of Guise and Lorraine, those of Nicolas Fouquet and of Poussin, the latter's painting with its inscription 'Et in Arcadia Ego', and the use of the same image (though without that text and with an undeciphered set of letters) on a tomb at Shugborough Hall in Staffordshire, which is said to be part of a body of material suggesting connections between the Grand Masters of the Priory and Freemasonry throughout Europe, of which Rosslyn Chapel in Scotland is said to be another example. In the course of this part of the book they describe what might amount to attempts by the Priory of Sion to make a bid for power, in France and elsewhere, and taking different forms, between the seventeenth and nineteenth centuries. They describe the modernist movement in the Roman Catholic Church but also, later, moving on to the more recent past and the time at which they were writing, the position of traditionalists including Archbishop Marcel Lefebvre and Abbe Ducaud-Bourget, who is said to have become Grand Master of the Priory in 1963 in succession to Jean Cocteau. The authors mention M Pierre Plantard who they say appeared to be an important potential source of information about the Priory, and describe how they eventually were able to meet him on several occasions, though without becoming significantly the wiser. Then they discuss the Merovingian kings, the 'Long-Haired Monarchs'. They describe Clovis I (king from 481 to 511), his conversion to Christianity in 496 and his pact with the Roman Church, influenced by his wife, who was a Christian, and by her confessor, Saint Remy. They contend that on that occasion 'an indissoluble bond was established between church and state, each pledging allegiance to the other, each binding itself to the other in perpetuity' (p 256). On the death of Clovis his extensive kingdom was divided between his four sons. One of the four parts, Austrasie, was ruled by Sigisbert III until his death in 656. His son Dagobert II, then five years old, was kidnapped and prevented from succeeding to the throne. Later, in 674, he did take the throne of Austrasie, but was murdered in 679. The authors suggest that the Church approved the assassination of Dagobert II and thereby betrayed the pact which it had entered into with Clovis on 496. Though Merovingian kings still reigned for a time in others of the kingdoms, the authors contend that the death of Dagobert II was, for practical purposes, the end of the Merovingian kings, but they assert that he was in fact survived by a son, Sigisbert IV, still an infant at the time of his father's death, who became Count of Razes. (His mother was Giselle of Razes; Razes is an area in southern France which includes Rennes-le-Chateau.) The authors say (at p 274):

'We could thus tentatively accept, in the absence of any contradictory evidence, that the Merovingian bloodline did continue, more or less as the Prieure documents maintained. We could tentatively accept that Sigisbert did survive his father's murder, did adopt the family name of Plantard and, as Count of Razes, did perpetuate his father's lineage.'

[25] The authors then seek to trace the Merovingian bloodline down from Sigisbert IV. They suggest that the line continued to Godfroi de Bouillon, Duke of Lorraine and leader of the First Crusade. In a passage which is relied on in the proceedings, they say at p 279:

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

'For four centuries the Merovingian blood royal appears to have flowed through gnarled and numerous family trees. At last, through a process analogous to the grafting of vines in viticulture, it would seem to have borne fruit in Godfroi de Bouillon, Duke of Lorraine. And here, in the House of Lorraine, it established a new patrimony.'

They go on to comment that he would have been a rightful king, in his own eyes and those of his supporters, as a legitimate Claimant of the dynasty which was deposed with the death of Dagobert II.

[26] Focussing on the Merovingian line, the authors then describe their research further back in time, including threads leading back to the siege of Troy, or (more usefully for their purposes) to the Old Testament and the tribe of Benjamin, and to the existence of many Judaic communities in southern France, even before the fall of Jerusalem in AD 70 and before the Christian era.

[27] That then leads to the third part of the book, the Bloodline, in which the authors turn their attention to the Holy Grail, the legends associated with it and the romances in which it was first treated, particularly those of Chretien de Troyes and Wolfram von Eschenbach. In a passage relied on in the proceedings, the authors say this at p 320:

'In many of the earlier manuscripts, the Grail is called the 'Sangraal'; and even in the later version by Malory it is called the 'Sangreal'. It is likely that some such form - 'Sangraal' or 'Sangreal' - was in fact the original one. It is also likely that one word was subsequently broken in the wrong place. In other words 'Sangraal' or Sangreal' may not have been intended to divide into 'San Graal' or 'San Greal' - but into 'Sang Raal' or 'Sang Real'. Or, to employ the modern spelling, Sang Royal. Royal blood.'

[28] The authors proceed from there, with the comment that 'quite clearly, the Grail would appear to pertain in some way to blood and a bloodline', to postulate a connection between the Grail and the Merovingian dynasty. By applying a technique of synthesis to materials which, separately, would be regarded as the province of different disciplines, the authors approach a hypothesis first indicated at p 329, namely that Mary Magdalene was married to Jesus Christ, that they had offspring, that after the Crucifixion Mary Magdalene and at least one child went to southern France (Gaul), finding refuge in an existing Judaic community, and that, by this means, the bloodline of Jesus was preserved and perpetuated for some four hundred years, and eventually in the fifth century it became allied with the royal line of the Franks, engendering the Merovingian dynasty.

[29] They then turn to the Gospels, and to the historical context of the New Testament and the early Christian Church, in search of material with which to test their hypothesis. They draw from the Gospel of St Matthew (Ch 1) the proposition that Jesus was an aristocrat, if not a rightful and legitimate king, descended from David via Solomon (p 332). They then discuss the history of the Gospels, and the suppression of parts of the four Gospels, as also of other gospels, as well as describing the circumstances in Palestine at the time of Christ. They take up the question of Jesus' marital status, advancing the thesis that it would have been highly abnormal for Jesus not to be married, as an adult Jew, and particularly as a teacher (Rabbi), so that, if he had not been married, it would almost certainly have been the subject of comment in one or more of the Gospels, instead of which they are silent on the point. They then consider who his wife might be, and deal first with Mary Magdalene, and next with Mary of Bethany, concluding that it is likely that these two were the same person, and the same as the person who anointed Jesus with ointment, and that she is the only candidate for having been Jesus' wife. They then discuss Lazarus, brother of Mary of Bethany, and conclude, in passage which has no equivalent in DVC, that he was the 'beloved disciple' and the author of the Fourth Gospel. Reverting to material which is also relevant to DVC, they hypothesise that Mary Magdalene was of the tribe of Benjamin, so that the marriage of Jesus, of the tribe of Judah and the royal house of David, could be seen as an important dynastic and intertribal alliance, with a real claim to be 'King of the Jews'. Turning to the Crucifixion and related events, they suggest that 'Jesus Barabbas' (see Matthew, Ch 27, verse 16) may have been Jesus' son, and that Jesus may have had other children. They raise a number of questions about the Crucifixion, including whether Jesus survived it (a point not taken up in DVC), and find reinforcement in this ('it seemed increasingly clear', p 377) for their theory that Jesus was a priest-king, an aristocrat and legitimate Claimant to the throne, and that, whether or not he survived and, if he did, whatever became of him, his wife and at least one child of theirs escaped from Palestine to southern France, bringing the Sangraal, the 'blood royal', into France.

[30] Turning their attention to the development of the early Church, they suggest that the priority of those concerned with preserving and enhancing the role of the followers of Christ was to emphasise the message and the authority of him from whom it was derived, and that anything to do with the real family of Jesus was irrelevant and potentially embarrassing, so that it needed to be suppressed. This brought the authors to discuss the role of Constantine in relation to the early Church. According to church tradition, Constantine was converted to Christianity after a vision on the eve of the battle of the Milvian Bridge, adopting the Chi-Rho sign as his banner, which gave him victory over Maxentius in

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

312, and Christianity then became the official religion of the Roman Empire. The authors suggest that this is all a myth created by later church writers, that Constantine was only baptised on his deathbed, in 337, and that he acted throughout his life as the chief priest of the state religion of the empire which was pagan sun worship. They recognise, however, that he did convene the Council of Nicaea in 325, which settled the date of Easter, defined the authority of bishops, and decided in favour of the doctrine that Jesus was not a mortal prophet but was divine, and they make the point that, to that extent, and later in other ways, Constantine supported what became Christian orthodoxy, including the commissioning and financing of new copies of the Bible, which enabled those who were entrusted with responsibility for that task to settle the contents of the Bible in a way which, in practice, became definitive, and which conformed with their approach. The authors then discuss some of the suppressed apocryphal gospel texts, in which they find support for their hypothesis that Jesus was married to Mary Magdalene. Taking forward their discussion of the heterogeneity of the views of the followers of Jesus in the earliest period, the authors move to discuss the question of orthodoxy and heresy, mentioning Manichaeanism and the Arian heresy, and suggesting that Arianism, despite having been condemned at the Council of Nicaea, was very widely followed in the fifth century, at the time when the Merovingians emerged to power, and was particularly prevalent in southern France, under Visigothic rule. Given the Arian belief that Jesus was mortal, not divine, the authors suggest that Jesus' family would not have been persecuted and, indeed, would probably have been highly esteemed, and might well have intermarried with Visigoth nobility before its subsequent intermarriage with the Franks to produce the Merovingians (pp 408-9).

[31] Then the authors describe how they sought confirmation for their theory in relation to the Merovingian dynasty, and find some support in what they suggest are indications, of various different kinds, of connections with Jewish traditions. They also describe events in relation to a principality of Septimania, in southern France, including Narbonne and the area around Rennes-le-Chateau. In the mid eighth century this is said to have become a kingdom ruled by Guillem de Gellone, as a Jewish state only nominally owing allegiance to the Carolingian ruler, Pepin, and resulting from a deal between Pepin and the Jewish population of Narbonne, whereby a lengthy siege of that city was resolved by the Jewish population turning on the Islamic defenders of the city and opening the gates to the besieging Franks, followed by a coronation of Pepin which acknowledged his claim to a legitimate Biblical succession. They assert that Guillem was unquestionably Jewish, that he was not only a warrior but a scholar, establishing both an academy at Gellone, which became a centre of Judaic studies, and concurrently one of the first seats in Europe for the cult of the Magdalene, but that he was also a Merovingian. From Guillem, the authors then trace the bloodline on to Godfroi de Bouillon.

[32] In the final chapter of HBHG, Conclusion and Portents for the Future, the authors recapitulate their theory about the bloodline of Jesus surviving and becoming intermingled with that of the Merovingians. They advance the suggestion that the Temple may have contained documents which included official records pertaining to Israel's royal line, including some relevant to Jesus' own position, and that although any gold and other obvious treasure in the Temple would have been seized on the sack of Jerusalem in AD 70, items such as documents, including items relating to the rightful king of Israel, the acknowledged Messiah and the royal family, may have been successfully hidden from the conquerors, possibly even beneath the Temple. They proceed to suggest that the Knights Templar did carry out substantial searches under the Temple, in the so-called Stables of Solomon, and that they found what they were looking for and brought it back to Europe. They recognise that what became of it after that is a mystery, but suggest that it might have been hidden at or near Rennes-le-Chateau, and may have become part of the Cathar treasure. The Frankish kingdom of Jerusalem, established after the First Crusade, might have provided an opportunity for the re-establishment of the Merovingian line, and with it the line of Jesus himself, but circumstances did not allow that, because the kingdom was never sufficiently secure. The authors refer to a number of later attempts, which they had described earlier, on the part of the Merovingian line to regain its heritage within Europe. They also identify the Priory of Sion as a society, originally secret and now not quite secret though still secretive, founded by Godfroi de Bouillon and inextricably linked with the Merovingian dynasty. Earlier in the book they had described its structure, with a Grand Master or Nautonnier (helmsman) and below him (or her) a pyramidal hierarchy. They gave the names of the successive Grand Masters from 1188 onwards as far as Jean Cocteau, including Botticelli, Leonardo da Vinci, Robert Boyle, Isaac Newton, Victor Hugo and Claude Debussy, as well as many less famous names. In the book, and in particular in the Appendix, they discuss what is known about these people and the connections between them.

