EXHIBIT 3

RAVENSCROFT v. HERBERT AND NEW ENGLISH LIBRARY LIMITED

HIGH COURT OF JUSTICE -- CHANCERY DIVISION

[1980] RPC 193

HEARING-DATES: 25, 26, 31 January, 1, 2, 5-9, 26-29 February, 22 March, 23-25 July 1979

25 July 1979

**CATCHWORDS:**

Copyright -- Infringement of a literary work -- Language copying -- Incident copying -- Whether copying is of a substantial part -- What amounts to flagrancy of infringement -- What amounts to benefit from infringement -- Conversion -- Whether an author and his publisher are joint tortfeasors -- Quantification of damages when infringing material is interspersed with non-infringing material.

Copyright Act 1956 sections 1, 2, 17, 18, 49.

**HEADNOTE:**

The plaintiff's claim was in respect of infringement of copyright in a literary work. The plaintiff's work was a book of non-fiction. It detailed the history of a spear -- the spear which forms part of the Hapsburg treasure in the Hofburg Museum, Vienna. The plaintiff had traced this spear back through time and had identified it as the spear which pierced the side of Christ at the crucifixion. Further he had identified it as the spear used by many legendary historical personages. Further he had identified it as the source of inspiration for Hitler's Germany. The plaintiff had researched the history of the spear by orthodox methods and by using mystical meditation. The first defendant was an author of works of fiction. He had read the plaintiff's book and had been fascinated by it. He thought it would make a good basis for a novel. He wrote a work of fiction about the post-war fate of the spear. The book was about a neo-Hitler group, secret agents, terrorists and the like. The book was divided into sections. At the beginning of each was a prologue. The prologues recounted the story of the Hofburg spear from the Crucifixion to the end of the 1939 war. The first defendant admitted using the plaintiff's work as a source but denied copying such a substantial part as to amount to infringement of copyright. He said that he had used only the historical facts contained in the plaintiff's work, and that his purpose in so doing was to give an air of credence to his novel. The second defendants were the publishers of the first defendant's novel. They had a contract with the first defendant which obliged them to publish. The second defendants pleaded that even if the work was an infringement of copyright, they were not liable for damages for conversion since they had reasonable grounds for believing it was not an infringement. The plaintiff claimed that in any event the first defendant was jointly liable with the second defendants for the latter's conversion since, because of the publishing contract, he was a joint tortfeasor. In the plaintiff's claim for damages there was a claim under section 17(3) of the Copyright Act. He claimed that the defendants' activities amounted to a flagrant breach of his rights. There had been an order for a speedy trial and that the affidavits filed in interlocutory proceedings should stand as pleadings. {194}

Held, giving judgment for the plaintiff,

(i) the defendants had infringed the copyright of the plaintiff. In writing the prologues for his work, the first defendant had copied the plaintiff's work to a substantial extent; there was much language copying; there were the same characters, incidents, and interpretation of the significance of events in both the plaintiff's and the first defendant's 5 works.

(ii) the defence of the second defendants to the claim for conversion damages failed.

(iii) the first defendant was liable as a joint tortfeasor for the conversion of the second defendants; there had been a common design, and that was to publish the book. Morton-Norwich Products Inc. v. Intercen Ltd. [1978] R.P.C. 152 followed.

(iv) for the purposes of section 17(3) of the Copyright Act, "flagrancy" implied the existence of scandalous conduct, deceit and such like; it included deliberate and calculated infringements, and "benefit" implied that the defendant had reaped a pecuniary advantage in excess of the damages he would otherwise have to pay. The present case was not one in which damages under section 17(3) of the Copyright Act were appropriate.

(v) in assessing the quantum of damages the court had to assess the value of the infringing part of the defendant's work in relation to the whole of it; and that although the infringing part represented only 4% of the defendant's work, the value of that 4% was 15% of the whole.

Observed,

(i) copyright protects the skill and labour employed by an author in the production of his work. That skill and labour embraces not only the language originated and used by the author but such skill and labour as he employed in selection and compilation. Harman Pictures N.V. v. Osborne [1967] 1 W.L.R. 723, Elanco (Products Ltd.) v. Mandops Ltd. [1979] F.S.R. 46 (C.A.) followed.

(ii) an author is not entitled, under the guise of producing an original work, to reproduce arguments and illustrations of another author so as to appropriate to himself the literary labour of that author. Pike. Nicholas (1870) L.R. 5 Ch. App. 251 followed.

(iii) the law of copyright will probably allow a wider use to be made of a historical work than of a novel.

(iv) the claim and defence would have been better appreciated if there had been proper pleadings. {195}

## INTRODUCTION:

The plaintiff, Trevor Ravenscroft, was the author of a book called "The Spear of Destiny". The first defendant, James Herbert, was an author of popular fiction. In particular, he wrote a book called "The Spear". The second defendants, New English Library Limited, were its publishers. The action was in respect of alleged infringement of copyright.

## COUNSEL:

Peter Sheridan Q.C. and E.P. Skone James appeared for the plaintiff. Hugh Laddie and John Baldwin appeared for the defendants.

**PANEL:** Before: MR. JUSTICE BRIGHTMAN

**JUDGMENTBY-1:** Brightman J.

**JUDGMENT-1:**

Brightman J. -- This is a copyright action brought by the author of a non-fiction book called The Spear of Destiny. The plaintiff alleges that the first defendant, Mr. James Herbert, in writing a novel entitled The Spear, has infringed his copyright. The second defendant is the publisher. A central feature of both books is a spearhead which forms part of the Hapsburg treasure exhibited in Vienna. The spearhead is described in the museum guide as The Holy Lance. The middle of the spearhead has been cut out and the space filled by what is described as the Holy Nail. The guide book (I have been referred to the 1963 edition) records that the spear was carried in important battles as an emblem of the king; that victories were attributed to its power; and that after the 13th century it was venerated as the lance with which the side of Our Lord was pierced at the Crucifixion. The plaintiff's book, which combines historical fact with a great deal of mysticism, purports to tell the story of the spear from the earliest times down to the end of the last war. Mr. Herbert's book is a thriller which weaves an improbable story of neo-Hitler terrorism in England around the supposed post-war exploits of the spear. The fact that the Hofburg Spear, as I will sometimes call it, is harmlessly lying in the Hofburg Museum in Vienna for anyone to see causes Mr. {196} Herbert no problem because, according to the novel, this is only a useless replica. So far, no copyright problem emerges. The reason that battle has been joined is that Mr. Herbert is alleged to have made extensive use of the plaintiff's non-fiction work in order to paint in a backcloth of apparent truth against which his own fiction story can be narrated. The question for decision is whether Mr. Herbert has made a legitimate or illegitimate use of the plaintiff's work.

