EXHIBIT 4

1 of 3 DOCUMENTS

WARWICK FILM PRODUCTIONS, LTD. v. EISINGER AND OTHERS.

CHANCERY DIVISION

[1969] 1 Ch 508, [1967] 3 All ER 367, [1967] 3 WLR 1599

HEARING-DATES: 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 27, 28, 29, 30 June, 3, 4, 5, 31 July 1967

31 July 1967

**CATCHWORDS:**

Copyright -- Infringement -- Substantial part of literary work -- Book included copying from shorthand transcript of proceedings at certain trials, with editorial comment -- Second book, published over thirty years later, included unedited copying from first book's account of the proceedings at the trials -- Film script made subsequently by another author containing matter drawn from unedited copying in second book -- Whether a substantial part of the literary work taken -- Whether infringement of copyright in either book -- Copyright Act, 1956 (4 & 5 Eliz. 2 c. 74), s. 2 (5), s. 49 (1).

Copyright -- Literary work -- Selection of copied material and original matter -- Books including accounts of the trials of Oscar Wilde -- One book published anonymously in 1911 or 1912, much of it based on a shorthand note of the proceedings -- Another book published in 1948 containing some unedited copying from account of proceedings in first book and some original matter and editing -- Presumption of ownership of copyright in publishers of first book -- Whether each book a literary work entitled to copyright -- Copyright Act, 1956 (4 & 5 Eliz, 2 c. 74), s. 20 (4).

**HEADNOTE:**

In 1911 or 1912 a book, "Oscar Wilde: Three Times Tried" (herein referred to as "Three Times Tried") was published anonymously, bearing the name of F., Ltd. as publishers. The book was a day-to-day account of the three trials and certain connected proceedings, interspersed with the author's comments, and appeared to have been written by someone with inside knowledge. It could not have been compiled from newspaper accounts: it set out verbatim passages from the evidence of witnesses, counsel's speeches and the words of judges, and must have been based on a shorthand note, from which selected passages would have been taken. In 1948 a book entitled "The Trials of Oscar Wilde", edited by H., was published. This consited of a long introduction (about 90 pp.), a report (230 pp.), largely verbatim, of the three trials and six appendices (about 40 pp.); there was an acknowledgment to a Mr. Palmer who, with another, had published a cheaper edition of "Three Times Tried" in 1914, of permission to use the book. F., Ltd. had been dissolved in 1928, and there was no sufficient evidence of connexion between Mr. Palmer and F., Ltd. The account of the trial proceedings in H.'s book was substantially drawn from "Three Times Tried", but certain portions of H.'s account were his own contribution, added between square brackets, and he had done a good deal of editing *. Two companies contemporaneously made talking pictures based on the tragedy of Oscar Wilde. The plaintiffs (one of the companies) in April, 1960, brought an action and sought an injunction to restrain exhibition of the other company's film. The plaintiffs claimed to be exclusive licensees of certain rights of copyright in H.'s book and to be entitled to certain exclusive rights to copyright in "Three Times Tried"; they claimed that the latter book was written by a Mr. Millard and that they derived their rights of copyright from him. Their claim was based on alleged infringement of copyright. The script for the film was written by the first defendant who admitted that he made use of parts of the speeches of counsel, words of judges and questions to, and answers of, Oscar Wilde reproduced in H.'s book, excepting the matter between the square brackets. The defendants denied that the film based on the first defendant's script reproduced a substantial part of either book; they further relied on s. 20 (4) n+ of the Copyright Act, 1956, as leading to the conclusion that the plaintiffs had no rights of copyright in "Three Times Tried", and they further denied that either book was an original literary work.

---

* See as to this p. 379, letters F. to I, post.

n+ Section 20 (4), so far as material, is set out at p. 374, letter D, post.

Held: (i) although the author of the book "Three Times Tried" must have worked on a shorthand note of the court proceedings, yet the book was a literary work in which copyright subsisted, but the plaintiffs had not established any title to the copyright in the book (see p. 379, letter D, post) because --

(a) by virtue of s. 20 (4) * of the Copyright Act, 1956, F. Ltd. were presumed, unless the plaintiffs established the contrary, to have been the owners of the copyright, the presumption under s. 20 (4) not being confined, as was that under s. 6 (3) (b) of the Copyright Act, 1911, to proceedings for infringement, and on the evidence the plaintiffs had not rebutted the presumption (see p. 377, letter D, and p. 374, letter I, post).

* Section 20 (4), so far as material, is set out at p. 374, letter D, post.

Hogg v. Toye & Co., Ltd. ([1935] All E.R. Rep. 618) distinguished.

(b) reference could not be made to art. 15 (2) of the Brussels Convention, 1948, for the purpose of construing s. 20 (4) of the Act of 1956, as s. 20 (4) was not ambiguous (see p. 377, letter E, and pp. 378, 379, letters I to A, post).

Dictum of MAUGHAM, L.J., in Hogg v. Toye & Co., Ltd. ([1935] All E.R. Rep. at pp. 625, 626) not followed.

Ellerman Lines, Ltd. v. Murray ([1930] All E.R. Rep. 503) followed.

(ii) although on the evidence the use of "Three Times Tried" that was made by H. was made without proper authority, H.'s book was as a whole a literary work entitled to copyright in its own right, but there had not been reproduction of a substantial part n+ of H.'s book and accordingly the plaintiffs had not established infringement (see p. 379, letters H and I, post) because --

n+ The element of substantiality depends on the provisions of s. 49 (1) of the Copyright Act, 1956.

(a) any use made in the first defendant's script of the parts of H.'s book which were edited copying of "three Times Tried" was very limited and not substantial, and

(b) the use made in the first defendant's script of the unedited copying in H.'s book did not constitute the reproduction of a substantial part of the book, as the unedited copying had no originality and attracted copyright in H.'s book only by reason of its collocation as part of H.'s book, but a part thereof that could not in law be for the present purpose a substantial part (see p. 385, letters G and H, post).

Dictum of LORD PEARCE in Ladbroke (Football), Ltd. v. William Hill (Football), Ltd. ([1964] 1 All E.R. at p. 481) applied.

(iii) the action, therefore, would be dismissed.

Per CURIAM: even if the plaintiffs had established rights of copyright in "Three Times Tried", the plaintiffs would have failed to establish infringement, because the relevant parts of that book were original only by reason of their collocation and, when robbed of that collocation, did not form a substantial part of the copyright in the whole (see p. 385, letter I, post).

**NOTES:**

As to copyright in compilations and selections, see 8 HALSBURY'S LAWS (3rd Edn.) 374, 375, paras. 687, 688; and for cases on the subject, see 13 DIGEST (Repl.) 61, 62, 93-98.

As to infringement of copyright, see 8 HALSBURY'S LAWS (3rd Edn.) 427, 428, para. 777; and for cases on the subject, see 13 DIGEST (Repl.) 104-110, 451-518.

For the Copyright Act, 1911, s. 6 (3) (b), see 4 HALSBURY'S STATUTES (2nd Edn.) 787; and for the Copyright Act, 1956, s. 19, s. 20, and s. 49 (1), see 36 HALSBURY'S STATUTES (2nd Edn.) 107, 109, 145.

**CASES-REF-TO:**

American Code Co., Inc. v. Bensinger, (1922), 282 Fed. Rep. 829.

Cary v. Faden, (1799), 5 Vex. 24; 31 E.R. 453; 13 Digest (Repl.) 56, 62.
Cary v. Longman, (1801), 1 East. 358; 102 E.R. 138; 13 Digest (Repl.) 57. 63.
Ellerman Lines, Ltd. v. Murray, White Star Line of Royal and United States Mail Steamers Oceanic Steam Navigation Co., Ltd. v. Comerford, [1930] All E.R. Rep. 503; [1931] A.C. 126; sub nom. The Croxteth Hall, The Celtic, 100 L.J.P. 25; 144 L.T. 441; 44 Digest (Repl.) 228, 462.
Hogg v. Toye & Co., Ltd., [1935] All E.R. Rep. 618; [1935] Ch. 497; 104 L.J.Ch. 232; 152 L.T. 495; 13 Digest (Repl.) 126, 665.
Ladbroke (Football), Ltd. v. William Hill (Football), Ltd., [1964] 1 All E.R. 465; [1964] 1 W.L.R. 273; Digest (Cont. Vol. B) 145, 98b.
Leslie v. J. Young & Sons, [1894] A.C. 335; 13 Digest (Repl.) 61, 95.
Low v. Ward, (1868), L.R. 6 Eq. 415; 37 L.J.Ch. 841; 13 Digest (Repl.) 54, 44.
Macmillan & Co., Ltd. v. Cooper, (1923), L.R. 51 Ind. App. 109; 93 L.J.P.C. 113; 130 L.T. 675; 40 T.L.R. 186; 13 Digest (Repl.) 63, 106.
Salomon v. Comrs. of Customs and Excise, [1966] 3 All E.R. 871; [1967] 2 Q.B. 116; 1966] 3 W.L.R. 1223; Digest (Cont. Vol. B) 621, 77a.
Thompson (Edward) Co. v. American Law Book Co., (1903), 122 Fed. Rep. 922.
University of London Press, Ltd. v. University Tutorial Press, Ltd., [1916] 2 Ch. 601; 86 L.J.Ch. 107; 115 L.T. 301; 13 Digest (Repl.) 55, 53.
Victoria City Corpn. v. Bishop of Vancouver Island, [1921] 2 A.C. 384; 90 L.J.P.C. 213; 44 Digest (Repl.) 232, 518.
Walter v. Lane, [1900] A.C. 539; 69 L.J.Ch. 699; 83 L.T. 289; 13 Digest (Repl.) 78, 221.
Walter v. Steinkopff, [1892] 3 Ch. 489; 61 L.J.Ch. 521; 67 L.T. 184; 13 Digest (Repl.) 52, 22.

