EXHIBIT 5

1 of 1 DOCUMENT

ELANCO PRODUCTS LIMITED AND ANOTHER v. MANDOPS (AGRO-CHEMICAL SPECIALISTS) LIMITED AND ANOTHER*

*Partially reported [1979] F.S.R. 46.

SUPREME COURT OF JUDICATURE -- COURT OF APPEAL

[1980] RPC 213, [1979] FSR 46

**HEARING-DATES:** 25, 26, 27 July 1978

27 July 1978

**CATCHWORDS:**

Copyright -- Compilation -- Whether change in language avoids infringement if contents taken -- copyright in information in the public domain -- Protection of skill and labour -- interlocutory injunction -- Balance of convenience -- Appeal -- Injunction granted.

**HEADNOTE:**

The plaintiffs were the inventors of the herbicide Trifluralin. The chemical had been patented. As a result, the plaintiffs were responsible for the bulk of the commercial trials which had been carried out in the U.K. on how the product should be used. Various research institutions had carried out experimental trials with the herbicide. The results of much of the work of both the plaintiffs and the independent researchers had been published in scientific journals. The plaintiffs sold their herbicide in tins. Accompanying each tin was a label and leaflet which gave detailed instructions on how the herbicide should be used, upon which crops it should be used and when, and what weeds it would control. The plaintiffs claimed that the label and leaflet were a compilation of what they regarded as relevant information and which they had extracted from all the literature which was available on Trifluralin, especially the literature generated by themselves. They claimed they had copyright in that compilation; that any reproduction of that compilation, whether using the same or different language, was an infringement of that copyright. The defendants started to sell Trifluralin after the expiry of the patent. At the date of the writ they had just begun to market their commodity and their sales were small. They sold their Trifluralin in tins with an accompanying leaflet and label. The language they used in their first leaflet was identical in parts and very similar in other parts to that used by the plaintiffs. The plaintiffs complained and the defendants undertook not to use their first leaflet. They produced a second leaflet which they submitted to the plaintiffs for approval. The plaintiffs observed that whilst the format and language of the second leaflet were different from that in the first, it contained virtually the same data as the first. They again complained and the defendants gave an undertaking for a limited period. The defendants then produced a third version which they claimed to be entitled to use. It was similar to the second version. The plaintiffs commenced proceedings claiming that the third leaflet was a mere reproduction of the first leaflet in a different form and that the first leaflet was a blatant copy of their leaflet. They claimed that the copyright in their compilation had been infringed and moved for interlocutory relief. Whitford J., having accepted that the plaintiffs had a compilation in which they were entitled to 214 assert a copyright interest, balanced the strengths of the respective cases so far as the issue of copyrith and of damage was concerned and refused the application. The plaintiffs appealed. On the hearing of the appeal, the defendants argued that there was no serious issue to be tried, that the material in which the plaintiffs were asserting copyright was information in the public domain, and that copyright protected the form of expression of language and not the content of it. It was a fact that most if not all of the information in the defendants' literature could be traced to public sources.

Held, allowing the appeal, (i) there was clearly an arguable case that the plaintiffs had a copyright on which they were entitled to sue.

[1980] RPC 213, [1979] FSR 46

Page 2

Ladbroke (Football) Limited v. William Hill (Football) Limited [1964] 1 W.L.R. 273, applied.

(ii) There was clearly an arguable case that there had been infringement of that copyright.

Scott v. Stamford (1866) L.R. 3 Eq 723, Moffat & Paige Limited v. George Gill & Sons Limited (1902) 86 L.T. 465, 471, applied.

(iii) That damages were an adequate remedy to neither party, and that the balance of convenience was in favour of preserving the status quo.

Observed (i) (per Goff L.J.) the compilation cases all go on there being skill and labour involved in making the compilation, as distinct from skill and labour in ascertaining the information.

(ii) (Per Buckely L.J.) the defendants were fully entitled to make use of any information which was available to them in the public domain for the purpose of compiling their trade literature, but they were not entitled to copy the plaintiffs' trade literature thereby making use of the plaintiffs' skill and judgment and saving themselves the trouble and costs of assembling their own information and thereby making their own selection of material to put into literature.

(iii) (Per Buckley L.J.) in respect of the question of infringement, the question to be answered was: would the defendants, by using the literature they were anxious to use, be making use of the skill and judgment of the plaintiffs, or would they have done their work for themselves?

