EXHIBIT 6

# INTERNATIONAL COPYRIGHT LAW AND PRACTICE

General Editor

**PAUL EDWARD GELLER**

Original Editors

MELVILLE B. NIMMER
PAUL EDWARD GELLER

**VOLUME 2**

RECEIVED

NOV 3 0 2006

NIXON PEABODY LLP

 LexisNexis·

## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:

Deneil C. Targowski ............................................................. 1–800–252–9257 Ext. 2223
Outside the United States and Canada please call ................................. (973) 820-2000

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at ......................................................... (800) 833-9844
Outside the United States and Canada, please call  ........................... (518) 487-3000
Fax number .................................................................................................. (518) 487-3584
Customer Service Website ...................................... http://www.lexisnexis.com/custserv/

For information on other Matthew Bender Publications, please call
Your account manager or ...................................................................... (800) 223-1940
Outside the United States and Canada, please call ............................... (518) 487-3000

ISBN 0-8205-1399-7

Editorial Offices
744 Broad Street, Newark, NJ 07102 (973) 820-2000
201 Mission St., San Francisco, CA 94105-1831 (415) 908-3200
www.lexis.com

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

LexisNexis and the Knowledge Burst Logo are registered trademarks, and Michie is a trademark of Reed Elsevier Properties Inc., used under license. Matthew Bender is a registered trademark of Matthew Bender Properties Inc.

Copyright © 2006 Matthew Bender & Company, Inc., a member of the LexisNexis Group.
Originally published in 1993

All Rights Reserved.
No copyright is claimed in the text of statutes, regulations, and excerpts from court opinions quoted within this work. Permission to copy material exceeding fair use, 17 U.S.C. §107, may be licensed for a fee of $1 per page per copy from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA. 01923, telephone (978) 750-8400.

MATTHEW♦BENDER

(Rel.18—9/06  Pub.399)

# UNITED KINGDOM

(Rel.18–9/06 Pub.399)

# UNITED KINGDOM

### Lionel Bently[*]

---

### William R. Cornish[**]

---

## SYNOPSIS

Table of Abbreviations
§ 1  Introduction
    [1]  General
        [a]  Statutory Foundation
        [b]  Related Common Law Actions
        [c]  Distinctive Features of U.K. Law
    [2]  Historical Development
        [a]  15th to 19th Centuries
        [b]  The Copyright Act 1911
        [c]  The Copyright Act 1956
    [3]  Current Law
        [a]  The Copyright, Designs and Patents Act 1988
        [b]  E.C. Developments; Transitional Provisions
        [c]  Other Copyright Amendments
§ 2  Subject Matter
    [1]  Standards for Protection
        [a]  Formal Requirements
        [b]  Substantive Criteria
            [i]  Cases Meeting the Criteria

---

[*] Lionel Bently, Herchel Smith Professor of Intellectual Property Law, University of Cambridge, has written this chapter since 1998.

[**] William Cornish, Professor Emeritus of Intellectual Property Law, University of Cambridge, wrote this chapter through 1997.

(Rel.18–9/06 Pub.399)

   [ii] Cases Not Meeting the Criteria
   [iii] Works Subject to Special Criteria
  [2] Categories or Types of Works
   [a] Original Works
    [i] Literary Works
    [ii] Dramatic Works
    [iii] Musical Works
    [iv] Artistic Works
   [b] Hybrid Category: Films
   [c] Other Media Productions
    [i] Sound Recordings
    [ii] Sound and Television Broadcasts
    [iii] Published Editions
  [3] Derivative Works, New Versions, and Compilations
   [a] Adaptations; Translations; New Editions
   [b] Compilations and Databases
  [4] Special Problem Areas
   [a] Titles
   [b] Characters
   [c] Works of Applied Art; Design Protection
    [i] Copyright in Artistic Works
    [ii] Unregistered Design Right
    [iii] Registered Design Right
   [d] Computer Software
   [e] Government Works
§ 3 Duration
  [1] General Rules
   [a] Literary, Dramatic, Musical, and Artistic Works
   [b] Joint Works and Films
   [c] Anonymous and Pseudonymous Works
   [d] Posthumous Works
    [i] Unpublished Works in which Copyright Still Subsists
    [ii] Publication Right in Works in which Copyright has Lapsed
  [2] Special Terms
   [a] Recordings, Broadcasts, Editions; Performances
   [b] Prior and Revived Rights; Reliance Issues
    [i] Rights Subsisting, Extended, or Revived
    [ii] Entitled and Reliance Parties
  [3] Foreign Works
§ 4 Ownership and Transfer
  [1] Initial Ownership
   [a] Joint Works
    [i] In General
    [ii] Films
   [b] Works Made for Hire
    [i] Employees' Works and Films
    [ii] Commissioned Works and Films
    [iii] Recordings, Broadcasts, Editions
  [2] Transfers

(Rel.18–9/06 Pub.399)

UK–3                    UNITED KINGDOM

          [a]  Interests Subject to Transfer
          [b]  Formal Requisites for Transfers
          [c]  Contractual and Related Presumptions
          [d]  Recordation; Priority of Transfers
        [3]  Limitations of Transfer
          [a]  Equity and Public Policy
             [i]  Equity Between Parties
             [ii]  Public Policy; Competition
          [b]  Unwaivable Rental-Remuneration Rights
          [c]  Scope of Transfers; Attachment
          [d]  Reversionary Rights
          [e]  Resale Right: *Droit de Suite*
§ 5  Formal Procedures
      [1]  Special Copyright Jurisdiction
      [2]  Functions of Special Agencies
      [3]  Registration, Deposit, and Other Formalities
        [a]  General Principle: No Formalities
        [b]  Caveats in Two Cases
            [i]  Moral Right of Attribution
            [ii]  Rental-Remuneration Rights
      [4]  First Publication
§ 6  Protection of Foreign Works
      [1]  Requirements for Eligibility
        [a]  Basic Concepts and Sources of Law
            [i]  Extension and Application
            [ii]  National Treatment and Exceptions
        [b]  Specific Criteria of Eligibility
            [i]  Authorship
            [ii]  First Publication
            [iii]  Place of Transmission
        [c]  Illustrations
        [d]  Application in Time
            [i]  Transitional Questions
            [ii]  Retroactivity
      [2]  Multilateral Conventions
      [3]  Bilateral Agreements
      [4]  Cross-References
§ 7  Moral Rights
      [1]  Particular Rights
        [a]  Right to Attribution of Authorship
        [b]  Right Against False Attribution
        [c]  Right Against Derogatory Treatment
            [i]  Proof of Violation
            [ii]  Special Limitations
        [d]  Rights of Disclosure or Withdrawal
        [e]  Privacy in Photographs and Films
      [2]  Limitations
      [3]  Duration
      [4]  Waiver and Transfer

