```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ROGER R. CRANE, JR.,                 :
                                     :
                Plaintiff,           :
                                     :
        v.                           :
                                     :
POETIC PRODUCTS LIMITED,             :
                                     :
                Defendant.           :
------------------------------------x
POETIC PRODUCTS LIMITED,             :
                                     :
                Counterclaimant,     :
        v.                           :
                                     :
ROGER G. CRANE, JR.,                 :
                                     :
                Counterdefendant. :
------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/8/09

07 Civ. 7063 (BSJ)(FM)

**OPINION and ORDER**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

### INTRODUCTION

Plaintiff and Counterdefendant, Roger R. Crane, Jr. ("Crane" or "Plaintiff"), filed this action against Defendant and Counterclaimant, Poetic Products Limited ("PPL" or "Defendant"), seeking a declaratory judgment that his play, The Last Confession, does not infringe the copyright of Defendant's book, In God's Name: An Investigation into the Murder of Pope John Paul I, under the laws of both the United States and the United Kingdom. Defendant filed counterclaims alleging copyright infringement in violation of 17 U.S.C. § 101 et seq. ("Copyright Act") and common law unfair competition for

1

Plaintiff's authorship, marketing, and distribution of The Last
Confession in the United States.  Plaintiff moved for summary
judgment on his declaratory judgment claim.  For the reasons set
forth below, Plaintiff's motion is granted in part and denied in
part, and Defendant's counterclaims are dismissed.

## BACKGROUND

Plaintiff Roger R. Crane, Jr., is an attorney who resides
and practices law in New York.  Crane is the author and U.S.
copyright owner of The Last Confession ("The Last Confession" or
"TLC").  (Compl. ¶ 5.)  The Last Confession is a fictional two-
act play based on the historic events surrounding the succession
and death of Pope John Paul I.  The play's protagonist, Cardinal
Giovanni Benelli, tells the story of John Paul I's election as
Pope, his time in the Vatican, his death, and the aftermath of
that death in a series of flashbacks.  TLC's content is
comprised of dialogue and stage directions.  The synopsis on the
back cover describes TLC as a "gripping thriller [that] goes
behind the scenes at the Vatican, uncovering the bitter
rivalries, the political maneuverings and the unspoken crises of
faith that surrounded the death of 'the Smiling Pope.'"

Defendant Poetic Products Limited is a private company
incorporated under the laws of England and Wales.  Defendant
owns the U.S. and U.K. copyrights of In God's Name: An
Investigation into the Murder of Pope John Paul I ("In God's

Name" or "IGN"), authored by David A. Yallop. (Defendant's Answer, Counterclaims, and Demand for a Jury Trial ("Def. Answer") ¶¶ 2, 6-7.) In God's Name is a factual investigation of the circumstances surrounding the death of Pope John Paul I in 1978. The book contains biographical details of the Pope's life, as well as extensive documentation of the financial and political corruption that plagued the Vatican in the 1970s. The synopsis on the back cover describes IGN as a "classic work of investigative writing . . . ." Yallop describes the book as "the product of nearly three years' intensive research," and states that "all the information, all the details, all the facts, have been checked and double checked to the extent multiple sources were available." IGN, at xv, xvii. After an examination of the historical facts and circumstances surrounding Pope John I's birth, rise to power, brief tenure as Pope, death, and the aftermath of his death, Yallop concludes that that a faction of powerful men both inside and outside of the Vatican conspired to murder Pope John Paul I. Id. at 248-304.

## DISCUSSION

### I.    Summary Judgment Standard

A court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

3

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does so successfully, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). The party opposing summary judgment cannot rely on "conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jang Gan v. City of N.Y., 996 F.2d 522, 535 (2d Cir. 1993). Nonetheless, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. U.S. Copyright Infringement

### A. Facts vs. theories

Ordinary historical facts and events are not protectable elements under the Copyright Act. See Rosemont Enters., Inc. v. Random House, Inc., 366 F.2d 303, 307 (2d Cir. 1966). More relevant to this case, *interpretations* of historical facts or events are not protectable, "including theories or plots." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 978-79 (2d Cir. 1980) (finding the hypothesis that a particular individual destroyed the Hindenburg zeppelin was based entirely

on the interpretation of historical facts, which "whether or not
it originated with [the plaintiff], is not protected by his
copyright and can be freely used by subsequent authors").