DVC - A SUMMARY

[33] The judge presented an analysis of DVC at paras 81 to 94 of his judgment. I will summarise it more briefly, not least because if the Claimants can prove that it contains material which has been copied from HBHG, it matters not whether that is significant or substantial in the context of DVC. However, on the question of copying, the judge's find-

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

ings as to the process of writing DVC are important, and it is necessary to bear in mind both the completed work and the Synopsis, written at an early stage.

[34] DVC is a thriller set at the beginning of the 21st century. It is set against a context of what is presented as fact: the existence of the Priory of Sion, founded in 1099 and still active although secret, together with the Roman Catholic organisation Opus Dei and various buildings and works of art, notably Leonardo da Vinci's Mona Lisa and his Last Supper wall painting in Milan, as well as the Temple Church and other buildings in England and Scotland. The tension in the thriller is enhanced by the apparent opposition of Opus Dei and the Priory of Sion, and it comes to take the form of a quest for the Holy Grail, though of a rather different kind from those described by writers such as Wolfram von Eschenbach. At the start of the book, a curator at the Louvre, Jacques Sauniere, is murdered in the museum. It turns out that he is Grand Master of the Priory of Sion, and that the three next most senior members have also been murdered the same day. They alone are supposed to have possessed the secret of the whereabouts of the Holy Grail. An American academic, Robert Langdon, and a French police cryptographer, Sophie Neveu (granddaughter of M Sauniere) meet at the scene of the murder and discover messages left by him. This leads them to pursue the secret together, and having to evade both the French police and the murderer of M Sauniere. Robert Langdon has been writing a book about the Priory of Sion. When Sophie Neveu tells him things about M Sauniere which make him suspect that Sauniere was a member of the Priory of Sion, he starts to tell her about the Priory (including the involvement of Leonardo da Vinci) from its foun-dation by Godfroi de Bouillon in 1099, the creation of the Templar order, the discovery of something of great impor-tance at Jerusalem, leading to the power and wealth of the Templars, and to the coup of 1307. He also starts to explain about the Holy Grail. Later they visit Sir Leigh Teabing, at a property near Versailles, who tells Sophie Neveu more about the Holy Grail, particularly with reference to Leonardo da Vinci. He touches on the role of Constantine and the contrast between the latter's supposed position and what he actually did, including the Council of Nicaea and the sup-pression of heterodox texts. This leads to the proposition that the Holy Grail is not a thing but a person, and specifically Mary Magdalene (said to be depicted in the Last Supper wall painting), and that she was married to Jesus Christ and the mother of his child. He also mentions the lineage of Jesus Christ, via David, and that of Mary Magdalene, of the tribe of Benjamin, and the reading of Sangraal or Sangreal, correctly, as Sang Real. Teabing shows Sophie Neveu books on the subject, including HBHG which he says is 'perhaps the best known tome', and speaks of the Church's suppression of the idea of the bloodline of Jesus, and of any other reminder of the mortal, rather than divine, nature of Christ. Teabing takes the story on to Mary Magdalene's flight to France, the birth of her daughter Sarah, and the continuity of the blood-line in France:

'Nonetheless, Christ's line grew quietly under cover in France until making a bold move in the fifth century, when it intermarried with French royal blood and created a lineage known as the Merovingian bloodline' (p 345)

[35] He explained that the Merovingian bloodline survived via Sigisbert and continued to Godfroi de Bouillon and thence to modern times, to two families named Plantard and Saint-Clair (Sinclair in Scotland). An important element in DVC is codes and ciphers in which not only is Sophie Neveu professionally adept, but she was educated in them by Sauniere who brought her up. She and Robert Langdon obtain an object described as a cryptex, said to be based on drawings and designs by Leonardo da Vinci, which contains a clue to the search, only accessible if its own lock is deci-phered.

[36] There is much in DVC which has nothing in common in HBHG, including the whole part based on Leonardo da Vinci (who features in HBHG only as one in the line of Grand Masters). Correspondingly there is a great deal in HBHG which has no equivalent in DVC, including the whole Rennes-le-Chateau aspect (other than the name Sauniere), the Arians, Manichaeans and Cathars, and the political aspects of the supposed activities of the Priory of Sion in the seventeenth to nineteenth centuries. Nevertheless, there is a lot of common ground between the two books in what Langdon and Teabing tell Sophie Neveu, forming what were referred to as the Langdon/Teabing lectures, in chs 37, 38, 55, 56, 58 and 59.

HOW MR BROWN WROTE DVC

[37] In January 2001 Mr Brown wrote a synopsis for his literary agent, by which his idea could be presented to publishers. This superseded several shorter documents which have not survived, one called DVC and another called the Botticelli Code. According to Mr Brown's evidence, research for DVC had begun, on the part of himself and his wife Blythe Brown, in 2000. She created some documents during 2000 which have survived.

[38] Mr Brown started writing DVC in May 2001. On 15 March 2002 he sent to his editor (Mr Kaufman) the first 190 pages of DVC. These did not include Teabing as a character, nor any of the material which is said to have been

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

derived from HBHG. This material was edited down by Mr Kaufman. Mr Brown submitted the final text of DVC in August 2002. By then the material said to have been copied was in the text.

MR BROWN'S SYNOPSIS

[39] A good deal of attention was devoted to the Synopsis, in the light of the Defendant's contention that everything of importance in DVC itself is already in the Synopsis, and that the latter was written without using HBHG at all. As regards the last point, while the judge accepted that Mr Brown did not himself use HBHG at that stage, he rejected Mr Brown's evidence that HBHG was not available to himself and his wife until later. In this respect the most important factor was one of several documents produced by Mrs Brown, this one being called Jesus Survived. The second part of this, headed Jesus the Man, is largely drawn from HBHG. The judge held, at para 325, that this was created by Mrs Brown in 2000 before the Synopsis was written, and using HBHG.

[40] Mrs Brown did not give evidence at the trial. It seemed to the judge clear that there was relevant evidence that she could have given. She was not said to be unavailable. Mr Brown explained in a witness statement that she was not called for two reasons: first that they were very close and he believed that he could answer any question about her assistance to him in the research, and secondly that he thought the claim was spurious, and he did not want his wife troubled by it, exposed to the glare of public attention and the stress of direct involvement in the court proceedings. The judge found that, if Mr Brown did think he could answer all the questions that Mrs Brown could have, he was wrong. He did not regard the reasons for her not being called as satisfactory, and went so far as to say, at the end of para 214, that the reasons put forward were not credible. In para 215 he said this:

'Accordingly I conclude that her absence is explicable only on the basis that she would not support Mr Brown's assertion as to the use made of HBHG and when that use occurred in that evidence.'

[41] Mr Brown had not been cross-examined as to the genuineness of the reasons he gave for her not being called. In those circumstances it seems to me that it was not open to the judge not to accept those reasons as accurate. He could say that the position was not satisfactory, and he could draw inferences from her absence on points which Mr Brown was not able to deal with himself, but it was not right, in effect, to hold that Mr Brown was not telling the truth when he explained why he did not give evidence, and to hold that the reason was that it was known that she would have given unhelpful evidence. In fact, the inferences which the judge actually drew as to her use of HBHG were open to him without his having held that Mr Brown's evidence as to why she was not called was dishonest, which is what para 215 amounts to.

[42] So the judge accepted that HBHG was available to the Browns at an earlier time than Mr Brown had said, and that use was made of it by Mrs Brown in 2000, before the Synopsis came to be created. It did not follow that Mr Brown used it even indirectly in writing the Synopsis. That could be tested, to some extent, by considering whether the sources acknowledged by Mr Brown could account for all the relevant content of the Synopsis. That task overlaps with the assessment of the Defendants' contention that all the material points were in the Synopsis. At para 130, in a passage summarising the contentions for the Defendant, the judge said this:

'Second Mr Brown contends that he wrote the Synopsis for DVC before either he or his wife ever looked at HBHG. Yet it is accepted that the Synopsis contains most of the ideas complained of as having been taken from HBHG.'

[43] It is not clear whether the second sentence is a statement by the judge of his understanding of the position between the parties, or a summary of the contention for the Defendant. In context it ought to be the latter, the more so because Mr Rayner James said that this proposition was not accepted for the Claimants. Paragraph 96 of the Claimants' written closing submissions to the judge bears this out. A full examination of the relevant parts of the judgment seems to me to confirm that the judge did not treat this as common ground.

[44] The judge dealt with the sources for the Synopsis later in his judgment. He described Mr Brown's, and the Defendant's, best point as being that the Synopsis has, at the end, a partial bibliography, included in order to impress on the publishers the fact of Mr Brown's diligent preparation and research, and that this list of books does not include HBHG (judgment paras 204-5).

[45] The judge then considered the content of the Synopsis, and found that much of what is relevant in the Synopsis to this dispute could have been derived from the works which are listed in the bibliography, and one of the points, as treated in the Synopsis, could not have come from HBHG (the name of Jesus' daughter as being Sarah, which is not in HBHG but is in the Woman with the Alabaster Jar: Mary Magdalene and the Holy Grail, by Margaret Starbird) (judgment para 206).

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[46] Then the judge considered the evidence on a point which is in the Synopsis (at p 48): 'the line of Rose extends from vine to sea', which is said there to be a cryptic reference to the Merovingian line: 'mer' being the French for sea and 'vigne' for vine. Mr Brown said in para 123 of his witness statement that the source for this was The Woman with the Alabaster Jar, but he was mistaken in this, because that book puts forward a different derivation, namely that mer and vine refer to Mary and Vine, not to sea and vine. HBHG, on the other hand, comments (at p 246 in the UK paperback edition) that the name of Merovee, the legendary ruler from whom the Merovingians derived their name, 'echoes the French word for 'mother', as well as both the French and Latin words for 'sea''. The cross-examination of Mr Brown on this point was clearly effective in undermining his credibility (judgment paras 207 to 212). It was at that point that the judge paused to consider the relevance of Mrs Brown's failure to give evidence. I have already commented on what he said in that respect. Having drawn the inference, which in my view was not open to him, that she was not called because her evidence would not have supported that of Mr Brown as to the non-availability of HBHG at the early stage (see judgment para 215, quoted above at para 40), he nevertheless accepted Mr Brown's evidence and the Defendant's case on this aspect:

'216 With that in mind however I accept Mr Brown's evidence that he did not use HBHG when he wrote the Synopsis. The single point identified in this extract of cross examination referred to above is equally explicable on the basis of Mr Brown being caught out in paragraph 123 in being overly casual. I do not accept that this single point is sufficient to reject his evidence on this point. It is quite possible that the annotation occurred after the Synopsis was written when Sophie was linked to Sauniere.

217 He is supported in my view by an examination of the theme of the Synopsis. It seems to me that the theme of the Synopsis is clearly derived from [The Woman with the Alabaster Jar, The Templar Revelation, The Hiram Key, and The Goddess in the Gospels]. It concentrates on the artistic elements of Leonardo da Vinci and the Sacred Feminine Line. I accept that this was down to Blythe Brown's beliefs in this area and I can see and determine in my view that those were the sources for the Synopsis.'