Page 3

[1980] RPC 193

The plaintiff, Mr. Trevor Ravenscroft, has had a varied career. He was born in 1921. After training at Sandhurst he was commissioned in the Royal Scots Fusiliers. He served in the 1939 war and joined the Commandoes. He was taken prisoner after a raid on Rommel's Headquarters in North Africa. Twice he escaped and was recaptured. After the war he studied for some time as a medical student before turning to journalism. In 1948 he made the acquaintance of Dr. Walter Stein.

Dr. Stein was an Austrian. He had lived in Vienna and was educated at the University there. During the period 1909 to 1913 he became acquainted with Hitler who was, at that time, living in poor circumstances in Vienna. They had many conversations together. When war broke out in 1914 Dr. Stein served as an officer in the Austrian Army. After the end of the 1914 war he taught history in Stuttgart in Germany. He opposed the rise of Nazi power, and for this purpose infiltrated a Nazi secret society called the Thule Gesellschaft. In 1933 he fled from Germany, came to England and built up a medical practice in London.

During his time as a prisoner of war the plaintiff had become interested in what has been described to me as supernatural levels of consciousness, which means learning about past facts through meditation. This interest led him to a study of medieval European history and, in particular, of the legends surrounding the Holy Grail. In the course of his reading he came across a book written by Dr. Stein called The Ninth Century. This is a study of the historical background of the Grail romances. The plaintiff was much impressed by this book. He thought that Dr. Stein had achieved those supernatural levels of consciousness which so much interested him. He sought the acquaintance of Dr. Stein, and a close friendship developed between them. Dr. Stein indeed believed that he had the power to recapture lost moments of history by meditation, and he found a ready listener in the plaintiff. Their friendship began in the year 1948. Their discussions ranged over a wide field, including medieval and modern European history, contemporary politics and medicine. Although each was working, the plaintiff as a journalist and Dr. Stein as a doctor, their homes were close together, in Kensington, and they would meet in the evenings.

In pursuing his studies into medieval mythology the plaintiff became interested in the Hofburg Spear. This also was an interest of Dr. Stein. The plaintiff was in Vienna in 1948 and he saw the Hofburg Spear. He was not, I think, then aware that the museum attributed to it the ancestry and the powers mentioned in the current museum guide book. Dr. Stein unfolded to the plaintiff the story of the spear, as he claimed to have traced it, partly by orthodox historical study and partly by meditation, beginning in pre-Christian times and continuing to the present day.

The plaintiff did not make anything approaching a full record of what was told him by Dr. Stein. He did not, at that time, have any notion of himself writing a book about the Hofburg Spear. He did, however, keep a diary from time to time, and he also made separate notes for future reference. However, one evening in 1957 Dr. Stein telephoned the plaintiff and asked him to call. There is some evidence, though it is inconclusive, that Dr. Stein had a few days previously made up his mind to compose his own book {197} about the spear. However that may be, on that evening Dr. Stein told the plaintiff that it was he who would have to write the story of the Hofburg Spear. They had a long session together, the plaintiff returning home in the early hours of the morning. It was the last time they met. Dr. Stein was taken ill next day and shortly afterwards died in hospital. The plaintiff believes that Dr. Stein had a premonition of his early death.

After the death of Dr. Stein the plaintiff continued his work as a journalist. He did not, for the time being, try to write the story of the spear. He had married in 1954 and he needed to make money in order to support his wife and family. He did, however, continue to research the subject and read widely. He told me that history was his main interest in life and that he had studied it for more than 30 years. For a time he gave up journalism in order to lecture on history. His familiarity with the recorded events of the Middle Ages was apparent when he gave his evidence. In 1969 he finally ceased to be a journalist and started to write his book about the Hofburg Spear. He spent two years on the task. He devoted the whole of his time to it and did no other work. He made use of Dr. Stein's book, The Ninth Century, his own records, his recollections of what Dr. Stein had told him twelve or more years earlier and his own notes on Medieval History. He travelled extensively and studied in the British Museum Library and elsewhere.

In 1972 the plaintiff's book came out. It was entitled The Spear of Destiny. It was published by Neville Spearman Publishers Ltd. in hard-back covers in 1972. Mr. Armstrong of that company, as the agent of the plaintiff, gave Trans-World Publishers Ltd. a licence to produce a Corgi paperback edition in 1974. The Corgi edition was the one used throughout this case, as the English hardback is now difficult to come by. The Corgi edition has, on the cover, a picture of a diminutive Hitler wearing a sort of red Roman toga and holding the spear and a swastika shield, depicted against a lurid background of Hitler's face in electric blue. This was done without the plaintiff's approval while he was in America. He was much incensed because it was not the sort of impression he desired his book to give to a potential reader.

There was also an American hardback edition published in 1973. Since those days the plaintiff and Mr. Armstrong have fallen out over various matters. The plaintiff has now received back all the rights with which he had parted, including the American rights. It is not in dispute that the plaintiff is now the sole owner of the copyright in The Spear of Destiny.

The Spear of Destiny is a book of some 350 pages in the paperback edition. It is discursive and disjointed, and demands of the reader considerable effort and concentration. It is packed with an immense amount of historical data which no one suggests are in any way inaccurate. It also contains much philosophical discussion and mysticism. It is divided into a brief prologue, an introduction, 24 chapters and an epilogue.

The prologue introduces the reader to the spear. Its early history is lightly sketched by the plaintiff. Joshua is mentioned as an early holder. It is implied that it helped him to demolish the walls of Jericho. Later it passed to King David, and also into the hands of Herod, before coming into the possession of one of the Roman soldiers present at the Crucifixion. A legend grew up, the plaintiff recounted, that whoever held the spear would have immense power to control the destiny of the world either for good or for evil, as he might choose.