**CASES-CITED:**

Millar v. Taylor, (1769), 4 Burr. 2303; Dering v. Earl of Winchelsea, (1787); 1 Cox Eq. Cas. 318; Platt v. Button, (1815), 19 Ves. 447; R. v. Debenham (Inhabitants), (1818), 2 B. & Ald. 185; Rundell v. Murray, (1821), Jac. 311; Short v. Lee, (1821), 2 Jac. & W. 464; Humble v. Hunter, [1843-60] All E.R. Rep. 468; (1848), 12 Q.B. 310; Jefferys v. Boosey, (1854), 4 H.L.Cas. 815; Hogg v. Scott, (1874), L.R. 18 Eq. 444; R. v.f Wilson, (1877), 3 Q.B.D. 42; Weldon v.d Dicks, (1878), 10 Ch.D. 247; Hudson v. Fernyhough, (1889), 61 L.T. 722; E. M. Bowden's Patents Syndicate, Ltd. v. Herbert Smith & Co., [1904] 2 Ch. 86, 122; Re Jude's Musical Compositions, [1906] 2 Ch. 595; [1907] 1 Ch. 651; Formby Brothers v. Formby, (1910), 102 L.T. 116; Attenborough & Son v. Solomon, [1911-13] All E.R. Rep. 155; [1913] A.C. 76; H. Blacklock & Co., Ltd. v. C. Arthur Pearson, Ltd., [1915] 2 Ch. 376; Moody v. Cox, [1916-17] All E.R. Rep. 578; [1917] 2 Ch. 71; Litvinoff v. Kent, (1918), 34 T.L.R. 298; Fred Drughorn, Ltd. v. Rederiaktiebolaget Transatlantic, [1918-19] All E.R. Rep. 1122, [1919] A.C. 203; Erskine MacDonald, Ltd. v. Eyles,d [1921] 1 Ch. 631; Performing Right Society, Ltd. v. London Theatre of Varieties, Ltd., [1922] 2 K.B. 433; [1924] A.C. 1; Wise v. Whitburn, [1924] 1 Ch. 460; Barstow v. Terry, [1924] 2 Ch. 316; Messager v. British Broadcasting Co., Ltd., [1928] All E.R. Rep. 272; [1929] A.C. 151; Harmer v. Armstrong, [1933] All E.R. Rep. 778; [1934] Ch. 65; Infields, Ltd. v. Rosen, [1939] 1 All E.R. 121; Saltman Engineering Co., Ltd. v. Campbell Engineering Co., Ltd., (1948), 65 R.P.C. 203; Ozzard-Low v. Ozzard-Low and Wonham, [1953] 2 All E.R. 550; [1953] P. 272; Jonathan Cape, Ltd. v. Consolidated Press, Ltd., [1954] 3 All E.R. 253; Nichrotherm Electrical Co., Ltd. v. Percy, [1957] R.P.C. 207; Bearmans', Ltd. v. Metropolitan Police District Receiver, [1961] 1 All E.R. 384; Francis Day & Hunter, Ltd. v. Bron, [1963] 2 All E.R. 16; [1963] Ch. 587; Harvey v. Smith-Wood, [1963] 2 All E.R. 127; [1964] 2 Q.B. 171; Hilton v. Lancashire Dynamo Nevelin, Ltd., [1964] 2 All E.R. 769.

**INTRODUCTION:**

Action. This was an action by the plaintiffs, Warwick Film Productions, Ltd., by writ issued on Apr. 26, 1960, and subsequently amended against the following defendants, (1) Joseph Eisinger, (2) Robert Goldstein, (3) Gregory Ratoff (since deceased), (4) Vantage Films, Ltd., (5) Twentieth Centrury Fox Film Co., Ltd., and (6) William Hodge & Co., Ltd. ("Hodges"). The first defendant was the scriptwriter of the defendants' film. The third defendant who had been joined as the director of the defendants' film, died in December, 1960, and the action against him had abated. The fourth defendants were sued as the production company of the defendants' film, and were struck off the register of companies in 1965. The fifth defendants were sued as distributors of the defendants' film. The sixth defendants, who had originally been joint plaintiffs, as owners of the copyright in the Hyde book pursuant to s. 19 (3) of the Copyright Act,

1956, were struck out as plaintiffs and joined as defendants by order dated Apr. 2, 1963. They took no part in the hearing of the action.

By their statement of claim delivered on July 18, 1960, as later amended, the plaintiffs alleged infringements of copyright by a cinematograph film "Oscar Wilde" made from the first defendant's film script, which reproduced from the book, hereinafter referred to, "The Trials of Oscar Wilde", which contained an account of the proceedings at his trials derived from an earlier book, published anonymously, but of which the plaintiffs alleged a Mr. Millard was the author, called "Oscar Wilde: Three Times Tried". The plaintiffs claimed (1) an injunction to restrain the first five defendants from infringing their copyright in a literary work entitled "The Trials of Oscar Wilde" and written by H. Montgomery Hyde, and their copyright in a literary work entitled "Oscar Wilde: Three Times Tried" and written by Christopher Sclater Millard or either of the said copyrights by making any adaption of the said works or either of them or any substantial part thereof or by reproducing the same or either of them or any substantial part thereof or any such adaptation or by publishing, exhibiting, selling, letting for hire, by way of trade, offering for sale or hire, or distributing for purposes of trade the said defendants' cinematograph film "Oscar Wilde" or any cinematograph film which reproduced the said literary works or either of them or any substantial part of either of them or any adaptation thereof or by authorising any of the acts aforesaid without the licence or consent of the plaintiffs. (2) An inquiry as to the damages suffered by the plaintiffs by reason of the defendants' infringements of the plaintiffs' copyright in the said works and each of them.

By their defence delivered on Aug. 26, 1961, as amended, the first and second defendants did not admit that H. Montgomery Hyde wrote "The Trials of Oscar Wilde" or that copyright subsisted in the work or any part thereof. If, which was not admitted, Mr. Hyde wrote the said work and/or copyright subsisted in the said work, it was denied that Mr. Hyde ever had or now had any copyright in so much of the said work as purported to be and/or was represented in the said work as being and/or was a verbatim transcript of what was said in court in the proceedings in 1895 in R. (Wilde) v. Queensberry and R. v. Oscar Fingal O'Flahertie Wills Wilde or in the indictments laid in the said proceedings. It was denied that "The Trials of Oscar Wilde", alternatively the passages therein which were material to the action, were an original literary work. By para. 5 of their defence, the first and second defendants did not admit that Mr. Millard wrote "Oscar Wilde: Three Times Tried" or any part thereof or that copyright subsisted in the said work or any part thereof. If Mr. Millard wrote the work or copyright subsisted in it, it was denied that he had any copyright in so much of the work as purported to be and/or was represented in the said work as being a verbatim transcript of what was said in court in the aforementioned proceedings. It was also denied that the said work was an original literary work. Further, or in the alternative, the passages aforesaid were not the original literary work of Millard. By para. 6 of the defence, the first two defendants alleged that if copyright did subsist in "Oscar Wilde: Three Times Tried" or any part thereof, the work was first published in the United Kingdom within the period of fifty years ending with the beginning of 1960, and no name purporting to be that of the author appeared on copies of the said work so published but the name "The Ferrestone Press, Ltd." purporting to be that of the publisher appeared on the said copies of the said work as first published as aforesaid, and in the premises the Ferrestone Press, Ltd. were to be presumed to have been the owners of the copyright in the said work at the time of publication. The first and second defendants relied on s. 20 (4) of the Copyright Act, 1956. Further, if, which was not admitted, copyright subsisted in the said work, it was denied that the plaintiffs were or at any material time had been the owners of the alleged or any exclusive rights in the work or any part thereof. By para. 9 of the defence the first defendant admitted that he wrote the script for the film "Oscar Wilde" without the licence or consent of the plaintiffs but denied that any such licence or consent was required; the fourth defendant, Vantage Films, Ltd., admitted that they made a cinematograph film "Oscar Wilde" without the licence or consent of the plaintiffs, but denied that such licence or consent was needed. It was not admitted that the said film or script reproduced a substantial part of either of the said works. The defendants denied that they infringed the alleged copyright or other rights of the plaintiffs as alleged or at all. By para. 13 of the defence the first and second defendants pleaded that the copyright (if any) in "The Trials of Oscar Wilde" and in "Oscar Wilde: Three Times Tried" were not respectively infringed by the reproduction or adaptation of so much of the said works as purported to be and were represented in the said works as being verbatim transcripts of what was said in court proceedings or by the reproduction of any part of extracts from such portions of the said works. The first and second defendants denied that the plaintiffs had suffered or were calculated to suffer any damage as alleged, and alleged that they were not entitled to any relief claimed and in particular to any equitable relief by reason of the conduct of themselves, their servants and agents, prior to action brought.