The following additional authorities were cited in the judgments:

American Cyanamid Co. v. Ethicon Limited [1975] A.C. 396.

Collis v. Cater (1898) 78 L.T. 6139

Springfield v. Thame (1903) 89 L.T. 465.

The following additional authorities were cited in argument:

Cabburn v. Lloyds Limited [1905-1910] Macg. Cop. Cas. 215.

Cambridge University Press v. University Tutorial Press (1928) 45 R.P.C. 335, [1923-1928] Macg. Cop. Cas. 349.

Chatauqua School of Nursing v. National School of Nursing 238 F. 151.

Cramp & Sons Limited v. Smythson Limited [1944] A.C. 329.

Football League Limited v. Littlewoods Pools Limited [1959] 1 Ch. 637.

Graves v. Pocket Publications Limited (1938) 159 L.T. 471, [1936-1945] Macg. Cop.

Cas. 236. 215

Kelley v. Morris 14 L.T. 222, (1865) L.R. 1 Eq. 697.

L.B. (Plastics) Limited v. Swish Products Limited [1978] F.S.R. 32.

Macmillan v. Cooper (1923) 93 L.J.P.C. 113.

Macmillan v. Suresh Chunder Deb (1890) 17 I.l.r./ Cal. 952.

Patterson v. Gas Light and Coke Co. (1877) 3 App. Cas. 239.

Polaroid Corp. v. Eastman Kodak Corp. [1977] R.P.C. 379.

Purefoy Engineering Co. Limited v. Sykes Boxall & Co. Limited (1954) 71 R.P.C. 227.

Trade Auxiliary Co. v. Middlesbrough and District Tradesman's Protection Association (1889) 40 Ch. 425.

**INTRODUCTION:**

This was an action between Elanco Products Limited and Lilly Industries Limited against Mandops Etc. Limited and K. & K. Greef Chemical Group Limited for infringement of copyright. The motion came before Whitford J. on 13 June 1978. * The appeal was heard on 20 June 1978. The Court of Appeal adjourned the hearing on the ground that the

[1980] RPC 213, [1979] FSR 46

trial of the action could take place in July 1978. In July the plaintiffs applied to continue the adjourned hearing before the Court of Appeal when it became apparent that it was not possible to have a trial before October 1978.

The following is the relevant part of the plaintiffs' 1978 version can label contained in exhibit F.T.R. 1:

[See exhibit in original] 223

**COUNSEL:**

Peter Prescott, appeared for the plaintiffs before Whitford J. and at the first hearing in the Court of Appeal. In his absence, Hugh Laddie and John Baldwin appeared for the plaintiffs on the resumed hearing in the Court of Appeal. Anthony Walton Q.C. and Mark Platts-Mills appeared for the defendants throughout. 213

**PANEL:** Before: LORD JUSTICE BUCKLEY LORD JUSTICE ROSKILL LORD JUSTICE GOFF

**JUDGMENTBY-1:** Goff L.J.

**JUDGMENT-1:**

Goff L.J. -- This is an appeal from a judgment of Whitford J. given on 13 June 1978, whereby he refused to grant the plaintiffs (appellants) an interlocutory injunction pending trial in an action for infringement of copyright.

The plaintiffs are members of a group of which the parent is an American company called Eli Lilly (U.S.), which held an English patent for a selective herbicide, Trifluralin, which, unlike some weedkillers, acts not directly by application to the weeds themselves but by incorporation into the soil, and it was, I think, the first of its kind. In order to make this new product a viable commercial proposition, it was necessary for the plaintiffs to decide which weeds would be susceptible to this treatment, which plants or crops would most benefit, or indeed might be harmed, which would be likely to afford a profitable market, what would be the most appropriate method of application, what depth would be suitable, and whether it should or should not be combined with some other, and if so what, herbicides. Then they had to obtain approval from two public bodies, the Pesticide Safety Precaution Scheme, referred to as "PSPS", and the Agricultural Chemical Approval Scheme, referred to as "ACAS". The former, as its name implies, is concerned with the safety of the public, and the latter with the validity of the claims made by the producers of herbicides as to their effects.

For this purpose they conducted a considerable number of field tests and carried on other research work over a very considerable period of time. They refer to it in their evidence as "a Herculean effort". Having done all that, they then complied certain sales literature, consisting in part of what they put upon the containers and in part of separate leaflets giving information on all relevant matters and such warnings as might be necessary. The action arises out of alleged copying by the respondents of the appellants' sales literature.