INTERNATIONAL COPYRIGHT LAW                         UK–4

§ 8   Economic Rights; Enforcement
      [1]   General Content of Rights
            [a]   Infringement Analysis
            [b]   Economic Rights
                  [i]    Reproduction
                  [ii]   Translation; Adaptation
                  [iii]  Distribution; Rental and Lending
                         [A]   Issuing to the Public
                         [B]   Rental and Lending
                         [C]   Public Lending Right
                  [iv]   Public Performance, Playing, or Showing
                  [v]    Communication to the Public
            [c]   Party Liability
                  [i]    Primary and Secondary Liability
                  [ii]   Information-Society Service Providers
                  [iii]  Circumventing Technical Safeguards
                         [A]   Measures Applied to Copyright Works, Etc.
                         [B]   Measures Applied to Copyright Computer Programs
                         [C]   Measures Applied to Transmissions, Broadcasts, Etc.
                         [D]   Rights-Management Information
      [2]   Exceptions and Limitations
            [a]   Background
                  [i]    Construction; Judge-Made Exceptions
                  [ii]   Contractual Waiver; Technological Safeguards
            [b]   Private, Research, Library, Educational, and Charitable Uses
                  [i]    Research and Private Study
                  [ii]   Library and Archival Uses
                  [iii]  Educational Uses
                         [A]   Specific Exceptions
                         [B]   Exemptions to Induce Collective Licensing
                  [iv]   Charitable and Related Uses: the Handicapped, Deaf, Blind,
                         Etc.
            [c]   Informational, Incidental, and Governmental Uses
                  [i]    Criticism and Review; News
                  [ii]   Recitation and Incidental Uses
                  [iii]  Governmental Uses
            [d]   Subject-Matter and Media-Specific Uses
                  [i]    Artistic Works: in Public; Catalogs; Other Copies
                  [ii]   Broadcast Works and Programs
                  [iii]  Computer Programs; Works in Electronic Form; Databases
                  [iv]   Temporary Copies for Network or Lawful Uses
            [e]   Non-Voluntary Licenses; Related Schemes
                  [i]    Lending
                  [ii]   Cable Retransmission
                  [iii]  Licenses to Avoid Anti-Competitive Abuses
                         [A]   Broadcast of Sound Recordings
                         [B]   Television Listings
                  [iv]   Enemy-Owned Copyright
      [3]   Enforcement Proceedings

(Rel.18–9/06 Pub.399)

UK–5                                        UNITED KINGDOM

    [a]  Court Structures
    [b]  Cross-Border Cases
  [4]  Civil and Criminal Remedies
    [a]  Civil Remedies
      [i]   Self-help Action
      [ii]  Preliminary Orders
      [iii] Relief Upon Trial
      [iv] Defenses; Time Limitations
    [b]  Criminal Proceedings
    [c]  Other Remedies
      [i]   Customs Prohibition
      [ii]  Trading Standards Authorities
      [iii] Notice and Take-down
§ 9  Miscellaneous
  [1]  Overlapping and Neighboring Rights
    [a]  Rights in Performances
      [i]   Non-Property Rights
      [ii]  Property and Remuneration Rights
      [iii] Exclusive Recording Contracts
      [iv] Moral Rights
      [v]  Coverage, Duration, and Remedies
      [vi] Foreign Performances
    [b]  Publication Right in Works in which Copyright has Lapsed
    [c]  *Sui Generis* Database Right
      [i]   Subsistence
      [ii]  Makers and Owners
      [iii] Infringement; Rights and Remedies
      [iv] Exceptions and Defenses
      [v]  Foreign Databases
    [d]  Semiconductor Topographies
  [2]  Collecting Societies; Other Organizations

UK–7            UNITED KINGDOM

## TABLE OF ABBREVIATIONS

### Judicial Titles[1]

| | |
|---|---|
| J. | Mister Justice (High Court) |
| L.C. | Lord Chancellor (House of Lords) |
| L.C.J. | Lord Chief Justice (Court of Appeal, Criminal Division) |
| L.J. | Lord Justice of Appeal (Court of Appeal) |
| M.R. | Master of the Rolls (Court of Appeal) |
| Q.C. | Queens Counsel (as Deputy Judge of the High Court) |
| V.-C. | Vice-Chancellor (High Court) |

### Reporters

| | |
|---|---|
| A.C. | Appeal Case Reports |
| A.L.J.R. | Australian Law Journal Reports |
| All E.R. | All England Law Reports |
| C.B. | Common Bench Reports |
| C.B. (N.S.) | Common Bench, New Series |
| Ch. | Chancery Reports |
| C.M.L.R. | Common Market Law Reports |
| C.P.R. | Canadian Patent Reporter |
| E.C.D.R. | European Copyright and Design Reports |
| E.C.R. | European Court Reports |
| E.G.L.R. | Estates Gazette Law Reports |
| E.M.L.R. | Entertainment and Media Law Reports |
| E.R. | English Reports |
| EWCA | Court of Appeal of England and Wales (Transcript)[2] |
| EWHC | High Court of England and Wales (Transcript)[3] |
| F.S.R. | Fleet Street Intellectual Property Reports |
| H.L. | House of Lords |
| I.P.R. | Intellectual Property Reports |
| K.B. | King's Bench Reports |
| L.J.P.C. | Law Journal Privy Council |
| L.R.C.P. | Law Reports—Common Pleas |
| L.R. Eq. | Law Reports—Equity |
| L.R.Q.B. | Law Reports—Queen's Bench |
| L.T. | Law Times |

[1] On the court system in the United Kingdom, see § 8[3][a] *infra.*

[2] *Available at* www.bailii.org/databases.html

[3] *Id.*

(Rel.18–9/06 Pub.399)

INTERNATIONAL COPYRIGHT LAW                           UK–8

| | |
|---|---|
| MacG. C.C. | MacGillivray's Copyright Cases |
| N.Z.L.R. | New Zealand Law Reports |
| Q.B. | Queen's Bench Reports |
| Q.B.D. | Queen's Bench Division Reports |
| R.P.C. | Reports of Patent Cases |
| T.L.R. | Times Law Reports |
| V.R. | Victorian Reports (Australia) |
| W.L.R. | Weekly Law Reports |

**Periodicals**

| | |
|---|---|
| C.L.J. | Cambridge Law Journal |
| E.I.P.R. | European Intellectual Property Review |
| Ent. L.R. | Entertainment Law Review |
| I.I.C. | International Review of Industrial Property and Copyright Law |
| I.P.J. | Intellectual Property Journal |
| J.B.L. | Journal of Business Law |
| L.Q.R. | Law Quarterly Review |
| R.I.D.A. | Revue Internationale du Droit d'Auteur |

(Rel.18–9/06 Pub.399)

## § 1  Introduction

### [1]—General

British copyright law is found in statutory form in the Copyright, Designs and Patents Act 1988 which, as amended, has effect in connection with other statutory and regulatory instruments.[1] This law operates uniformly in the three jurisdictions of the United Kingdom, that is, England and Wales, Scotland, and Northern Ireland, save in a few details.[2]

[a]—Statutory Foundation. In its early development, statutory copyright was confined to published works of specific types. It was supplemented by a common law action which protected unpublished works in general. The Copyright Act 1911 rationalized the various statutory provisions into a single code and simultaneously abrogated common law copyright in unpublished works.

The Copyright Act 1956 superseded the 1911 Act, but the Copyright, Designs and Patents Act 1988[3] further revised British copyright law in part and recodified it in its entirety. This revision, like the one before it, has led to a considerable expansion in the size of the statute and the detailed legal rules embodied therein. The 1988 Act has subsequently been amended, most significantly to implement European Community (E.C.) directives. For some time, transitional provisions from old to new law will have major practical consequences.[4] The commentaries now focus primarily on the 1988 Act.[5]

[b]—Related Common Law Actions. Although copyright is now primarily a matter of statutory law, British judges have developed equitable

---

[1] The law discussed here is current to January 1, 2006. Cases indicated as "unreported" as of that date may be reported at a later date.