Hoehling also holds that scénes á faire (stock or standard
literary devices used by many authors depicting a particular
historical period) are not copyrightable as a matter of law.
Id. at 979.

Hoehling, however, must be read alongside Feist
Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340
(1991).  In Feist, the Supreme Court held that while copyrights
do not apply to facts themselves, "thin" copyright protection
does exist for an original selection or arrangement of facts,
"but the copyright is limited to the particular selection or
arrangement."  Feist, 499 U.S. at 349-51.  The Court in Feist
ultimately held that copyright protection did *not* extend to the
white pages listings at issue, which were taken from one
telephone book for use in another, because the listings lacked
originality in selection, coordination and arrangement.  Id. at
363-64.

As applied here, Hoehling and Feist result in the following
conclusion: the theory that Pope John Paul I was murdered and
the facts surrounding his death are *not* protectable elements of
In God's Name under the Copyright Act, but IGN's *expression* of
that theory and surrounding facts -- its selection, coordination,

5

and arrangement of its theories and facts — *is* protectable.[1]   To

determine whether PPL's copyright to IGN's expression has been

infringed by The Last Confession, the Court must decide whether

The Last Confession is substantially similar to the protectable

elements of IGN.

## B.   Substantial similarity test

To establish copyright infringement, a party must show (1)

ownership of a valid copyright and (2) copying of constituent

elements of the work that are original.   See Feist, 499 U.S. at

361.   Plaintiff does not dispute that PPL owns a valid copyright

to In God's Name.   Therefore, in order to prevail on its

counterclaim, PPL must show that Crane copied protectable

elements of IGN.   In the absence of direct evidence, actual

copying must be demonstrated "by showing '(a) that [the alleged

infringing party] had access to the copyrighted work and (b) the

substantial similarity of protectable material in the two

works.'"   Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996)

(quoting Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir.

1993)).   Crane does not dispute that he had access to IGN, hence

this case turns on whether the two works are substantially

similar.   In applying this test, a court must focus on whether,

---

[1] Hoehling, which was decided before Feist, did not address the selection and
arrangement issue, except to note that a "verbatim reproduction of another
work . . . even in the realm of nonfiction, is actionable as copyright
infringement."   Hoehling, 618 F.2d at 980.   Because the Second Circuit did
not find such a verbatim reproduction, it affirmed the district court's grant
of summary judgment for the plaintiff.   Id.

in the eyes of an ordinary lay observer, The Last Confession is
substantially similar to the protectable expression in In God's
Name.  Id.; Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25
F.3d 119, 123 (2d Cir. 1994).

In general, the question of substantial similarity is a
close question of fact; therefore, "summary judgment has
traditionally been frowned upon in copyright litigation."
Hoehling, 618 F.2d at 977.  Yet, summary judgment may be granted
when any similarity concerns non-protectable elements or "no
reasonable trier of fact could find the works substantially
similar."  Walker v. Time Life Films, 784 F.2d 44, 48 (2d Cir.
1986) (affirming summary judgment after finding no substantial
similarity between a factual account of corruption in a Bronx
police department and a screenplay and film based on the
historical events described in that account); Tabachnik v.
Dorsey, 04 Civ. 9865 (SAS), 2005 U.S. Dist. LEXIS 14267, at *14
(S.D.N.Y. July 15, 2005) (dismissing a copyright infringement
claim after finding that the presentation of the same historical
facts in defendant's book was not substantially similar to
plaintiff's copyrighted dissertation because the defendant
presented those same facts in "his own distinct style and
wording"); Gardner v. Nizer, 391 F. Supp. 940, 943-44 (S.D.N.Y.
1975) (finding that most of the allegedly infringing passages

from defendant's biography "merely recount factual events with little or no similarity in style or form of expression").

The law in this Circuit is clear that the substantial similarity must be between protectable elements.  Williams, 84 F.3d at 588 ("When we determine that a work contains both protectable and unprotectable elements, we must take care to inquire only whether 'the *protectable elements, standing alone,* are substantially similar.'") (quoting Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995)).  To decide this motion, the Court need only compare the two works themselves without having to consider any extrinsic evidence.  See Flaherty v. Filardi, 388 F. Supp. 2d 274, 291 (S.D.N.Y. 2005) ("[T]he relevant inquiry for summary judgment on the copyright and related claims . . . focuses on the substantial similarities between Plaintiff's screenplay and Defendants' finished film, both of which are in evidence.").