[47] Later in his judgment, he held that Mr Brown did not use the 'Jesus Survived' document when he wrote the Synopsis (para 327). That is therefore a finding of fact to the effect that, even though HBHG was, indirectly, available to Mr Brown when he wrote the Synopsis, because it was available to Mrs Brown and she used it at that stage to prepare this one research document, nevertheless, Mr Brown did not use HBHG at that stage, because he did not use, and may not even have been aware of, the document which she had prepared.

[48] At para 294 of the judgment the judge observed that:

'The Synopsis does not, in reality, have what is in effect the Claimants' case of the Langdon and Teabing lectures. As I have set out above those lectures are where the Central Themes are found.'

Later, at para 306, he said:

'I conclude that, in the main, the majority of the Central Themes were drawn from HBHG in a language sense but it was not the sole source of Blythe Brown's efforts. She had the other books and they were used for the Synopsis. However, it seems to me clear that when it came to providing the Langdon and Teabing lectures a different pattern emerges. The Teacher, so called in the Synopsis, had no name. When it came to write the rest of the book at a later stage he was given the name Leigh Teabing, which is drawn from HBHG. It is logical, in my view, that having drawn the name from the authors of HBHG, Mr and Mrs Brown would do that at the time when they were writing the lecture parts of the second part of DVC. That is when they introduce HBHG into the list of books and it is in my view when the detail of the language of the Themes is created. I have already observed that in my view Blythe Brown had done significant research using HBHG from some time in 2000. I do not believe Mr Brown used it, as I have said, for the Synopsis, but it was deployed at this later stage when these lectures were written. As the bulk of the material set out in the themes is to be found in HBHG, I can not believe that Blythe Brown would have adopted a scatter gun approach to find these various themes in a series of other books. She used the other books to expand slightly the material which came from HBHG.'

In turn at para 308 he said this:

'I therefore conclude that the historical parts in the Synopsis were written using [The Templar Revelation, The Woman with the Alabaster Jar and The Goddess in the Gospels] mainly and not using HBHG. When the later material was deployed, however, I find that it was done using HBHG possibly supplemented by already accrued material from, mainly, [the Woman with the Alabaster Jar].'

[49] Thus he did not treat his finding that HBHG was not used as a source at the stage of the Synopsis as conclusive in favour of the Defendant. Mr Rayner James relied on that, and also on a passage in para 221 of the judgment, which is part of the basis for what the judge said at para 306, quoted above:

'My view, as set out above, is that HBHG did not feature at that stage [ie the Synopsis] but I am firmly of the view that HBHG was the essential tool for the Langdon/Teabing Lectures which were written at a later stage. That stage is of course much later, but not as late as Mr Brown suggests in his evidence. The first 190 pages of the book were delivered in March 2002 and it is accepted that there is no use of HBHG in that part. It does not of course follow that whilst Mr Brown up until that stage, might not have used any HBHG material, that Blythe Brown was not already extensively researching the remainder of the book for subsequent use by him. This is, in my view, what happened.'

In addition, Mr Rayner James relied on para 273 of the judgment, of which the relevant part is as follows:

'As I have said my firm view is that the Langdon and Teabing lectures were written at stage 2 of writing DVC. When Mr Brown wrote stage 2 which in my view is when the character of Teabing was created the US copy of HBHG possessed by Mr Brown and Blythe Brown was used as the primary vehicle for those lectures almost exclusively. I accept that they had recourse to the other material but I do not believe that other material was used significantly for that part of DVC. When I say 'used' it is my firm view that HBHG was used by Blythe Brown to provide the material. I am unsure as to whether or not Mr Brown knew that, but it does not matter as he incorporated it whether he knew its source or not. I make no finding in that regard.'

The judge referred to the same point in the last sentence of para 346 'The major part of the writings of the lectures at a later stage have substantially come from HBHG.'

THE USE MADE OF HBHG IN WRITING DVC: THE JUDGE'S FINDINGS

[50] So the Synopsis is not a short cut but a red herring. The question at issue had to be decided, as the judge said, by an examination of HBHG and a comparison between that book and DVC, as a finished work. Mr Rayner James submitted that what the judge said at paras 221, 273 and 306 showed that he did find that HBHG was the principal source for part of DVC, and that this amounted to a finding of copying. Mr Baldwin submitted that when the judgment is read properly, this can be seen not to be the judge's conclusion at all. Mr Baldwin also criticised the judge's findings in those passages as to the extent to which Mr Brown had used HBHG when writing the Langdon/Teabing lectures, and this was one of a number of points raised in the Respondent's Notice. In view of the conclusion which I have come to on the appeal, I do not need to consider whether that criticism is justified.

[51] The judge's reasons for his decision appear in ss I and J of the judgment, headed 'The Central Themes and Analysis' and 'Conclusion on Central Themes', paras 224 to 271. He held that the Central Theme was not to be found 'expressed as such' in HBHG (para 256) and that even if it were there it is no more than 'an expression of a number of facts and ideas at a very general level' and accordingly not capable of copyright protection (para 259), and alternatively that it did not amount to a substantial part of HBHG (para 266).

[52] After that, and in case a different view were taken, he turned to a consideration of the Central Theme 'in the context of language similarities and the source of such similarities': para 274. It is in this part of the judgment that he compared the two books by reference to the Central Theme elements, and concluded (as I have already mentioned) that only 11 out of the 15 elements are common to both books to any extent. At para 295 he said:

'I go on to consider whether he copied from HBHG. I bear in mind that the Claimants do not rely upon textual copying as a basis for primary liability.'

[53] The part of the judgment which follows (s L) includes paras 306 and 308 from which I have already quoted (at para 48 above). The conclusion of s L is in para 309, as follows:

'I therefore accept the Claimants' first point to show that there are grounds that Mr Brown copied language from HBHG. I do not accept they are evidence of copyright infringement by substantial copying of HBHG whether textual or non textual as they are as I have said too general and too low level of abstraction.'

(In this last sentence, as elsewhere, the judge must mean too high a level, rather than too low a level, of abstraction.)

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[54] The reference to the Claimants' first point in that passage is to the contention that copying is proved by the fact that the (or some of the) Central Theme points appear in both books. In para 333 later in the judgment (quoted at para 59 below) he puts it rather lower, by saying that 'aspects of the Central Themes can be traced through' into DVC.

[55] The next section of the judgment, s M, is headed Language Copying. This dealt with nine examples of textual copying which the Claimants relied on, not as constituting copyright infringement in themselves, because they were not of a substantial part of HBHG, but to show that there had been copying of HBHG. The judge found this point to be made out on the evidence. At para 316 he said:

'I regard the suggestion that Mr Brown and Blythe Brown created the Langdon/Teabing lectures from the other sources as completely unsustainable. It flies in the face of logic and the documents as carefully demonstrated by the Claimants in the annex of language similarities set out in their closing submissions. The conclusion is irresistible. Blythe Brown provided the material for the lectures with HBHG in her hands.'

He then went on to explain why this finding was of no real significance, at paras 318 and 319:

'318 None of this actually matters very much in the overall scheme. First, Mr Brown has always acknowledged that he used HBHG at some stage. Second, the use of HBHG for copying of these generalised parts of the text is not of itself actionable. They have no independent cause of action. They fall with the primary decision that I have made above.

319 The Claimants were right not to rely upon these as evidence of textual infringement because an examination of them shows they are extremely generalised. Many of them are in effect the only way in which they can be expressed.'

[56] The Claimants' third point in support of the allegation of copying was the numerous references to HBHG in DVC and the research materials used for it, including in particular the research documents prepared by Mrs Brown. In addition to 'Jesus Survived', to which I have already referred, which she prepared in 2000, two others were of importance, called 'Langdon Reveals' and 'Constantine'. The first of these was drawn in part from HBHG (which is acknowledged in the text) and the second is almost entirely drawn from HBHG. The judge dealt with this in s N of the judgment. He said, at paras 328 and 329, that it was the Claimants' case that these latter two documents were prepared after the date of the Synopsis. Mr Rayner James submitted that a fairer way of describing the Claimants' case would have been that the Claimants did not contend that they were prepared before the Synopsis, but nothing turns on that for the purposes of this appeal. The judge did accept that all three documents showed Mrs Brown as having copied text from HBHG when preparing research material for Mr Brown to write the second part of DVC (para 330).

[57] He did not deal with a fourth element of the Claimants' arguments for showing copying, referred to as 'two supporting arguments' (see para 299). These were two points identified in the Claimants' Further Information served in response to a request for clarification of the Claimant's opening skeleton argument. At para 61 of that skeleton argument Mr Rayner James had asserted that the Central Theme is presented in DVC in the same form and in the same order and 'in some cases with the same supporting arguments' as in HBHG. The Further Information identified the 'some cases' as being elements 1 and 2. The arguments were said to be:

i) as regards point 1, that Jesus had a legitimate claim to the throne of Palestine because his wife Mary was of the Tribe of Benjamin and he was of Davidic descent;

ii) as regards point 2, to support the theory that Jesus was married, it was argued that he was a Jew, it was an obligation for a Jewish father to find a wife for his son and if he were not married at least one of the Gospel accounts would have mentioned it.

[58] I do not find it surprising that the judge did not deal with these points, even though he said at para 299 that he would do so. They are very minor points, only relevant as 'fingerprints' to show the fact of copying, which the judge found established by, among other things, the nine instances of language copying. The Claimants' written closing submissions did not deal with them, though they may have been covered in oral submissions. The Defendant's written closing submissions pointed out that the first of the two does not accurately summarise the argument presented in HBHG, and that the argument used in DVC is more akin to that in The Woman with the Alabaster Jar. The second argument is selective as to the arguments used in HBHG, not mentioning points that were used in HBHG but not in DVC. Moreover both arguments are said to have been capable of being derived from well-known sources pre-dating HBHG, so that they could not properly be regarded as proving that these Central Theme elements were derived from HBHG rather than from one or more of the many other available sources.

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[59] Having reviewed the first three of the points relied on by the Claimants for showing that Mr Brown had copied from HBHG, the judge rejected the argument that such copying as had been established could amount to an infringement of copyright on Mr Brown's part by copying the Central Theme. His conclusion on this part of the case can be seen in paras 333 to 337:

'333 As I have said above there are no Central Themes in HBHG. Mr Brown cannot have copied the Central Themes in any event. It is true that aspects of the Central Themes can be traced through the textual parts identified by the Claimants. That is because the Central Themes are too general and nothing significant is to be concluded from that identification. If it was the Claimants would have elevated the textual citings of the Central Themes to evidence of textual infringement. However they have studiously avoided doing that.

334 All of this material therefore shows simply that as part of a mechanistic exercise Blythe Brown used HBHG in providing generalised and low level abstract material primarily from HBHG but also from other sources as background material for Mr Brown when he wrote DVC.

335 It follows therefore that there has been no copying of the Central Themes and the Claimants' case is not made out based on this material. If there is no copying of the Central Themes there is no copying of the Central Themes when they are to be found in HBHG.

336 Equally there can be no substantial copying of the Central Themes for the same reason and thus no substantial copying of HBHG.

337 None of this material even though established by the Claimants, assist them in their case because they do not lead to a direct allegation of textual infringement.'

[60] It seems to me that, in this treatment of the arguments put before him, the judge found as a fact that Mr Brown had copied some material from HBHG in writing DVC. On the face of it, therefore, he answered the question which he had posed at para 295 by saying that there had been copying. However he also held that the material copied did not amount to a substantial part of HBHG and was on the ideas side of the dividing line between ideas and expression, because it was at too high a level of abstraction. He also found that the Central Theme was not a part of HBHG at all. That is a rather different point which arises only in a non-textual infringement case of this kind.