The introduction explains that the book would have been written by Dr. Stein but for his untimely death. The reader is told of the plaintiff's friendship with Dr. Stein, of Dr. Stein's intimate knowledge of Hitler before the 1914 war, and of the way Hitler {198} was attracted to the power of the spear during this period. The first chapter contains a graphic description of Hitler's supposed visit to the Hofburg Museum in 1909 and of his fascination with the guide's description of its supernatural powers.

The book ranges through history, legend and mythology, at times branching into collateral matters, culminating in Hitler's attempt at world domination due to his possession of the spear with its unique properties of good and evil. We are shown, as I understand the tale, how in the 4th century the Roman Emperor Constantine the Great held the spear, followed by the Emperor Theodosius, and in the 5th century by Alaric and Theodoric. Justinian held it for the Eastern Empire in the 6th century, the barbarian Charles Martel in the 8th century, Charlemagne in the 9th century, and so to Otto the Great in the 10th century and Barbarossa and Frederick II of the House of Hohenstauffen in the 12th and 13th centuries. All this, we are told, was researched by Hitler himself among books in the Hofburg Library, as he endeavoured to satisfy himself that the Hofburg Spear was in fact the supernatural spear traceable to the Crucifixion. It was Dr. Stein's interest in the spear and Hitler's obsession with it that led to their mutual acquaintance in the period 1909 to 1913.

After the end of the 1914 war we see the rise to power of Hitler, his association with the occult secret societies of Germany and his partnership with Himmler. The crisis came, we are informed, in 1939 when Hitler invaded Austria in order to obtain the spear and possess its power. He removed it to Nuremberg, where it remained throughout the war. After the repeated bombing of Nuremberg it was discovered with other treasures in an underground chamber and passed for a short while into the possession of the United States of America in the person of General Patton before being returned, in 1946, to the Hofburg Museum with other Austrian possessions.

The book has a single theme, the identity of the Hofburg Spear with that used at the Crucifixion, and the supernatural qualities of such spear. The book itself is largely a mixture of selected authentic episodes from European history in general, and German history in particular, in the Middle Ages and modern times, derived from the plaintiff's very considerable knowledge as a historian, plus his recollection of what Dr. Stein revealed to him. Authentic recorded history, the personal knowledge of Dr. Stein and the meditations of Dr. Stein, are inextricably mingled and served up to the reader in a highly individualistic and unusual book.

I now turn to the defendant. Mr. Herbert is a successful novelist. He was born in 1943. After he left school he studied art, and in 1963 went into advertising, where he did well. He joined a company in a large way of business and, after progressing from typographer to art director was placed in charge of a team of typographers and copywriters under an art director. Finally he was made an associate director of his company and became more involved with the business side of the concern. He did not find this gave him a sufficient interest. He took to writing novels. His first novel was called The Rats. He worked on it in the evenings and over such weekends as he was not on duty for his company. The novel took nine months to complete. It was published by the second defendant, New English Library Limited. In 1973 or thereabouts he wrote The Fog. In 1974 The Survivor. Next came Fluke, written in about 1975. These books were all published by New English Library Ltd. During this time he remained with his advertising company but, he said, "it was actually killing me working seven days a week for those years".

Page 5

[1980] RPC 193

In 1974 Mr. Herbert had a spell in hospital. Someone brought him a magazine called Penthouse. It contained a potted version of The Spear of Destiny. He thought it {199} would make a splendid theme for a novel. He bought the book and read it. He also read books about Hitler, Himmler, and the preoccupation of the Nazi Regime with the occult. He also read books and newspaper articles about terrorism, espionage and weapons. He read Parsival, written by the 13th century Bavarian poet Wolfram von Eschenbach, and the libretto of Wagner's opera on the same theme.

He started his new novel in the autumn of 1976 and completed it in the following summer. He was still in advertising and still writing only in the evenings and at some weekends. The novel was published by the second defendant in 1978. It was called The Spear. It bears on the dust cover a picture of the Hofburg Spear.

Mr. Herbert' novel contains 278 pages. It is divided into seven prologues, twenty-three chapters and an Author's note. The prologues recount the story of the Hofburg Spear from the Crucifixion down to the end of the 1939 war. The chapters record, in the form of a novel, the post-war exploits of the spear.

I will, for the moment, leave aside the prologues and attempt a brief summary of the novel. The time is the present. The hero is a private detective called Steadman, sometimes identified in the story as a modern Parsifal. Steadman is approached by an Israeli Intelligence agent for the purpose of tracing one of their operators who is missing. Steadman turns down the assignment. However, his female business partner thinks that the assignment should be accepted and secretly makes contact with the Israeli agent. She is captured by an enemy and killed in most unpleasant circumstances. Steadman seeks out the Israeli Intelligence agent, thinking that he is the murderer. The agent tells him that the murderer is an arms dealer called Gant. Steadman returns home and finds on the doorstep a man called Pope, who introduces himself as an agent of M15. Pope tells Steadman that Gant is connected with a Nazi secret society called the Thule Gesellschaft operating in England. Pope hints that the society is in possession of a magic spear. Pope tells Steadman that he is anxious to infiltrate Gant's organisation. He persuades Steadman to contact Gant on the pretence of negotiating an arms deal for a client. Steadman drives to Aldershot where the Ministry of Defence has laid on an exhibition of weapons and armaments for potential purchasers. Steadman introduces himself to Gant, discusses his pretended requirements and arranges to see Gant at his home in Guildford. He falls in with an attractive young lady called Holly, who has been interviewing Gant on behalf of a newspaper. They leave the exhibition grounds together but are chased and nearly killed by a remote controlled tank. Steadman proceeds to Gant's country house at Guildford. Gant makes a prisoner of Steadman and reveals to him that he is working with the Thule Gesellschaft to take over power in England. Gant then leaves for his secret hide-out in Devon, which is named after the Nazi stronghold built by Himmler for top Nazis at Paderborn in Germany and called The Wewelsburg. Steadman is left in the care of Gant's henchmen at Guildford but manages to elude his guard and make his way to the Devonshire Wewelsburg. He is met on the doorstep by Gant and also by Pope, now revealed in his true colours, and by other unpleasant characters. Steadman, who is shortly to be liquidated, is told more details of Gant's plot to take over power in England, and in particular of the planned destruction by missile of the aircraft carrying the United States Secretary of State to London. This assault, it was hoped, would sabotage Arab/Israeli peace talks and help to create world chaos. For his execution Steadman is led into a hall where members of the secret society are holding a meeting. They are grouped round the Hofburg Spear. This, it appears, was cunningly switched with a replica during the last days of Nuremberg and brought by a Nazi to England. Steadman learns that it will be used to slay him in a ritual killing. Fortunately the police, aided by local agents of M15 and the CIA, and a detachment {200} of Marine Commandoes flown from Plymouth, successfully assault the Devonshire Wewelsburg. In the course of the operation, however, Steadman undergoes the alarming experience of being chased by the skeleton of Himmler, which normally reposes in the basement of the house. Luckily he is saved by the redoubtable Holly in the nick of time. The missile is destroyed on its launching pad and Steadman hurls the spear into the flaming debris.