The fifth defendants, distributors of the film "Oscar Wilde", by their defence, re-delivered on Oct. 27, 1965 as amended, did not admit that the plaintiffs were the owners of the copyright in "Oscar Wilde: Three Times Tried", or that

the film was made in infringement of copyright in Mr. Hyde's book; their defence contained other denials not material to be specified in this report.

**COUNSEL:**

G. T. Aldous, Q.C., D W. Falconer, Q.C., and D. E. M. Young for the plaintiffs. Michael Stranders, Q.C., and J. N. B. Penny for the first and second defendants. F. P. Neill, Q.C., and J. N. B. Penny for the fifth defendants. W. Aldous for the sixth defendants.

**JUDGMENT-READ:**

Cur. adv. vult. July 31.

**PANEL:** Plowman, J.

**JUDGMENTBY-1:** PLOWMAN, J.

**JUDGMENT-1:**

PLOWMAN, J., read the following judgment: In my judgment this action fails. It arises out of a dispute between two companies who simultaneously made talking pictures based on the tragedy of Oscar Wilde. One of those companies was the plaintiff company, Warwick Film Productions, Ltd., who issued their writ as long ago as Apr. 26, 1960, and immediately launched a motion for an injunction to stop those who were responsible for the other film exhibiting it. In this the plaintiffs were unsuccessful and in consequence they seem to have lost any enthusiasm that they ever had for bringing their action to trial. Over seven years elapsed before the action came on before me.

The plaintiffs' claim in this action is based on alleged infringement of copyright. They claim to be the exclusive licensees of certain rights of copyright in a book entitled "The Trials of Oscar Wilde", edited by Mr. Montgomery Hyde and published in 1948 by William Hodge & Co., Ltd. (to whom I will refer as "Hodges") in their Notable British Trials series. They also claim to be entitled to certain exclusive rights of copyright in another book called "Oscar Wilde: Three Times Tried", which was written anonymously and published by the Ferrestone Press, Ltd. in 1911 or 1912. They claim that this book was in fact written by one Christopher Sclater Millard and that they derive their title to their rights of copyright through him. I will refer to these books as "the Hyde book" and "Three Times Tried" respectively.

The kplaintiffs' case is that the account of the trial proceedings in the Hyde book was substantially copied from the account of those proceedings in "Three Times Tried"; that the defendants' film reproduces from the Hyde book parts of the speeches of counsel, the words of the judges and the questions to and answers of Oscar Wilde; that such reproduction comprises a substantial part of both books and that the defendants have accordingly infringed the plaintiffs' rights of copyright in both books. The script for the defendants' film was written by the defendant Joseph Eisinger, who has admitted that he took from the Hyde book and used for his script parts of the verbatim report of the words of counsel, the judges and Oscar Wilde, but the defendants deny (inter alia) that their film reproduces a substantial part of either book.

When the writ in this action was issued there were two plaintiffs, Warwick Film Productions, Ltd. and Hodges, who were joined as owners of the copyright in the Hyde book pursuant to s. 19 (3) of the Copyright Act, 1956. The defendants were Mr. Eisinger, Robert Goldstein, Gregory Ratoff and Vantage Films, Ltd. Twentieth Century Fox Film Co., Ltd. were added as defendants, and at a later date still, Hodges, who were no longer willing to make common cause with their co-plaintiffs, were struck out as plaintiffs and joined as defendants. They have taken no part in the hearing, no doubt with s. 19 (8) in mind. Mr.f Eisinger was, as I have said, the script-writer of the defendants' film. Mr. Goldstein's precise position as defendant is ambiguous. He has admitted in his defence that as managing director of the fifth defendants, Twentieth Century Fox, he authorised the exhibition of the defendants' film, but it appears that in fact he was managing director of a different company in the Twentiethf Fox group. I declined, however, to allow his admission to be withdrawn after it had stood on the record for nearly six years. Mr. Gregory Ratoff was joined as the director of the defendants' film. He died in December, 1960, and against him the action has abated. Vantage Films, Ltd. were sued as the production company of the defendants' film. They were struck off the register of companies in 1965. Twentieth Century Fox is sued as distributor of the defendants' film.

The fact that the plaintiffs and the defendants simultaneously came to make and exhibit films about Oscar Wilde was no coincidence. The idea originated with Mr. Eisinger, screen-writer, playright and novelist, an American citizen

who has lived in this country for the past eight years. He was living in America in 1938 when the play "Oscar Wilde" by Leslie and Sewell Stokes was put on at the Fulton Theatre in New York with Mr. Robert Morley in the title role. Eisinger was much impressed with this play and saw it a number of times. He admired the author's technique in combining dramatic effect withd an economical use of the trial material available. He thought that it would make a magnificent film. Until recently, however, censorship difficulties were likely to confront anyone making a film about the trials of Oscar Wilde, concerning, as they did, homosexuality; but with a change in the climate of public opinion, the time came when Mr.f Eisinger thought that it should be possible to make such a film and that, if he could find anyone to finance and distribute it, he would write a script. He already had in his mind certain ideas as to the form which his script would take. He put up the idea to Mr. Goldstein, who liked it, but, after making enquiries in America, came to the conclusion that Twentieth Century Fox would not be able to get approval under the American Motion Picture Producers Code. He said, however, that he thought that he might be able to find another company willing to distribute and finance the making of the film, and it was in fact through his introduction that Mr. Eisinger met a Mr. Shipman, a director of Eros Films, a distribution company, and a Mr. Allen, who was a director both of Eros Films and of the plaintiff company. Mr. Allen, to whom he had already broached the subject, appeared to be very interested and initiated discussions between Mr.f Eisinger and a Mr.f Kenneth Hughes, who was proposed by Mr. Allen as director of the film. Discussions were well under way when suddenly Mr. Hughes told Mr. Eisinger that Mr. Allen had instructed him to drop the discussions. later, Mr. Hughes told him that Mr. Allen had decided to produce his own Oscar Wilde film, through his own production company, that he had no need to use Mr. Eisinger, and that Mr. Allen did not want him to speak to Mr. Eisinger again. At the time of his discussions with Mr. Allen, Mr. Eisinger had not written his script, and the breakdown in negotiations was no doubt at least partly due to Mr. Eisinger's delay in producing one. Mr. Eisinger does not suggest that Mr. Allen entered into any contractual obligation to go ahead with his, Mr. Eisinger's, project. I have seen Mr. Eisinger in the box and also Mr. Goldstein, who corroborates his evidence in a number of respects, and I accept their evidence as the evidence of truthful witnesses, particularly as neither Mr. Allen nor Mr. Hughes has gone into the box to contradict it. I have touched on this matter at this point only to explain why, when no other film company had apparently ever before thought it possible or worth while to make a film on Oscar Wilde, two film companies should embark on the project at the same time. The defendants submitted that the plaintiffs' conduct in relation to this matter (to only part of which I have referred) was such as to disentitled them to any equitable relief by way of injunction, but I am not concerned with that aspect of the case for the moment.