They assert in the evidence that this sales literature is highly important. The respondents' witness, Dr. Sampson, in paragraph 22 of his affidavit agreed with this contention, but in the same affidavit appeared to resile from that view, because in paragraph 26 he asserted that there was no importance in the sales literature at all, and he said that he in fact doubted whether farmers ever read it. So there is some doubt on that point, but certainly there is evidence that the literature may be of importance, and perhaps very important, and it is, I think, bound up with obtaining approval from ACAS. As I understand it, however, the appellants did not merely conduct field trials and researches. At any rate, they did not base their conclusions and selections exclusively upon those. They also consulted other literature of an extensive character as to the qualities of this chemical.

The appellants have marketed Trifluralin under the trade name "Treflan", and, of course, during the currency of the patent they had a monopoly. The patent expired in August 1977. During all this period they have, of course, made use of their literature in connection with the marketing and sale of the product and they are continuing so to do. 224

Since the expiration of the patent the respondents, as they are clearly entitled to do, have brought on to the market, or are seeking to bring on to the market, their own brand of Trifluralin at a price, I gather, about 25% less than that charged by the appellants. The respondents have their own sales and instruction literature, which is the subject-matter of the action, including a leaflet, folded and strapped, or otherwise secured to the canister, and a label which goes round the canister. The appellants contend that the respondents have thereby infringed, and unless restrained by the injunction sought in this action or similar relief, threaten to infringe the appellants' copyright in their leaflet.

[1980] RPC 213, [1979] FSR 46

When the respondents commenced to market their Trifluralin, the folded and affixed leaflet to which I have referred was as contained in the exhibit FTR 2. The appellants' literature, FTR 1, consists of a leaflet and a pamphlet. These are set out and contrasted in Volume E. The left-hand side is the respondents' leaflet FTR 2 and the right-hand side is a composite document consisting of extracts from the appellants' leaflet and one or two pieces from their pamphlet, all taken from FTR 1. These are so similar as to be virtually identical, even to the point of including the same diagrammatic representation.

On complaint being made, the respondents' solicitors gave an undertaking to withdraw the leaflet FTR 2 entirely. They were asked to submit a draft of the replacement, which they did on 21 April of this year. The appellants observed that whilst the format and language were now quite different, the data was virtually the same, and so they objected to this also, and the respondents gave further undertaking out of court not to use this label before 28 April, and on 28 April the appellants wrote a letter noting that the respondents had failed to comply with their request for an undertaking by 2 May not to use the revised version, enclosing an underlined copy to show the passages as to which complaint was made and stating that proceedings would be commenced -- in effect the letter before action. The specially indorsed writ and the notice of motion were served on 3 May.

The respondents later produced a third version, which first came to the notice of the appellants in the respondents' evidence; it is exhibit MJSA. It is not known precisely when this was first used. It does not, I think, differ greatly from the second version, and as I gather the second version was never in fact used. Having regard to the undertakings, neither the second nor the third version can have been used before 28 April, and the appellants say that despite the very brief interval between that date and 3 May, the status quo is really that the respondents had at the commencement of the action only begun to introduce their product on to the market, that they had not progressed very far and that it had been supported only by the original alleged offending leaflet, FTR 2.

In my judgment the action raises two main issues: (1) Have the appellants a good legal copyright; and (2) if so, have the respondents infringed, or are they threatening to do so? The appellants must of course succeed on both points, but it must be remembered that as a fondation for an interlocutory injunction, all they have to do is to show an arguable case.

The learned judge appears to have taken the view that not only was the appellants' case arguable but, at any rate so far as the claim to copyright is concerned, it was really established, for he said: 225

"Thus we must start from the position that the plaintiffs here have a compilation in which they are entitled to assert a copyright interest. The question is whether there has been an infringement".

When reaching his final conclusion he said:

"Having taken all the matters into consideration, having balanced the strengths of the respective cases so far as the issue of copyright is concerned and the position so far as damage is concerned, I have reached the conclusion that this is not a case in which it would be appropriate to grant interlocutory relief".

He says there merely that he has balanced the strengths of the respective cases, but as I have observed, he has previously started from the proposition that there was copyright in the compilation.