[2] On the main changes to copyright following the devolution of powers from Parliament to the Welsh Assembly, Northern Ireland Assembly, and Scottish Parliament, see § 2[4][e] *infra.* On the extension of the copyright law to the Isle of Man, the Channel Islands, and British colonies, see § 6[1] *infra.*

[3] The text refers to the Copyright, Designs and Patents Act 1988 as the "Act" or the "1988 Act" (hereinafter C.D.P.A.), brought into force by Statutory Instrument (hereinafter S.I.) 1989/816. Statutory references in the text refer to the 1988 Act unless otherwise indicated, for example, by references to the Copyright Act 1956 (hereinafter C.A. 1956) or other laws. British citation usage (e.g., Registered Designs Act 1949) is followed throughout.

[4] On general transitional provisions, see § 1[3][b] *infra;* on specific transitional provisions with regard to the terms of rights, § 3[2][b] *infra;* with regard to foreign works and productions, § 6[1][d] *infra.*

[5] For commentaries on the 1988 Act, see J. Rayner James, K.M. Garnett, and G. Davies, *Copinger and Skone James on Copyright* (15th ed., 2005) (hereinafter *Copinger and Skone James on Copyright*); H. Laddie, P. Prescott, M. Vitoria, L. Lane, and A. Speck, *The Modern Law of Copyright* (3rd ed., 2000) (hereinafter Laddie, *et al., The Modern Law of Copyright*); W.R. Cornish and D. Llewelyn, *Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights* (5th ed., 2003) (hereinafter Cornish, *Intellectual Property*); L. Bently and B. Sherman, *Intellectual Property Law* (2nd ed., 2004) (hereinafter Bently and Sherman, *Intellectual Property Law*).

actions for passing-off, that is, misrepresenting goods or services to be those of another, as well as for the unauthorized disclosure or other use of confidential information.[6] These remedies may be useful to a plaintiff as a supplement to an action for infringement, especially where the copyright action is dubious. These equitable actions possess flexibility: the action for breach of confidence, in particular, may protect individual privacy. However, neither the cause of action for passing-off nor that for unauthorized disclosure has been extended to the still broader notion of a tort embracing unfair or dishonest misappropriations of information, ideas, and the other material used in industries that rely on copyright.

**[c]—Distinctive Features of U.K. Law.** Copyright law in the United Kingdom, while traditionally sharing many basic approaches with copyright laws in former British dominions, is increasingly influenced by Continental European models. As a result, U.K. copyright law has a number of distinctive features that are worth noting.

To start, U.K. copyright law is not confined to the typical coverage of literary and artistic works. In addition, there are now distinct "copyrights" conferred in sound recordings, broadcasts, and the typographical format of published editions, all of which are referred to as "works." Since the rights conferred under this distinct group of copyrights are given initially, not to the human creator, but to the body or person responsible financially and organizationally for the production of the material, they are of a type which most European regimes would distinguish as "neighboring" or "related rights."

Further, the approach to subject matters and rights, in the United Kingdom, does not reflect any rigid underlying logic. British law has traditionally accorded copyright in most works if they satisfy criteria of originality that, quite unlike criteria in Continental laws of *droit d'auteur*, do not call for minimal "creativity," although E.C. developments in the United Kingdom now leave these criteria in flux.[7] While most media productions, such as recordings and broadcasts, fall under "copyright" in the United Kingdom, rights of performers are treated separately in Part II of the 1988 Act.[8] Database contents are given protection by *sui generis* rights.[9]

Finally, the law in the United Kingdom treats copyright as a property right rather than an "author's right." This emphasis is reflected in the law's presumption that an employer is the first owner of copyright in works made by an

[6] For the relevance of passing-off and breach of confidence in the general field of copyright, see *Copinger and Skone James on Copyright*, Chaps. 20 and 21; Cornish, *Intellectual Property*, Chaps. 8 and 16; Bently and Sherman, *Intellectual Property Law*, Chaps. 32–34, 44–46. For further details, see §§ 2[4], 2[4][a],

2[4][b], and 7[1] *infra*.

[7] See § 2[1][b] *infra*. See also §§ 2[3][b], and 2[4][d] *infra* (different standard is required for copyright in databases and computer programs).

[8] See § 9[1][a] *infra*.

[9] See § 9[1][c] *infra*.

employee, the paucity of legal restrictions on alienability, and the limited and half-hearted recognition of moral rights.[10] However, as in European laws, there is no generally invoked "fair use" limitation to copyright, but rather a plethora of limited and narrowly defined exceptions.[11]

## [2]—Historical Development[12]

Copyright, as a private right in published works, was instituted in the Statute of Anne 1710 and was soon buttressed by important principles of common law applicable to unpublished works. The United States was to inherit and to preserve this eighteenth-century structure in recognizable form even longer than Britain. During the nineteenth century, treaty developments exposed British copyright to Continental European influences.[13]

### [a]—15th to 19th Centuries. When printing was introduced into late fifteenth-century England, its attractions to exploiters were irresistible, whether their prime interest was commercial or political. The Tudor monarchs and their churchmen developed a system of censorship which operated in conjunction with the Stationers' Company—the guild of the respectable publishers. The Company's Charter of 1556 gave it search and seizure powers which it built up into a system of licensing through registration.

This system survived the vagaries of the Stuart period until 1694 when it was finally allowed to lapse and the stationers were left without statutory protection of their interests. The Statute of Anne 1710, by which the stationers retrieved their position, proclaimed their interest by applying only to published works and by requiring registration as a precondition of protection. But it marked itself out as the origin of modern copyright by conferring its right upon the author or his assigns for fourteen years from publication, an interest that was "returned" to him for a further fourteen years if he was living at the end of the first term. Here was a foreshadowing of more modern attempts to distinguish the author's property from the first publisher's protection of his investment.

---

[10] See §§ 4[1][b], 4[3], and 7[1] infra.

[11] For limited defenses based on public interest or policy, see § 8[2][a][i] infra.

[12] For further details, see Copinger and Skone James on Copyright, Chap. 2; Laddie, et al., The Modern Law of Copyright, pp. 51–59, 250–257; Cornish, Intellectual Property, pp. 345–371; T.E. Scrutton, Law of Copyright, Chap. 4 (1883); A. Birrell, Seven Lectures on Copyright (1898); B. Kaplan, An Unhurried View of Copyright, 1–25 (1967); L.R. Patterson, Copyright in Historical Perspective (1968); D. Saunders,

Authorship and Copyright (1992); B. Sherman and A. Strowel (eds.), Of Authors and Origins (1994); M. Rose, Authors and Owners (1993); B. Sherman and L. Bently, The Making of Modern Intellectual Property Law: The British Experience, 1760-1911 (1999); C. Seville, Literary Copyright Reform in Early Victorian England (1999).

[13] See B. Sherman, "Remembering and Forgetting: The Birth of Modern Copyright Law" (1995) 10 I.P.J. 1 (surveying impact of international copyright relations upon the development of images of U.K. copyright law).

The statute itself said nothing about the position of unpublished works, though ultimately in *Donaldson v. Beckett*[14] the House of Lords decided that common law copyright ceased upon publication. The statute covered "books," a term which was extended to include sheet music;[15] but separate legislation was needed to protect engravings, sculptures and, eventually, other forms of fine art, including photographs.[16] A performing right in dramatic works was given by Bulwer Lytton's Act of 1833 and extended to musical works in 1842. In that year Talfourd's Act, preceded by a celebrated debate on the political economy of copyright, repealed the Act of Anne and conferred protection for the author's life and seven years thereafter, or for forty-two years, whichever term was longer. The registration requirement survived, but only as a precondition for bringing an action.