### 1. **No substantial similarity exists between** The Last Confession **and the protectable elements of** In God's Name

#### a. Specific claims of similarity of selection, coordination, and arrangement of expression

PPL has extensively documented its claims of alleged infringement with line-by-line comparisons of quoted passages of IGN with dialogue from TLC.  (Yallop Decl., Exs. 4-5.)  Upon careful review of the entirety of PPL's line-by-line

comparisons, the following seven examples are representative of, and are the strongest of, PPL's claims.

| Example | In God's Name | The Last Confession |
|---|---|---|
| **1**<br><br>(Yallop Decl., Ex. 4 at 2-3) | PP. 48-49:<br><br>Eventually, a collection of the letters was published in book form, *Illustrissimi* — the most illustrious ones.<br><br>The book is a delight.<br><br>P. 148:<br><br>He quoted Mark Twain, Jules Verne and the Italian poet Trilussa. | P. 11:<br><br>BENELLI: Albino, it's good to see you. I enjoyed your book.<br><br>LUCIANI: You did? Thank you. It was just some letters.<br><br>BENELLI: Yes (*Smiling.*) but to Mark Twain, Jules Verne . . . very illustrious. |
| **2**<br><br>(Yallop Decl., Ex. 4 at 3-4) | P. 25:<br><br>It was customary for the Patriarch of Venice to have his own boat. Luciani had neither the personal wealth nor the inclination for what seemed to him an unnecessary extravagance. . . . If it was an urgent appointment Luciani would telephone the local fire brigade, the carabinieri or the finance police and beg the loan of one of their boats. | P. 12:<br><br>LUCIANI: My parishioners wanted me to have my own boat and gondolier. Can you imagine a private boat just waiting for me?<br><br>BENELLI: I've seen your car. You could do with a boat . . . What do you do when you need one?<br><br>LUCIANI: Call the fire brigade. They lend me one of theirs. |
| **3**<br><br>(Yallop Decl., Ex. 4 at 6-8) | PP. 27-28:<br><br>The offices of the Patriarch were frequently filled with ex-prisoners, alcoholics, poor people, abandoned people, tramps, women who could no longer work as prostitutes. | PP. 12-13<br><br>LUCIANI: When the Pope sent me to Venice the churches were empty but the streets were filled with prostitutes, with the mentally ill, with the handicapped. The City had shut its doors. I opened |

| | | |
|---|---|---|
| | . . .<br><br>One of the injustices that Luciani continuously worked to eliminate in Venice concerned a widely prevalent attitude towards the subnormal and the handicapped. Not only the mayor and city officials showed indifference, but Luciani found the same prejudice among some of his parish priests. When he went to give First Communion to a large group of handicapped people at St Pius X in Marghera he had to cope with a delegation of protesting priests who argued that he should not do such a thing. 'These creatures do not understand.'<br><br>. . .<br><br>Alter [sic] the Mass he picked up a young girl suffering from spina bifida. . . .<br><br>'Do you know whom you have received today?' he asked the little girl.<br><br>'Yes. Jesus.' | mine. Many priests objected to giving communion to the prostitutes and the handicapped. These creatures do not understand, they said. So after mass I asked a young girl who was afflicted with a terrible spinal disease if she knew what she had received. She said, 'Yes: Jesus.' I will not abandon them. |
| **4**<br><br>(Yallop Decl., Ex. 4 at 26-27) | P. 145:<br><br>When Albino Luciani threw open the windows of the Papal Apartments within twenty-four hours of his election, the gesture personified his entire Papacy. Fresh air and sunlight rushed into a | P. 23:<br><br>FELICI: Pope John and the Second Vatican Council said they wanted to open the windows of the Church for a dialogue with the world. |

| | | |
|---|---|---|
| | Roman Catholic Church which had grown increasingly dark and sombre during the last years of Paul VI. | |