[61] The judge's findings as to copying, so far as they go, are helpful to the Claimants, but they were of no avail to them because of his findings, first, that the Central Theme was not present in HBHG and, secondly, that to the extent that it was there, and was copied, it was too general to be eligible for copyright protection, either at all or as a substantial part of the copyright work, HBHG. The Claimants argue that in reaching that conclusion he applied the wrong legal test by asking whether the Central Theme itself qualified for protection as a copyright work. If they were right as to that, the issue would need to be reconsidered. But subject to that, the passages to which I have referred, and in part quoted, involve findings of fact as to the relationship between the Central Theme and HBHG as a whole which are not challenged in the Appellant's Notice.

DID THE JUDGE ADOPT AN INCORRECT LEGAL TEST?

[62] I must therefore deal with the submission that the judge misdirected himself as a matter of law. This is at the heart of the points taken in the Appellant's Notice. At para 226 of the judgment he said this:

'It is essential therefore, for the Claimants to show that the Central Theme is expressed in HBHG, that expression of Central Theme is capable of protection as a literary work under CPDA 88 and that Mr Brown has not only copied it but has substantially copied it.'

He appeared to make a similar point to the second of those propositions earlier in his judgment at para 128, in these words:

'As it [ie the claim] is not based on textual copying it is necessary to identify precisely what it [ie, presumably, the Central Theme] is as a first step before it can actually be considered whether it is actually capable of subsisting as a literary work which can be infringed by it copying.'

In turn, at para 245 he said this:

'It follows therefore that if overall the Central Theme cannot amount to any literary work because it is too general or too low a level of abstraction or because it is a collection of facts and ideas without any architecture or structure then the same must be said of HBHG which is allegedly copied.'

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[63] Mr Rayner James submitted that these three passages show that the judge proceeded on the basis, which is wrong in law, that in order to prove a case of infringement of copyright in a literary work based on the taking of a substantial part of the copyright work, the part taken must itself be capable of copyright protection as a literary work. Mr Baldwin did not suggest that, if that was the judge's approach, it was not wrong in law. It is, at first sight, a misdirection. It was one of the factors which led me to grant permission to appeal in a case which, as presented to the judge, was said not to involve any issue of law.

[64] Mr Baldwin submitted that in these three passages the judge was expressing himself in shorthand, as it were. In particular he suggested that the text in para 128 should be read as if it had said 'whether it is actually capable of subsisting as a literary work or is a substantial part of a literary work which can be infringed by copying'.

[65] Similar expansion of the text could show that none of these passages really involves a misdirection. He argued that, even if the judge's language in these passages appears to show an error of law, the way in which the judge actually dealt with the relevant material was not influenced by any error of law that may, at first sight, be found in these passages. In particular, he argued, other passages showed that one of the judge's main reasons for rejecting the claim was that such material as was said to have been the subject of infringing copying was too general to be the subject of copyright protection: see in particular para 259:

'Even if there is a Central Theme as alleged by the Claimants in HBHG its expression in the Central Theme it is merely an expression of a number of facts and ideas at a very general level. There is nothing in them in my view that goes beyond that proposition. It follows therefore that the Central Theme as expressed is not such as to justify being protected against copying.'

[66] On that basis, the judge's references to the Central Theme being capable of protection as a literary work should, he submitted, be understood as referring not to the question whether the Central Theme was a self-sufficient literary work, but to whether the material comprised in it was on the right side of the line between ideas and their expression to be protectable at all. In any event, he said, the judge's actual decision was on that basis (in the alternative to his primary finding that the Central Theme was not there in HBHG at all).

THE JUDGE'S TREATMENT OF THE ISSUE OF SUBSTANTIALITY

[67] The Appellant's Notice also challenges the judge's treatment of the question of substantiality, contending that the judge did not address in any proper way the question whether what had been copied was a substantial part of HBHG. As Mr Baldwin pointed out, this presupposes that the judge found that anything had been copied. He submitted that the judge made no such finding, and that, in the absence of a challenge by the Appellants to the judge's finding of no copying, the appeal could not get off the ground. That illustrates the differences between the parties resulting from the terms in which the judge expressed himself.

[68] In any event, it must be right to examine not only the way in which the judge set out the questions that the court had to deal with, but also how he answered them.

[69] The claim was formulated on the basis that HBHG expressed a central theme, as set out in the Annex to the Amended Particulars of Claim, consisting of 15 elements. As the judge said at para 253:

'To suggest HBHG has very little in it apart from this Central Theme does a great disservice to the Claimants and I do not believe for one minute they genuinely believe it.'

[70] This is a reference to a submission made by Mr Rayner James at trial, not to any part of the Claimants' pleaded case, to the effect that 'HBHG expresses its Central Theme and without it there is very little to be found in the book' (see para 225). Mr Baldwin showed us passages from Mr Rayner James' written opening submissions and his oral opening at the trial which were the basis for the judge's understanding of the nature of the Claimants' case on this point, namely that the Central Theme was the essence of HBHG. In the written submissions it was said, for example, at para 65 that 'Without the Central Theme there is very little left to HBHG.' Correspondingly, in his opening at the trial, in a passage in which he led up to a citation of para 24 of Lord Hoffmann's speech in Designers' Guild, Mr Rayner James said (Day 1, p 74):

'What is happening is that, by reading and understanding the whole text, we say the central theme is what the reader has understood and what the plot effectively for the reader of the book is. So expressing that understanding, which is necessary for forensic purposes, is necessarily a process of abstraction.'

Shortly afterwards, at pp 75-6 of the transcript, he said this:

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

'In order for an exercise such as the central theme to be of any help it has to be at a sensible level of abstraction which does justice to the complexity of the full text but which, nevertheless, serves as a synopsis or summary. We say that is what the Claimants have sought to do in putting forward the central theme as a collection of 15 points.'

[71] The judge's finding that the Central Theme cannot be seen as a precis or summary of the essence of HBHG is not itself challenged, and it is plainly right. A question could arise as to the relationship which a formulated 'theme' must bear to the literary work as a whole, to be relevant to a claim for breach of copyright by non-textual copying, as envisaged by Lord Hoffmann in Designers' Guild, as quoted above. Understandably the judge did not attempt to answer that question in general terms or at all, but dealt with the proposition on the facts.

[72] As a matter of fact, he found that, although eleven relevant elements were in HBHG (only eleven because three others, though in HBHG, were not in DVC), nevertheless the Central Theme itself was not in HBHG. At para 227 he said that it was:

'not enough to point to ideas or facts that exist in the Central Themes that are to be found in HBHG and DVC. It must be shown that the architecture or structure is substantially copied.'

The only thing that the Claimants relied on as regards architecture or structure was the presentation of the 15 Central Theme elements in a natural chronological order. Ultimately, the Claimants relied on the Central Theme as a piece of text with no particular structure. The judge noted that the Claimants divided the Central Theme up into 15 component parts, thereby inviting attack on the parts on an individual basis. It seems to me that there is some force in Mr Rayner James' point that this is a somewhat unfair comment on the judge's part. The Claimants' contention was that HBHG expressed a single central theme. For practical forensic purposes it had to be divided up into separate elements; not to do so would have made the forensic process quite unmanageable. Despite this, the case was that there was a central theme, not fifteen points which put together made up a central theme. Of course, the judge found that one part of the Central Theme was not in HBHG, so that this was irrelevant to the case. The question was whether what remained relevant was a central theme in HBHG. The three elements of the Central Theme which were in HBHG but not in DVC could in theory be relevant to whether the Central Theme qualified as a theme of HBHG at all, and therefore as a substantial part of it, though if it did the question would then become whether copying part of the Central Theme was an infringement, as being of a substantial part (eleven out of fourteen elements) of a substantial part (the Central Theme) of HBHG.

[73] The judge's approach to the Claimants' case as regards the Central Theme can be seen at a number of points in the judgment. At para 128, shortly before the passage quoted at para 62 above he said:

'It is the Central Theme that is alleged to have been copied. The Central Theme therefore must be found in HBHG and it must be that that must be copied and found in DVC. Indeed that is the purpose of the VSS. This necessarily in my view involves a careful analysis of the Central Theme to see what the Central Theme actually comprises and consequently once it is correctly analysed whether it is of such substance that it can be protected by the action when it is established that the Defendants have copied it.'

[74] The Defendant took issue directly with the proposition that the Central Theme was to be found in HBHG. Quite apart from the fact that not all elements of it were common to both books, Mr Baldwin said, as recorded by the judge at para 131:

'Further it is contended that the Central Theme does not represent a theme which is presented by HBHG as it is neither central nor any theme of HBHG. In this context it is contended that the 15 points are not presented in HBHG in a way that they are differentiated from or distinguished from a mass of other material and is not apparent to a reader that 15 Central Theme points are the Central Theme of HBHG.'

He reverted to this at para 187:

'The Defence also contends that HBHG contains a very large number of ideas and suggestions not all of which are consistent with each other and many of which appear to be marginal. The Central Theme it is suggested is an arbitrary selection of some of those ideas and suggestions with modifications and amplification to suit a presently unknown purpose. That was further expanded in the trial. The Defendants contend that the Central Theme is an artificial creation dovetailed to what can be found in the DVC. Thus it is submitted large parts of essential elements of HBHG are jettisoned from the Central Theme because they do not appear in the DVC and are thus inconvenient for the purpose of present play.'

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[75] The judge was influenced in his decision that the Central Theme was not present in HBHG by two forensic matters. One was that Mr Baigent gave evidence attempting to support the proposition that the Central Theme was present in HBHG as a theme, but his evidence was 'comprehensively destroyed' in cross-examination (see paras 231 and 233); the other was the history of changes in the formulation of the Central Theme as a matter of pleading in the course of the case. As regards Mr Baigent, it seems somewhat surprising that evidence other than the text of the book should have been relied on to show that a theme was present in it, and what that theme was. However, since the Claimants did put Mr Baigent's evidence before the court on this point, it was inevitable that he should be cross-examined on this evidence and, when his evidence proved so lamentably inadequate as the judge described at para 231, it was right that the judge should refer to this and take it into account in coming to his conclusion. As he said at para 240:

'I am entitled to see whether or not the Claimants evidence about their Central Theme is credible. At the end of the day if they are unable to say in a coherent way what their Central Theme is that is strongly supportive of the proposition that there is no such Central Theme as alleged.'

[76] Mr Leigh had also given evidence, and had been cross-examined about the Central Theme. He identified as original to HBHG the proposition that Jesus' bloodline was merged with that of the Merovingians, and said that the proposition that the Holy Grail was not only a thing or a phenomenon but was also a person and a bloodline was also unique to HBHG. The judge accepted that the first of those two propositions was original in HBHG, though not the second: see para 254. Mr Leigh's evidence did not support the idea that there was a more extensive Central Theme to be found in HBHG. Mr Baldwin showed us something he said in cross-examination on Day 6 (p 810 of the transcript):

'What we are talking about when we refer to the central theme is an artificial legal construct developed for the purposes of this case. None of us thought in these terms prior to this case. We are dealing with an artificial construct about which, I confess, I have always had some misgivings.'

[77] The judge did not refer to this, but it fits exactly with the judge's decision as to the status of the Central Theme. In terms of his expressed reasoning, the destruction of Mr Baigent's evidence on the point was more significant.