To this short account of the novel one would need, for completeness, to add half a dozen more murders and some very unpleasant torture secens.

One must not under-estimate the commercial attraction of the rubbish which I have attempted to describe. The book is written with much inventiveness and a racy flow of language and incident, and the numerous scenes of violence exercise a strong appeal to certain readers. The defendant's novels have enjoyed great financial success. Mr. Herbert does not think of himself as a serious novelist.

"All my books go in for violence for the sake of violence. I make no excuse for it, it is what I do; it is what people enjoy reading".
He writes tongue in cheek, and agrees that The Spear is a horror comic.

I turn now to the prologues, as I will, for convenience, but inaccurately, call them. They are not in fact proemial, but interleave the story of the novel. Mr. Herbert considered that his novel would benefit if an air of credibility were introduced. His novel should contain, for the instruction of the reader, a series of prologues setting out the allegedly true story of the spear in former times. In five of the seven prologues the plaintiff's rendering of the story of the Hofburg Spear is copied to the extend which I must now indicate.

Mr. Herbert does not dispute that the used the plaintiff's book for the source of much of the material which he recounts in the prologues. He used, he said, the Penthouse article as a sort of card index for identifying the facts which he desired to use, and The Spear of Destiny as a filing cabinet where he could glean the full facts.

"I used the Penthouse feature as the main reference for me... If I felt I needed to embellish anything, or it was not quite clear... then I would go to The Spear of Destiny".

The instances of copying complained of are set out in the exhibit TTR.4 to the plaintiff's evidence, supplemented by the exhibit TTR.X. To a large extent these instances speak for themselves. It would not be possible, in a judgment of reasonable length, to deal with every instance individually. It will be sufficient if I indicate the general picture.

There are, in all, fifty alleged instances of language copying in TTR.4. One is to be found on the dust jacket of the defendant's book. Eight in the first prologue, which deals with the Crucifixion. None in the second prologue, which is only concerned with the capture and death of Himmler. Eleven in the third prologue, which deals with Hitler's alleged first visit to the Hofburg Museum in 1909. Eleven in the fourth prologue, which deals with Hitler's alleged historical researches in the Hofburg Library before the First World War. Thirteen in the fifth prologue, which covers the seizure of the spear at the time of the Anschluss. And large scale copying, with particular emphasis on three incidents, in the sixth prologue, which deals with General Patton's {201} visit to the underground store of treasures in Nuremberg. There is no significant copying in the last prologue, which traces the fictional escape of the authentic Hofburg Spear to England.

In the "Author's Note" at the end of the book there is included this sentence:

"The idea for this book came from Trevor Ravenscroft's extraordinary The Spear of Destiny, a detailed (and unsettling) study of Adolf Hitler's association with the Heilige Lance".

It is quite obvious from a comparison of the two books and from the defendant's evidence that he had the Penthouse article and the plaintiff's book in front of him as he wrote five of the prologues. The first prologue opens with the Roman soldier seated on his horse at the foot of the Cross and ends with the miraculous cure of his defective vision after he had used his spear. All the main facts in the prologue, which extends over two pages, are taken from pages ix to xi of the plaintiff's book. The defendant condenses the story and changes the language to a greater or lesser extent. Where the defendant concedes that the language is the same his answer is:

"Of course they would be identical words; we are saying the same thing"; or: "Would you think there is another way of putting that?"; or: "I put the same facts down, they have got to appear similar. It would have been very easy for me to disguise all this, but there was no reason to".

The third prologue describes Hitler's supposed visit to the Hofburg Museum in 1909, when he allegedly became obsessed with the Hofburg Spear. The prologue extends over one and a half pages. The plaintiff's knowledge of this supposed visit was derived exclusively from Dr. Stein, to whom it is supposed to have been related by Hitler himself. The prologue is a condensed version of pages 6 to 9 of the plaintiff's book. Hitler throws away his sketch book in despair at his failure in life. He seeks shelter from the rain in the Hofburg Museum. He hears the guide explain to tourists the magic power of the spear. He stands transfixed before the spear until closing time. This prologue contains instances of close language copying. The defendant does not shirk the issue. Dealing with Hitler's discarded sketch book and his sheltering in the Museum he is asked:

"(Q) Do you agree with me there is a remarkable similarity in the words? (A) Of course there is, they are saying exactly the same thing. (Q) The one is copied from the other -- is it? (A) If that is what Mr. Ravenscroft says and that is the fact of it, yes, I would say that, of course I would. (Q) You have more or less used the words used by Mr. Ravenscroft, have you not? (A) That is how it was".

The two descriptions of the spear (which Mr. Herbert had never seen for himself) and its mode of display are almost identical.

Page 7

[1980] RPC 193

"(Q) Almost identical words, do you agree? (A) Well, that is what the spear was lying in. Why should I change that? (Q) The one was taken from the other, yes? (A) Of course it is taken from the other, yes.

"(Q) An exact copy, is it not, one from the other? (A) That is the description of the spear, it has got to be exact... Yes, it is saying the same thing, it must be. (Q) You borrowed it because it was a jolly good description, was it not, that Mr. Ravenscroft used? (A) Of course it was... yes... That was how the spear {202} looks, why change it? That was the description. (Q) Again, you liked the words, did you, that Mr. Ravenscroft used? (A) They were saying exactly what needed to be said. (Q) Well enough for you to use most of the words yourself? (A) I saw no reason to disguise the words".