I turn now in more detail to the question of copyright in the two books and the manner in which that copyright is said to have been infringed. I need say very little about the trials themselves; they are so well known as to be matters of general knowledge. Briefly, however, they came about in this way:

In the year 1895 the eighth Marquess of Queensberry publicly accused Oscar Wilde of "posing as a Sodomite", and Socar Wilde prosecuted him for criminal libel. Lord Queensberry's trial is the first of the trials referred to in the title of the book "Three Times Tried". Lord Queensberry filed a plea of justification and on the third day of the trial Sir Edward Clarke on behalf of Oscar Wilde, seeing how the case had gone so far and seeing the nature of the evidence which was yet to come in support of the plea of justification, asked leave to withdraw the prosecution. The result was that Lord Queensberry was acquitted on the verdict of the jury. Three weeks later Oscar Wilde himself went on trial at the Old Bailey for offences under the Criminal Law Amendment Act, 1885, involving acts of gross indecency with other male persons. On the fifth day of the trial the jury disagreed and were discharged. This was the second of the trials referred to in the title of the book "Three Times Tried". Oscar Wilde was put up for trial again three weeks later and on this occasion he was found guilty on a number of counts and sentenced to two years' imprisonment with hard labour. This was the third of the three trials.

The trials were extensively reported in the Press at the time so far as the nature of the case would allow, but apart from certain extracts of the proceedings (though not of the Queensberry trial) which were privately printed in Paris in 1906, no report of the trial in book form seems to have been published until "Three Times Tried" appeared in the last days of 1911 or early in 1912. The body of this book consists of a day by day account of the three trials and certain connected proceedings, interspersed with the author's comments and with descriptive passages about the scene and the persons involved. It appears to have been written by someone who had access to inside information about the events which he records and who, unlike the majority of his contemporaries, was sympathetic to Oscar Wilde. Although some of the passages are based on newspaper accounts, Mr. Montgomery Hyde, who has studied the newspaper reports of the trials, agreed that it would have been impossible to assemble from those reports the record of the trials which is found in "Three Times Tried". The book sets out partly in direct and partly in indirect speech the speeches of counsel, the questions put to witnesses and their answers and the words of the judges. Clearly, however, a drastic process of selection has taken place for a book of the size of "Three Times Tried" is far too small to contain every word that was said in the

course of the fourteen days which the trials occupied. The author of the book was, I think, plainly working on a transcript of a shorthand note of the proceedings; whose is unknown; but whatever his sources, I feel no doubt, after reading the book, that "Three Times Tried" was a literary work in its own right and one in which copyright subsisted.

"Three Times Tried" was issued in a cheaper edition in 1914. The publishers of this edition are stated to be not Ferrestone Press, but Frank and Cecil Palmer. Their address was the same as that of the Ferrestone Press, namely, Red Lion Court; and Frank, though not Cecil, Palmer, was a director of and shareholder in the Ferrestone Press. That company was wound up and dissolved in the year 1928. There is no evidence of its ever having published any book except the first edition of "Three Times Tried", which undoubtedly became a source-book for subsequent studies in the same field. It was, for example, the principal source for Mr. Hyde's own account of the trials and for the trial scenes in the Stokes play.

The question then arises, who owned the copyright in "Three Times Tried"? The plaintiffs claim that Mr. Millard, as the author of the book, became the owner of the copyright, that this copyright formed part of his estate when he died in 1927, and that it remained part of his estate until 1960, when they bought it from his surviving executor. The first matter which I propose to examine is not the authorship of "Three Times Tried" (about which the evidence is far from clear), but the ownership of the copyright in it.

I start with s. 20 (4) of the Copyright Act, 1956, which, so far as material, is as follows:

"(4) Where, in an action brought by virtue of this Part of this Act with respect to a literary, dramatic, musical or artistic work, sub-s. (2) of this section does not apply, but it is established -- (a) that the work was first published in the United Kingdom, or in another country to which s. 2, or, as the case may be, s. 3, of this Act extends, and was so published within the period of fifty years ending with the beginning of the calendar year in which the action was brought, and (b) that a name purporting to be that of the publisher appeared on copies of the work as first published, then, unless the contrary is shown, copyright shall be presumed to subsist in the work and the person whose name so appeared shall be presumed to have been the owner of that copyright at the time of the publication..."

It is common ground: (i) that this is an action brought by virtue of "this Part of this Act" with respect to a literary work; (ii) that sub-s. (2) does not apply; (iii) that "Three Times Tried" was first published in the United Kingdom; (iv) that it was so published within the period of fifty years ending with the beginning of the calendar year in which the action was brought; and (v) that a name, i.e., The Ferrestone Press, Ltd., purporting to be that of the publisher appeared on copies of the work as first published. If, therefore, the subsection means what it says, it follows that, unless the contrary is shown, copyright must be presumed to subsist in the work and that Ferrestone Press, Ltd. must be presumed to have been the owners of that copyright at the time of publication. From this it follows that for the plaintiffs to succeed in their claim to be owners of the copyright, they must either accept the benefit of the presumption and trace title through the publishers, or else (as a first step) establish that Ferrestone Press, Ltd. were not the owners of the copyright at the time of publication. They have not attempted to do the former, and, in my judgment, they have not succeeded in doing the latter.

In order to establish that the publisher of a book was not the owner of the copyright at the date of publication, it is not enough to show that he was not the author. As a matter of probability it is most unlikely that he would have been the author, and in the case of a publisher who was a limited company, impossible. The statutory presumption cannot, therefore, be based on any inherent probability. Moreover, if the publisher is to be presumed to have been the owner of the copyright at the time of publication, it must follow that the author is to be presumed not to have owned the copyright at that time. The onus is therefore on the plaintiffs to prove affirmatively, if they can, not that Mr. Millard was the author (which, of itself, would seem to me to avail them nothing), but that the Ferrestone Press, Ltd. did not own the copyright when "There Times Tried" was published, and this, as I have said, they have in my judgment failed to do.

The plaintiffs seek to avoid this result in two ways.

In the first place they submit that the presumption applies only in an action in which the publisher himself is plaintiff and therefore has no application in the present case. This submission is founded on the decision of the Court of Appeal in the case of Hogg v. Toge & Co., Ltd. n(1), a case decided on the Act of 1911. The headnote is as follows n(2):

n(1) [1935] All E.R. Rep. 618; [1935] Ch. 497.

n(2) [1935] Ch. at pp. 497, 498.

"By s. 6(3) of the Copyright Act, 1911: 'In any action for infringement of copyright in any work, the work shall be presumed to be a work in which copyright subsists and the plaintiff shall be presumed to be the owner of the copyright, unless the defendant puts in issue the existence of the copyright, or, as the case may be, the title of the plaintiff, and where any such question is in issue, then -- (a) if a name purporting to be that of the author of the work is printed or otherwise indicated thereon in the usual manner, the person whose name is so printed or indicated shall, unless the contrary is proved, be presumed to be the author of the work; (b) if no name is so printed or indicated, or if the name so printed or indicated is not the author's true name or the name by which he is commonly known, and a name purporting to be that of the publisher or proprietor of the work is printed or otherwise indicated thereon in the usual manner, the person whose name is so printed or indicated shall, unless the contrary is proved, be presumed to be the owner of the copyright in the work for the purposes of proceedings in respect of the infringement of copyright therein.'

"In 1896, there was published a new edition of a handbook entitled 'The Perfect Ceremonies of Craft Masonry', which, for the purposes of the Copyright Act, 1842, was a new work, but the name of its author was unknown. That edition and all the subsequent editions, which were mere reprints of the 1896 edition and contained no new or original work, bore on their flyleaves the imprint: 'Privately printed for A. Lewis.' From about the year 1906 to the date of his death on Aug. 2, 1909, one John Hogg carried on the business of publishing masonic rituals at 13, Paternoster Row, London, under the name of A. Lewis. Thereafter Godfrey Hogg down to the date of his death in 1922 and thenceforth his widow, the plaintiff Charlotte Hogg, carried on the same business under the name of A. Lewis. In an action by Charlotte Hogg, who claimed to be the owner of the copyright in the work entitled: 'The Perfect Ceremonies of Creaft Masonary', for infringment thereof the defendants pur in issue the existence of any copyright in the work and the title of the plaintiff to copyright, if any, therein; and in the absence of proof of her derivative title to copyright, the plaintiff relied on s. 6 (3) (b) of the Copyright Act, 1911, and claimed that she, as publisher whose name was imprinted on the flyleaves of her editions of the work, must be presumed to be the owner of the copyright in the work. Held, by CLAUSON, J., and the Court of Appeal, that the presumption referred to in s. 6 (3) (b) of the Copyright Act, 1911, that the person whose name is indicated on an anonymous work as the publisher thereof is the owner of the copyright therein, is based on the hypothesis that the publisher whose name is so indicated is not the real owner of the copyright therein and is raised merely for the purpose of giving such a publisher a 'locus standi' in proceedings for infringement taken by him under that section on behalf of the real owner of the copyright, and that, accordingly, and in view of the fact that the reprints of the 1896 edition issued by the plaintiff could not be the subject of copyright, the presumption did not enure to the benefit of the plaintiff further than as aforesaid in the absence of proof of her derivative title to an antecedent copyright."
Both CLAUSON, J., at first instance and MAUGHAM, L.J., in the Court of Appeal observed that this interpretation of the subsection might seem a narrow one, but they and the other members of the Court of Appeal were constrained to reach it on a construction of the language used, in particular, (i) the present force of the words "be presumed to be"; (ii) the reference to "the plaintiff"; and (iii) the words "for the purposes of proceedings in respect of the infringement". CLAUSON, J., said this n(3):

n(3) [1935] Ch. at p. 505.