The appellants' case on the first limb is that their literature is a compilation of information discovered or selected by them, in which they have copyright on the principles laid down by the House of Lords in Ladbroke (Football) Ltd. v. William Hill (Football) Ltd. [1964] 1 W.L.R. 273. The respondents, on the other hand, contend that all the skill and labour exerted by the appellants went into preparatory work and that there is nothing in the content of the literature itself which can be the subject of copyright. Mr. Walton raised a preliminary objection on behalf of the respondents, supported by some further evidence which we allowed to be adduced before us. He said that the appellants' literature was in any event not put out by the appellants themselves but by certain distributing agents, Murphy & Pan Britannica, and he relied on affidavits by Mr. Roscoe and Mr. Peake. In my judgment, however, that point was clearly answered by further evidence which we allowed in reply, which consists of affidavits by Mr. Birch and Mr. Farrant. That shows that whilst Murphy & Pan Britannica certainly took part in the researches and experimentation, it was in conjunction with the appellants, who took a leading part therein, and if the appellants' case is otherwise right, I do not see that this point would afford any answer. Reference may here conveniently be made to a short passage in the judgment of Page Wood V.-C. in Scott v. Stamford L.R. 3 Eq. 723, where he said:

"It appears to me quite immaterial whether he has been assisted in the compilation by his own clerks or by those of the corporation. A great deal of time and labour must have been spent in this compilation, more indeed than in the case of a directory or guide, and there can be no doubt that he is entitled to be protected in the fruits of his labour".

The substantial defence raised by the respondents is that they were entitled to take any information available to the public, including that contained in the appellants' literature, provided that they did not adopt the same form or the same language, that is to say, provided they did not just copy the appellants' literature. Mr. Walton said that they could go to any public source, including the information published by ACAS in their booklet, the issue for 1978 of which is included in our exhibits. He relies very strongly on an admission in the appellants' own evidence that if the respondents conducted such private investigation for themselves, as the appellants contend they ought, they might come up with something very similar to the appellants' own literature. That is to be found in an affidavit by Mr. Shumard, in which the deponent said:

"If the defendants did their own work and came up with the result which they expressed in the same language as their second or third version labels, we could not and would not complain". 226

The appellants have argued, however, that the respondents are not entitled to make the same selection as the appellants, at any rate simply by looking at the selection which the latter have in fact made, but must conduct independent work of their own, and one of the deponents put the matter as high as saying that they must conduct their own field trials. They have also argued that in carrying out whatever independent work they might do, the respondents could not take the lists published by ACAS because, as the fact is, the information there given was derived from the appellants and, so it was suggested this would be merely indirect copying. The true position will of course be something to be resolved by the trial judge, but for my part I think the appellants, in those submissions, put their case too high.

There is no copyright in information or ideas, but only in the manner of expressing them, and the compilation cases, of which there are many, on which the appellants rely, all go on there being skill and labour involved in making the compilation, as distinct from skill and labour in ascertaining information.

I cite two passages from the speeches in Ladbroke (Football) Ltd. v. William Hill (Football) Ltd. [1964] 1 W.L.R. 273. The first is taken from Lord Evershed's speech on page 281, where he said:

"The result, in my opinion, is that the respondents' coupon is in truth a compilation in writing which is distinctive and original. True it is that a great amount of work is devoted to calculating the odds; but this is not a case in which, in my opinion, the resulting document, that is the coupon, has involved no further skill, labour or judgment -- any more than was the list of matches themselves treated as involving no distinctive or original work by Upjohn J. (as he then was) in the case of the Football League Ltd. v. Littlewoods Pools Ltd. n1 There can, in my judgment, be no doubt upon the evidence in the present case that, when all the hard work has been done in deciding upon the wagers to be offered, there still remains the further distinct task, requiring considerable skill, labour and judgment (though of a different kind) in the way in which the chosen wagers are expressed and presented to the eye of the customer".

n1 (1959) Ch. 637.

The second comes from Lord Hodson at page 287:

"The argument is supported by reference to the case of Purefoy Engineering Co. Ltd. v. Sykes Boxall & Co. Ltd. n2 The actual decision in that case does not assist the argument, but there is there drawn a distinction between skill and labour devoted to the selection of a range of goods in which the plaintiffs were intending to trade and that employed for the purpose of bringing into existence the literary work, namely, a catalogue. It may well be that there are cases in which expenditure of time and money has been laid out which cannot properly be taken into account as skill and labour involved in bringing into existence the literary work, be it catalogue or other compilation".

n2 (1954) 71 R.P.C. 227.