Thus, by the Victorian period, the classic subject matters of copyright—literary, dramatic, musical, and artistic works—were covered by rights partly at common law and partly under statute, the latter giving in the case of publication various limited terms subject to a variety of formal preconditions. Under an Act of 1844[17] Britain had begun to build bilateral arrangements with other countries for the mutual recognition of copyrights. These did not include arrangements with the United States, where a trade flourished in unauthorized copies of the works of British authors. A more general basis for international collaboration came only with the Berne Convention.[18] English common law adheres strictly to the principle that the country's international obligations take effect in domestic law only by statute. Accordingly, the International Copyright Act 1886 was enacted to implement Berne obligations.

**[b]—The Copyright Act 1911.** It was the Berlin Revision of the Berne Convention in 1908 that obliged the United Kingdom to make major changes in the substantive features of its copyright law. The opportunity was used to bring together under a single statute, the Copyright Act 1911, all forms of copyright.

---

[14] (1774) 2 Brown's Prerogative Cases; Cobbett's Parliamentary History XVII 954. For further analysis, see R. Deazley, *On the Origin of the Right to Copy: Charting the movement of Copyright in Eighteenth Century Britain* (2004).

[15] *Bach v. Longman* (1777) 2 Cowper 623.

[16] *See* Engraving Copyright Act 1734, extended in 1766, 1776, and 1836 (giving protection for 28 years from publication); Sculpture Copyright Act 1798, replaced in 1814 (giving 14 years from publication with a reversionary right similar to that of the Statute of Anne); Fine Arts Copyright Act 1862 (giving the artist's life and 7 years). On the latter, see L. Bently, "Art

and the Making of Modern Copyright Law," in D. McLean and K. Schubert (eds.), *Dear Images: Art, Copyright and Culture*, 331–351 (2002).

[17] A previous Act of 1838, giving the Crown a narrower power to enter into arrangements had proved too limiting. No bilateral arrangements were concluded under the 1838 Act, and it was therefore repealed in 1844. *See* S. Nowell-Smith, *International Copyright Law and the Publisher in the Reign of Queen Victoria* (1968).

[18] On the British background, see L. Bently and B. Sherman, "Great Britain and the Signing of the Berne Convention in 1886," 48 J. Copr. Society USA 311 (2001).

The Copyright Act 1911 therefore conferred copyright protection upon creation rather than publication in relation to all classes of work. It also abandoned all former requirements of the various statutes concerning registration with the Stationers' Company or notification on originals or copies. The effect of vesting copyright upon creation rather than publication might have been to create a complicated overlap between statutory and common law copyright. The Act avoided such dual protection by abolishing common law copyright and according its statutory protection relative to all works in which either common law or statutory copyright subsisted up to its commencement date: July 1, 1912.[19] This shift left to common law principles only protection of confidential information and against passing-off.[20]

The Copyright Act 1911 adopted as the main period of protection the author's life plus 50 years, applying this term to the works then covered by the Berne Convention: literary, dramatic, musical, and artistic works other than photographs, which received a term of 50 years from making. The scope of what would constitute infringement was broadened, principally to bring into account the new media of sound recording and film: infringement could in particular consist of reproduction "in a material form."[21] Films were protected as "photographs," without prejudice to copyright in the dramatic works embodied in films. Sound recordings themselves became the subject of copyright; they were deemed to be musical works, and this aggregation was held to give the owner a performing right as well as a reproduction right.[22] With this instance began the British willingness to confer separate copyright upon investors in technical productions.

The Copyright Act 1911 had large repercussions, given that the British Empire had at the time reached the zenith of its size and power. The changes it effectuated were extended directly to Britain's dependent colonies, and it was copied more or less exactly by the self-governing dominions: Australia, Canada, New Zealand, and South Africa.[23] Thus was created "Imperial Copyright," a system of mutual recognition that stood on a par with the young Berne Convention. The influence of Imperial Copyright continues to have a marked impress upon almost all the countries that it reached.

**[c]—The Copyright Act 1956.** The Brussels Revision of the Berne Convention in 1948, taken in conjunction with the signing of the Universal Copyright Convention in 1952, imposed the necessity of further legislation.[24] The 1956 Copyright Act, which followed, was enacted in an era of scrupulous

---

[19] C.A. 1911, Sec. 24 and Sched. 1.

[20] See § 1[1][b] supra.

[21] C.A. 1911, Sec. 1(2).

[22] C.A. 1911, Sec. 19.

[23] For the Australian and Canadian positions,

respectively, see Sherman, "Australia" (hereinafter "Australia"), and Gendreau, "Canada," herein.

[24] See Report of the Gregory Committee on the Law of Copyright, Cmnd. 8662 (1952).

judicial interpretation of legislation. This fact helped to account for the elaborate nature of its drafting.

The 1956 Act extended the range of rights which would protect investment in the technologies of information, learning, and entertainment. It gave a distinct copyright to the producers, but not to the directors or other actual creators, of films. It created what it also called "copyright" in sound and television broadcasts, given to the two British broadcasting authorities, and in the typographical format of a published edition, given to the publisher. The classical forms of copyright, being granted in "works" in Part I of the 1956 Act,[25] were separated from these other copyrights, together with that in sound recordings originally created in 1911; the latter were placed in Part II of the 1956 Act.[26] This careful discrimination, approximating to the European distinction between authors' rights in original works and neighboring rights in other media productions,[27] has been abandoned in the 1988 Act.[28]

In 1961, the United Kingdom was a prime mover towards the Rome Convention on the Protection of Performers, Producers of Phonograms and Broadcasting Organizations.[29] She also signed and ratified the Geneva Convention on Phonograms of 1971 and is a party to the European Agreements on Program Exchanges by Television Films of 1958 and on the Protection of Television Broadcasts of 1960. Copyright was not, however, conferred directly on performers under the 1956 Act, but a more limited protection was given under the Performers Protection Acts. It was primarily confined to sanctions under the criminal law, although case law began the evolution to the rights in performances statutorily granted by the 1988 Act.[30]

Three amendments to the 1956 Act should be noted, because of their potential transitional implications. First, the Design Copyright Act 1968 had the effect of introducing artistic copyright into the sphere of industrial production.[31] Second, the Cable and Broadcasting Act of 1984 added a Part II copyright in cable programs. Third, the Copyright (Computer Software) Act 1985 clarified the copyright position of both programs and works stored in computers.

### [3]—Current Law

Both the Berne and Universal Copyright Conventions were revised in Paris in 1971. To implement eventual British accession to their Paris Acts, statutory changes were finally made in 1988. E.C. developments have most often motivated subsequent legislative amendments.

---

[25] C.A. 1956, Secs. 1–11.

[26] C.A. 1956, Secs. 12–16.

[27] On this distinction generally, see Geller, "International Copyright: An Introduction," herein, at § 2[2][c] (hereinafter "Introduction").

[28] See § 2[2] infra.

[29] See § 6[2] infra.

[30] See § 9[1][a] infra.

[31] See § 2[4][c] infra.

**[a]—The Copyright, Designs and Patents Act 1988.** The Whitford Committee made extensive proposals in 1977 for the revision of the Copyright Act 1956. These addressed, in part, the controversial results of amendments concerning copyright and design laws and, in part, the advance of copying and media technology.[32] It took another decade for reform proposals to mature into the Copyright, Designs and Patents Act 1988.[33]

In the composite 1988 Act, Part I restates British copyright law completely, so far as it takes legislative form, incorporating numerous amendments and additions to the former statutory provisions. Behind these changes, however, lie principles, some of them of first importance, which are embodied in prior case law and can be regarded for the most part as carried forward without alteration. Part II deals with rights to the protection of performances.