| **5**<br><br>(Yallop Decl., Ex. 4 at 33-35) | PP. 58-59:<br><br>The Latin American cardinals were not the only group to formulate a document that amounted to a job description. A week earlier, a group of Catholics calling themselves CREP (Committee for the Responsible Election of the Pope) held a Press conference in the Columbus Hotel, Rome. The brave man chosen to field questions from over 400 reporters was Father Andrew Greeley. Not himself a member of CREP, Greeley and a group of theologians had drawn up the job description on behalf of the Committee.<br><br>. . .<br><br>HELP WANTED<br><br>A hopeful, holy man can who smile.<br><br>Interesting work, guaranteed income, residence comes with position. Protection by proven security organization. Apply College of Cardinals, Vatican City.<br>. . .<br><br>' . . . A Pope not for all Catholics but for all peoples. A man totally free | P. 32:<br><br>SUENENS: . . . And then there is CREEP . . .<br><br>BENELLI: What is creep?<br><br>SUENENS: Committee for the Responsible Election of the Pope.<br><br>BENELLI: I assume it doesn't include any cardinals.<br><br>SUENENS: Correct . . . Listen to their criteria. (*SUENENS takes out a piece of paper and reads from it*.) 'Help wanted. A hopeful, holy man who can smile.' (*Looking up*). That's the heading. (*Continuing his reading*) 'Interesting work, guaranteed income, residence comes with position. Protection by proven security organisation. Apply College of Cardinals, Vatican City.' It goes on: (*Back to paper*). 'A Pope not for all Catholics but for all peoples. A man totally free from the slightest taint of financial wheeling and dealing.' |

| | | |
|---|---|---|
| | from the slightest taint of financial organizational wheeling and dealing.' | |
| **6** (Yallop Decl., Ex. 4 at 38) | P. 303: He dreamt of a Church which would dispense with the wealth, power and prestige that it had acquired through Vatican Incorporated; of a Church which would get out of the market place and reject the moneylenders where the message of Christ had become tainted . . . | P. 34: GANTIN: What we need is a Christ to drive the money-lenders from the temple. |
| **7** (Yallop Decl., Ex. 5 at 121-22) | P. 70: There was no doubt whatsoever in the minds of many present that the Holy Spirit was manifest on that hot afternoon. P. 248: When voting in the Conclave to select a successor to Albino Luciani began on Sunday, October 15th, 1978, the Holy Ghost was noticeably absent. | P. 105: GANTIN: In the last conclave we left feeling that we had been inspired by the Holy Spirit. BENELLI: The Holy Spirit has been noticeably absent in this conclave. |

All but one of these examples fail to show that the selected dialogue from The Last Confession is substantially similar to the selection, coordination, and arrangement of facts in In God's Name.  The Court will discuss each example in turn.

In Example 1, the use of the same English translation of a book title ("illustrious") to describe a book and the same order of names ("Mark Twain, Jules Verne") does not result in

substantially similar coordination of facts.  The sharing of a similar viewpoint by IGN's author ("The book is a delight") and by a character in TLC ("I enjoyed your book") are not substantially similar in expression, as the latter statement is an opinion by one of the play's characters and the former is an opinion by the author in a non-fiction book.

In Example 2, TLC dramatizes IGN's description of Luciani's refusal to own a boat and corresponding need to rely on the fire brigade's boat to get around Venice.  While this detail is indeed a vivid illustration of Luciani's humility, it is a historical fact, and TLC's dramatization of this fact, while *somewhat* similar to IGN's description, is not *substantially* similar, not least because TLC describes that fact through dialogue between two characters, rather than through historical narrative.

Example 3 presents a similar dramatization of a historical fact: Luciani's open door policy towards former prostitutes, the disabled, and other forgotten citizens of Venice.  TLC's dramatization of the historical facts discussed in IGN is even less similar here than in Example 2, since the text of each is markedly different.  TLC does contain two quotations that are taken directly from quoted statements by individuals in IGN ("These creatures do not understand" and "Yes: Jesus"), but these statements from IGN are presented as *actual* quotations by

13

real people, and are therefore historical facts that are not protectable by copyright.

In Example 4, both IGN and TLC use the phrase "open the windows," but the former work describes Pope John Paul I opening the windows of the Papal Apartments to let fresh air into the Catholic Church, while the latter work has a character employ that phrase to describe what Pope John Paul II and the Second Vatican Council had hoped to achieve.  TLC's use of a common metaphor to depict the hopes and actions of a *different* character can hardly be described as substantially similar to IGN's use of that phrase.