[78] In the light of the failure of Mr Baigent's evidence, the Claimants took a stance in closing submissions, which is at least logical, as described by the judge as follows (para 241):

'. . . the Claimants in their closing submissions retreated to the submission that the Central Theme should be read as a whole it being the Central Theme of HBHG. They submit that it does not have to be the only possible description of what is to be found in the book in that there can be other themes that are dealt with in the book. It was not intended to be a precis full or partial nor was it to be approached as if it were a substitute for the book.'

[79] The judge noted that, although the Particulars of Claim had from the first alleged that HBHG expressed a central theme, it had originally been formulated in general terms (in para 3 of the Particulars of Claim). In response to a Request for Further Information, the Claimants had first put forward a Central Theme by reference to 19 numbered points. That was abandoned at about the time of the application to Lewison J which led to the making of the order referred to at para 9 above. It was then replaced by a different formulation, broken down into 15 points. By virtue of the order, that formulation was the definitive statement of the Claimants' case for the purposes of the proceedings, supported by the VSS to the extent referred to in the order.

[80] The judge referred to some of the changes in the formulation of the Central Theme at paras 117 to 120. Later in the judgment, having dealt with Mr Baigent's evidence about the Central Theme, the judge commented on some details of the formulation of the Central Theme at para 247. He commented on the process of formulating the Central Theme in para 249:

'The fact that the Claimants had difficulty formulating their own Central Theme which was allegedly always in their minds when they wrote HBHG is incredible. I can forgive the obvious blunder of missing the Grail out of the first 19 but there are limits to forgiveness. No satisfactory explanation has been given as to why the original CT16 (colloquially 'the Splitting of the Elm at Gisors' in 1188) has disappeared. I would have thought that that was important. Old CT14 and 15 which dealt with Godfroi and his special circle of counsellors (allegedly the Order of Sion) and the creation of the Knights Templar by the Order of Sion to act on their behalf (now CT11 and 12) show the chronological development of the Order of Sion. I cannot see how the dissolution of the relationship between the Order of Sion and the Knights Templar is so insignificant compared with the creation of the two that it disappears as a Central Theme. Equally the removal of old CT9 with the collapse of 'the empire' (unspecified) (Roman or Byzantine) is not explained either. It is a significant part of that theme that the Church of Rome made a pact with Clovis the most powerful of the Merovingian monarchs. In return for that conversion it is alleged the church pledged itself in perpetuity to his bloodline.

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

The betrayal of that pledge survives in new CT9 which was a distillation of old CT10, 11 and 12. This is the converse of the splitting of the Elm problem. The surviving parts are the breaking of the pact between the Church and the Dynasty but the creation of the pact is left out. This is unbelievable in my view.'

[81] In the light of that, and of the destruction of Mr Baigent's evidence (and no doubt, though he does not refer to it in terms in this context, the lack of support provided by Mr Leigh's evidence), the judge came to a conclusion which he expressed at para 250, for reasons which he set out in the following paragraphs, from 252 to 271.

'250 . . . It seems to me (and this is what the Defendant submit) is that the Central Theme is not a genuine Central Theme of HBHG and I do no accept that the Claimants genuinely believe it is as such. In my view it is an artificial contrivance designed to create an illusion of a Central Theme for the purposes of alleging infringement of a substantial part of HBHG.'

[82] The first reason stated is in para 252:

'First I reject the suggestion that the Central Theme as such exists in HBHG. I have read HBHG many times (over the 20 years since its publication) and to attempt to find the Central Theme as one cohesive statement as representing in effect the major substantial part of HBHG by reading the text is a task in my view beyond any reader. One simply cannot read HBHG and then having read it discern from that reading that the Central Theme (whether dissected or not) is the Central Theme of HBHG. If it was one would have expected at least to find somewhere a statement that this is the Central Theme. This is where the Green case [Green v Broadcasting Corporation of New Zealand [1989] RPC 700] is relevant.'

[83] Further on that topic, he made the comment in para 253 which I have already quoted (at para 69 above), and pointed out that Part One of the book (see para 23 above) and substantial elements of Part Two (see paras 24 to 26 above) are omitted from the Central Theme, but cannot, in his judgment, be dismissed as irrelevant to the theme of the book. He then observed that, if there is a Central Theme, it is the first of the two points identified by Mr Leigh (see para 76 above) but that this is an idea of too general a level of abstraction to be capable of protection under copyright law. At paras 256 to 259 he reiterated the point that, if and to the extent that the Central Theme is to be found in HBHG (contrary to his own view on having read the book) it is so generalised in terms of ideas, assertions and facts that it is not capable of protection under copyright law, because it lies on the wrong side of the line between ideas and their expression.

[84] Next he commented on the Claimants' elusive and incoherent propositions as regards the 'architecture' or 'structure' of the Central Theme, at paras 261-2. Ultimately the Claimants were driven to rely on no more than the 'natural chronological order' of the 15 elements. The judge said that such an order was not significant in this context - 'What other order could there be?' - but he went on to observe that the Central Theme elements were not present in HBHG (to the extent that they were there at all) in chronological order. In fact they appear in an order which reflects the Claimants' account of the progress of their research and enquiries.

[85] The need for the Claimants to be able to show some structure or architecture for their Central Theme results from the fact that, if it is to be seen merely as a number of facts, ideas or assertions, there is nothing in the Central Theme that can be seen as being the product of the skill and labour involved in the creation of a literary work, so as to be properly eligible for protection under copyright law. The Claimants have never put forward a case based on the particular collocation of discrete elements. By trying to identify some structure in the Central Theme, they have sought to show that it is more than just a number of different, albeit connected, ideas, assertions or facts, none of which by itself can be protectable by way of copyright.

[86] The judge also made this comment at para 338:

'The destruction of Mr Baigent's evidence shows that the Claimants have not in my view created the Central Theme as alleged as a substantial part of HBHG by their time and effort (as opposed to writing HBHG generally).'

[87] That seems to me to be a finding of fact (as Mr Baldwin submitted it was) which is directly relevant to the question whether the Central Theme, if it were there in HBHG in any shape or form, does qualify as a substantial part of the copyright work. If a precis of a literary work were put forward as being an abstraction from that work which had been copied in breach of copyright, and if it were found to be a fair summary of the work, then it would be easy to conclude that, by creating the work as a whole, the author had expended time and effort in the creation of something which was fairly represented by the summary. The summary would not itself be the copyright work, but it would properly be regarded as the product of relevant skill and labour. In the present case, however, the judge's conclusion is that the Cen-

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

tral Theme is not such a summary, and therefore cannot be treated as an, as it were, indirect product of the skill and effort that went into the creation of HBHG itself. Nor is it the product of relevant skill and labour in any other way, apart from the irrelevant skill and labour exerted in devising it for the purposes of the litigation.

[88] The judge's final reasons for rejecting the claim are forcefully expressed at paras 262 and 263:

'262 Further there is no such chronological order in HBHG as an examination of the location of the themes in the VSS demonstrates. This too demonstrates the falsity of the Central Theme and provides clear indication that they are an artificial creation simply to provide a platform for the present litigation. The Claimants know that their idea of the merger of the two lines of itself is not protectable. Equally they know that mere statements of ideas and fact are not protectable. It is necessary therefore to create a pretence of a structure to found the cause of action. That is what the Central Theme is about and their repeated re-drafting of it is demonstrative again of its falsity.

263 The conclusion I draw from this is that the Claimants started with DVC to find things in it and worked backwards from that exercise to create the Central Theme in HBHG rather than identifying the Central Theme in HBHG and seeing whether it was to be found in DVC.'

[89] As it seems to me, the judge there addressed the question whether, in the terms used by Lord Hoffmann in Designers' Guild, the Central Theme is a 'feature or combination of features of the work, abstracted from it rather than forming a discrete part', corresponding to the original elements in the plot of a play or novel (see para 6 above). In order to qualify as such it must be possible for the features in question to be identified objectively by a study of the work as a whole. Whether it is necessary in all cases for the combination of features, in respect of a literary work, to amount to 'one cohesive statement representing in effect the major substantial part' of the literary work (see the judgment, para 252, quoted above at para 82) does not need to be decided for the purposes of this appeal. It seems to me, as I think it did to the judge, that by their allegation that HBHG 'expressed a central theme' the Claimants asserted that the Central Theme was the essence of HBHG. It is difficult, as a matter of language, to see that one literary work could express more than one central theme. That is confirmed by the passages which I have quoted at para 70 above.

[90] The case having been put in that way in opening, it seems to me that it was not only understandable but correct for the judge to have considered whether the Central Theme as alleged was the, not merely a, central theme of HBHG, in order then to consider whether, if it was copied, such copying amounted to an infringement of copyright in HBHG, in the light of Lord Hoffmann's guidance in Designers' Guild.

[91] For these reasons it seems to me that, in practice, the judge was right to test the allegation which the Claimants made as to the Central Theme by considering whether it did justice to the significant elements in HBHG, and he was entitled to reject the allegation on the basis that it was not central because it ignored too much that was of significance in the content of the book.

[92] I also agree with the judge that, even if it were right to examine what was left of the Central Theme after deleting that which he held was not found in HBHG, the elements remaining were of too high a level of generality and abstraction to qualify for copyright protection: they were ideas, not the expression of ideas. That is all the more clearly so given the absence of any relevant architecture or structure to the combination of features or elements relied on.

[93] Mr Rayner James submitted that there was nothing wrong with the Claimants relying on a Central Theme which had been put together for the purposes of the litigation, and that if the Central Theme asserted had been a precis or summary of the book it would have contained a great deal of material that was irrelevant to the claim, which would have to have been ignored. The question would have been whether what was taken from a more comprehensive Central Theme amounted to a substantial part of the Central Theme as a whole, and therefore in turn a substantial part of HBHG. I disagree. It seems to me that, if a Claimant seeks to rely on an abstract from a literary work as being that which (or a substantial part of which) was copied in breach of copyright, it is right to require the Claimant, first, to justify the proposed abstraction by reference to the work as a whole, and then to show that this abstraction, or a substantial part of it, has been copied. Accordingly, although the judge did not put the point expressly in these terms, I agree with him that it was not open to the Claimants to devise a summary which is not fairly drawn from the work as a whole, but is conditioned by reference to what is said to have been copied by the Defendant. For that reason, I would hold that his decision that the Central Theme is not in HBHG as a central theme, or, by reference to the words of the Amended Particulars of Claim, that HBHG does not express the central theme alleged, is one to which he was entitled to come.

[94] It does not matter, therefore, whether he may have misdirected himself at paras 128, 226 or 245 (see para 62 above) as to whether a substantial part which has been copied must be capable of subsisting as a literary work in its own right, and eligible for protection under copyright law as such. On reflection, it seems to me that this is not what the

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

judge meant in those passages. I think what he had in mind was that, for the copying of a substantial part to amount to a breach of copyright, the material copied must lie on the right side of the line between ideas and their expression. I come to that conclusion particularly because of the language of para 245. If that is what he meant, he would have been right.

ANIMUS FURANDI

[95] We had some submissions about the possible relevance of the intention of the copier, sometimes referred to as animus furandi. Mr Rayner James criticised the judge for not dealing with this point. It seems to me that it is irrelevant as a matter of law; even if the judge ought to have mentioned it, his failure to do so does not show an error in his reasoning as regards the result of the case.

[96] Breach of copyright does not depend on intention or knowledge (though these may be relevant in some cases to remedy, under the Copyright, Designs and Patents Act 1988, s 97). The idea of animus furandi is referred to by Sir James Page-Wood VC in Jarrold v Houlston (1857) 3 K & J 708, 3 Jur NS 1051, but the law was very different then, and the principal issue, apart from whether there had been any copying (which was found, in face of a denial), was whether the use made had been fair or not. In Ravenscroft v Herbert [1980] RPC 193, Brightman J referred to animus furandi as being relevant to the question whether a part taken is a substantial part, meaning thereby an intention on the copier's part to take material from the copyright work in order to save himself labour: see p 203 at lines 42-45 (recording the submissions of Mr Laddie for the Defendants), and p 207 at lines 27 to 29.