The fourth prologue in the defendant's novel is headed "1913" and outlines the result of Hitler's four years of historical research. It names eleven alleged holders of the spear and records that in all 45 Emperors had claimed the spear between the coronation of Charlemagne (commonly dated A.D. 800) and the fall of the Germanic Empire 1,000 years later. The eleven supposed holders, named by the defendant in his historical survey are Mauritius, Maximin, Constantine the Great, Theodosius, Alaric the Visigoth, Theoderic the Visigoth, Justinian, Charles Martel, Frederick Barbarossa, Frederick the Second Hohnestauffen and Otto the Great. These are the identical characters in history named by the plaintiff on pages 13 to 18 in his book, with the addition, in the plaintiff's record, of the Roman general Aetius and for a brief moment St. Francis of Assisi.

When asked why he selected the eleven particular names he mentioned the defendant replied: "These are the ones that are important. They are important to Mr. Ravenscroft so they are obviously important to me". The defendant agrees that he has no independent knowledge of Medieval History and did no research of his own. There is much language copying from one book to the other in the defendant's writing of this prologue.

The fifth prologue deals with the Anschluss. It extends over two pages and is mainly taken from pages 311 to 316 of the plaintiff's book. At this stage Dr. Stein was no longer in touch with Hitler, so that the plaintiff is writing of what he has researched himself or recollected from his talks with Dr. Stein some twelve years or more previously. The prologue opens with three German officials standing on the steps of the Hofburg awaiting the arrival of Hitler to view the spear. It closes with the decision Hitler then made to exterminate the Jewish people and dominate the world. The language copying is less pronounced, but there are the same characters, the same incidents and the same interpretation of the significance of the Anschluss. Hitler arrives with Himmler and is met by Von Sievers, Major Buch and Kaltenbrunner; Hitler has a private session with the spear; Winston Churchill alone is aware of the significance of his entry into Vienna; it is at this moment that Hitler decides to conquer the world.

The penultimate prologue in the defendant's book is concerned with the recovery from two underground hide-outs in Nuremberg of treasures looted by the Nazis, including the Hapsburg Regalia and other items taken from the Hofburg Museum. This much is recorded in historical fact. The plaintiff, as the result of the revelations of Dr. Stein stemming from his meditations on history, is able to go further and tell us that General Patton personally visited the main underground treasurehouse; and that he stood spellbound before the Hofburg Spear. I refer to, but without actually reading, three pages from the plaintiff's book and 2 1/2 pages from the defendant's book as illustrations of the plaintiff's style of writing history, and the scope of the defendant's copying. Those passages are, the first full paragraph on page 342 of The Spear of Destiny down to the third full paragraph on page 345; and in the defendant's book, pages 175 and 176 and the second and third paragraphs on page 177. In connection with these passages I observe that nowhere save in The Spear of Destiny had Mr. Herbert read that General Patton had made a study of The Holy Grail; that he had visited Klingsor's Castle above Monte Castello; that the spear lay on the Polish altar as described; that {203} General Patton knew anything whatever about the spear or had the slightest interest in it. These facts, or supposed facts, are strung together, with much language copying as appears from the passages to which I have referred, in exactly the same way as the plaintiff had strung them together in support of his theory of the ancestry and power of the spear. Not one supposed fact contained in the passage from the defendant's book was taken from any source but the plaintiff's book.

The writ was issued in October 1978. The matter came before the judge on motion on the 7th November. Both sides accepted an order that the affidavits should stand as pleadings in the action. There was, I think, a mistaken impression that such an order would facilitate a speedy trial. In fact it might have been more helpful to a proper appreciation of the claim and the defence to it if pleadings had been served, and this need not have occasioned any delay in preparing for trial.

In his defence as adumbrated in his affidavit, Mr. Herbert states that the prologues are included as a form of historical background to add credence to the fictional story he was written, and although they are not, he says, central to the

[1980] RPC 193

Page 8

story, they form an important part of the structure of the novel. I think that is a fair statement. I do not think I need to refer any more to the evidence.

As a prelude to a consideration of the opposing arguments I will refer briefly to the nature of copyright protection. Under section 1 of the 1956 Act copyright in relation to a work means (put shortly) "the exclusive right... to do certain acts in relation to that work". Such acts are "those acts which... are designated as the acts restricted by the copyright in a work of that description". Under section 2, sub-section (5) the acts restricted by the copyright in (inter alia) a literary or dramatic work include "reproducing the work in any material form". Under section 49 any reference in the Act "to the doing of an act in relation to a work... shall be taken to include a reference to the doing of that act in relation to a substantial part thereof".

The question with I have to decide is a question of fact, whether there has been substantial copying of The Spear of Destiny amounting to an infringement of the plaintiff's rights. This raises two issues, first whether there has been copying, and, secondly, whether such copying is substantial within the meaning of section 49. I have read both books. The platintiff gave evidence before me during a period of over four days, and the defendant for almost three days. It is absolutely plain that in writing five of the prologues that I have mentioned the defendant copied from the plaintiff's book. The next issue, therefore, is whether such copying is in relation to a substantial part of the platinff's book and therefore in excess of what is a legitimate degree of copying.

Mr. Laddie, for the defendants, rightly says that an author has no copyright in his facts, nor in his ideas, but only in his original expression of such facts or ideas. He submitted that in deciding whether copying is substantial there are four principal matters to be taken into account. First, the volume of the material taken, bearing in mind that quality is more important than quantity; secondly, how much of such material is the subject-matter of copyright and how much is not; thirdly, whether there has been an animus furandi on the part of the defendant; this was treated by Pare-Wood V.C. in Jarrold v. Houlston (1857) 3 K & J. 708 as equivalent to an intention on the part of the defendant to take for the purpose of saving himself labour; fourthly, the extent to which the plaintiff's and the defendant's books are competing works. {204}

Copyright protects the skill and labour employed by the plaintiff in production of his work. That skill and labour embraces not only language originated and used by the plaintiff, but also such skill and labour as he has employed in selection and compilation. The principles are clear from the cases. There is a helpful summary of the authorities in Harman Pictures N.V. v. Osborne ([1967] 1 W.L.R. 723). For my purposes it is sufficient to cite two passages from that case which are taken from earlier authority:

"... another person may originate another work in the same general form, provided he does so from his own resources and makes the work he so originates a work of his own by his own labour and industry bestowed upon it. In determining whether an injunction should be ordered, the question, where the matter of the plaintiff's work is not original, is how far an unfair or undue use has been made of the work? If, instead of searching into the common sources and obtaining your subject-matter from thence, you avail yourself of the labour of your predecessor, adopt his arrangements and questions, or adopt them with a colourable variation, it is an illegitimate use".
This appears at page 730 of the report.
There is also this passage:

"In the case of works not original in the proper sense of the term, but composed of, or compiled or prepared from materials which are open to all, the fact that one man has produced such a work does not take away from anyone else the right to produce another work of the same kind, and in doing so to use all the materials open to him. But as the law has been precisely stated by Hall V.C. in Hogg v. Scott, 'the true principle in all these cases is that the defendant is not at liberty to use or avail himself of the labour which the plaintiff has been at for the purpose of producing his work, that is, in fact, merely to take away the result of another man's labour or, in other words, his property'": see page 732.