"In my view the clause in effect says that in the case of, I will call it for convenience, and anonymous work (which is not exactly exhaustive), if you find a publisher's name imprinted on it, the person so named, if he is the plaintiff in the action, is to be presumed, until the contrary is shown, to be the owner of the copyright in the work. But there is no presumption as regards anybody except that person."
LORD HANWORTH, M.R., in relation to s. 6 (3) (b), said this n(4):

n(4) [1935] All E.R. Rep. at p. 621; [1935] Ch. at p. 511.

"What does the section then provide? A person whose name is so indicated 'shall... be presumed to be the owner of the copyright in the work for the purposes of proceedings in respect of the infringement of copyright therein'. That seems to me in comparatively clear terms to indicate that for the purposes of the proceedings the person who can say that he has the name indicated upon the work is to have a locus standi as the plaintiff to enforce his rights against an infringer."
Then LORD HANWORTH, M.R., said n(5):

n(5) [1935] All E.R. Rep. at p. 621; [1935] Ch. at p. 512.

"I think that counsel for the defendants is right and that the learned judge is right in saying that the words are 'to be' and ought not to be interpreted as being 'to have been' -- that they are, so to speak, of present force and validity, and are not retrospective in their effect."
ROMER, L.J., said n(6):

n(6) [1935] All E.R. Rep. at p. 623; [1935] Ch. at p. 516.

"It will be observed that the subsection in no way purports to divest the author or other true owner of the copyright of his rights. It is not confined to the case of an author whose whereabouts cannot be ascertained. Such a case is not, indeed, in terms mentioned in the section. What it does contemplate is that there is an author whose name is well known to the public, but who for reasons of his own does not desire his neme to appear on the published work, who desires to remain anonymous or who has published it work under a nom de plume. In that case the person whose name is printed on the work as publisher is to be presumed for the purposes of the proceedings, and only for those purposes, to be the owner of the copyright."
Then MAUGHAM, L.J., said n(7):

n(7) [1935] All E.R. Rep. at pp. 625, 626; [1935] Ch. at pp. 520, 521.

"In my opinion, it follows that, the presumption being one only for the purposes of proceedings for infringement, there is no ground for presuming under the subsection that some publisher who published a work long ago, but who is now dead and never was concerned in an infringement action, was the owner of the copyright in the work. The presumption does not apply to him, because it can only apply for the purposes of an infringement action, which that deceased publisher was never concerned with. The difficulty in giving the wide construction to the subsection for which counsel for the plaintiff contends does not rest, I think, simply on the use of the tense in the sentence 'whose name is so printed... shall... be presumed to be the owner of the copyright', but is also to be gathered from the words 'presumed to be the owner of the copyright in the work for the purposes of proceedings in respect of infringement' and accordingly, in my view, it is wrong to suppose that any presumption can be made with regard to ownership of a past publisher, since he cannot be presumed 'to be' the owner for the purposes of these infringement proceedings. As CLAUSON, J., observed, it may seem a narrow interpretation of the section, but we are not entitled, as it seems to me, in a section relating to proof of certain evidential facts in an infringement action to go beyond the language of the section, and I do not think it is very surprising that a section introduced for the purpose of giving effect to the rights of anonymous authors was not framed so as to apply... long after the anonymous author is dead or the original purlisher is dead."
It the position the same under s. 20 (4) of the Act of 1956? In my judgment it is not. Each of the three matters of language which, as I have said, appear to have constrained the Court of Appeal to reach its conclusion has been altered in or omitted from the Act of 1956. First, the words are no longer "shall be presumed to be", but "shall be presumed to have been... at the time of publication". Secondly, the reference to "the plaintiff" has been omitted; and, thirdly, the words "for the purposes of proceedings in respect of the infringement" have gone too. The inference seems to me to be that Parliament deliberately decided to broaden the scope of the presumption and did so by omitting from s. 20 (4) of the Act of 1956 that part of the corresponding section of the Act of 1911 on which the decision in Hogg v. Toye & Co., Ltd. n(8) was based.

n(8) [1935] All E.R. Rep. 618; [1935] Ch. 497.

Counsel for the plaintiffs submitted that the subsection ought to be construed in the light of art. 15 (2) of the Brussells Convention, 1948, n(9), and that so to construe it would lead to a different result and restore the authority of Hogg v. Toye & Co., Ltd. n(8). In my judgment, however, it is not permissible to refer to the Brussels Convention for this purpose.

n(8) [1935] All E.R. Rep. 618; [1935] Ch. 497.

n(9) Cmd. 7815.

There does not appear to be any ambituity in s. 20 (4) which would entitle me to depart from what I take to be the general rule, namely, that a convention, such as the Brussels Convention, cannot be referred to for the purpose of giving to a section a meaning other than its natural meaning. This principles is to be found in Ellerman Lines, Ltd. v. Murray n(10). Part of the headnote to that case is as follows n(11):

n(10) [1930] All .E.R. Rep. 503; [1931] A.C. 126.

n(11) [1931] A.C. at p. 127.

"Held, further, that, the section [s. 1 of the Merchant Shipping (International Labour Conventions) Act, 1925] being unambiguous, it was not permissible to refer to the preamble of the Act or to the draft Convention to which the Act was intended to give effect in order to give the section a meaning other than its natural meaning."
LORD TOMLIN said this in the course of his speech n(12):

n(12) [1930] All E.R. Rep. at p. 513; [1931] A.C. at p. 147.

"I cannot find in any part of the section anything which introduces a cutting down of the two months' period by reference to the date at which but for the wreck or loss the service would have terminated. Nor do I think that, assuming there is any divergence between the draft Convention and the Act, it would be proper to resort to the draft Convention for the purpose of giving to the section a meaning other than that which in my judgment is its natural meaning."
Then LORD MACMILLAN said n(13):

n(13) [1930] All E.R. Rep. at p. 513; [1931] A.C. at pp. 148, 149.

"It is no doubt true that where the language used by the Legislature presents a choice of two or more meanings equally tenable it is admissible within certain limits to have resort to the aid of extraneous considerations and certainly to the context of the statute itself in order to discover which meaning was most probably intended (see for example, Victoria City Corpn. v. Bishop of Vancouver Island n(14), per LORD ATKINSON and authorities there cited). But the terms of the statute in the present case offer no such choice to my mind and only a sophisticated reading could import any ambiguity into them. The object of representing the subsection to be ambiguous, as your Lordships were frankly told, was to pray in aid of its interpretation the language of the preamble and of the scheduled convention, to give effect to which the statute appears to have been enacted. But if it were legitimate or necessary to go outside the terms of the subsection and resort to these aids I do not think that they assist the shipowner's case."

n(14) [1921] 2 A.C. 384 at pp. 387, 388.
This case was recently considered by DIPLOCK, L.J., in Salmon v. Comrs. of Customs and Excise n(15). After referring to a particular convention as one of those public acts of state of Her Majesty's government of which Her Majesty's judges must take judicial notice if it be relevant to the determination of a case before them, DIPLOCK, L.J., said this n(16):

n(15) [1966] 3 All E.R. 871; [1967] 2 Q.B. 116.

n(16) [1966] 3 All E.R. at pp. 875, 876; [1967] 2 Q.B. at pp. 143, 144.