Then we were referred to the case of Collis v. Cater (1898) 78 L.T. 613, but that was a pure and simple case of copying. I think however that the case of Springfield v. Thame (1903) 89 L.T. 242, on which Mr. Walton relied, does assist his argument, because there the copyright article was not in fact publishied but merely a precis of it; 227 the precis was copied and it was held that there was no infringement because the article was merely disseminating news. Joyce J. said this:

[1980] RPC 213, [1979] FSR 46

Page 6

"In my opinion, if the original composition had been accepted and published verbatim et litteratim in the Daily Mail, the paragraph in the Evening Standard would still have been no infringement of the copyright in the original composition, since there is no copyright in news, but only in the manner of expressing it".

Mr. Walton has taken us very carefully through the evidence to show that the information which he gives as to crops, weeds and methods of use of the herbicide are indeed all to be found in public documents, the ACAS booklet, various short term leaflets and similar sources. I do not think I need review all this in detail, but it is clear that most, if not all, of the information which appears in the respondents' literature can indeed be traced to those public sources. The appellants relied as evidence of copying, amongst other things upon the fact that the respondents in their label relating to lettuces, referred to "seeding and transplanting" which is exactly what the appellants themselves say; and subject to the question how far the appellants are entitled to get information from the appellants' documents, that may be a significant piece of evidence. Mr. Walton seeks to explain this away by reference to one of the short-term leaflets which does indeed speak of two types of lettuce, but the language is not the same, because there it is drilled and transplanted. So far as weeds are concerned, not only does he say that (I think with possibly one or two exceptions) everything in his literature under that head is to be found in the public documents, but he draws attention to not inconsiderable differences between the literature of the two parties.

It seems to me that at the trial the learned judge, in the light of all the evidence, will have to reach a final conclusion upon the question whether the appellants' literature was something in which there could be copyright, or whether it was merely something which gave news or information of which competitors could freely avail themselves, and in that connection whether there was separate work and research which went into the preparation of the literature, as distinct from work designed to enable the appellants to see whether they had a marketable commodity, and, if so, how they could market it, and to enable them to obtain the requisite approval of PSPS and ACAS.

In my judgment, therefore, on the first limb, the question whether there is any copyright in respect of which the appellants are entitled to sue, though I would not commit myself to saying that there is (one should not normally do that on an interlocutory application anyway,) it seems to me that there clearly is an arguable case.

So then one turns to the second limb, which is the question of infringement of copyright. The respondents deny, or at any rate they do not admit, that the first leaflet was simply a copy of the appellants' literature. Dr. Sampson has pur in a long affidavit, in which he seeks to say that in so far as it appeared to be copying, it was purely unconscious. The learned judge took the view that at this stage, there being no cross-examination, that ought to be left as an open question, but I am bound to say that for my part I find it extremely diffcult, if not impossible, to believe that that could have been anything other than a piece of deliberate and conscious copying. The similarities are so remarkable, particularly, as I have said, in that the two contain the same diagrammatic representation. 228

However, assuming that to be so, we are of course concerned with the second, or the third, variant and Mr. Walton says that inasmuch as in those the form and the language are changed, then that is the end of the argument. All that the appellants can be entitled to protect is the way in which they have arranged the information and presented it in their literature.

It may well be that if the respondents had in fact at the start start simply looked at the available information, including what appears in ACAS and, I think, what appears in the appellants' own literature, and from that decided what they would put in their literature and how they would express it, the appellants would at least have had considerable difficulty in bringing home any charge of infringement, even, having regard to the evidence, if the result had been extremely similar and the selection of items had been the same. But they chose, on the evidence as it stands at the moment, to proceed by making a simple and, as I think unauthorised, copy, and then they proceeded to revise it. It may well be that the result produced that way is an infringement. I say no more than that, because it will be for the trial judge to make up his mind upon all that when he has the whole of the evidence, when it has been sifted and the matter has been argued before him.

I refer again to the case of Scott v. Stamford, where the Vice-Chancellor stated the principle thus at the end of his judgment:

"No man is entitled to avail himself of the previous labours of another for the purpose of conveying to the public the same information, although he may append additional information to that already published".