Parts III and IV accord rights, respectively, in unregistered and registered designs. These two sets of provisions are to be read together with Sections 51 and 52 from Part I, which limit the operation of artistic copyright in the sphere of industrial production.[34] However, in 2001, the implementation of the E.C. Design Directive modified this regime.[35]

**[b]—E.C. Developments; Transitional Provisions.** Two types of transitional provisions must be distinguished: those generally governing the transition from the 1956 Act to the 1988 Act, and those specifically governing the transitions upon subsequent revisions.[36]

The 1988 Act, like the 1956 Act before it, operates upon a basic assumption that it applies to things in existence at commencement as it applies to things brought into existence subsequently.[37] There are, however, explicit exceptions, the most significant of which, undoubtedly, is that the subsistence of copyright in a work created before the 1988 Act went into effect on August 1, 1989, depends on the position immediately before that date.[38] Thus, a work in existence prior to July 31, 1989, will be protected under the 1988 Act if and only if it was protected by copyright under the 1956 Act on that date. These two general rules are subject to special rules referred to below.[39]

---

[32] Report of the Committee on Copyright and Designs Law (Cmnd. 6732, 1977).

[33] *See* Green Paper, *Reform of the Law relating to Copyright, Designs and Performers' Protection* (Cmnd. 8302, 1981); Green Paper by the Chief Scientific Officer, Cabinet Office, *Intellectual Property Rights and Innovation* (Cmnd. 9117, 1983); White Paper, *Intellectual Property and Innovation* (Cmnd. 9712, 1986).

[34] *See* § 2[4][c] *infra.*

[35] On this directive, see Smulders, "The Law of the E.C. and Copyright," herein, at § 4[3][c][i] (hereinafter "E.C.").

[36] For the transitional provisions in general, see C.D.P.A., Sched. 1.

[37] C.D.P.A., Sched. 1, para. 3.

[38] C.D.P.A., Sched. 1, para. 5(1).

[39] *See, e.g.,* § 2[2][b] *infra* (pre-1957 films), § 2[4][c] *infra* (industrial designs), § 3[2][b] *infra* (terms of protection), § 4[1][b] *infra* (rights vested in initial owners), § 6[1][d] *infra* (foreign works); § 7[3] *infra* (moral rights), and § 8[1]-[2] *infra* (infringing acts).

Since the United Kingdom is a member state of the European Community, its laws relating to intellectual property are subject to the requirements of the Treaty of Rome and E.C. directives,[40] as well as to the relevant judgments of the European Court of Justice. However, the E.C. Commission is harmonizing copyright piece-meal, while the United Kingdom has taken a minimalist approach to implementing the directives, so that the amended Act is becoming even more complicated and less orderly than before.[41] The United Kingdom implements E.C. directives by statutory instruments made under the European Communities Act 1972, and these instruments, known as "regulations," may introduce amendments into the Copyright, Designs and Patents Act 1988.[42] In the alternative, where new subjects, for example, the "publication right" and the "database right," are introduced without any existing place in the statutory regime or where special transitional provisions are called for, the relevant provisions simply form part of the relevant regulation. In both situations, the draftsman typically "rewrites" the terms of the relevant directive into the "style" of British statute law. This practice has led one of the leading commentators to suggest that the implementing regulations are, in some cases, *ultra vires* the European Communities Act.[43]

It is thus crucial, in relevant circumstances, not only to take account of amended provisions in the 1988 Act, but of self-standing provisions in the regulations. E.C. directives have then been implemented as follows:

- the Software Directive, in the Copyright (Computer Programs) Regulations, amending the 1988 Act effective January 1, 1993;[44]

- the Term Directive, in the Duration of Copyright and Rights in Performances Regulations, amending and supplementing the Act effective January 1, 1996,[45] while the "publication right" was introduced by the Copyright and Related Right Regulations on December 1, 1996;[46]

---

[40] On the E.C. copyright directives, see "E.C.," herein, at § 4[2], with texts in Appendices.

[41] Most obviously in relation to authorship and duration of films. *See* §§ 2[2][b] and [3][1][b] *infra*.

[42] *N.b.*, by virtue of the amendment of Section 1(2) of the European Communities Act 1972 by Section 1 of the European Economic Area Act 1993 (c. 51), regulations may be made under Section 2(2) to implement obligations of the United Kingdom arising under the E.E.A. Agreement, that is, the Agreement on the European Economic Area signed at Oporto on May 2, 1992, as adjusted by the Protocol signed at Brussels on March 17, 1993.

[43] Laddie, *et al.*, *The Modern Law of Copyright*, Chap. 2.

[44] S.I. 1992/3233 (hereinafter "Software Regs."). For further analysis, see § 2[4][d] *infra*.

[45] S.I. 1995/3297 (hereinafter "Duration Regs."). Part III contains self-standing provisions. For further analysis, see § 3 *infra*.

[46] S.I. 1996/2967 (hereinafter "Related Rights Regs."). Regulations 16 and 17 are self-standing, with effects explained in §§ 3[1][d] and 9[1][b] *infra*.

- the Rental and Related Rights Directive and the Cable and Satellite Directive, both in the same Related Rights Regulations, amending the Act effective December 1, 1996;

- the Database Directive, in the Copyright and Rights in Databases Regulations, effective January 1, 1998;[47]

- the Conditional-Access Directive, in the Conditional Access Regulations 2000;[48]

- the Designs Directive, in the Registered Designs Regulations 2001;[49]

- the Electronic Commerce Directive, in the Electronic Commerce (E.C. Directive) Regulations 2002, effective August 21, 2002;[50]

- the Information-Society Directive, in the Copyright and Related Rights Regulations 2003;[51]

- the Resale-Rights Directive, by the Artist's Resale Right Regulations.[52]

[c]—**Other Copyright Amendments.** Although the majority of amendments of the 1988 Act have their legislative origins in European harmonization initiatives, some alterations are domestic. The Copyright (Visually Impaired Persons) Act 2002 has added limited exceptions to infringement of copyright where copies are made in order to enable visually impaired persons to access works.[53] The Copyright and Trade Marks (Offences and Enforcement) Act 2002 has amended the 1988 Act by strengthening the potential punishment of criminal offenses relating to copyright, performers' rights, and the supply of unauthorized decoders.[54]

---

[47] S.I. 1997/3032 (hereinafter "Database Regs."). For further analysis, see§ 9[1][c] *infra*.

[48] S.I. 2000/1175. See§ 8[1][c][ii] *infra*. On this directive, see "E.C.," herein, at § 4[3][b][i].

[49] S.I. 2001/3949 (hereinafter the "Designs Regulations"). On the Design Directive, see "E.C.," herein, at § 4[3][c][i].

[50] S.I. 2002/2013. See§ 8[1][c][ii] *infra*.

[51] S.I. 2003/2498 (hereinafter "Information Society Regs."). On the Information-Society Directive, see "E.C.," herein, at § 4[2][g], with text in Appendix 7. The transitional provisions are in Part 3 of the Information Society Regulations: the basic rule is that the Regulations apply

to works and other protected materials whether made before or after commencement, though prospectively only, so that the status of "acts" taking place before commencement is unaffected.

[52] S.I. 2006/346. *See* § 4[3][e] *infra*.

[53] Brought into force from October 31, 2003 by the Copyright (Visually Impaired Persons) Act 2002 Commencement Order 2003, S.I. 2003/2499. *See* § 8[2][b][i] and 8[2][b][iii][B] *infra*.