In Example 5, TLC excerpts extensively from an advertisement quoted and described in IGN.  Plaintiff himself admits that "[t]he text of the CREP advertisement may have been derived from IGN page 59, although it may also have come from a newspaper article."  (Crane Decl., Ex. C, at 13.)  Defendant argues that no such article exists, implying that IGN is the exclusive source of this newspaper article. (Yallop Decl., Ex. 4, at 33.)  The existence of an alternative source for this advertisement is irrelevant, as IGN presents this advertisement as an *actual* historical document; thus, it is not protected by the Copyright Act.  The same analysis applies to *all* of the uses of TLC of quotations by historical figures or from historical documents that are taken directly from IGN, including dialogue.

14

The Prologue to IGN states that "while the dialogue within this book is reconstructed, it is not fabricated." IGN, at xvii. As long as IGN presents this dialogue as fact, it is not protectable by copyright. See Rokeach v. Avco Embassy Pictures Corp., 197 U.S.P.Q. 155, 161 (S.D.N.Y. 1978); Suid v. Newsweek Magazine, 503 F. Supp. 146, 148 (D.D.C. 1980) ("The author of a factual work may not, without an assignment of copyright, claim copyright in statements by others and reported in the work since the author may not claim originality as to those statements.").

In Example 6, both IGN and TLC paraphrase a frequently quoted passage from the New Testament's Book of Matthew: "And Jesus went into the temple of God, and cast out all them that sold and bought in the temple, and overthrew the tables of the moneychangers . . . ." Matthew 21:12. The quoted passages from IGN and TLC are *both* substantially similar to the original biblical quotation; therefore, the TLC passage cannot have infringed the copyright of IGN by paraphrasing the same Bible verse.

Example 7 provides the only conceivable instance of TLC using substantially similar expression to IGN. TLC has two characters refer to the presence of the Holy Spirit in the first conclave and the absence of the Holy Spirit in the second, in language that is virtually identical to expression in IGN. However, in light of the absence of any other such examples,

15

such an "infinitesimal portion" of each work cannot be said to constitute copyright infringement. See Gardner, 391 F. Supp. at 944 (observing that three passages that may have been copied "comprise[d] an infinitesimal portion of each publication" and were not sufficient to sustain a finding of copyright infringement).

In assessing Example 7 and the works in general, Tabachnik v. Dorsey is instructive. Tabachnik concerned the alleged copyright infringement of the plaintiff's doctoral dissertation by the defendant's book on the same historical subject. The Court found that "[a]lthough [defendant] does state some of the same facts as [plaintiff], he does so in his own distinct style and wording. It cannot be said that [defendant]'s presentation is substantially similar to that of [plaintiff]." Tabachnik, 2005 U.S. Dist. LEXIS 14267, at *14. What could not be said in Tabachnik also cannot be said here: aside from Example 7 above, Crane not only has his own "distinct style and wording," he has his own distinct medium — a two-act fictional play. Aside from Example 7 and the historical quotations discussed above, the only substantial similarity in selection, coordination, and arrangement of expression between the two works is their timeline: both are presented in roughly chronological order, although the story in TLC is told in a series of flashbacks. The thin copyright protection afforded by Feist to the

16

selection, arrangement, and coordination of facts surely does not extend to the presentation of historical events in the order in which they took place.

### b. Plot, theme, and total concept and feel

When examining two works of fiction, courts in the Second Circuit will generally compare such elements as plot, theme, and total concept and feel. See, e.g., Williams, 84 F.3d at 588-91 (finding that the novel and film versions of Jurassic Park were not substantially similar to earlier copyrighted children's novels in total concept and feel, theme, setting, characters, time sequence, plot, and pacing); Brown v. Perdue, No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995, at *28-41 (finding that The Da Vinci Code was not substantially similar to an earlier copyrighted novel, Daughter of God, in total concept and feel, thematic expression, plot, characters, sequence, pace, and setting to give rise to an actionable infringement claim). In this case, the Court is comparing a work of fiction with a work of non-fiction. For purposes of this litigation, however, PPL has attempted to re-characterize the non-fictional nature of the work by claiming that the book is "not a conventional historical work, but puts forward a controversial compilation and interpretation of events and characters which has been heavily criticised and even derided." (Yallop Decl. ¶ 44.) As noted supra, interpretations of historical events, including theories

17

or plots, are not protectable under the Copyright Act. See Hoehling, 618 F.2d at 978-79 (2d Cir. 1980).  Even if such interpretations *were* protectable, a comparison of the two works' plot, theme, and total concept and feel demonstrates that the two works are not substantially similar.