[97] Whatever may have been the state of the law at the time of Jarrold v Houlston, the question now is whether there has been copying, not what the intention of the copier was in doing it. If the alleged infringer denies copying, and is disbelieved, then what matters is the finding of fact as to copying which follows, though no doubt his being disbelieved may also have other forensic effects as to the findings made by the judge in the case. I cannot see how the intention with which any copying was done is or can be legally relevant to the issue whether the copying is an infringement, either generally or by reference to the question whether what was copied is a substantial part of the copyright work. Mr Rayner James submitted that a wrongful denial of copying can and should assist the court in concluding that what has been copied is of value and is therefore likely to represent a substantial part of the effort of the author in producing the copyright work. I disagree. That seems to me to be as a misleading a rhetorical device as the proposition that if something is worth copying, it is worth protecting, and should therefore be found to be a substantial part of the work from which it is taken. It seems to me that animus furandi is a red herring in modern English copyright law, and that it should not be invoked in future.

[98] We were referred to recent decisions in Australia and Canada in which the point has been mentioned. Neither of those seem to me to lead to any different conclusion as to its possible relevance.

CONCLUSION

[99] Although the judge did not express his reasoning in these terms, it seems to me that his judgment can be analysed as proceeding as follows:

i) There is relevant material in HBHG which is also to be found in DVC, namely eleven of the Central Theme elements.

ii) Mr Brown had access to HBHG at the time when he wrote the parts of DVC which include this common material. It is not in dispute that Mr Brown used HBHG at this stage.

iii) Mr Brown based relevant parts of DVC (the Langdon/Teabing lectures) on material in HBHG.

iv) Nevertheless, what he took from HBHG amounted to generalised propositions, at too high a level of abstraction to qualify for copyright protection, because it was not the product of the application of skill and labour by the authors of HBHG in the creation of their literary work. It lay on the wrong side of the line between ideas and their expression.

v) In any event (this being the judge's principal ground for decision) although the relevant eleven Central Theme elements were to be found in both books, the claim depended on showing that the Central Theme propounded was a central theme of HBHG, sufficient to qualify as a substantial part of the work, albeit as a combination of features obtained by abstraction, as described by Lord Hoffmann in para 24 of Designers' Guild, and this assertion by the Claimants was not justified, because the Central Theme was not a theme of HBHG at all, but rather was no more than a selection of features of HBHG collated for forensic purposes rather than emerging from a fair reading of the book as a whole. The basis of the Claimants' contention that the Central Theme was a substantial part depended entirely on showing that it was a central theme of the book and, as appears from the passages which I have quoted at para 70 above, was really

the central theme of the book. The judge rejected that contention on the facts. It does not seem to me that it was necessary for him to provide any further explanation for his conclusion that, whatever elements (if any) were copied from HBHG, they did not amount to a substantial part of it.

[100] In my judgment it has not been shown that the judge was wrong in the conclusions to which he came. On the contrary, it seems to me that he was entitled to come to those conclusions. I would therefore dismiss this appeal.

**JUDGMENTBY-2:** RIX LJ:

**JUDGMENT-2:**

RIX LJ:

[101] I agree with the judgments of Lloyd and Mummery LJJ and with their reasons. In particular I agree that, although, properly understood, the judge did find that, in the six chapters of DVC in question, aspects of 11 of the 15 pleaded elements of the Central Theme had been taken, and thus, if one likes, copied from HBHG (as well as other sources), it has not been shown that the judge was wrong in his ultimate conclusion that the Claimants have failed to establish that a substantial part of HBHG has been copied. I agree that the judge was entitled to come to his conclusion. In the circumstances, while gratefully adopting my Lords' judgments, there is little that I would wish to add or underline.

[102] Certainly, Designers' Guild, referred to at para 6 above and para 125 below, is a leading and highly relevant authority relating both to what it is that one is looking for in asking whether a substantial part of a copyright work has been copied and to the importance of respecting a trial judge's view as to the issue of substantiality. As Lord Hoffmann said (at para 26):

'Originality, in the sense of the contribution of the author's skill and labour, tends to lie in the detail with which the basic idea is presented. Copyright law protects foxes better than hedgehogs.'

And Lord Millett said (at para 35) that an appellate court should always be very slow to reject a finding of substantiality, since it is 'essentially a matter of impression'.

[103] It remains true that a copyright work can be copied and substantially so in other than discretely linguistic ways, as Lord Hoffmann observed at para 24 of Designers' Guild. That is what, in one sense, occurred in Ravenscroft v Herbert and New English Library Ltd [1980] RPC 193, but in that case there was wholesale pillaging of not only theme (and 'a single theme' at that, see p 198, line 25) but also incident and language (see at 200/203), which on any view has not occurred here.

[104] In the present case, the Central Theme was the means by which the Claimants sought to demonstrate, by a process of deconstruction and then reconstruction, what DVC reproduced of HBHG in the relevant six chapters. Whether or not those elements of the Central Theme where the allegation of copying was made good constituted a substantial part of HBHG remained to be assessed. Despite a small number of examples of linguistic or verbal copying, which were not relied on for relevant purposes, the Claimants had to make good their case of substantiality basing themselves entirely on allegations of use of thematic material, as distinct from copying of incident and language. I am inclined to agree that it is difficult to have more than one 'central' theme, even if a literary work may well have more than one substantial theme. Even if, however, 'central' is viewed merely as forensic hyperbole for 'substantial', and even if, as I would accept, a substantial part of HBHG could be copied even if its essence was not, Lloyd's LJ review of the contents of HBHG itself demonstrates some of the difficulties in the way of the Claimants' case.

[105] Those difficulties can also be identified by both macro and micro illustrations. On the macro level, I would underline the failure of the Claimants themselves in their evidence at trial to support their forensic case about the Central Theme. On the micro level, I would point, merely as examples, to element 1 ('Jesus was of royal blood, with a legitimate claim to the throne of Palestine' (sic)), which might be described as an idea fully in the world, with a pedigree back to Matthew; and to element 8 ('the Roman Empire in the fourth century AD, under the auspices of Constantine, had adopted 'Pauline' Christianity . . . By the end of the century Christianity had become the official religion of the Roman Empire. . .'), which is concerned with a view of history which, whether accurately elaborated or not, is hardly original; and whose place in any theme is not obviously explicable. If the individual elements are concerned with ideas rather than their expression, and the structure which binds them together is merely chronological, the judge's view of the Central Theme as falling on the wrong side of the line (for the purposes of establishing copyright infringement) between ideas and their expression is well understandable.

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[106] The test of copyright infringement is an objective one. As Lloyd LJ has pointed out, it is not necessary to prove a guilty mind to establish liability, and it is no defence to prove an innocent mind if in fact a substantial part of a copyright work has been copied. Nevertheless, it may be observed that in writing the Langdon/Teabing lectures Mr Brown has acknowledged the use of HBHG as a source for the lectures' ideas in HBHG both cryptically, since Leigh Teabing is an anagram of Messrs Baigent and Leigh, and straightforwardly, when he has Teabing show HBHG to Sophie, describing it as 'perhaps the best-known tome' on the subject and recording its claim to be 'The Acclaimed International Bestseller'. That is not the mark of an author who thought that he was making illegitimate use of the fruits of someone else's literary labours, but of one who intended to acknowledge a debt of ideas, which he has gone on to express in his own way and for his own purposes.

**JUDGMENTBY-3:** MUMMERY LJ:

**JUDGMENT-3:**

MUMMERY LJ:

[107] I agree with the judgment of Lloyd LJ. The Claimants have not satisfied me that the decision of Peter Smith J was wrong. I would also dismiss the appeal.

[108] I gratefully adopt Lloyd LJ's full account of the facts of the case and of the issues and submissions on the appeal. In my judgment, his concluding analysis in para 99 correctly states the basis on which the decision of the judge should be upheld.

[109] I add general comments on several aspects of copyright law and litigation arising from points made in and on the judgment of Peter Smith J. Although I agree with his decision, I do not agree with some parts of his judgment and it is necessary to say something about the formulation and treatment of the issues and the presentation of conclusions in cases of this kind.

A. FINDINGS

[110] On the appeal there was a dispute about what findings the judge had actually made. Each side argued that key findings of the judge on the allegations of copying were in their favour.

[111] Mr Jonathan Rayner James QC, appearing for the Claimants, said that most of their allegations of copying had succeeded and that the judge had found that parts of the Claimants' work HBHG were copied in DVC. He cited paras 221, 273, 306 and 315-317 of the judgment.

[112] Mr Rayner James then submitted that the judge had seriously misdirected himself in law on the correct legal test for deciding whether 'a substantial part' of HBHG had been copied in DVC.

[113] Mr John Baldwin QC, appearing for the Defendant, said that the judge decided that DVC did not copy the Central Theme of HBHG. Mr Baldwin cited paras 332 to 338 of the judgment, in which the judge said that 'there are no Central Themes in HBHG', that there had been 'no copying of the Central Themes' and that there was 'no substantial copying of HBHG'.

[114] Unfortunately, the judgment, which is very long and complicated, provided both sides with ammunition for their arguments that the judge reached conclusions in their favour on the threshold issue of copying. The particular paragraphs cited from his judgment indicated that there was a degree of confusion and possible self-contradiction and misdirection in the fact finding process.

[115] It is fair to say that, if the judgment had presented the findings, together with supporting reasoning, in better order and with greater clarity, the scope for the parties to engage in these arguments would have been reduced.

[116] As copyright actions go, this case is unusual, but it is not specially difficult or complex. There is common ground on areas in which thorny factual and legal problems sometimes have to be investigated, such as the subsistence and ownership of copyright in the Claimants' work. The two main issues on which findings had to be made were both essentially matters of fact and degree.

[117] The first issue was whether there had been copying, ie had certain passages in DVC been copied, either directly or indirectly, from HBHG, in particular in the six chapters in DVC containing the Langdon/Teabing lectures? If the alleged similarities between the two works were not the result of copying from HBHG, the infringement claim in

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

respect of DVC would fail on that ground alone. Similarities resulting from coincidence or from the use of the same or similar sources arouse suspicion, but they are not actionable as infringements of copyright. If, however, it is found that the similarities between the two works result from the copying of parts of HBHG, there is a possible case of infringement. The outcome of the infringement claim will then turn on the second issue of substantiality, ie in this case did the material, which was derived from HBHG and appeared in DVC, amount to 'a substantial part' of HBHG?

[118] The overall decision of the judge was that the infringement action should be dismissed because the Claimants had not established that DVC was an infringement of the literary copyright in HBHG. Although it is possible to criticise individual paragraphs in the judgment on the issues of copying and infringement, it is necessary to read the whole judgment fairly and reasonably as a complete set of the judge's reasons for his decision.

[119] The judgment contains findings that some similarities between HBHG and DVC, as identified in the particulars of the Central Theme of HBHG in the Voluntary Supplemental Schedule (the VSS), were the result of copying. The issue of a causal link between the two works was resolved in favour of the Claimants. As Mr Jonathan Rayner James QC, appearing for the Claimants, put it, there was 'a bridge' between HBHG, which was alleged to have been copied, and parts of DVC. What was described in the pleadings (and the VSS) as the 'Central Theme' of HBHG was a bridge connecting the two works.