In this case the judge was confronted with the well-known book by Mrs. Cecil Woodham Smith entitled The Reason Why and also the script for a motion picture written by John Osborne. The question which the judge posed was this (at page 736):

"... did John Osborne work independently and produce a script which, from the nature of things, has much in common with the book, or did he proceed the other way round and use the book as a basis, taking his selection of incidents and quotations therefrom, albeit omitting a number and making some alterations and additions, by reference to the common sources and by some reference to other sources?"

[1980] RPC 193

That is the same test as was stated by Buckley L.J. in Elanco Products Ltd. v. Mandops (Agrochemical Specialists) Ltd. [1979] F.S.R. 46 which was heard on motion for interim relief. The facts, briefly, were that the plaintiffs had invented a herbicide and had carried out trials in order to discover how the product could best be used. Various research establishments had also conducted their own field trials. The results of both the plaintiffs' trials and of the independent trials had been published in certain scientific journals. The plaintiffs marketed the herbicide in tins with which they included a leaflet compiled by the plaintiffs which set out detailed instructions on how the herbicide should be used, upon what crops and when, and what weeds it would best control. The plaintiffs claimed copyright in the leaflet and asserted that it was a {205} compilation of what they regarded as relevant information extracted from all the available literature and especially from their own. After the patent had expired the defendants began to sell the same herbicide with a leaflet which was alleged to be similar to the plaintiffs'. The substantial defence raised by the defendants was that they were entitled to take any information available to the public including that contained in the plaintiffs' literature provided that they did not not adopt the same form or the same language, that is to say provided that they did not just copy the plaintiffs' literature. Buckley L.J. said this at page 57:

"As I understand the law in this case, the defendants were fully entitled to make use of any information of a technical or any other kind, which was available to them in the public domain, for the purpose of compiling their label and their trade literature, and they were not entitled to copy the plaintiffs' label or trade literature thereby making use of the plaintiffs' skill and judgment and saving themselves the trouble, and very possibly the cost, of assembling their own information, either from their own researches or from sources available in documents in the public domain and thereby making their own selection of material to put into that literature and producing their own label and trade literature".

The main thrust of Mr. Laddie's argument was that the plaintiff intended his book to be read as a factual account of historical events, that the defendant accepted it as fact and did no more than repeat certain of those facts. The plaintiff cannot claim a monopoly in historical facts. The law of copyright does not preclude another author from writing upon the same theme. It is perfectly legitimate for another person to contrive a novel about the Hofburg spear, even about its supposed ancestry and supernatural powers. Otherwise one would be driven to the conclusion that the plaintiff has a monopoly of the facts. Members of the public are entitled to use The Spear of Destiny as a historical work of reference. Mr. Laddie conceded that if the plaintiff had researched and selected which facts to use, and had expended substantial labour in making that selection, and a substantial amount of his labour had been taken by the defendant, then there might be infringement. In the present case, he submitted, the plaintiff's facts were selected by history or by Dr. Stein and not by the plaintiff. In the result, there had been no reproduction of the plaintiff's book in relation to a substantial part thereof. In the course of his copying the defendant confined himself to those matters which are represented in the plaintiff's book as historical facts, whether their origin is to be found in documented history or in the meditations of Dr. Stein.

In developing his argument Mr. Laddie drew a distinction between historical works and works of fiction. He said that if any author writes a history book he obtains copyright, but what amounts to an infringement of that copyright, i.e. substantial reproduction, depends to a great extent upon whether all the defendant has taken is historical facts or amounts to more than that. The degree of user which would amount to an infringement is different in the case of a historical work than in the case of a work of fiction. There is more freedom to copy in the case of the historical work.

I am inclined to accept that a historical work is not to be judged by precisely the same standards as a work of fiction. The purpose of a novel is usually to interest the reader and to contribute to his enjoyment of his leisure. A historical work may well have that purpose, but the author of a serious and original historical work may properly be assumed by his readers to have another purpose as well, namely to add to the knowledge possessed by the reader and perhaps in the process to increase the sum {206} total of human experience and understanding. The author of a historical work must, I think, have attributed to him an intention that the information thereby imparted may be used by the reader, because knowledge would become sterile if it could not be applied. Therefore, it seems to me reasonable to suppose that the law of copyright will allow a wider use to be made of a historical work than of a novel so that knowledge can be built upon knowledge.

Mr. Laddie referred me to Oxford Book Co. v. College Entrance Book Co. 98 Fed. Rep. 688 a decision of the United States Circuit Court of Appeal. The publisher of Visualised American History sued the publisher of Visualised Units of American History alleging breach of copyright. The following passage occurs in one of the judgments:

"Historical facts are not copyrightable per se nor are errors in fact. The plaintiff's book was designed to convey information to the readers. The defendant authors were as free to read it as anyone else, and to acquire from it such information as they could. They could indeed with equal right obtain such mis-information as it contained for the copy-

right gave no monopoly of the contents of the book... and so far as plaintiff's copyright is concerned they could use whatever of either character they gleaned from the book in their own writing provided they did not copy any substantial part of the copyrighted work but created something distinctly their own".

Mr. Laddie told me that the nearest English case in direct support of his submission on the special position of a history book is Springfield v. Thame (1903) 89 L.T. 242. The plaintiff had composed an article which described in 83 lines the narrow escape from drowning of a distinguished eye specialist. He sent copies of the article to the Daily Mail and to the Evening Standard. The Daily Mail accepted the article, paid the plaintiff for it and published a sub-edited version which was condensed into 18 lines. The Evening Standard, without the licence of the plaintiff, then published the same paragraph with slight alterations.