"Where by a treaty Her Majesty's government undertakes either to introduce domestic legislation to achieve a specified result in the United Kingdom or to secure a specified result which can only be achieved by legislation, the treaty, since in English law it is not self-operating, remains irrelevant to any issue in the English courts until Her Majesty's government has taken steps by way of legislation to fulfil its treaty obligations. Once the government has legislated, which it may do in anticipation of the coming into effect of the treaty as it did in this case, the court must in the first instance construe the legislation, for that is what the court has to apply. If the terms of the legislation are clear and unambiguous, they must be given effect to whether or not they carry out Her Majesty's treaty obligations, for the sovereign power of the Queen in Parliament extends to breaking treaties (see Ellerman Lines, Ltd. v. Murray n(17)), and any remedy for such a breach of an international obligation lies in a forum other than Her Majesty's own courts. If the terms of the legislation are not clear, however, but are reasonably capable of more than one meaning, the treaty itself becomes relevant, for there is a prima facie presumption that Parliament does not intend to act in breach of international law, including therein specific treaty obligations; and if one of the meanings which can reasonably be ascribed to the legislation os consonant with the treaty obligations and another or others are not, the meaning which is consonant is to be pre-

ferred. Thus, in case of lack of clarity in the words used in the legislation, the terms of the treaty are relevant to enable the court to make its choice between the possible meanings of these words by applying this presumption."

n(17) [1930] All E.R. Rep. 503; [1931] A.C. 126.
Later on, DIPLOCK, L.J., said n(18):

n(18) [1966] 3 All E.R. at p. 876; [1867] 2 Q.B. at p. 145.

"In my view, we can refer to the convention to resolve ambiguities or obscurities of language in the section of, and the schedule to, the statute."
In is true that in Hogg v. Toye & Co., Ltd. n(19) MAUGHAM, L.J., did refer to art. 11 of the Berne Convention, 1886; but, having regard to the Ellerman Lines case n(17) (to which he did not refer), I think that this must either have been per incuriam, as is suggested in 36 HALSBURY'S LAWS OF ENGLAND (3rd Edn.) p. 411, or because he regared s. 6 (3) of the Act 1911 as ambiguous. Any such ambiguity as there may have been has, in my judgment, been removed by s. 20 (4) of the Act of 1956. I should perhaps add that in any case I am far from convinced that a reference to the Brussels Convention would lead to a different result.

n(17) [1930] All E.r. r/ep. 503; [1931] A.C. 126.

n(19) [1935] All E.R. Rep. 618; [1935] Ch. 497.

The other argument by which the plaintiffs sought to avoid the effect of the presumption in s. 20 (4) was to this effect, namely, that if one speculated on what facts might have existed which would render the presumption true as a matter of fact (if, for example, Mr. Millard had assigned the copyright to Ferrestone Press, Ltd.), then as a matter of law, the copyright would have automatically reversted to Mr. Millard's estate in 1953 or 1954, thus enabling his executor to sell it to the plaintiffs. I need not trace this argument (which centred round s. 24 (1) of the Copyright Act, 1911) in detail for two reasons: first, because it is not, in my judgment, legitimate to speculate on what facts might have existed which would render the statutory presumption true as a matter of fact; and, secondly, because even if it were, speculation would be idle unless in every conceivable situation reverter was bound to have taken place. But this is not so. To give only one example, under proviso (a) to s. 24 (1) of the Act of 1911 reverter takes place only in the absence of express agreement, and if Mr. Millard did assign his copyright (assuming that he had any) to Ferrestone Press, Ltd; it cannot be predicated that reverter was not excluded by agreement.

For these reasons I reach the conclusion that the plaintiffs have not established any title to the copyright in "The Times Tried".

I pass now to the Hyde book.

This book consists of a foreword by the late HUMPHREYS, J., who had been one of the junior counsel for Oscar Wilde in each of the three trials; a long introduction of some ninety pages by Mr. Hyde; a report, largely verbatim, of the three trials extending to some 230 pages and six appendices occupying about forty pages.

Mr. Hyde assembled his material from a number of sources. He used the newspaper library at the British Museum and visited the Bodleian to look at the collection of Wilde material there; he had his own collection of Wildeana; he had conversations with persons who had been present at the trials; he had, in the past, had conversations with Lord Alfred Douglas, who was, of course, intimately connection with the affair; and he met Mr. Cecil Palmer, of whom, in his preface, he states:

"I am especially indebted to Mr. Cecil Palmer for the use he has kindly permitted me to make of Oscar Wilde: Three Times Tried, which he originally published in 1912 in collaboration with the late C. S. Millard, whose bibliography of Oscar Wilde, written under the pseudonym 'Stuart Mason', I have likewise found indispensable."
In fact, there is no evidence of any connexion between Mr. Cecil Palmer and the Ferrestone Press, Ltd., or of any right in Mr. Cecil Palmer to permit the use of "Three Times Tried", and his use of "Three Times Tried" was, on the evidence, made without any proper authority. Although his account of the proceedings of the trials was substantiall copied from the account in "Three Times Tried", he himself did a good deal of editing. Certain portions of his account printed in square brackets were his own contribution, and he added material, omitted material, made verbal alterations, rearranged

material, transposed material and abbreviated material. The instances of this editorial work on which the plaintiffs rely number eighty-eight and res set out in a document which forms part of the pleadings and is headed "Schedule of Textual Alterations". Moreover, Mr. Hyde frequently put into oratio recta speeches which are reported in "Three times Tried" in oratio obliqua. Again, I take the view, after reading it, that the book as a whole is a literary work entitled to copyright in its own right.

I come now to Mr. Eisinger's script of the defendants' film. At the time when he wrote it, Mr. Eisinger not only made no direct use of "Three Times Tried", but he had never even heard of it. In his defence, however, he repeats the admission, which he made in an affidavit which he swore in opposition to the plaintiffs' motion, that he made use of parts of the speeches of counsel, the words of the judges and questions to and answers of Oscar Wilde reproduced in the Hyde book, excepting the parts in square brackets. He says, and I accept, that he did this on the strength of Mr. Hyde's representation in the last paragraph of the preface, confirmed by the foreword of HUMPHREYS, J., of the trials being an authentic account taken from contempory shorthand notes of what was actually said by the judges, counsel and witnesses taking part. He might have added a reference to the last sentence of the introduction which says: "Now let the records of the trials speak for themselves." He also said, and again I accept, that it never occurred to him that a person who frankly stated that he merely reproduced contemporary verbatim reports of a public trial could claim copyright in such material itself and that nothing in any of the passages in his script was derived from any passages in the Hyde book which did not purport to be the unaltered text of a contemporary shorthand note.

The inspiration for his film script, which tells the story of Oscar Wilde's fatal friendship with Lord Alfred Douglas and its consequence, was undoubtedly the Stockes play. The release script of the film consists of eighty-eight pages, only about half of which are concerned with trial scences. Thirty-seven pages are devoted to the Queensberry trial and six to Oscar Wilde's second trial, and it is only this half of the film-play which is alleged to infringe the plaintiffs' copyright. Oscar Wilde himself is the only witness featuring in the dramatis personae. The passages complained of are set out in certain particulars delivered by the plaintiffs designated "Table B", where they are tabulated against the corresponding passages in the Hyde book and "Three Times Tried".

Mr. Eisinger has given evidence about the use that he made of the Hyde book, and I will refer to half a dozen passages from his evidence. In examination-in-chief he said:

"I worked with the Montgomery Hyde book and I worked with the Stokes play. What I then attempted to do was to reduce to manageable proportions for myself all of the lengthy trial record as found in the Hyde book to see whether or not this could be fitted, or any additional information which I might have that could be fitted into the Stokes structure of the trial. Q. -- What did you do when you read the Hyde book? A. -- When I sat down to work with the Hyde book and with the Stokes play, I also had other material -- sources. I had the Hesketh Pearson book and various others. I marked the Hyde book, comparing it with the testimony which I found in the Stokes play; and then I looked to see if there was other testimony which would be useful in the cinema which Stokes had not used out of the trial record, you see, and I marked up the Hyde book. It was rather complicated, because I did not follow the continuity of the actual trial record. Some scences were taken. I say "scenes". I mean some actual portions of the actual trial I took out of context, and I suppose either ahead or behind their actual point of development; and I marked the book up with arrows and heiroglyphics which I understand; and then I worked with the Stokes play and the Hyde book and produced the notebook here in order that I would have reduced it to manageable proportions for myself, so that I would not have to constantly be referring back to the lengthy record of the trial as given in the Hyde book and to the play in Stokes. Once I had completed that process, I was able to put the books away, you see, and not have to go flipping through the pages constantly. Then I took the notebook which I had produced to do that work, and I used that on the further re-shaping of the material, as I went on on the typewriter, which resulted in the very first rough draft which was called C.C.3. Q. -- I am coming to C.C.3. Tell us what you took out of the Hyde book and put in the notebook, as far as you recall. A. -- I cannot remember now whether I got a word out of Hyde or out of Stokes. Buth were exact phrases and words and questions and answers in the books. Q. -- But, you see, in this action you have admitted that you took a certain part from the book? A. -- Yes, I did. Q. -- For example, you admitted that you took part of the speeches of counsel? A. -- Yes. Q. -- Some of the words of judges and some of the questions and answers? A. -- Yes. Q. -- I think that is admitted. Now all I want you to do is this, if you can help my lord by saying what parts you took -- well and good; if you cannot, say so. A. -- By telling you which words I took? Q. -- Which parts you took. You will tell us if you cannot remember now which you took? A. -- I took, I think, the opening speeches of counsel. I really cannot remember. If i could have the book in front of me of my script, it might help to refresh my memory. I do not know. But after seven years it is impossible to tell. Q. -- How about things in square brackets in the Hyde book? A. -- I did not us anything which was in brackets. I used only what I considered to be true reports of the trial record. Q. -- Well, just explain that to my lord -- what you mean by