I would refer also to a passage in the judgment of the Master of the Rolls in Moffatt & Paige Ltd. v. George Gill & Sons Ltd. (1902) 86 L.T. 465 at 471. This is a case having some similarity to the history in this case, since there was there a first edition to which objection was taken and which was then withdrawn, and a second edition which was com-

piled making use of the first, but altering it in such ways as it was thought would protect the second from any charge that it was an infringement. The learned Master of the Rolls said:

"No doubt he says: 'I am a very well-informed man; I have given, in fact, the greater part of my attention to these works, and I have no doubt I could have evloved the whole of these quotations from researches which I could have made: I know not only where those quotations come from but I know the authors and have named them as appropriate to the particular matters, and I could tell you who they were'. But, unfortunately, he did not go through that process himself; he has adopted the work of another man who may or may not have gone through it, but whether he did or did not, the defendant did not. He simply took what another man had done".

There again it seems to me plain that the appellants have an arguable case. The learned judge at the trial may decide that it was sufficient to make revisions to the offending first copy, or he may think otherwise; but in my view it plainly is an arguable case that the respondents having started off, if I may put it that way, on the wrong foot by making what I think will be found to be a deliberate copy, did not sufficiently cure the position by working from that copy instead of going to the whole of the publicly available information and starting from scratch. 229

So I agree with the learned judge that the case comes down to one of the balance of convenience, and I direct myself according to the guidelines laid down in the American Cyanamid case.

The first of those guidelines is, would damages be an adequate remedy for the appellants, and if not, would it be so for the respondents? On that aspect of the matter I think the answer is that it would not be in either case, because of the extreme difficulty in ascertaining the damage and quantifying it. In the course of the argument some question was raised as to whether it might be easier to assess the damages in the one case rather than in the other, but for my part I do not think that is a very helpful exercise. I think it is probably much the same in either case, but sufficient, as it seems to me, is the fact that damages would not in my judgment be an adequate remedy in either case.

So then we have to consider the matter generally and we have to bear in mind that, other things being equal, it is reasonably safe to proceed upon the basis of preserving the status quo. Mr. Walton has relied upon the fact that the appellants have a world-wide trade in this commodity, so that in considering the position in this country one is dealing only with a minor, or lesser, aspect of the matter. I do not myself attach great weight to that consideration.

Taking the status quo, on the face of it that seems to me to be strongly in favour of an injunction being granted, since the respondents had at the date of the writ only just begun to bring their commodity on to the market and their sales have been small. In his affidavit, Dr. Sampson sets out the position of the respondents thus:

"It is correct to say that K. & K. had limited clearance of the sale of Trifluralin 48 (that is the respondents' product) from PSPS. It is not correct to say that we are therefore not on the market. When applying for clearance I asked for clearance to treat 7,000 hectares of crops, which corresponded approximately to 15,000 litres of products. This was granted for the 1978 season only and I was informed that subject to the presentation of certain specified toxicological work, commercial clearance would be granted. This work is now in hand. In fact we have today sold on the open market some 3,732 litres of Trifluralin 48 under what has been described as our first leaflet, and some 1,678 litres under our third leaflet".

So their business is only just beginning, whereas of course the appellants have an established business. So the status quo, looked at nakedly, must be that the appellants are in the field and the respondents are not.

But I confess that this aspect of the matter has given me some anxiety, because on the one hand the appellants have an established business which is likely only to be dented by any trading using what turns out to be, if it does, infringing material, whereas the respondents may suffer more enduring harm because they have a somewhat infantile and fragile plant, and they do indeed express the fear that if they are delayed by an injunction and are forced to take up time in composing a new leaflet by unassailable methods, they may -- indeed will -- almost certainly lose the autumn market and may find other competitors getting in ahead of them, though it is true, as the appellants point out, that at this moment there is no evidence that other competitors are in the field or that they are poised ready to enter it. 230

However, having weighed the matter as best I can, and having regard to my view that the respondents have to a large extent brought their difficulties upon themselves by starting off with what, as I have said, on the evidence before us appears to me to be a blatant copy, the status quo in its bare form should be observed and should tip the scale.

[1980] RPC 213, [1979] FSR 46

Page 8

Having weighed the considerations which I have recited, and all the points which Mr. Walton has urged in his argument on the balance of convenience, for my part with all respect I would not agree with the learned judge and I would think that this is a case in which an injunction should be granted.