[54] Brought into force as of November 20, 2002 by the Copyright and Trade Marks (Offences and Enforcement) Act 2002 (Commencement) Order 2002, S.I. 2002/2749. See§ 8[4][b] *infra*.

## § 2  Subject Matter

### [1]—Standards for Protection

**[a]—Formal Requirements.** The 1988 Act specifies that a literary, dramatic, or musical work is not the subject of copyright unless and until it is "recorded, in writing or otherwise."[1] For instance, a work may be fixed by tape-recording or filming it, assuming sufficient fidelity in the process.[2] Section 3(3) then states that it is immaterial whether the author gave permission for the act of recording or not.

A person who arranges for a stenographer to take down his speech is the author of the resulting work, for it has merely been transcribed by an amanuensis.[3] Even if the transcription, recording, or other such fixation is independently arranged, the Act treats the person whose thoughts are fixed as the author of the work, although there may be a distinct copyright in the resulting transcription, recording, or other fixation. If a work was made in writing, the person who reduces it to this form also acquires a distinct literary copyright if he himself brings sufficient skill and judgment to the task.[4]

Fixation or recording are, more properly speaking, elements in the definition of certain other types of protected subject matters. For example, artistic works have traditionally existed as physical art objects and are normally protected as such, although somewhat transient artistic works have also been protected.[5] Fixation is an essential component of sound recordings, films, and published editions, but sound and television broadcasts, broadly defined to include cable programs, are protected whether or not a permanent version of them is made by the broadcasting authority.[6]

---

[1] C.D.P.A., Sec. 3(2).

[2] See, e.g., Norowzian v. Arks (No.2) [2000] E.M.L.R. 67, 73 (holding that, where a work of dance was filmed and the film edited drastically, but no claim made in the original unedited film, the edited film "is not a recording of" the dance) (also glossed under § 2[2][a][ii] infra).

[3] See, e.g., Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. [1995] F.S.R. 818, 835 (to say that the person who pushes the pen is the creator is "too narrow a view of authorship"; rather "[i]t is both the words or lines and the skill and effort involved in creating, selecting or gathering together the detailed concepts, data or emotions which those words or lines have fixed in some tangible form which is protected"). On joint authorship, see § 4[1][a] infra.

[4] See Walter v. Lane [1900] A.C. 539; Express Newspapers v. News (UK) [1990] F.S.R. 359. See also Hadley & Ors. v. Kemp [1999] E.M.L.R. 589, 643 (considering that the input of a "performer" is not relevant). For discussion, see Arnold, "Are Performers Authors?" [1999] E.I.P.R. 464.

[5] See, e.g., Merchandising Corp. of America v. Harpbond [1983] F.S.R. 32 (no copyright in pop star's make-up); Creation Records Ltd. v. News Group Ltd. [1997] E.M.L.R. 444 (collection of objets trouvés not a work of artistic craftsmanship or collage since it existed only for a few hours and its continued existence was to be in the form of a photographic image). But cf. Metix UK Ltd. v. G.H. Maughan [1997] F.S.R. 718 (something with transient existence such as ice sculpture could be protected).

[6] Compare C.D.P.A., Secs. 5A(1), 8(1), with id., Sec. 6 (as amended).

In appropriate cases, creative effort expended prior to fixation may be protected by an action for breach of confidence.[7]

**[b]—Substantive Criteria.**[8] The 1988 Act specifies that, to attract copyright, a literary, dramatic, musical, or artistic work must be "original."[9] In a much-quoted passage construing this notion, Mr. Justice Peterson said:

> "The word 'original' does not in this connection mean that the work must be the expression of original or inventive thought. Copyright Acts are not concerned with the originality of ideas, but with the expression of thought, and, in the case of 'literary work', with the expression of thought in print or writing. The originality which is required relates to the expression of the thought. But the Act does not require that the expression must be in an original or novel form, but that the work must not be copied from another work—that it should originate from the author."[10]

Origination is frequently equated with the exercise of labor, skill, or judgment in the production of the work. How much must be exercised, according to Lord Atkinson, "cannot be defined in precise terms," but "[i]n every case it must depend largely on the special facts of that case and must in each case be very much a question of degree."[11] According to one statement, the work must be the result of a "substantial degree" of skill, industry or experience; according to another statement in the same case, the amount need only be "more than negligible."[12]

**[i]—Cases Meeting the Criteria.** Effort involved in the pre-expressive stage, for example, generating ideas or collecting information, is capable of rendering the resulting work original.[13] For example, the construction of a chronological list of matches between ninety-two clubs in four divisions took considerable time, ingenuity, and skill, so that copyright existed in resulting lists.[14] Even if the expressive form is a consequence of function, the work is

---

[7] *See, e.g.*, Creation Records Ltd. v. News Group Ltd. [1997] E.M.L.R. 444 (arrangement of objects in preparation of photograph not protected by copyright, but arranger was protected from others photographing the scene and exploiting those photographs by an implied obligation of confidentiality).

[8] For further analysis, see *Copinger and Skone James on Copyright*, paras. 3-123 – 3-151, pp. 116–135; Laddie, *et al., The Modern Law of Copyright*, paras. 3.21–3.76, pp. 61–97; Cornish, *Intellectual Property*, paras. 10-04 – 10-10, pp. 388–393.

[9] C.D.P.A., Sec. 1(1)(a).

[10] University of London Press v. University Tutorial Press [1916] 2 Ch. 601, at 608.

[11] Macmillan & Co. Ltd. v. K. &. J. Cooper (1923) 93 L.J.P.C. 113.

[12] Ladbroke v. William Hill [1964] 1 All E.R. 465, 478 (Lord Devlin) and 476 (Lord Hodson). *See also* Football League v. Littlewoods [1959] Ch. 637 (Upjohn J.) ("some labour, skill, judgment or ingenuity"); "Karo Step" Trade Mark [1977] R.P.C. 273 (Whitford J.) ("some degree of skill and labour.").

[13] Walter v. Lane [1900] A.C. 539, 546 (Earl of Halsbury L.C.).

[14] Football League v. Littlewoods [1959] Ch. 637, *approved*, Ladbroke v. William Hill [1964] 1 All E.R. 465.

(Rel.18–9/06 Pub.399)

protected: thus there is copyright in a drawing of a design of an exhaust pipe, though the features might express some engineering principle,[15] or in a computer program though the program might achieve a function.[16] As regards artistic works, it has been said that there is copyright even in "the coarsest, or the most commonplace, or the most mechanical representation of the commonest object," but that copyright might be confined to that which is special to the individual drawing over and above the object.[17]

[ii]—Cases Not Meeting the Criteria. In the absence of sufficient effort, there will be, in principle, no protection. For example, sufficient originality was not found in the following cases: make-up comprised of three lines of grease paint;[18] the drawing of a circle or straight line;[19] short slogans or titles;[20] the routine application of a formula to produce forecasts in greyhound races;[21] a list of odds on horses running in a particular race.[22] Furthermore, even if a copy is a product of labor, skill, and judgment, originality is lacking where it is wholly copied from an existing work, without any significant addition, alteration, transformation, or combination with other material.[23]

---

**15** British Leyland v. Armstrong [1986] R.P.C. 279, 296 (Oliver L.J.) (also discussed in § 8[2][a][i] *infra*). On protecting designs by copyright or other rights, see § 2[4][c] *infra*.