IGN is an investigation into the death of Pope John Paul I that uses facts to support the author's theory that the Pope was murdered.  The book also documents the Pope's early life and rise through the ranks of the Roman Catholic Church, as well as the political and financial intrigues that surrounded the Church in the 1960s and 1970s.  By contrast, TLC is a fictional two-act play that focuses on the immediate period before, during, and after Pope John Paul I's death, as told through a series of flashbacks by the main character, Cardinal Benelli, to the Confessor, who subsequently turns out to be Pope John Paul II. The play does not conclude that John Paul I was murdered — the audience is left to draw its own conclusions.

To the extent that both works are about Pope John Paul I's succession and death, such "basic plot ideas" are not protectable, even if they were not historical facts.  See Jones v. CBS, Inc., 733 F. Supp. 748, 754 (S.D.N.Y. 1990); Hogan v. DC Comics, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999).  While IGN and TLC both share many of the same characters, nearly all of them are historical figures and are therefore unprotectable elements.

18

Further, the protagonist of TLC is Cardinal Benelli, who figures only as a minor character in IGN.  Benelli is on-stage in the majority of the scenes in TLC, and it is his perspective that dominates the play.  IGN, in contrast, focuses primarily on the figure of Pope John Paul I.  The difference in main characters is critical evidence of a lack of substantial similarity.  See, e.g., Flaherty, 388 F. Supp. 2d at 287-88 (finding no substantial similarity where, among other elements, the protagonist in each work was different).

The Last Confession also has several themes, most notably the tension between religious devotion and human ambition, as well as Cardinal Benelli's loss of faith and ultimate redemption.  Because it is a factual work, In God's Name's themes are more difficult to discern, although the book focuses primarily on the saint-like character of Pope John Paul I in contrast to the corrupt nature of his colleagues in the Vatican. Both works, in their own ways, speculate on how the future of the Church might have been different if John Paul I had not died, but this particular theme, which would arise out of any treatment of the Pope's death, is not protectable by copyright. See Brown, No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995, at *29 ("[T]hematic concepts which flow from similar plot situations are not afforded protection under the copyright laws."); Reyher v. Children's Television Workshop, 533 F.2d 87,

91 (2d Cir. 1976) ("Copyrights . . . do not protect thematic concepts or scenes which necessarily must follow from certain similar plot situations.").  Due to these substantial differences in plot and theme, as well as the different mediums each author uses (non-fiction book versus fictional play), the two works cannot be said to be substantially similar in total concept and feel to support a finding of copyright infringement, even if IGN's historical interpretations were protectable.  See Brown, No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995, at *32 ("Where there is a marked difference in total concept and feel, summary judgment is appropriate.").

### C.   Defendant's alternative arguments

Defendant provides several examples of articles or interviews by third parties who assumed that TLC was based on In God's Name and argues that these sources further support his copyright infringement claim.  (See Yallop Decl. ¶¶ 45-49, Exs. 2-3.)  This argument is meritless.  First, only one of the examples provided actually states that TLC is based directly on IGN, but the author of the article offers no sources or other evidence for her statement.  (See Yallop Decl., Ex. 3, at 3.)  Second, the opinions of third parties in secondary materials are irrelevant, as "comparison of secondary or descriptive materials cannot prove substantial similarity under the copyright laws . . . because the works themselves, not descriptions or

20

impressions of them, are the real test for claims of infringement." Walker, 784 F.2d at 51.

PPL also attempts to draw parallels to Burgess v. Chase-Riboud, 765 F. Supp. 233 (E.D. Pa 1991), where the court held that the defendant's play about Thomas Jefferson's alleged love affair with one of his slaves, Sally Hemings, infringed the plaintiff's novel based on the same subject. Defendant's reliance on Burgess is misplaced, however, because the infringed work in that case was another work of *fiction* derived from the same set of historical facts, not a work of *non-fiction* that described those historical facts. The court found "the sheer number of similarities in the *fictional* details of [the two works] . . . similarities [which] cannot be traced to any historical account" to be critical in its finding of copyright infringement. Burgess, 765 F. Supp. at 239 (emphasis added). In this case, the only similarities are between *non-fictional* details, thus Burgess offers little help to PPL.