[120] There was a separate issue on substantiality on which the judge considered the evidence and the arguments. As his overall decision was that there was no copyright infringement, the judge must have concluded that the copying in DVC was not of 'a substantial part' of HBHG. Like Lloyd LJ I am satisfied that, on a fair and reasonable reading of the judgment as a whole, the judge concluded and was entitled to conclude that the Central Theme material in HBHG which was copied in DVC did not amount to 'a substantial part' of HBHG.

[121] The point which I wish to highlight is that the debate in this court about what findings the judge in fact made could have been avoided if the judgment had set out the facts, the law and the conclusions in a more orderly way. I appreciate that there were time pressures on the judge, who did well to produce such a long and complex reserved judgment in the short time that he did. Following the cross examination of witnesses there was a lot of evidence to consider in addition to detailed comparisons between the two works (and other works) and bulky written submissions from the parties on fact and law. The judgment would have benefited from a longer period for reflection and from spending more time on the assimilation and compression of all this material, on sorting out and setting out the issues for decision and on presenting the conclusions and supporting reasoning.

[122] In particular, in cases in which the issue of copying has to be decided on disputed evidence the court should be guided by the sound legal principle that proof of similarity between the alleged infringing work and the original copyright work, coupled with proof of direct or indirect access to the original, is prima facie evidence of copying for the Defendant to answer: Francis Day & Hunter v Bron [1963] Ch 587 at 612, [1963] 2 All ER 16, [1963] 2 WLR 868 per Wilberforce J (a wise judgment, which does not seem to have been cited to the judge).

[123] The application of this principle and some reference to the applicable provisions of the 1988 Act (none of which feature in the judgment) would, I think, have disciplined the reasoning and strengthened the structure of the judgment.

[124] The following issues frequently arise for decision in proceedings for infringement of literary copyright under the 1988 Act. Although this is not an exhaustive check list, the following are worth bearing in mind as issues that will usually need to be considered, preferably in a chronological setting or, in more complicated cases, of sub-sets of chronologies:

(1) What are the similarities between the alleged infringing work and the original copyright work? Unless similarities exist, there is no arguable case of copying and an allegation of infringement should never get as far as legal proceedings, let alone a trial. The 1988 Act confers on the owner the exclusive right 'to copy the work' either directly or indirectly (s 16). This is not an exclusive right to prevent the publication of a work on a similar subject or a work which happens to contain similar material, thematic or otherwise.

(2) What access, direct or indirect, did the author of the alleged infringing work have to the original copyright work? Unless there was some evidence from which access can be directly proved or properly inferred, it will not be possible to establish a causal connection between the two works, which is essential if the Claimants are to prove that the Defendant's work is a copy.

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

(3) Did the author of the alleged infringing work make some use in his work of material derived by him, directly or indirectly, from the original work?

(4) If the Defendant contends that no such use was made, what is his explanation for the similarities between the alleged infringing work and the original copyright work? Are they, for example, coincidental? Or are they explained by the use of similar sources? If the latter, what are the common sources which explain the similarities? How were the sources used by the authors of the respective works?

(5) If, however, use was made of the original copyright work in producing the alleged infringing work, did it amount, in all the circumstances, to 'a substantial part' of the original work? The acts restricted by the copyright in a literary work are to the doing of them 'in relation to the work as a whole or any substantial part of it'. See s 16(3) (b) of the 1988 Act.

(6) What are the circumstances or factors which justify evaluating the part copied in the alleged infringing work as 'a substantial part' of the original copyright work?

B. THE ROLE OF THE COURT OF APPEAL

[125] The decision of the House of Lords in Designers Guild Ltd v Russell Williams (Textiles) Ltd [2001] 1 All ER 700, [2000] 1 WLR 2416, [2001] FSR 113 (a case of artistic copyright based on visual comparisons) is authority for the proposition that an appellate court should not interfere with the conclusion which the trial judge has reached on the issue of 'a substantial part' by applying correct legal principles to the facts of the case. His conclusion on this mixed question of fact and law should be respected. In the absence of an error of legal principle or unless the decision is plainly unsustainable, it is not for the Court of Appeal to reverse the judge's decision and replace his view with their view as to whether there has been copying of a 'substantial part' (see paras 27 - 30, 41-42, 77-78 and 116-117).

[126] Substantiality is just the sort of issue which a trial judge, who has heard all the evidence as the story unfolds in the course of the trial, who has considered the evidence in the context of the whole case and who has got the feel of the case, is better placed to decide than an appellate court. Issues of this kind cannot be re-tried on appeal: the focus of appeal arguments tends to be on discrete points of law, evidence and procedure. The probabilities are that the trial judge will make a more rounded and better balanced assessment on whether the copying has been of 'a substantial part'. For these reasons appellate courts are well advised to practise self restraint on such issues.

C. THE ORIGINAL COPYRIGHT WORK

[127] There is some confusion in this case both in the judgment and in the Defendant's submissions between the subsistence of copyright (what is the copyright work?) and its infringement (has a substantial part of the copyright work been copied?). Under the 1988 Act subsistence and infringement are distinct issues.

[128] The pleadings identified HBHG as the original literary work in which the Claimant authors owned the copyright (see para 2 of the amended Particulars of Claim). They pleaded that they had expended:

'. . . a substantial amount of skill and labour in the creation of [HBHG] through the research and identification of the source materials, the collation, consideration and interpretation of these materials, the development of the Central Theme (as defined in paragraph 3 herein) and the presentation of the hypotheses and arguments resulting from this extensive work by the Claimants. The Claimants expended this skill and labour over many years culminating in the publication of [HBHG]. As part of the creation of [HBHG], the Claimants selected and compiled a sequence of events, incidents and conclusions from a wide variety of sources using the Claimants' skill, knowledge and judgment.'

[129] The Claimants served the VSS on 14 October 2005 in support of the claim that HBHG contained the Central Theme and in support of the allegation that the similarities between HBHG and DVC were such that DVC had been substantially copied from HBHG, thereby infringing the copyright in it. As explained by Lloyd LJ, the order made by Lewison J on 27 October 2005 contained confirmation by the Claimants that, apart from 'some instances of similarities of language to prove copying', the only matter relied on by them in support of the allegation of copying was that expressly set out in the 15 Central Theme Points (or elements) in the VSS.

[130] The identity of the original copyright work is central to the arguments on whether 'a substantial part' of it has been copied. Nothing in the VSS changed the identity and definition of the original literary work on which the infringement action was based ie HBHG. The issue was whether DVC was an infringement of the copyright in that work as a result of the copying of 'a substantial part' of it.

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[131] As Lord Reid observed in Ladbroke (Football) Ltd v William Hill (Football) Ltd [1964] 1 All ER 465, [1964] 1 WLR 273 at 277, you can reach a wrong result in a copyright case by dividing up the original copyright work into separate parts and then asking whether the separate parts standing on their own could be the subject of copyright. In my judgment, this criticism of the destructive dissection of the original copyright work is as valid when considering the issue of infringement as it is when considering the issue of subsistence of copyright discussed by Lord Reid in that part of his opinion.

[132] The point is so fundamental to the proper conduct of copyright litigation that it needs to be spelt out. On the issue of subsistence it is wrong to divide up the whole copyright work into parts and to destroy the copyright in the whole work by concluding that there is no copyright in the individual segments. Similarly, on the issue of infringement, it is wrong to take the parts of the original copyright work that have been copied in the alleged infringing work, to isolate them from the whole original copyright work and then to conclude that 'a substantial part' of the original copyright work has not been copied because there was no copyright in the copied parts on their own.

[133] Turning to the particular facts of this case, the issue is not whether the Central Theme and/or its 15 constituent points or elements are sufficient in themselves to be or to qualify as an original literary work in which copyright subsists or which are copyrightable. The Central Theme and the 15 points or elements were alleged to be in the original work HBHG. They were part of the whole literary work.

[134] The distinct issues were:

(a) whether the Central Theme and its 15 points or elements also appeared in DVC; and, if so,

(b) whether their appearance in DVC was the consequence of direct or indirect copying from HBHG; and, if so,

(c) whether the parts copied from HBHG in DVC amounted to 'a substantial part' of HBHG.

[135] I emphasise this point because the judge's statement (in para 259 of his judgment) that '. . . the Central Theme as expressed is not such as to justify being protected against copying' tends to blur the distinct issues of subsistence and infringement. The notion that the specific parts alleged to have been copied from the original literary work must, in themselves, be capable of protection as a literary work under the 1988 Act was also evident from what the judge said in paras 128, 226 and 245 of the judgment.

[136] On the issue of 'a substantial part' it is nothing to the point that copyright does not subsist in the Central Theme or its 15 points or elements as an original literary work. It was not in dispute that copyright subsists in HBHG. It was not claimed that the Central Theme or its elements were a copyright work. The issue was whether the copyright in the work HBHG was infringed by copying the Central Theme. The statutory requirement of substantial copying necessitated an evaluation by the court of the part copied in DVC in relation to HBHG as a whole.

[137] However, for the reasons given by Lloyd LJ I am satisfied that in this case the judge reached the right conclusion on substantiality and that his conclusion was not vitiated by a misdirection of law on the proper test to apply. If there was a misdirection in the paragraphs referred to, it did not produce the wrong answer to the substantial part issue. Reading the judgment as a whole and in the context of the way in which the case was pleaded, the judge proceeded on the basis that the copying was not substantial, because it was of ideas expressed in HBHG rather than of the form or manner in which ideas were expressed.

[138] Incidentally, I question the accuracy of the description of the matters in the VSS as 'the Central Theme' or as 'Central Theme Points'. In ordinary usage a 'theme' of a literary work simply describes what it is about in general terms. I would not normally regard a list of individual assertions of actual or virtual history contained in HBHG (such as that the Roman Empire under Constantine adopted Pauline Christianity as officially sanctioned religion or as to the creation of the Knights Templar as an arm of the Priory of Sion) as themes or as theme points.

[139] In the VSS 'Theme Points' is not the same use as, for example, 'theme' in the expression 'theme tune', which may consist of an entire musical work or a substantial part of it. In his choice of words the pleader in this case may well have had in mind understandable copyright law reasons for describing his points as themes or theme points rather than as ideas, facts or items of information.

D. NATURE OF COPYING

[140] It is unhelpful, as was done in some of the submissions to the judge and to this court, to use loose non-statutory terminology when characterising the nature of the copying alleged. For example, reference has been made in

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

this case to 'language copying' and also to 'textual copying'. The 1988 Act does not use these expressions to describe the nature of the copying of a literary work. The relevant statutory provisions refer simply to copying a substantial part of a work. The nature, form and extent of copying differ from case to case. If distinctions are to be drawn in respect of the nature of copying, it is important to be clear about what they are and what effect they have on establishing infringement.

[141] For example, it is easier to establish infringement of the copyright in a literary work if the copying is exactly word for word (verbatim or 'slavish' copying), or if there are only slight changes in the wording, perhaps in some optimistic attempt to disguise plagiarism. The essence of literary copyright is proprietary protection (in the form of exclusive rights to do acts restricted by the copyright in the work) for a literary work in recognition of the investment of effort, time and skill in reducing it into material form, such as words, signs and symbols. Although there is no objection to calling word for word copying 'language copying', it is, in my view, potentially confusing to describe it as 'textual copying' and it is better to avoid the use of that expression. The 'text' of a literary work may cover more than the particular words in which it is expressed and extend to its overall content, including the selection, arrangement and development of ideas, theories, information, facts, incidents, characters, narrative and so on.