Joyce J. said this obiter:

"In my opinion, if the original composition had been accepted and published verbatim et litteratim in the Daily Mail, the paragraph in the Evening Standard would still have been no infringement of the copyright in the original composition, since there is no copyright in news, but only in the manner of expressing it".

I do not think that much can be read into this case for present purposes. It proceeded upon the basis that Mr. Springfield had no monopoly in the facts of the escape and was not entitled under the law of copyright to any protection for his skill and labour (if any) in researching such facts. The learned judge found that the offending paragraph was in truth and in substance a different statement of the facts contained in the original composition.

In my judgment, Mr. Laddie's proposition must not be pressed too far. It is, I think, clear from the authorities that an author is not entitled, under the guise of producing an original work, to reproduce the arguments and illustrations of another author so as to appropriate to himself the literary labours of that author: see Pike v. Nicholas (1870) L.R. 5 Ch. App. 251, Ladbroke (Football) Ltd. v. William Hill [1964] 1 W.L.R. 273 and the passages, which I have already read, from the Harman Pictures N.V. case. {207}

Mr. Sheridan, for the plaintiff, invites me to view the matter in a different light. He submits that the plaintiff's work is not a historical work of the conventional type, because it is not a chronology. It is not a continuous methodical record of public events (which is the primary dictionary definition of "history"). The plaintiff's book is poles away from history. It is disjointed and unmethodical (no offensive criticism is intended of the literary technique that he employs) being composed of a variety of different events, recollections, quotations, philosophy, meditations and so on, designed to support the theory in which the plaintiff had come to believe. Vast areas of history are left out by the plaintiff in his attempt to persuade the reader that the Hofburg Spear has the ancestry and attributes which the plaintiff believes are to be ascribed to it. The book is a very personal insight into history. What the plaintiff has done is to select events from history and from his recollection of the meditations of Dr. Stein in order to present to the reader the credentials of the Hofburg Spear.

I accept Mr. Sheridan's analysis of the nature of the plaintiff's work.

There was a suggestion by Mr. Laddie that some distinction should be drawn in the present case because much of what the defendant copied from The Spear of Destiny was merely information derived by the plaintiff from Dr. Stein. I do not think it matters whether the source of the plaintiff's book was painstaking research into documented history or painstaking recording and recollection of what Dr. Stein had told him. It was also suggested that a distinction should be drawn on the ground that The Spear of Destiny was, since the death of Dr. Stein, the only possible source of certain of the facts brought to light by the meditation of Dr. Stein. It does not, however, seem to me that the paucity of sources of information excuses the defendant from taking the trouble of assembling his own information and making his own selection of material. If that is not practicable, he can always apply to the plaintiff for a licence.

I find as a fact that in writing five of the prologues to The Spear Mr. Herbert made use of The Spear of Destiny animo furandi that is to say, with an intention on his part to take from The Spear of Destiny for the purpose of saving himself labour. I also find as a fact that The Spear and The Spear of Destiny are competing works to an appreciable extent. Both are written for the general reader, although I would suppose that the educational and intellectual level of the average reader of The Spear of Destiny is likely to be higher than that of the average reader of The Spear. The Spear of Destiny is not a history book written for historians, but a non-fiction book for the ordinary public.

Having studied the two books and heard the evidence, I have no shadow of doubt that the defendant has copied from The Spear of Destiny to a substantial extent. In the prologues that I have mentioned he has deliberately copied the language of the plaintiff on many occasions. To a more significant extent he has adopted wholesale the identical inci-

[1980] RPC 193

dents of documented and occult history which the plaintiff used in support of his theory of the ancestry and attributes of the spear, of Hitler's obsession with it and also General Patton's. He did this in order to give his novel a backbone of truth with the least possible labour to himself. In so doing he annexed for his own purposes the skill and labour of the plaintiff to an extent which is not permissible under the law of copyright. The defendant has clearly infringed the plaintiff's copyright. I am only sorry that so much time, effort and money has had to be spent on the trial of this action.

[The court heard further argument before giving judgment on the relief that should be granted.] {208}

I must now deal with the form of the Order following upon the judgment which I delivered in March.

The injunction. There is no dispute between the parties, as I understand it, that it is appropriate for an injunction to be granted in the terms set out in paragraph (1) of the Writ. To avoid any obscurity the injunction will be preceded by a declaration that the relevant prologues, which will have to be identified in some intelligible way -- I have been calling them numbers one, three, four, five and part of six -- infringe the plaintiff's copyright.

Damages for infringement. There will be an enquiry as to the damage sustained by the plaintiff by reason of the breach of copyright. The plaintiff claims to be entitled to additional damages under section 17(3) of the Act of 1956. That is a matter which I am entitled to leave to the enquiry, but for the convenience of the parties I intend to decide the point now. To entitle the plaintiff to such additional damages it must be established that effective relief would not otherwise be available to the plaintiff giving regard to the flagrancy of the infringement, any benefit shown to have accrued to the defendants by reason of the infringement, and other material considerations. Flagrancy in my view implies the existence of scandalous conduct, deceit and such like; it includes deliberate and calculated copyright infringements. There is some guidance to be obtained from the Concise Oxford English Dictionary, Nichols Advanced Vehicle Systems v. Rees, Oliver and Others [1979] R.P.C. 127, and also from a New Zealand case, International Credit Control Limited v. Axelton [1974] 1 N.Z.L.R. 695 at 705.

"Benefit" in sub-section (3) in my view implies that the defendant has reaped a pecuniary advantage in excess of the damages he would have otherwise to pay. In my judgment the sub-section is not applicable to the present case. There was no cover up by the defendants. The author's note printed as the last page of the text draws attention to the fact that the first defendant had drawn inspiration from the plaintiff's work, which is referred to both by its title and by its authorship. I am satisfied that the first defendant did not intend to injure the plaintiff and did not appreciate that he was doing so. Nor do I think that there is any benefit, within the meaning of section 17(3), or other material considerations which would justify me in deciding that the sub-section was applicable to this case.