saying, 'what I considered to be true reports of the trial record'. A. -- Well, what I considered was a verbatim report of what had been said in the trials. It never occurred to me that what I am saying now in court -- somebody can go out and claim copyright of it. I do not think it would do them much good commercially; but I did not realise that that might be the situation in law. I went to whatever source I could find where the trial reports were printed, and had no inhibitions about using that. Q. -- You thought you were perfectly entitled to? A. -- Absolutely, sir, because I found many works and each work repeated the other; and I had never heard anybody screaming that, 'This belongs to me'... Q. -- Then you produced the notebook. What did you do when you had poduced the notebook? A. -- The next step was to put aside the printed copies of the Hyde book and all the other material sources which I had lying about on my work table; so that I was able to refer to what I had selected in my notebook; and then I sat down at the typewriter and I started to write my play -- the first draft, which is identified as C.C.3; and then from that, when I reached the trial scenes, a further reshaping took place as I wrote my first draft from my notebook. I then created many passages in the trials which actually never took place in the trials -- passages between Sir Edward Carson and Oscar Wilde. I did not falsify, but I dramatised the prevailing attitudes between Carson and Wilde by creating passages. Q. -- As a result of your conversation with Mr. Morley, did you do anything in regard to this play? A. -- Yes, I did. Q. -- Tell my lord what you did. A. -- I added some scenes to the script which Mr. Morley wanted to play; and, in order to do that, I purchased -- that is, the company purchased -- the play 'Oscar Wilde, by Leslie & Sewell Stokes', because that play contained those scenes which were actually non-trial scenes. [At that stage Mr. Robert Morley was going to play 'Oscar Wilde']... Q. -- This was a gentleman who had played the part, and you were telling us that as a result of your meeting with him you changed your script. A. -- Yes. I made certain changes in the script which Mr. Morley thought would enhance the dramatic value of the script, because he had played those scenes very effectively on stage in the theatre, in the Leslie & Sewell Stokes play 'Oscar Wilde'. Am I permitted to say what I told Mr. Morley? Q. -- No, I think not. Did you make any changes in the trial scenes? A. -- Yes, I made some changes in the trial scenes, at the request of Mr. Morley."
And then the witness went on to state what those changes were.

Then in cross-examination he was asked whether he could say which passages he had taken from the Hyde book and which from the Stokes play; and he said this:

"It would be enormously difficult for me to try to separate words which are common to more than one source or to two sources and say: 'I took this answer from Mr. Montgomery Hyde', or 'I took this question from Mr. Cyril Stokes'. After this period of time, seven years, it would be very difficult for me to say absolutely the truth 'This is what happened', much as I would like... Q. -- And you then mentioned that when the time came, Vantage Films bought the copyright of the Stokes play? A. -- When you say I put in certain parts of the Stokes play, were you referring to the trial scenes? Q. -- I was not at the moment distinguishing between the two. Should I? A. -- Yes, I think so, for this reason, that prior to the purchase of the Stokes play, I had no right to use any scenes out of the Stokes play other than that reported in the trial. I assumed that this portion of the play was not copyright because it was a report of a trial. The other scenes in the Stokes play which were incorporated in my script in C.C.3 were so incorporated after the purchase of the Stokes play. Q. -- Now, we know you had the Hyde book before you when you were writing the trial scenes, because we have got the references to the pages in the note you produced? A. -- Yes, that is right. Q. -- And one can therefore presume, can one not, that where there are similarities -- striking similarities -- between your book and the Hyde book in places other than those where you put references to the pages, you got those parts from the Hyde book too? A. -- Parts which I did not take from the Stokes book -- is that what you mean, sir? It is difficult for me to say 'I took this from Hyde', or 'I took tat from Stokes'. Q. -- I expect we shall have to work it out in the end ourselves, if necessary. A. -- Perhaps you can ask me the question again. I am trying to be helpful. I am not trying to evade the question. Q. -- It may be you cannot be more helpful than you are being. I am not suggesting you are being unhelpful: I want you to understand that. A. -- I understand, sir."
Later on I said this to the witness:

"Confine your mind entirely to the trial scenes in your film script, and what we are trying to discover is, in writing those trial scenes is it possible to find out how much of them you took from Hyde and how much of them you took from Cyril Stokes? A. -- It would be very difficult for me to unscramble the egg."
Further light is, I think, thrown on the matter by an analysis of and comparison between two documents which I have already mentioned, namely, the schedule of textual alterations and table B and a third document which also forms part of the pleadings, namely, table C, which consists of a table setting out those parts of the Hyde book which were not derived from "Three Times Tried", but which are alleged to have been infringed by the defendants.

This analysis and comparison, assisted where necessary by a reference to the works concerned, produces the following results: (i) that of the eighty-eight matters of editing by Mr. Hyde set out in the Schedule of Textual Alterations,

Mr. Eisinger makes use of only two, one being Mr. Hyde's substitution in one place of the name "Grainger" for the name "Mavor" which had been used in "Three Times Tried", and the other being a table C matter; and (ii) that of the items enumerated in table C (including that last referred to), Mr. Eisinger took a total of thirty or forty words, apart from a quotation or two from the indictment, and the phrases "May it please your lordship" and "Gentlemen of the jury". It is right, however, not to lose sight of the fact that the parts of his trial scenes which Mr. Eisinger copied from Stokes and from those parts of Mr. Hyde's book which are unoriginal to him (because he copied them direct from "Three Times Tried" without editing them) are very much more extensive.

The question then arises whether in the circumstances which I have outlined, Mr. Eisinger infringed the copyright in the Hyde book. It was argued on behalf of the defendants that since, when Mr. Hyde wrote his book in 1947, he had no permission from anyone who has been proved to be the owner of the copyright in "Three Times Tried" to use that book, his accounts of the trials must be regarded as piratical, and that no copyright exists in a pirated book, or, at any rate, in so much thereof as was pirated. In support of this submission counsel cited Cary v. Faden n(20); Cary v. Longman n(21); Walter v. Steinkopff n(22), and Walter v. Lane n(23) per LORD BRAMPTON, as well as two cases from the United States of America: Edward Thompson Co. v. American Law Book Co. n(24) and American Code Co., Inc. v. Bensinger n(25).

> n(20) (1799), 5 Ves. 24.
>
> n(21) (1801), 1 East. 358.
>
> n(22) [1892] 3 Ch. 489 at p. 496.
>
> n(23) [1900] A.C. 539 at p. 558.
>
> n(24) (1903), 122 Fed. Rep. 922.
>
> n(25) (1922), 282 Fed. Rep. 829.

Counsel also submitted the alternative argument that, as a matter of law, copyright can subsist in some parts of a literary work without subsisting in other parts, and that no copyright will be held to subsist in those parts which consist of copied raw material on which no labour and skill have been expended. In support of these propositions counsel cited Low v. Ward n(26); Leslie v. Young & Sons n(27) and Macmillan & Co., Ltd. v. Cooper n(28).

> n(26) (1868), L.R. 6 Eq. 415.
>
> n(27) [1894] A.C. 335.
>
> n(28) (1923), 130 L.T. 675.
>
> n(29) [1964] 1 All E.R. 465.

I do not, however, propose to refer to these cases in any further detail because recently the House of Lords has preferred a different approach to the problem which arises where a literary work includes unoriginal or pirated material. I refer to Ladbroke (Football), Ltd. v. William Hill (Football), Ltd. n(29). The facts were as follows. Since 1951 the respondents, who were well-known bookmakers, has sent their customers each week fixed odds football betting coupons arranged in a certain general form. In 1959 the appellants, who were also bookmakers, started to send out coupons closely resmebling the respondents. The respondents' coupons contained sixteen lists, each with an appropriate name. The appellants' coupons, which contained fifteen lists, closely resembled the respondents'. The lists offered by the appellants were almost identical with those offered by the respondents in their corresponding lists. For some lists the appellants devised new headings and they worked out for themselves the different odds offered in respect of the various kinds of bets which, accordingly, they did not copy. The matches, which altered every week, were not copied either. What the appellants adopted from the respondents were the types of wagers and to a large extent the arrangements and the headings. It was held that there had been a breach of copyright by the appellants, since the respondents' compilation, which must be regarded as a single work, was "original" and protected by copyright and the part taken by the appellants was substantial. It did not follow that because the fragments of the compilation, taken separately, would not be copyright, the whole could not be copyright. LORD REID said this n(30):

> n(29) [1964] 1 All E.R. 465.