**JUDGMENTBY-2:** Roskill L.J.

**JUDGMENT-2:**

Roskill L.J. -- I agree that an injunction should be granted, but as this is an interlocutory appeal and as this court proposes to grant an interlocutory injunction, I shall say very little, because there are matters in controversy which can only be finally determined at the trial.

Whitford J., who refused the injunction, analysed the evidence in this case with great care, but at the end of his judgment the learned judge expressed his conclusion thus:

"Having taken all the matters into consideration, having balanced the strengths of the respective cases so far as the issue of copyright is concerned and the position so far as damage is concerned, I have reached the conclusion that this is not a case in which it would be appropriate to grant interlocutory relief".

With great respect to a most experienced judge, I am afraid that I have reached the opposite conclusion, although I agree with much of what the learned judge has so clearly set out in the judgment.

The learned judge did say -- and with great respect he may perhaps have gone rather too far in so stating at an interlocutory stage -- "Thus we must start from the position that the plaintiffs here have a compilation in which they are entitled to assert a copyright interest". That has been challenged by Mr. Walton, both yesterday and again this morning, and that is the first question which will have to be determined at the trial. Therefore unlike the learned judge, I express no view upon that, other than that in my judgment (to quote Lord Diplock in the American Cyanamid case) there is in that respect a serious question to be tried.

As to the rest, on balance of convenience, as I have already indicated I have reached a different conclusion from Whitford J. It seems to me that if one goes through the steps of American Cyanamid, enjoined upon the judge of first instance and this Court, before deciding whether or not to grant an interlocutory injunction, all the pointers are in favour of granting an injunction. For my part, I do not think that damages are an adequate remedy either way, and I think the balance of convenience clearly lies in preserving the status quo. If this case comes on for trial in the autumn, which we have been told is likely, that would involve only a comparatively short restriction on the defendants acting as they wish to proceed, and I am clearly of the view that the balance of convenience lies in that direction.

Therefore, like my Lord, I would grant the interlocutory injunction, subject to hearing counsel further. 231

**JUDGMENTBY-3:** Buckley L.J.

**JUDGMENT-3:**

Buckley L.J. -- I agree. As I understand the law in this case, the defendants were fully entitled to make use of any information, of a technical or any other kind, which was available to them in the public domain, for the purpose of compiling their label and their trade literature, but they were not entitled to copy the plaintiffs' label or trade literature thereby making use of the plaintiffs' skill and judgment and saving themselves the trouble, and very possibly the cost, of assembling their own information, either from their own researches or from sources available in documents in the public domain, and thereby making their own selection of material to put into that literature and producing their own label and trade literature.

I agree with what has been said about the form of the first label and brochure produced by the defendants. It is not for us to decide here and now whether in fact that was or was not copied from the plaintiffs' material, but it seems to me to be strongly arguable that it was, and that is an issue of fact which may very possibly -- and I say no more than that, because, as I say, it is not our function to decide the issue -- be decided against the defendants.

If that is the outcome upon that issue, the further question would arise as to whether the defendants' subsequent work in re-writing their label and literature was sufficient to eradicate the vice of copying.

I think another way of putting that same question is: Would the defendants, by using the label which they are anxious to use and the leaflet which they are anxious to use, still be making use of the skill and judgment of the plaintiffs, or would they have done their work for themselves? There again, it seems to me that although this is an issue which is not for us to determine here and now, on the material before the court there is a distinct possibility that it might be held that they have not done sufficient independent work to eradicate the vice of copying, if there were such an initial vice.

In those circumstances we have to consider whether or not the balance of convenience is in favour of the granting of an injunction or of the withholding of an injunction. For my part I have found this a rather difficult exercise, as I think it often is in these cases, because in either case one party or the other is at risk of incurring some damage which it may be difficult to assess and consequently difficult to be sure that it can be adequately compensated for in relation to what will happen between now and the time when the action comes on for trial. But, having given the matter the best consideration that I can, and having come to the conclusion that the difficulty of assessing damages on the one side or the other is, I think, about equal, in my opinion the right course is to maintain the existing status quo by the grant of an injunction.

Accordingly, I agree that this appeal succeeds.

**DISPOSITION:**

Appeal allowed. Plaintiffs' costs in cause.

**SOLICITORS:**

Baker & Mackenzie; Frank Charlesly & Co.