**16** Ibcos Computers Ltd. v. Barclays Mercantile Highland Finance Ltd. [1994] F.S.R. 275. On a special criterion for computer programs, see §§ 2[1][b][iii] and 2[4][d] *infra*.

**17** Kenrick & Co. v. Lawrence & Co. 25 Q.B.D. at 102 (Wills J.). *See also* IPC Magazines Ltd. v. MGN Ltd. [1998] F.S.R. 431 (copyright in magazine logo designed using well-known techniques); Antiques Portfolio.com Plc. v. Rodney Fitch & Co. Ltd. [2001] F.S.R. 345 (copyright in simple photographs of antiques protected because they involved judgment in the positioning of the object, the choice of angle, lighting, and focus). On "works of artistic craftsmanship," sometimes subject to a criterion of "artistic quality," see § 2[2][a][iv] *in fine infra*.

**18** Merchandising Corp. of America v. Harpbond [1983] F.S.R. 32.

**19** "Karo Step" Trade Mark [1977] R.P.C. 273 (Whitford J.). *See also* Guild v. Eskander [2003] F.S.R. 23, 39–40 (Court of Appeal) (overturning a first-instance finding that the combination of

various features of clothes, such as a cross-over, V-neck, and ribbed cuffs, was original). On protecting designs, see § 2[4][c] *infra*.

**20** *See, e.g.*, Sinanide v. La Maison Kosmeo (1924) L.T.R. 365 (holding that there was no copyright in the advertising slogan "Beauty is a social necessity not a Luxury," ostensibly on the basis of the principle *de minimis non curat lex*); Rose v. Information Services Ltd. [1981] F.S.R. 254 (Hoffmann J.) (denying copyright in the title "The Lawyer's Diary" because there was too slight a degree of skill and labor); Scottish Daily Record and Sunday Mail v. News Group Newspapers Ltd. [1998] S.L.T. 1411 (Court of Session, Inner House) (denying copyright in "Money Bags . . . Is there real money inside?"). On titles, see § 2[4][a] *infra*.

**21** Greyhound Services Ltd. v. Wilf Gilbert (Staffs) Ltd. [1994] F.S.R. 723. *See also* Greyhound Racing Assn. v. Shallis [1923-28] MacG. C.C. 370 (competitors in a greyhound race).

**22** Oldham Press Ltd. v. London and Provincial News Agency Ltd. [1935] Ch. 672. *See also* Cramp v. Smythson [1944] AC 329, 336 (Viscount Simon L.C.) (suggesting that originality would be lacking in a table of times when the sun rises and the moon sets).

**23** For further analysis, see§ 2[3][a] *infra*.

Statutory moral rights may be waived. Such waiver may be achieved by an instrument in writing, signed by the person giving up the right. A waiver of this kind may relate to a specific work, to works of a specified description, or to works in general; it may relate to existing or future works; it may be conditional or unconditional or subject to revocation.[54] The same result may be achieved by an informal waiver or other transaction having effect under the general law of contract or estoppel.[55]

## § 8  Economic Rights; Enforcement

### [1]—General Content of Rights

[a]—Infringement Analysis. Copyright infringement occurs upon the taking of at least a "substantial part" of the claimant's work.[1] The preliminary focus of the inquiry is whether defendant has indeed taken anything from that work.[2] If a taking is shown, but it is less than nearly complete taking of the work, inquiry then shifts to substantiality.[3]

The 1988 Act incorporates the notion of infringement by indirect copying, that is, by copying something that is itself a copy.[4] However, the claimant must prove a causal connection, whether directly or by inference, between the work at issue and the infringing copy.[5] Thus copyright in the cartoon character "Popeye" was infringed by making copies of dolls that were themselves derived from the cartoons.[6] Indirect copying of an artistic work might even occur where the intermediate stage is merely a written set of instructions reflecting in detail the configuration of the work such that, when those instructions are followed, a similar work is produced.[7]

---

[54] C.D.P.A., Sec. 87(1)–(3).

[55] C.D.P.A., Sec. 87(4).

[1] See Bently and Sherman, *Intellectual Property Law*, Chap. 8.

[2] See, e.g., Stoddard International Plc. v. William Lomas Carpets Ltd. [2001] F.S.R. 44 (analyzing burdens of proof of copying).

[3] Cf. Designers Guild v. Russell Williams [2000] 1 W.L.R. 2416, 2426 (Lord Millett) (suggesting that, where copying is proved from similarities between the claimant's and defendant's works, there will usually be no need to go on and consider whether a "substantial part" of the claimant's work has been taken).

[4] C.D.P.A., Sec. 17(3)(b).

[5] See Jones v. London Borough of Tower Hamlets [2001] R.P.C. 407. It does not matter whether the intermediate reproduction is itself legitimate or piratical. *But cf.* Purefoy v. Sykes Boxall (1955) 72 R.P.C. 215 (if one trader makes products and then puts out a catalog of them, and another copies the products and produces his own catalog, the second catalog is not copied from the first).

[6] King Features v. Kleeman [1941] A.C. 417. *See also* Dorling v. Honnor [1965] Ch. 1 (where a drawing of a yacht led to sales of kits of parts to make the yacht and an unlicensed copy of a kit was made up into a yacht, a photograph of that yacht was held to infringe copyright in the drawing).

[7] Plix Products v. Frank M. Winstone [1986] F.S.R. 608. On the issue as to whether the instructions themselves would infringe, which turns on whether they could be said to be a "copy," see § 8[1][b][i] *infra.*

Decisions over substantiality can raise difficult questions about the precise extent of the "work."[8] In any event, difficulties with identifying the parameters of a work are for the most part avoided by emphasizing that substantiality "depends much more on the quality than the quantity of what has been taken."[9] In this context, "quality" is judged from the point of view of the person to whom the work is addressed.[10] The reproduction of even small fragments of literally similar material has been treated as infringing, such that the courts have sometimes found assistance in the notion that "what is worth copying is worth protecting."[11] This phrase helpfully indicates the protectionist tendencies of some judges, although others remain skeptical of such a conclusory approach.[12]

In assessing substantiality, the court may consider the type of work involved. There are suggestions that a copyist may legitimately take greater amounts of technical or historical material than would be permitted in the case of fiction or fancy.[13] It is worth noting that the statute states explicitly that making a photograph of the whole or a substantial part of any image forming part of a film or broadcast—for instance, for a postcard or poster—is an infringement.[14]

---

**8** See generally Hyperion Records v. Warner Music (1991, unreported) (Laddie Q.C.) (explaining, after finding copyright in an entire "track" of a sound recording rather than in any eight-note sequence on the track, that "I do not accept that all copyright works can be considered as a package of copyright works, consisting of the copyright in the whole and an infinite number of sub-divisions . . . In my judgment, a copyright sound recording must have a beginning, middle and end . . .").

**9** See, e.g., The Newspaper Licensing Agency Ltd. v. Marks and Spencer Plc. [2001] 3 W.L.R. 390 (Lord Hoffmann) (suggesting that concern over what constituted the "edition" was largely misplaced, because the critical question of whether a substantial part had been appropriated was to be determined by reference to quality not quantity).

**10** Bilhofer Maschinenfabrik GmbH. v. Dixon & Co. Ltd. [1990] F.S.R. 105. Moreover, a substantial part of a newspaper protected by copyright as a "literary work" may well not be a substantial part of the "typographical arrangement": Newspaper Licensing Agency Ltd. v. Marks and Spencers Plc. [2000] E.M.L.R. 704, implicitly approved on appeal at [2001] 3 W.L.R. 390.