In sum, the Court finds that no reasonable observer could find the two works substantially similar, and whatever similarities exist are trivial or concern non-copyrightable material. Accordingly, the Court holds that The Last Confession does not infringe the U.S. copyright of In God's Name and

21

therefore dismisses Defendant's counterclaim of infringement.[2]
With respect to Plaintiff's request for declaratory relief, the
Court has discretion to grant such relief when it deems it
appropriate.  See 28 U.S.C. § 2201(a).  Declaratory judgments
have been awarded in copyright cases in this Circuit before.
See, e.g., Brown, No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS
15995, at *43.  Because the Court finds Defendant's copyright
infringement counterclaim meritless, it exercises its discretion
and awards Plaintiff a declaratory judgment that Crane's
authorship, publication, and exploitation of rights in and to
The Last Confession do not infringe any U.S. copyrights owned by
Defendant.

## III. **U.K. Copyright Infringement**

Plaintiff also seeks a declaratory judgment that The Last
Confession does not infringe In God's Name's U.K. copyright.  As
noted above, the Court has discretion to award a declaratory
judgment when it deems that such relief is appropriate.  See 28
U.S.C. § 2201(a); Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357,
359 (2d Cir. 2003).  This discretion must be exercised with
great care when foreign law and actions are involved.  See U.S.
v. Davis, 767 F.2d 1025, 1038 (2d Cir. 1985) ("[B]ecause an
order enjoining a litigant from continuing a foreign action is
facially obstructive, international comity demands that this

---

[2] Because it finds that there was no copyright infringement, the Court does
not address Plaintiff's possible defenses, including fair use.

extraordinary remedy be used only after other means of
redressing the injury sought to be avoided have been
explored."); Dow Jones & Co. v. Harrods Ltd., 237 F. Supp. 2d
394, 422 (S.D.N.Y. 2002) ("[T]he authority of federal courts to
enjoin foreign lawsuits involving litigants within their
jurisdiction . . . should be used sparingly and granted only
with care and restraint.").

In this case, no foreign action has been brought, nor does
Defendant make any counterclaims of U.K. copyright infringement
in this forum. Granting equitable relief in the form of a
declaratory judgment would thus not only offend international
comity, it would be premature, regardless of any alleged
similarities between the U.S. Copyright Act and the U.K.
Copyright, Designs and Patent Act. For these reasons, the Court
declines to grant a declaratory judgment that Plaintiff has not
infringed Defendant's U.K. copyrights.

## IV. Unfair Competition

PPL's second counterclaim is that Crane's allegedly
infringing conduct constitutes common law unfair competition
under state law. Pursuant to Second Circuit law, the federal
Copyright Act preempts a state law claim where (1) the
particular work the claim is being applied to falls within the
type of works protected by the Act (known as the "subject
matter" requirement) and (2) the claim seeks to vindicate legal

23

or equitable rights that are equivalent to one of the exclusive rights already protected by copyright law (known as the "general scope" requirement).  See Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004); Silverstein v. Penguin Putnam, Inc., 522 F. Supp. 2d 579, 608 (S.D.N.Y. 2007). The subject matter requirement is satisfied "if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."  Briarpatch, 373 F.3d at 305.  The general scope requirement is met when the state right would be abridged by an act (reproduction, adaptation, distribution, performance, or display) that would, by itself, infringe one of the exclusive rights provided by federal copyright law.  Id.; 17 U.S.C. § 106.

     In this case, PPL's unfair competition counterclaim meets the subject matter requirement, as it concerns a copyrighted book.  It also satisfies the general scope requirement, as it is based solely on the acts alleged in Defendant's copyright infringement counterclaim.  (See Def. Answer ¶ 21 ("Crane's acts and conduct, as alleged above [in the copyright infringement counterclaim] constitute unfair competition under applicable common law").)  The law is clear that "unfair competition claims grounded solely in the copying of a plaintiff's protected expression are preempted by Section 301 [of the Copyright Act]."

Computer Assocs. Int'l , Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992); see also Silverstein, 522 F. Supp. 2d at 608-09; Orange Counter Choppers, Inc. v. Olaes Enters., Inc., 497 F. Supp. 2d 541, 555 (S.D.N.Y. 2007). The Court therefore holds that Defendant's unfair competition counterclaim is preempted by the federal Copyright Act and must be dismissed.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is granted with respect to U.S. copyright law and denied with respect to U.K. copyright law. Defendant's U.S. copyright infringement and unfair competition counterclaims are dismissed. The Clerk of the Court is directed to close the case.

**SO ORDERED:**

_____
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          January 7, 2009