[142] Take the case of alleged infringement of copyright in an anthology of out of copyright literary works (17th century metaphysical poetry). There will usually be word for word copying of the pieces anthologised, but that verbatim copying of the anthologised pieces is irrelevant to infringement of copyright in the anthology as such being an original work (a literary compilation). The relevant form of expression of the work for deciding whether there has been an infringement of copyright in such a case is the selection and arrangement of the poetry, not the text of the individual poems themselves. An original selection and arrangement of the poems may also be properly described as 'the text' of the anthology. For the purposes of establishing infringement the focus would be on the similarity of the selection and arrangement of the anthologised pieces. To apply the term 'textual copying' to such a case would not clarify the issue for decision.

## E. INFRINGEMENT AND SUBSTANTIAL PART

[143] The decision on the substantiality or otherwise of the copying of HBHG in DVC required a careful assessment or evaluation of all the relevant evidence by the fact-finding tribunal in the context of the pleaded case. This included the nature and extent of the copying, having regard to the importance, as well as the amount, of what has been copied from the original work, and the nature of the respective works.

[144] The 1988 Act does not define 'a substantial part' or even indicate what factors are relevant to substantiality. I do not think that there is any real point in asking: what does 'a substantial part' mean? That sort of question is only a path to a dictionary and to the dubious substitution or addition of other words which do not help to answer the crucial question of fact: is DVC a copy of 'a substantial part' of HBHG?

[145] It is more sensible to ask whether there exist in this case the necessary and sufficient conditions for characterising the parts copied from the original work as 'a substantial part' of the original work. The decided cases help in identifying the relevant necessary and sufficient conditions for substantiality. Thus, it is not necessary for the actual language of the copyright work to be copied or even for similar words to be used tracking, like a translation, the language of the copyright work. It is sufficient to establish that there has been substantial copying of the original collection, selection, arrangement, and structure of literary material, even of material that is not in itself the subject of copyright.

[146] It is not, however, sufficient for the alleged infringing work simply to replicate or use items of information, facts, ideas, theories, arguments, themes and so on derived from the original copyright work.

[147] I agree with Lloyd LJ that no clear principle can be laid down on how or where to draw the line between the legitimate use of the ideas expressed and the unlawful copying of their expression.

[148] A judgment has to be reached by careful attention to the facts of each particular case. In this instance the amount of word for word similarity between HBHG and DVC was trifling in amount and importance. Only nine instances were cited in the Claimants' pleadings. The judge was right to hold that they were not 'a substantial part' of HBHG.

[149] The Claimants principally relied on non-verbal copying in the form of the Central Theme of HBHG and its individual points or elements as set out in the VSS. The judge found that 11 of the 15 pleaded aspects of the Central Theme of HBHG were to be found in DVC, but concluded that there was no infringement of the copyright in HBHG.

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

[150] As indicated earlier, I agree with Lloyd LJ that, reading the judgment as a whole and, in particular, paras 224 to 292, Peter Smith J concluded, and he was entitled to conclude, that there was copying of 11 Central Theme elements of HBHG in the Langdon/Teabing Lectures contained in 6 chapters of DVC, but that this did not amount to 'a substantial part' of HBHG.

[151] As for the fact of copying, there was ample evidence, both direct and by way of permissible inference, to support the finding that there was a causal link, which accounted for the similarity between HBHG and DVC, the former being the source for material in the Langdon/Teabing Lectures in Chs 37, 38, 55, 56, 58 and 60 of DVC, which were written in the second period between March 2002 and August 2003. A link was via the research done by Mrs Blythe Brown and her supply of research material to Mr Brown. It included reading and annotating HBHG and producing the papers passed to Mr Dan Brown.

[152] The statements in the judgment indicating that there was no copying are in passages that were not addressing the evidence of copying, but were dealing with a point that was of no real relevance to the issue of copying, namely that Central Theme was not protectable as a copyright work. The judge's statements in this point do not invalidate his conclusion that 11 individual aspects of the Central Theme were copied in DVC, but were not infringements because of their generalised abstract nature.

[153] I appreciate that the Central Theme and its elements particularised in the VSS are important to the Claimants. They are by - products of their years of research, discussion and speculation. Viewed objectively, however, in the context of the necessary and sufficient conditions for infringement, they are not 'a substantial part' of HBHG. They are not substantial in the copyright sense, any more than a fact or theory that took a lifetime to establish, or a discovery that cost a fortune to make.

[154] The position is that the individual elements of the Central Theme Points distilled from HBHG in the VSS are not of a sufficiently developed character to constitute a substantial part of HBHG. In the words of the judge they are 'too generalised' to be a substantial part of HBHG. They are an assortment of items of historical fact and information, virtual history, events, incidents, theories, arguments and propositions. They do not contain detailed similarities of language or 'architectural' similarities in the detailed treatment or development of the collection or arrangement of incidents, situations, characters and narrative, such as is normally found in cases of infringement of literary or dramatic copyright. The 11 aspects of the Central Theme in DVC are differently expressed, collected, selected, arranged and narrated.

[155] Of course, it takes time, effort and skill to conduct historical research, to collect materials for a book, to decide what facts are established by the evidence and to formulate arguments, theories, hypotheses, propositions and conclusions. It does not, however, follow, as suggested in the Claimants' submissions, that the use of items of information, fact and so on derived from the assembled material is, in itself, 'a substantial part' of HBHG simply because it has taken time skill and effort to carry out the necessary research.

[156] The literary copyright exists in HBHG by reason of the skill and labour expended by the Claimants in the original composition and production of it and the original manner or form of expression of the results of their research. Original expression includes not only the language in which the work is composed but also the original selection, arrangement and compilation of the raw research material. It does not, however, extend to clothing information, facts, ideas, theories and themes with exclusive property rights, so as to enable the Claimants to monopolise historical research or knowledge and prevent the legitimate use of historical and biographical material, theories propounded, general arguments deployed, or general hypotheses suggested (whether they are sound or not) or general themes written about.

[157] The reported cases in which infringement claims have succeeded in relation to historical works or semi-historical works do not assist the Claimants' case. They are decisions by experienced Chancery judges at first instance correctly applying well established general principles to the particular facts of the case. For example in Ravenscroft v Herbert [1980] RPC 193 Brightman J found that there was copying of a substantial part of a work of non-fiction (The Spear of Destiny) in the form of a novel. To an appreciable extent they were competing works. The Defendant's novel was alleged to contain as many as 50 instances of deliberate language copying, as well as copying of the same historical characters, historical incidents and interpretation of the significance of historical events.

[158] Harman Pictures NV v Osborne [1967] 2 All ER 324, [1967] 1 WLR 723 is another well known example of a case in which the author of a historical work (The Reason Why) obtained an interlocutory injunction in a copyright claim against the writer of a film script, which had much in common with the original copyright work in its selection of incidents and quotations supplemented by some alterations and additions attributed to other sources. Goff J found 'many

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

similarities of detail' in John Osborne's film script (p 735) and he was impressed by 'the marked similarity of the choice of incidents . . . and by the juxtaposition of ideas' for which there was a lack of explanation on the Defendant's side.

[159] In my judgment, the judge rightly held that the Claimants have not established that a substantial part of HBHG has been copied, either as to the original composition and expression of the work or as to the particular collection, selection and arrangement of material and its treatment in HBHG.

## DISPOSITION:

Judgment accordingly.

## SOLICITORS:

Orchard Brayton Graham LLP; Arnold & Porter (UK) LLP

## APPENDIX:

Appendix - The Central Theme

Points 10, 11 and 13 are in italics to show that they were held not to be in DVC. Point 14 is underlined to show that it was held not to be in HBHG:

1. Jesus was of royal blood, with a legitimate claim to the throne of Palestine.

2. Like any devout Jew of the time, and especially like a Rabbi and any royal or aristocratic Claimant, he would have been married.

3. As expected of any Jew at the time, he would have children.

4. At some time after the crucifixion, Jesus' wife, the figure known as Mary Magdalene, fled the Holy Land and found refuge in one of many Judaic communities then scattered around the south of France. When she fled the Holy Land, the Magdalene might have been pregnant with Jesus' offspring, or such offspring might already have been born and brought with her. We concluded from studying the Grail Romances and early manuscripts that Mary Magdalene fled the Holy Land with the Sangraal and that by turning Sangraal into 'Sang Raal' or 'Sang Real' we suggested that Mary Magdalene fled with the royal blood.

5. We considered what the Holy Grail was, whether the Holy Grail was a cup or whether the Grail was in some way related to Mary Magdalene and the Sang Real. We concluded that the Grail would have been at least two things simultaneously. On the one hand it would have been Jesus's bloodline and descendants and it would have been quite literally the vessel that contained Jesus's blood. In other words it would have been the womb of the Magdalene and by extension the Magdalene herself.

6. In a Judaic community in the South of France, the bloodline of Jesus and the Magdalene would have been perpetuated for some five centuries - not a particularly long time, so far as royal and aristocratic blood lines are concerned.

7. Towards the end of the 5th century, Jesus' bloodline intermarried with that of the royal line of the Franks. From this union, there issued the Merovingian dynasty.

8. In the meantime, the Roman Empire in the fourth century AD, under the auspices of Constantine, had adopted 'Pauline' Christianity as its officially sanctioned and tolerated form of Christianity. This was done as a matter of convenience to foster unity; and once 'Pauline' Christianity became the official orthodoxy, all other forms of Christianity became, by definition, heresies. By the end of the century Christianity had become the official religion of the Roman Empire. The Church's dogmatic religious stance thus benefited from the support of secular authority.

9. When the Merovingian dynasty grew weaker under Clovis' successors, the Church reneged on its pact and colluded in the assassination of Dagobert II, last of the Merovingian rulers. Although Dagobert died and the Merovingians were deposed, Dagobert's son, Sigisbert, survived and perpetuated the Merovingian bloodline through a number of noble houses. Towards the end of the 11th century, the Merovingian blood line emerged on the central stage of history in the person of Godfroi de Bouillon, Duke of Lorraine.

10. When Godfroi embarked on the first crusade in 1099, he was, in effect seeking to reclaim his birthright and heritage, the throne of Palestine to which his ancestors had possessed a claim a thousand years before.

[2007] EWCA Civ 247, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

11. Godfroi surrounded himself with a circle of counsellors, who were endowed with the Abbey situated on Mount Sion in Jerusalem and became known as the Ordre de Sion, or, subsequently, the Prieure de Sion (Priory of Sion).

12. The Ordre or Prieure de Sion created the Knights Templar as their administrative and executive arm.

13. In the mid-12th century, members of the Ordre de Sion established themselves in France, from where they subsequently spread out to own properties across the whole of Europe. When the Holy Land was lost, France became the Prieure's primary base and headquarters.

14. The Prieure continued to act as protectors and custodians of the Merovingian bloodline, the 'blood royal' or 'sang real', the so-called 'Holy Grail'.

15. During its early history - until the 14th century - the Grand Masters of the Prieure were drawn from a network of interlinked families, all of whom could claim Merovingian descent. From the 14th century on, the Prieure (according to its purported statutes, which Brown would appear not to have seen) would, for complicated reasons, move outside the family. Grand Masters would then be, on occasion, illustrious names - Leonardo, for example, Botticelli, Sir Isaac Newton, Victor Hugo, Debussy, Cocteau. Sometimes, however, the names would be rather more obscure, like Charles Nodier. In any case, all 'outsiders' listed as Grand Masters still have close connections with the network of families claiming Merovingian descent.