Conversion. Under section 18(1) of the Act the plaintiff is deemed to be the owner of infringing material and to have been the owner thereof since the time when such material was made. The relevant infringing material in the present case consists of the manuscript of the first defendant's book and the printed pages of infringing prologues. The manuscript was converted by the first defendant when he delivered it to the second defendant. The printed pages were converted by the second defendant when it bound them up with non-infringing material. Each of such acts was an act inconsistent with the title of the deemed owner. Under section 18 the plaintiff has all such rights and remedies in conversion as an owner is entitled to. Such rights and remedies include damages for conversion. So there must prima facie be an enquiry as to the damage sustained by the plaintiff by reason of the acts of conversion that I have mentioned. These acts of conversion raise three points for consideration: First, whether the second defendant acted innocently. If so the second defendant will not be liable in damages. Innocence is not the word used in the statute, which reads as follows:

"A plaintiff shall not be entitled by virtue of this section to any damages or to any other pecuniary remedy (except costs) if it is proved or admitted that, at the {209} time of the conversion... where the articles converted... were infringing copies, the defendant believed, and had reasonable grounds for believing, that they were not infringing copies".

The second defendant pleads that it had reasonable grounds. Asked for particulars it gave them as follows. I will read five of the grounds before commenting. "(1) The first defendant is a professional author whose books the second defendant has published since 1974. The four novels written by the first defendant prior to the writing of the book in suit were highly successful, selling in excess of one million copies in total. In respect of none of those books has any complaint been made that the same infringed copyright. (2) The first defendant claimed to the second defendant that he had done more research in the course of writing the book in suit than he had done in respect of any preceding book. (4) It was common in the trade, particularly in the case of fictional novels based on historical incidents, for the ideas for such novels to be derived from one or more antecedent factual works and for such derivation to be freely acknowledged without complaint of copyright infringement being made. (5) It is common in the trade for fictional novels to be based

on historical facts. (6) In preparing the book in suit the second defendants followed, so they believe, the recommendations as to copyright provisions contained in the guide prepared by the Publishers' Association".

I take the view that none of those reasons, either regarded separately or together, furnish reasonable grounds by themselves for believing that the prologues in question were not infringing copies. They do not seem to me to go at all to the root of the case which needs to be established by a defendant seeking to rely on section 18(2)(b).

I must give a little more time to paragraph (3) which I have not yet read: "The second defendant was not aware of any facts or matters which would put him on inquiry that the book in suit infringed copyright". The second defendant knew, as I have said, that the idea for the first defendant's book came from the plaintiff's book. That was made clear in the author's note to which I have referred, which was the subject-matter of some discussion between the first defendant and the second defendant. The second defendant took upon itself to obtain such licences for quoted matter as were thought necessary. Evidence was given by Mr. De Cruz, the managing director of the second defendant, on this point.:

"(Q) What precautions does your company take to prevent itself from being sued for infringement of copyright? (A) My compant has a skilled editorial staff, people who are experienced at handling these matters, and these books in manuscript form, well in advance of printing and publication, are read very carefully by our professional editorial staff".

There is no evidence before me from anyone employed by the second defendant that trouble was taken to check that there was no infringement so far as the plaintiff's book was concerned, notwithstanding that it was the source of the first defendant's inspiration. None of the skilled editorial staff, experienced at handling these matters, was called to give evidence before me. I do not know what they knew. In my judgment the second defendant has not established the defence which might have been available under section 18(2)(b).

A second point is whether the first defendant is liable jointly with the second defendant for the tort of conversion of the infringing pages which was committed when and so far as they were bound up with non-infringing material. I answer that {210} question yes. There was a contract between the first and second defendant whereby the second defendant was obliged to publish. There was therefore a common design and the first defendant is a joint tortfeasor with the second defendant: see Morton-Norwich Products Inc v. Intercen Limited [1978] R.P.C. 152. It is correct that there is no allegation in any pleading of a joint design. This was a case directed to be tried without pleadings, or more accurately, the affidavits were ordered to stand as pleadings. The contract to which I have referred was an agreed document before me although I think it was not an actual exhibit to any affidavit. In a case where such an order is made I think it would be wrong for me to base any decision upon fine points of pleading which might perhaps have been appropriate if the case had been tried on pleadings properly so called.

A third point arises because this is a case where infringing material is interspersed with non-infringing material. How, I need to ask myself, are damages to be quantified in such a case? There is a useful passage in paragraph 572 of the current edition of Copinger, which I will read:

"A difficult question arises where the work produced by the defendant consists in part of infringing matter and in part of innocent matter. It has been decided that, in such a case, the value of the whole work has first to be assessed as though the whole work had been converted. It is then necessary to ascertain the proportion of this sum which is properly attributable to the infringing material; this proportion will represent the damage recoverable. No exact method of calculation is prescribed. Clearly the respective lengths of infringing and non-infringing articles cannot be conclusive, since it is the value, and not the length of the material, which has to be taken into account. The court must, by what has been called rusticum judicium, determine, on the materials before it, the value of the plaintiff's part of the composite work at the date of conversion".

The infringing prologues represent approximately 4 per cent of the whole of the first defendant's book. The value could of course be less or more than 4 per cent. In my judgment it is more. How much more is a matter that could of course be left to the enquiry, but I think it may be convenient to the parties if I decide the point now, as I have the two books well in mind. In my judgment I said this:

"In his defence as adumbrated in his affidavit, Mr. Herbert states that the prologues are included as a form of historical background to add credence to the fictional story he has written, and although they are not, he says, central to the story, they form an important part of the structure of the novel. I think that is a fair statement".

The infringing prologues are the linchpin round which the first defendant's story revolves. Without that linchpin I think that the first defendant's story would be in danger of falling flat. I bear in mind, however, that there are obvious alternative linchpins which could be inserted into the axle which would not involve any breach of copyright. The par-

ticular linchpin chosen, unfortunately, by the first defendant has a value to the structure of the story which is disproportionate to its size and that is going to lead to consequences for the defendants. Assessing the matter as best I can I decide that the value of the infringing prologues to the book as a whole is 15 per cent.

An order is sought for delivery up of unbound infringing material -- I refer to the printed prologues -- so that order will be made. I am told, and this is obvious commonsense, that there is likely to be some overlap between such damages as may be {211} found in answer to the enquiry relating to infringement and the damages found in answer to the enquiry relating to conversion. Some appropriate formula may have to be included in the order to cover that point.

**DISPOSITION:**

Judgment for the plaintiff. Defendants to pay 90 per cent of plaintiff's costs.

**SOLICITORS:**

Raymond Tooth & Co.; Bartlett & Gluckstein, Crawley & de Reya.