[1969] 1 Ch 508, [1967] 3 All ER 367, [1967] 3 WLR 1599

Page 15

n(30) [1964] 1 All E.R. at pp. 468, 469.

"The first question to be determined is whether or to what extent copyright attaches to these coupons. The respondents say that a coupon must be regarded as a single work and that as such it is protected by copyright. The appellants seek to dissect the coupon. They would not only dissect it into the sixteen lists, but they would further dissect each list into heading, selection of matches, and statement of odds offered for the various kinds of bets. They admit that there is copyright in the selection and in the statements of odds offered: they can safely do that because there they did not copy. But they deny any copyright as regards the rest of the coupon. The Copyright Act, 1956, provides, by s. 2, that copyright shall subsist in every original literary work and, by s. 48, that literary work includes any written table or compilation. I have no doubt that the coupon must be treated as a single compilation. The appellants' dissection theory is derived from some statements in infringement cases and I must, therefore, examine at this point the law regarding infringement. Copyright gives the exclusive right to do certain things including 'reproducing the work in any material form' (s. 2 (5) (a)), and reproduction includes reproduction of a substantial part of the work (s. 49 (1)). Broadly, reproduction means copying, and does not include cases where an author or compiler produces a substantially similar result by independent work without copying. If he does copy, the question whether he has copied a substantial part depends much more on the quality than on the quantity of what he has taken. One test may be whether the part which he has taken is novel or striking, or is merely a common place arrangement of ordinary words or well-known data. So it may sometimes be a convenient short cut to ask whether the part taken could by itself be the subject of copyright. But, in my view, that is only a short cut, and the more correct approach is first to determine whether the plaintiffs' work as a whole is 'original' and protected by copyright, and then to inquire whether the part taken by the defendant is substantial.

"A wrong result can easily be reached if one begins by dissecting the plaintiffs' work and asking, could section A be the subject of copyright if it stood by itself, could section B be protected if it stood by itself, and so on. To my mind, it does not follow that, because the fragments taken separately would not be copyright, therefore the whole cannot be. Indeed, it has often been recognised that if sufficient skill and judgment have been exercised in devising the arrangements of the whole work, that can be an important or even decisive element in deciding whether the work as a whole is protected by copyright."
Then LORD HODSON said n(31):

n(31) [1964] 1 All E.R. at p. 475.

"The appellants have sought to argue that the coupons can be dissected and that on analysis no copyright attaches to any of their component parts and accordingly no protection is available. In my opinion this approach is wrong and the coupons must be looked at as a whole."
Then LORD DEVLIN said n(32):

n(32) [1964] 1 All E.R. at p. 479.

"I do not think it necessary in this type of case that the work done should have as its sole, or even as its main, object the preparation of a document such as a list or catalogue or race card. It is sufficient that the preparation of the document is an object of the work done. If that be so, the work cannot be split up and parts allotted to the several objects. The value of the work as a whole must be assessed when the claim to originality is being considered."
The reconciliation of the this approach to the problem with that of the earlier cases, where the courts appeared willing to analyse a literary work and to allocate copyright to some parts but not to others, is to be found in the speech of LORD PEARCE n(33). He said this:

n(33) [1964] 1 All E.R. at p. 481.

"In my opinion, the majority of the Court of Appeal rightly held that the respondents had established copyright in the coupon. Did the appellants reproduce a substantial part of it? Whether a part is substantial must be decided by its quality rather than its quantity. The reproduction of a part which by itself has no originality will not normally be a substantial part of the copyright and therefore will not be protected. For that which would not attract copyright except by reason of its collocation will, when robbed of that collocation, not be a substantial part of the copyright and therefore the courts will not hold its reproduction to be an infringement. It is this, I think which is meant by one or two judicial obserations that 'there is no copyright' in some unoriginal part of a whole that is copyright. They afford no justfication, in my view, for holding that one starts the inquiry as to whether copyright exists by dissecting the compilation into

[1969] 1 Ch 508, [1967] 3 All ER 367, [1967] 3 WLR 1599

component parts instead of starting it by regarding the compilation as a whole and seeing whether the whole has copyright. It is when one is debating whether the part reproduced is substantial that one considers the pirated portion on its own."
That passage which I have just read in my judgment is really decisive of the present case.

Did the defendants reproduce a substantial part of the Hyde book? Counsel for the plaintiffs argued that a good test by which to judge the answer to that question would be to see how important to the defendants was the part which had been copied, and he quoted the well-known dictum of PETERSON, J., in University of London Press, Ltd. v. University Tutorial Press, Ltd. n(34): "... after all, there remains the rough practical test that what is worth copying is prima facie worth protecting." Counsel for the plaintiffs then submitted that the part of the defendants' film which had been copied was the major part of the film in importance and was therefore a substantial part of the Hyde book.

n(34) [1916] 2 Ch. 601 at p. 610.

The objection to this argument, in my judgment, is that it transfers the criterion of substantiality to the wrong work. The qustion is whether the defendants' film reproduces a substantial part of the Hyde book, not whether the reproduced part of the Hyde book forms a substantial part of the defendants' film. I return to LORD PEARCE and I quote n(35):

n(35) [1964] 1 All E.R. at p. 481.

"Whether a part is substantial must be decided by its quality rather than its quantity. The reproduction of a part which by itself has no originality will not normally be a substantial part of the copyright and therefore will not be protected. For that which would not attract copyright except by reason of its collocation will, when robbed of that collocation, not be a substantial part of the copyright and therefore the courts will not hold its reproduction to be an infringement."
Let me try to apply that statement to the facts of the present case.

Mr. Hyde copied "Three Times Tried". The result is reflected in his book in two ways: (i) edited copying; and (ii) unedited copying. As regards Mr. Hyde's edited copying, Mr. Eisinger himself copied only to the very limited extent which I have already indicated. Such copying, taken by itself, does not, in my judgment, constitute the reproduction of a substantial part of the Hyde Book and cannot therefore constitute an infringement of copyright. As regards Mr. Hyde's undeited copying, it had no originality and it attracted copyright, as part of the whole book, only by reason of its collocation. When robbed of that collocation it does not, in my judgment, represent a substantial part of the copyright and so does not involve an infringement of it.

What is true of the two parts is, in my judgment, equally true of the whole, and I therefore hold that there was no reproduction of a substantial part of the Hyde book, and no infringement of copyright.

I should perhaps and this, that even if I am wrong in my view of the effect of the statutory presumption in s. 20 (4) of the Act of 1956 and even assuming that the plaintiffs have established a title to the relevant copyright in "Three Times Tried", I should nevertheless reach the same conclusion in regard to the infringement of that copyright as I reach in the case of the copyright in the Hyde book and for similar reasons. As I said earlier, "Three Times Tried" was clearly taken from the transcript of a shorthand note. The plaintiffs assert no claim based on infringement of copyright in that transcript. The relevant parts of the book were therefore original only by reason of their collocation, and accordingly, when robbed of that collocation, do not form a substantial part of the copyright in the whole.

Finally, I would recall that counsel for the plaintiffs, in opening the case, said that the sole question was whether the defendants or any of them had done any act which was an infringement of any copyright of the plaintiffs, without the plaintiffs' consent. That simple statement turned out to conceal a multitude of complications which extended the trial to over three weeks; but I have tried to meet the broad point equally broadly and it is not out of any disrespect for the arguments addressed to me that I have not pursued them all in this judgment.

In the result I dismiss the action.

**DISPOSITION:**

Action dismissed. Defendants' costs down to Apr. 2, 1963, to be paid by plaintiffs and Hodges. From that date, plaintiffs to pay defendants' costs and to indemnify Hodges against any such costs.

[1969] 1 Ch 508, [1967] 3 All ER 367, [1967] 3 WLR 1599

Page 17

**SOLICITORS:**

Gregory, Rowcliffe & Co. (for the plaintiffs); Goodman, Derrick & Co. (for the first and second defendants); Joynson-Hicks & Co. (for the fifth defendants); Radcliffes & Co. (for the sixth defendants).