**11** Ladbroke v. William Hill [1964] 1 W.L.R. 273. See, e.g. Ludlow Music v. Robbie Williams [2001] F.S.R. 271 (reproduction of, at most, 21 words from claimant's song was substantial part); A v. B. [2000] E.M.L.R. 1007 (copying two pages of diary was substantial). In some circumstances, the courts have gone further and held that the serial extraction of insubstantial parts may cumulatively constitute an infringement: Cate v. Devon Constitutional Newspaper (1889) 40 Ch. 500.

**12** See Electronic Techniques (Anglia) Ltd. v. Critchley Components [1997] F.S.R. 401 (Laddie J.); Hyperion Records v. Warner Music (1991, unreported) (Laddie Q.C.); Nationwide News Pty. Ltd. v. Copyright Agency Ltd. (1996) 34 I.P.R. 53, 71.

**13** See Elanco Products v. Mandops [1980] R.P.C. 213; Ravenscroft v. Herbert [1980] R.P.C. 193, 205. Although the copying of "unoriginal" elements contained in a claimant's work will not normally constitute a substantial part, "it is likely to do so when the amount copied includes the context" in which the part is situated: Biotrading & Financing Oy. v. Biohit Ltd. [1998] F.S.R. 109, 122.

**14** C.D.P.A., Sec. 17(4) (as amended by the Information Society Regs., Sched. 1, para. 3(1)(a)).

In relation to literary, dramatic, musical, and artistic works, it has often enough been said that what is protected is not an "idea" but its "expression." If this maxim were understood literally, it would often be impossible to establish infringement except where the defendant took the work or part of a work in unaltered form. Yet it is clear that there may be infringement when the plot of a play is copied in detail without taking the dialog,[15] when a cartoon is enacted as a revue sketch,[16] when details of a narrative history are embodied in a film script,[17] or when instructions on a weedkiller packet are repeated in different words.[18] All that is meant by saying that the "idea" itself is not protected is often either that the idea is unconnected with the expression or that the idea is commonplace and thus not a substantial part of the claimant's original work.[19] Consequently, one person may take from another the initial idea for the creation of a work,[20] which he then executes independently, as where he paints for himself the same scene[21] or draws his own cartoon for the same basic joke.[22] Where the claimant's work records information, the defendant must not copy its entire presentation but rather exercise his own labor, skill, and judgment in bringing information together. Thus it was infringement to compile a street directory by sending out slips for checking information culled from the claimant's directory.[23] It was also infringement to adopt the quotations selected by the claimant for a critical edition of a play by Shakespeare.[24]

Issues of this kind have arisen in software cases. Where a program for labeling and stock control was at issue, the plaintiff did not allege outright copying of the source code, but only of the specific compilation of certain program elements. After considering tensions in U.S. case law on point, the English judge found that copying three particular elements in the defendant's program sufficed for infringement.[25] By contrast, another judge, eschewing U.S. case law, adopted

---

[15] Corelli v. Gray (1913) 29 T.L.R. 570.

[16] Bradbury Agnew v. Day (1916) 32 T.L.R. 349.

[17] Harman v. Osborne [1967] 2 All E.R. 324.

[18] Elanco v. Mandops [1980] R.P.C. 213. See also M.S. Associates v. Power [1988] F.S.R. 242 (interlocutory proceeding for alleged infringement of computer program). Cf. Bowater Windows Ltd v. Aspen Windows Ltd [1999] F.S.R. 759, 781–2 (holding redrafted version of an 8-page sales ad not to infringe copyright in the document on which it was based because any literal similarity existed only in respect of aspects of the document which embodied a negligible amount of skill and labor and because no claim could be made to originality in the basis of the document).

[19] See Designers Guild v. Russell Williams [2000] 1 W.L.R. 2416, 2423 (Lord Hoffmann).

[20] Cf. Plix Products v. Frank M. Winstone [1986] F.S.R. 608 (New Zealand Court of Appeal, Pritchard J.) (distinguishing unprotectible "basic idea" from "constitutive ideas").

[21] See Krisarts v. Briarfine [1977] F.S.R. 537.

[22] See McCrum v. Eisner [1917-23] MacG. C.C. 14.

[23] Kelly v. Morris (1866) L.R. 1 Eq. 677. See also Waterlow Directories v. Reed Information [1992] F.S.R. 409 (on material recorded in an electronic database).

[24] Moffatt v. Gill (1902) 86 L.T. 465, 471.

[25] John Richardson v. Flanders [1993] F.S.R. 497.

a classic copyright approach, asking whether the defendant had copied a substantial part of the claimant's original work. The judge retained discretion to assess reproduction, without feeling compelled rigorously to exclude from protection, for example, idea-expression mergers or *scènes à faire*.[26] In a third case, the owner of copyright in source code brought an action against a former licensee who, having never seen the source code, tried to emulate the functional behavior of the program. The court found no infringement, stressing that the functional behavior of a program was different from the plot of a novel and that policy weighed against protecting the "business logic" of a program through copyright.[27]

     **[b]—Economic Rights.** The 1988 Act includes the following definitions of restricted acts:[28]

          **[i]—Reproduction.** In cases of literary, dramatic, musical, or artistic works, copying means "reproducing the work in a material form."[29] In most cases, it makes no difference that the copies are transient or incidental to some other use.[30]

    The 1988 Act specifically lists some of the material forms. It mentions storing the work in any medium by electronic means, which clearly covers computer storage.[31] Copying extends to the incorporation of the work in a record or film, as well as converting a two-dimensional artistic work into three dimensions, and vice versa.[32] Other changes of form may also count, for instance, turning a story into a ballet, copying a photograph by painting, making a knitting pattern into a fabric, or turning a drawing such as a cartoon into a revue sketch.[33] One court

---

   **26** Ibcos Computers v. Barclays Mercantile [1994] F.S.R. 275.

   **27** Navitaire Inc. v. Easy Jet Airline Co & BulletProof Technologies Inc. [2006] R.P.C. 111 (para. 130). *See also* Nova Productions Ltd. v. Bell Fruit Games [2006] R.P.C. (14) 379 (finding that similarities between video games were attributable to general ideas which had "little to do with skill and effort" expended by the programmer).

   **28** The 1956 Act included most of these acts. The transitional provisions apply the new definitions only to acts taking place after August 1, 1989: C.D.P.A., Sched. 1, para. 14. These transitional provisions also govern the application of exceptions to copyright. For further details, see § 8[2]-[3] *infra.* Remedies under the 1988 Act generally apply to acts subsequent to August 1, 1989: C.D.P.A., Sched. 1, para. 31.

   **29** C.D.P.A., Sec. 17(2).

   **30** C.D.P.A., Sec. 17(6). *See, e.g.,* Greyhound Services Ltd. v. Wilf Gilbert (Staffs.) Ltd. [1994] F.S.R. 724 (treating the presentation of information on a television screen as a reproduction). For further analysis, see Laddie, *et al., The Modern Law of Copyright,* para. 14.10–14.12, pp. 616–618. On permitted incidental uses, see § 8[2][c] *infra.*

   **31** C.D.P.A., Sec. 17(2).

   **32** C.D.P.A., Sec. 17(3). But, for caveats concerning the protection of industrial designs, see § 2[4][c][i] *supra.*

   **33** *See, respectively,* Holland v. Van Damm [1936–45] MacG. C.C. 69; Bauman v. Fussell [1978] R.P.C. 485; Lerose v. Hawick Jersey [1974] R.P.C. 42; Bradbury Agnew v. Day (1916) 32 T.L.R. 349.